Kathleen E. Brody, AZ Bar No. 026331
Darrell L. Hill, AZ Bar No. 030424
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
kbrody@acluaz.org
dhill@acluaz.org

Brian Hauss (*pro hac vice* application forthcoming)
Vera Eidelman (*pro hac vice* application forthcoming)
Ben Wizner (*pro hac vice* application forthcoming)
ACLU Foundation, Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org
bwizner@aclu.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., ) <br><br> Plaintiffs, ) <br> v. ) <br><br> Mark Brnovich, Arizona Attorney General; Jim ) <br> Driscoll, Coconino County Sheriff; Matt Ryan, ) <br> Coconino County Board of Supervisors Chair; ) <br> Lena Fowler, Coconino County Board of ) <br> Supervisors Vice Chair; Elizabeth Archuleta ) <br> Coconino County Board of Supervisors ) <br> Member; Art Babbott, Coconino County Board ) <br> of Supervisors Member; Jim Parks, Coconino ) <br> County Board of Supervisors Member; Sarah ) <br> Benatar, Coconino County Treasurer, all in ) <br> their official capacities, ) <br><br> Defendants. ) | No. CV17-08263-PCT-BSB <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION WITH ACCOMPANYING DECLARATION AND MEMORANDUM OF LAW** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................ii

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ....................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

  INTRODUCTION .........................................................................1

  STATEMENT OF FACTS .................................................................2

    The Act.............................................................................2

    Mr. Jordahl's Boycott Participation .................................................3

    The Coconino County Jail District Contract............................................5

    The Certification's Effects on Plaintiffs' Boycott Participation.................6

  ARGUMENT.............................................................................7

    I.  Plaintiffs Are Likely to Prevail on the Merits. ..................................7

      A.  The First Amendment Protects the Right to Engage in Political Boycotts. 8

      B.  HB 2617 Unconstitutionally Prohibits Government Contractors from Boycotting Israel. ....................................................................9

      C.  HB 2617 Unconstitutionally Compels Speech About Political Beliefs and Associations.......................................................................14

      D.  HB 2617 Violates the First Amendment as Applied to Mr. Jordahl and His Firm.............................................................................16

    II.  Plaintiffs Will Suffer Irreparable Harm Absent an Injunction. ....................16

    III.  The Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor. ...........................................................................16

  CONCLUSION...........................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*,
133 S. Ct. 2321 (2013).................................................................. 14, 15, 16

*Allee v. Medrano*, 416 U.S. 802 (1974) ..................................... 17

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ......................... 9

*Am. Beverage Ass'n v. City & Cty. of San Francisco*,
871 F.3d 884 (9th Cir. 2017) ....................................................... 16

*Ams. for Prosperity Found. v. Harris*,
182 F. Supp. 3d 1049 (C.D. Cal. 2016) ..................................... 16

*Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) ........................... 14

*Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996) .................. 10, 15

*Carey v. Brown*, 447 U.S. 455 (1980) ......................................... 9

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (201) ....................................... 10

*Elrod v. Burns*, 427 U.S. 347 (1976)........................................... 16

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1998) .................................. 9

*Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291 (5th Cir. 1979) ......................... 10

*Hobler v. Brueher*, 325 F.3d 1145 (9th Cir. 2003)........................ 15

*Hudson v. Craven*, 403 F.3d 691 (9th Cir. 2005)............................ 10

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) ....................................... 17

*Matal v. Tam*, 137 S. Ct. 1744 (2017) ......................................... 13

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995).................................. 10

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ............................ 8, 9, 10, 11

*Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017) ....................... 7

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996).................................. 15

*Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968) ................................................................. 10, 11

*Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92 (1972) ........................................... 14

*RAV v. City of St. Paul*, 505 U.S. 377 (1992) ................................................................. 13

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995)................................................................ 12, 13

*Tucker v. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996) .................................................... 12

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) .................... 10, 11, 12

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ..................................... 7

## Other Authorities

Arizona News Release, H.R. Rep. (Feb. 4, 2016) .................................................................. 3

Conf. Comm. Rep. Br. HB 2617, Ariz. 2016 Sess. ......................................................... 3, 12

## Statutes and Rules

50 U.S.C. § 4607 ...................................................................................................................... 3

A.R.S. § 35-393.01 .............................................................................................................. 1, 2, 6

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction restraining Defendants from enforcing the certification requirement contained in House Bill 2617, A.R.S. § 35-393.01 ("HB 2617" or "the Act"), which compels government contractors to certify that they are not participating in boycotts of Israel. Alternatively, Plaintiffs request a preliminary injunction preventing Defendants from enforcing HB 2617's certification requirement against them. This Motion is supported by the Complaint, the following Memorandum of Points and Authorities, and the accompanying exhibits.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Last year, Arizona enacted House Bill 2617, which requires government contractors throughout the state to sign written certifications that they do not participate in boycotts of Israel, including boycotts of goods produced by Israeli settlements in the occupied Palestinian territories. Plaintiff Mikkel Jordahl participates in a political boycott of consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories. He is also the sole owner of a law firm, Plaintiff Mikkel (Mik) Jordahl, P.C. ("Firm"). Mr. Jordahl's Firm has contracted with the Coconino County Jail District ("County") to provide legal services to incarcerated individuals for the past twelve years.

The County asked Mr. Jordahl to sign the certification on his Firm's behalf last year. He did so under protest, and made clear his understanding that the certification does not apply to his personal consumer decisions. Because he signed the certification, however, Mr. Jordahl was chilled from exercising his First Amendment rights: he was careful not to let his personal boycott affect his Firm's consumer purchases; he turned down opportunities for his Firm to support and affiliate with organizations that participate in

1

boycotts of Israel, such as Jewish Voice for Peace; and he refrained from speaking out vocally about his boycott participation for fear that it might cast suspicion on his Firm. Now, the Firm's contract has come up for renewal, and the County has again asked Mr. Jordahl to sign the certification. He does not want to sign, but he fears that he will lose a substantial portion of his income if his Firm loses its contract with the County.

HB 2617's certification requirement forces a blatantly unconstitutional choice on government contractors like Mr. Jordahl and his Firm: Either sign a written statement disavowing participation in constitutionally protected boycotts of Israel, or forfeit the opportunity to work for the government. The requirement imposes sweeping restrictions on core political expression and association. It also compels speech on contractors' beliefs, associations, and expression. A preliminary injunction is necessary to alleviate the ongoing and irreparable harm caused by the certification requirement's violation of First Amendment rights.

## STATEMENT OF FACTS

### The Act

Last year, Arizona enacted House Bill 2617. The Act, which went into effect on August 6, 2016, states in relevant part: "A public entity may not enter into a contract with a company to acquire or dispose of services, supplies, information technology or construction unless the contract includes a written certification that the company is not currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel." A.R.S. § 35-393.01(A).[1] The Act defines "Boycott" to mean:

> [E]ngaging in a refusal to deal, terminating business activities or performing other actions that are intended to limit commercial relations with Israel or with persons or entities doing business in Israel or in territories controlled by

---

[1] A separate provision of HB 2617 provides that "[a] public entity may not adopt a procurement, investment or other policy that has the effect of inducing or requiring a person or company to boycott Israel." A.R.S. § 35-393.01(B). That provision is not at issue here.

2

Israel, if those actions are taken either: (a) In compliance with or adherence to calls for a boycott of Israel other than those boycotts to which 50 United States Code section 4607(c) applies; [or] (b) In a manner that discriminates on the basis of nationality, national origin or religion and that is not based on a valid business reason.

*Id.* § 35-393(1).[2]

The Act's Committee Report states that "[t]here is no anticipated fiscal impact to the state General Fund associated with this legislation." Conf. Comm. Rep. Br. HB 2617, Ariz. 2016 Sess., 1. Rather, as reflected in the Act's legislative findings, HB 2617 purpose is to suppress the use of "[b]oycotts and related tactics" against Israel. In its press release announcing the Act's introduction, the Arizona House of Representatives Republican Caucus explained that the Act will "target companies engaging in actions that are politically motivated." Arizona News Release, H.R. Rep. (Feb. 4, 2016). One of the Act's sponsors, Representative Paul Boyer, said, "I stand proudly and publicly with Israel against those who would seek to delegitimize her." *Id.*

### Mr. Jordahl's Boycott Participation

Mr. Jordahl comes from three generations of Lutheran ministers, including his father. Declaration of Mikkel Jordahl ¶ 5. Mr. Jordahl first became interested in the Israeli-Palestinian conflict in 1977, when he spent three months with his parents while they were living in the West Bank. *Id.* ¶ 6. Both Mr. Jordahl and his parents were profoundly affected by what they saw in the occupied Palestinian territories. *Id*. Upon his return to the United States, Mr. Jordahl established the Oberlin College chapter of the Palestine Human Rights Campaign. *Id.*

Mr. Jordahl raised his son Jewish. *Id.* ¶ 7. They took a trip together to Israel and Palestine in the spring of 2017, after his son's Bar Mitzvah. *Id.* They were disheartened to

---

[2] 50 U.S.C. § 4607 is part of the Export Administration Act ("EAA"), which prohibits U.S. persons from complying with a foreign country's request to boycott a country friendly to the United States. HB 2617 seems to reference the EAA in order to avoid the EAA's preemption provision. *Id*. § 4607(c).

hear many people express the opinion that Israeli settlements in the occupied Palestinian territories would prevent an end to the occupation. *Id.* Many of the Palestinians they met expressed no hope that they would ever receive equal rights in the occupied territories. *Id.*

Mr. Jordahl has been moved by the Evangelical Lutheran Church in America's (ELCA) Peace Not Walls campaign, which seeks to promote the "equal human dignity and rights for all people in the Holy Land," as well as "an end to Israeli settlement building and the occupation of Palestinian land." *Id.* ¶ 9.[3] The campaign calls on "individuals to invest in Palestinian products to build their economy and to utilize selective purchasing to avoid buying products" made in Israeli settlements in the occupied Palestinian territories. *Id.*[4]

Mr. Jordahl is a non-Jewish member of Jewish Voice for Peace. Jordahl Decl. ¶ 10. Jewish Voice for Peace describes itself as a national grassroots organization inspired by Jewish tradition to work "for a just and lasting peace according to principles of human rights, equality, and international law for all the people of Israel and Palestine." *Id.*[5] Jewish Voice for Peace endorses the call from Palestinian civil society for Boycott, Divestment, and Sanctions campaigns to protest the Israeli government's occupation of Palestinian territories. *Id.*[6]

In conjunction with these calls for boycott, Mr. Jordahl personally boycotts consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories. *Id.* ¶ 11. Mr. Jordahl participates in this boycott to protest both the occupation and the settlements. *Id.*

---

[3] Evangelical Lutheran Church in America, *Peace Not Walls*, https://www.elca.org/Our-Work/Publicly-Engaged-Church/Peace-Not-Walls (last visited Dec. 7, 2017).

[4] *Id.*

[5] Jewish Voice for Peace, *About JVP*, https://jewishvoiceforpeace.org/ (last visited Dec. 7, 2017).

[6] Jewish Voice for Peace, *JVP Supports the BDS Movement*, https://jewishvoiceforpeace.org/boycott-divestment-and-sanctions/jvp-supports-the-bds-movement/ (last visited Dec. 7, 2017).

## The Coconino County Jail District Contract

For the past twelve years, Mr. Jordahl's Firm has maintained a contract with the County. *Id.* ¶ 12. Under the contract, the Firm provides legal advice to incarcerated individuals regarding issues like conditions of confinement, civil rights, extradition, and habeas corpus. *Id.* The current contract between the Firm and County is for a multi-year period, with annual renewals. *Id.* ¶ 15. Under the contract, the Firm receives a monthly payment of $1,533, or more than $18,000 per year. *Id.*

The current contract began in the fall of 2016. *Id.* When the Firm and the County were entering into that agreement, an official from the County asked Mr. Jordahl to sign not only the standard paperwork, but also a new form entitled "Certification Pursuant to A.R.S. § 35-393.01." *Id.* ¶ 16. The certification stated, "Pursuant to the requirements of A.R.S. § 35-393.01(A), the Independent Contractor hereby certifies that the Independent Contractor [and its subsidiaries, parent companies, or affiliates are] not currently engaged [nor shall engage] in a boycott of Israel." *See id.*, Exh. 1.

Mr. Jordahl was surprised by and opposed to the requirement that he sign the certification. *Id.* ¶ 18. Fearing loss of the contract, however, Mr. Jordahl signed the certification under protest on October 14, 2016. *Id.* ¶¶ 18, 19. He sent the original signed certification to an official with the County. *Id.* ¶ 19. He also sent a copy to Rose Winkeler, Deputy County Attorney of Coconino County, along with a letter entitled "Re: Israel Boycott Addendum to Inmate Civil Rights Advising Contract." *Id.*; *see id.*, Exh. 2. Mr. Jordahl wrote that although he would comply with the certification while the law was in effect, he believed that it violated his constitutional rights. *Id.* ¶ 20. He further wrote to clarify his understanding that the certification applied to him in his capacity "as a sole-proprietor contractor on behalf of [his] professional corporation and not in [his] personal capacity unrelated to any government contract." *Id.* This apparently satisfied the County, and the contract commenced on November 10, 2016. *Id.* ¶ 22; *see id.*, Exh. 3.

On November 14, 2017, Mr. Jordahl received a letter from the County regarding renewal of the 2016 contract. *Id.* ¶ 28. The letter, which was signed by Kathleen Levinson, the Administrative Manager of Coconino County Sheriff's Office, asked Mr. Jordahl to sign and notarize the enclosed "agreement[] approved by [the County's] Board of Directors." *Id.*; *see id.*, Exh. 4. The enclosed agreement stipulated to a one-year renewal of the 2016 contract between the Firm and the County; it did not change the contract's scope or compensation. *Id.* ¶ 29. It also included another Certification Pursuant to A.R.S. § 35-393.01, which was substantially unchanged from the certification Mr. Jordahl signed under protest in 2016. *Id.* ¶ 30; *see id.*, Exh. 5. Although Mr. Jordahl remains committed to providing his services to the County, he has not signed and returned the 2017 agreement, because he objects to making the certification. *Id.* ¶ 31.

### The Certification's Effects on Plaintiffs' Boycott Participation

Because of the certification, Mr. Jordahl has been careful to separate his personal boycott participation from the operation of his Firm, which currently does not participate in Mr. Jordahl's boycott of consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories. *Id.* ¶ 25. Were it not for the Act's certification requirement, Mr. Jordahl would extend his personal boycott participation to his Firm's consumer choices. *Id.* ¶ 24. For example, Mr. Jordahl would refuse to purchase Hewlett Packard equipment for his Firm, based on Hewlett Packard's provision of information technology services used by Israeli checkpoints throughout the West Bank. *Id.*

Mr. Jordahl has also been careful not to use his Firm to support or affiliate with entities participating in boycotts of Israel or Israeli settlements. *Id.* ¶ 25. Jewish Voice for Peace, which employs boycott, divestment, and sanctions tactics to put political pressure on Israel, has asked Mr. Jordahl's Firm to contribute office support and financial contributions to its boycott activities. *Id*. Although he wishes to provide this support, Mr. Jordahl has rejected these requests in order to comply with the certification. *Id*. Were it not for the certification requirement, Mr. Jordahl's Firm would provide support services and

financial contributions, as well as pro bono legal services, to Jewish Voice for Peace and other boycott participants. *Id.* ¶ 26.

Finally, although Mr. Jordahl does not understand the certification to apply to his personal activities, he reasonably fears that vocal advocacy about his personal boycott participation would lead to suspicion about whether his Firm is complying with the certification. *Id.* ¶ 27. As a result, he has felt chilled from publicly promoting or discussing his personal boycott participation. *Id.*

## ARGUMENT

A preliminary injunction is necessary to remedy the irreparable injuries inflicted on Plaintiffs, as well as government contractors throughout Arizona, by HB 2617's unconstitutional certification requirement. To obtain a preliminary injunction, the moving party must "establish (1) 'that [it] is likely to succeed on the merits,' (2) 'that [it] is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'that the balance of equities tips in [its] favor,' and (4) 'that an injunction is in the public interest.'" *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 730 (9th Cir. 2017) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)). Here, all four factors weigh decisively in Plaintiffs' favor.

### I.   Plaintiffs Are Likely to Prevail on the Merits.

Plaintiffs are likely to succeed in demonstrating that HB 2617's certification requirement violates the First Amendment. It is black letter law that the First Amendment rights to free association and free expression collectively encompass the right to participate in political boycotts. The state cannot condition government contracts on the forfeiture of this right. The certification requirement violates this principle in two respects. First, it restricts government contractors from engaging in core political expression, including both boycott participation and boycott-related speech, without any legitimate justification. Second, it compels speech regarding contractors' political beliefs, associations, and

expression. Plaintiffs are likely to prevail on either of these theories, but they need prevail on only one for this Court to issue a preliminary injunction.

> A.     **The First Amendment Protects the Right to Engage in Political Boycotts.**

Since the Supreme Court's landmark decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), it has been clear that the First Amendment protects the right to engage in politically motivated boycotts. *Claiborne* concerned a boycott of white-owned businesses in Port Gibson, Mississippi. *Id*. at 889. The boycott, which was organized with the help of the NAACP in March and April of 1966, was meant to protest ongoing racial segregation and widespread racial inequality in the community. *Id*. Three years later, several merchants targeted by the boycott sued the boycotters in Mississippi state court, seeking to recover business losses caused by the boycott and enjoin future boycott activity. *Id*. The Mississippi Supreme Court upheld the trial court's imposition of liability, concluding that "the entire boycott was unlawful" because the trial court had found that it was enforced through force, threats, and violence. *See id*. at 895. The state court summarily rejected the boycotters' First Amendment defense. *Id*.

The U.S. Supreme Court reversed, holding in relevant part that "the nonviolent elements of [the boycotters'] activities are entitled to the protection of the First Amendment." *Id*. at 915; *see also id*. ("The Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott. The fact that *such activity is constitutionally protected*, however, imposes a special obligation on this Court to examine critically the basis on which liability was imposed." (emphasis added)). Although the Court acknowledged that "States have broad power to regulate economic activity," it did "not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." *Id*. at 913. To the contrary, the Court observed that such "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values." *Id*. (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)). Accordingly, the Court held that both the boycott

8

itself and the associated "elements of speech, assembly, association, and petition" were entitled to First Amendment protection. *Id.* at 911, 915. Since *Claiborne*, the Court has repeatedly reaffirmed that the First Amendment protects the right to engage in political boycotts and related advocacy. *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 428 (1998); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988).

The principle laid down in *Claiborne* protects Mr. Jordahl's boycott. Along with likeminded people throughout Arizona and the United States, Mr. Jordahl protests Israel's occupation of the Palestinian territories by refusing to buy consumer goods and services offered by businesses supporting the occupation. Like the boycotters in *Claiborne*, Mr. Jordahl is not "motivated by any desire to lessen competition or to reap economic benefits," nor does he "stand to profit financially from a lessening of competition in the boycotted market." *Allied Tube*, 486 U.S. at 508. Rather, he is motivated by the aim of "vindicat[ing] rights of equality and freedom," and by his belief that those rights are currently being denied to Palestinians. *Claiborne*, 458 U.S. at 914. Because the boycott in which Mr. Jordahl participates is "designed to force governmental and economic change," it is "entitled to the protection of the First Amendment." *Id.* at 914–15.

### B. HB 2617 Unconstitutionally Prohibits Government Contractors from Boycotting Israel.

HB 2617 violates the First Amendment by imposing a blanket, content and viewpoint discriminatory restriction on government contractors' protected boycott participation, as well as their boycott-related speech and association. To determine whether the government has unconstitutionally infringed a government contractor's freedom of expression and association, courts apply the *Pickering* analysis used to assess government employee speech claims. *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674–75 (1996); *see also Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968); *Hudson v. Craven*, 403 F.3d 691, 698 (9th Cir. 2005) (holding that the *Pickering* analysis applies where the plaintiff raises

hybrid speech and association rights). Such cases "usually involve[] disciplinary actions taken in response to a government employee's speech." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995) ("*NTEU*") (striking down a federal statute prohibiting government employees from accepting honoraria for outside speaking and writing engagements). The First Amendment harms at issue here are graver.

First, HB 2617's "widespread impact . . . gives rise to far more serious [First Amendment] concerns than could any single supervisory decision." *Id*. at 468. By requiring government contractors to certify that they are not engaged in boycotts of Israel, the certification requirement directly prohibits a wide amount of protected expression. Although the requirement applies only to companies, the Supreme Court has made abundantly clear "that the Government may not suppress political speech based on the speaker's corporate identity." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 315 (201). Like others boycotting Israeli settlement products, Mr. Jordahl and his Firm seek "to bring about political, social, and economic change" through the "exercise of [their] First Amendment rights." *Claiborne*, 458 U.S. at 911. These boycotts are a form of "political speech lying at the core of the First Amendment." *Id*. at 915 (quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979)) (internal quotation marks omitted). Blanket restrictions on political expression, including boycott participation, undermine our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id*. at 913 (citations and internal quotation marks omitted). Such laws are subject to "exacting scrutiny." *E.g.*, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

Second, "unlike an adverse action taken in response to actual speech," HB 2617's certification requirement "chills speech before it happens." *NTEU*, 513 U.S. at 468. The certification directly restricts government contractors, like Mr. Jordahl's Firm, from participating in boycotts of Israel. But it also indirectly suppresses a wide range of related expression and association. Political boycotts typically involve a range of First Amendment

10

protected activity in addition to the decision not to purchase certain consumer goods or services, including: speech about the boycott and related issues; association with other boycott participants; demonstrations in support of the boycott; and petitions to public officials. *See Claiborne*, 458 U.S. at 907–12. By requiring government contractors to certify that they are not engaged in boycotts of Israel, the certification requirement chills government contractors from exercising *all* of those protected First Amendment rights, for fear that such expression could create suspicion about forbidden boycott participation. For instance, the certification requirement has prevented Mr. Jordahl's Firm from providing office support, financial contributions, and pro bono legal services to Jewish Voice for Peace and other boycott participants. Jordahl Decl. ¶ 26. Moreover, it has chilled Mr. Jordahl himself from publicly promoting or discussing his personal boycott participation, for fear that this would cast suspicion on his Firm's compliance with the certification. *Id.* ¶ 27. This "large-scale disincentive to [government contractors'] expression [and association] also imposes a significant burden on the public's right to read and hear what the [contractors] would otherwise have written and said." *NTEU*, 513 U.S. at 470.

In light of these glaring First Amendment concerns, the state bears a much heavier burden of justification than it would in a run-of-the-mill public-employee speech case. *Id.* at 468. It "must show that the interests of both potential audiences and a vast group of present and future [contractors] in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering*, 391 U.S. at 571). To make this showing, the state "must do more than simply 'posit the existence of the disease sought to be cured.' . . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (omission in original) (citation omitted). The state cannot meet that "exacting standard" here. *Tucker v. Dep't of Educ.*, 97 F.3d 1204, 1210–11 (9th Cir. 1996). Indeed, the Act's Committee Report states that "[t]here is no anticipated fiscal impact to the state General

11

Fund associated with this legislation." Conf. Comm. Rep. Br. HB 2617, Ariz. 2016 Sess., 1. It is therefore difficult to see how participation in political boycotts of Israel "so menaces the 'actual operation of the government,' as to render the [certification requirement's] significant restriction of [contractor] speech [and association] an acceptable response." *Sanjour v. EPA*, 56 F.3d 85, 95 (D.C. Cir. 1995) (*en banc*) (quoting *NTEU*, 513 U.S. at 468).

Even if the certification requirement *could* constitutionally be applied to some subset of government contractors, it is nonetheless facially invalid because it is overinclusive. "If the government has a substantial interest with respect to only a subcategory of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation." *Sanjour*, 56 F.3d at 97. Thus, "[i]n performing the *Pickering* balance . . . the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Id.* Here, even if there were some limited subset of government contractors whose boycott activity legitimately implicated state interests, that would not justify preventing a wide range of government contractors—including individual service providers, small businesses, and social service agencies—from participating in protected political boycotts. *See id.* at 98 ("[W]e believe that the extraordinary reach of the challenged regulations places a heavy justificatory burden on the government—or put another way, the great quantity of speech affected by the regulatory scheme weighs heavily on the side of the employees.").

More likely, the certification requirement is intended to accomplish precisely what *Claiborne* prohibits—the suppression of political boycotts. But whereas *Claiborne* concerned a state law that at least theoretically applied to all political boycotts, the certification requirement compounds the First Amendment violation by targeting boycotts based on their content and viewpoint. "The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of

12

disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *RAV v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). The category of content discrimination "includes a subtype of laws that go further, aimed at the suppression of particular views . . . on the subject." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment) (citation omitted) (alteration in original). "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id*. "It is perhaps the most fundamental principle of First Amendment jurisprudence that the government may not regulate speech on the ground that it expresses a dissenting viewpoint." *Sanjour*, 56 F.3d at 96.

Suppression of a dissenting viewpoint is HB 2617's *raison d'être*. The certification requirement prohibits government contractors from participating in boycotts of Israel, but allows them to participate in other political boycotts—including boycotts of other foreign countries and "reverse boycotts" targeting entities that are themselves engaged in boycotts of Israel.[7] This is quintessential viewpoint discrimination. *See Sanjour*, 56 F.3d at 96–97 (concluding that federal regulations requiring government employees to obtain approval before receiving reimbursement for outside speaking engagements were likely viewpoint discriminatory because it appeared that the government would not approve reimbursement for anti-government speech). At the very least, the certification requirement's selective prohibition is content discriminatory because it prevents government contractors from participating in boycotts based on the subject matter of those boycotts—i.e., Israel. *See, e.g.*, *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (holding that a Chicago ordinance exempting peaceful labor picketing from

---

[7] *See, e.g.*, Roz Rothstein & Roberta Seid, *Boycott the Boycotters*, Jewish Journal, (Aug. 25, 2010), http://jewishjournal.com/opinion/82483/.

a general prohibition on picketing next to a school was content discriminatory because it "describe[d] permissible picketing in terms of its subject matter").

### C.     HB 2617 Unconstitutionally Compels Speech About Political Beliefs and Associations.

HB 2617 also violates the fundamental First Amendment guarantee against government inquisition into protected political beliefs and associations. The Supreme Court's decision in *Baird v. State Bar of Arizona* is instructive. There, the Court held that the First Amendment prohibited the state bar from requiring an applicant "to state whether she had ever been a member of the Communist Party or any organization 'that advocates overthrow of the United States Government by force or violence.'" 401 U.S. 1, 4–5 (1971). Writing for the plurality, Justice Black stated: "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas, as Arizona has engaged in here, discourage citizens from exercising rights protected by the Constitution." *Id*. at 6. Accordingly, when a state inquires into these protected areas, "a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Id*. at 6–7. "And whatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Id*. at 7.

The same principle applies to conditions imposed on government employment and government contracts. *See Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 133 S. Ct. 2321, 2330 (2013) (holding that domestic organizations were likely to succeed on their challenge to a federal statutory provision requiring federal funding recipients to adopt a policy expressly opposing prostitution); *Umbehr*, 518 U.S. at 674–75 ("We have held that government workers are constitutionally protected from dismissal for refusing to take an oath regarding their political affiliation" (citations omitted)). Any attempt to penalize a government employee's or contractor's protected political beliefs or associations violates

14

the First Amendment, unless "the hiring authority can demonstrate that [a specific political belief] is an appropriate requirement for the effective performance of the public [work] involved." *Hobler v. Brueher*, 325 F.3d 1145, 1149 (9th Cir. 2003). Such political allegiance requirements are typically appropriate only for "policymakers" or "confidential employees." *Id.* at 1149, 1151; *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996) (holding that government contractors' political beliefs and associations are entitled to the same First Amendment protection as that received by government employees).

As discussed above, the certification requirement in this case is squarely aimed at punishing disfavored political beliefs and associations—i.e., boycott campaigns aimed at Israel or Israeli settlements in the occupied Palestinian territories. Companies that participate in such campaigns, or that affiliate with boycott participants, are marked with a scarlet letter and disqualified from receiving government contracts. To be sure, Mr. Jordahl has expressly assumed that the certification does not apply to individual boycott activity by a company's owners or employees. Jordahl Decl. ¶ 23; *id.*, Exh. 2. But that does not alleviate the compelled speech harms perpetrated by the Act. *See Open Society*, 133 S. Ct. at 2331. For contractors with numerous employees or owners whose individual identities are clearly distinct from the company as a whole, the actions of participating individuals would "not afford a means for the [company] to express *its* beliefs." *Id.* (emphasis in original). In cases where the company and its owner are closely identified, as Mr. Jordahl and his Firm are, the apparent inconsistency between the company's stated position and the owner's personal activities muddies the message. *Id.*[8]

---

[8] If the certification requirement's prohibition against affiliating with boycott participants included a contractor's owners or employees, the requirement would be even more manifestly unconstitutional than it already appears to be.

### D.     HB 2617 Violates the First Amendment as Applied to Mr. Jordahl and His Firm.

Even if the Court concludes that facial relief is inappropriate at this stage, it should enjoin Defendants from enforcing the Act against Plaintiffs. Mr. Jordahl is taking part in a voluntary, political boycott of Israel. He participates by refusing to use his personal income to purchase consumer goods associated with Israeli settlements in the occupied Palestinian territories. He would like to extend his boycott to include his Firm's purchases and associations. Mr. Jordahl's participation in, and his Firm's desire to join, this political boycott are fully protected by the First Amendment. Whatever interests Defendants may assert to defend HB 2617 as a whole, there is simply no justification for denying Plaintiffs the right to fully participate in a political consumer boycott.

## II.     Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.

HB 2617 is currently imposing irreparable harm on Plaintiffs and similarly situated government contractors throughout Arizona. It is well settled that a violation of constitutional rights, even temporarily, amounts to irreparable harm for purposes of the preliminary injunction analysis. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 871 F.3d 884, 898 (9th Cir. 2017). Moreover, it is impossible to determine how much protected expression and association is currently being chilled by the Act. *See Ams. for Prosperity Found. v. Harris*, 182 F. Supp. 3d 1049, 1059 (C.D. Cal. 2016) ("[T]he government causes 'irreparable injury' when, as here, it places individuals 'in fear of exercise their constitutionally protected rights of free expression, assembly, and association.'" (quoting *Allee v. Medrano*, 416 U.S. 802, 814–15 (1974)). A preliminary injunction is necessary to relieve these significant constitutional harms.

## III.    The Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor.

In contrast to the irreparable harm the Act is currently inflicting on Plaintiffs and other government contractors, the issuance of a preliminary injunction in this case poses

little, if any, risk of irreparable harm to Defendants' legitimate interests. Under such circumstances, the scales tip decisively in favor of a preliminary injunction. The Ninth Circuit has "consistently recognized the 'significant public interest' in upholding free speech principles as the 'ongoing enforcement of the potentially unconstitutional regulations would infringe not only the free expression interests of plaintiffs, but also the interests of other people.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). In such cases, "[t]he balance of equities and the public interest thus tip sharply in favor of enjoining the [offending statutory provision]." *Id*.

## CONCLUSION

For the foregoing reasons, the Court should issue a preliminary injunction prohibiting Defendants from enforcing the certification requirement with respect to all government contractors. Alternatively, the Court should issue a preliminary injunction prohibiting Defendants from enforcing the certification requirement with respect to Plaintiffs.

Respectfully submitted this 7th day of December, 2017.

/s/ *Kathleen E. Brody*
Kathleen E. Brody, AZ Bar No. 026331
Darrell L. Hill, AZ Bar No. 030424
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
kbrody@acluaz.org
dhill@acluaz.org

Brian Hauss*
Vera Eidelman*
Ben Wizner*
ACLU Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org
bwizner@aclu.org

*Applications for *pro hac vice* forthcoming

18