**MARK BRNOVICH**
**ATTORNEY GENERAL**
Drew C. Ensign (No. 25463)
Oramel H. (O.H.) Skinner (No. 32891)
Brunn (Beau) W. Roysden III (No. 28698)
Evan G. Daniels (No. 30624)
Keith J. Miller (No. 29885)
Aaron Duell (No. 33450)
  Assistant Attorneys General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for Defendant Mark Brnovich*
*in his official capacity as Attorney General*
*and Proposed Intervenor-Defendant*
*State of Arizona*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C.,<br><br>                    Plaintiffs,<br><br>vs.<br><br>Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities,<br><br>                    Defendants. | Case No: 3:17-cv-08263-PCT-DJH<br><br>**STATE'S COMBINED RESPONSE TO PLAINTIFFS' MOTION FOR A PRELINARY INJUNCTION AND MOTION TO DISMISS**<br><br>**Oral Argument Requested** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................iii

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

I.     PLAINTIFFS DO NOT FALL WITHIN THE ACT'S NARROW SCOPE......... 8

     A.    The Act Only Addresses "Boycott[s] Of Israel," Which Plaintiffs'
Boycott Is Not ................................................................................................ 8

     B.    The Act Does Not Regulate Any Speech Or Prohibit Contributions
To Those Engaged In Boycotts ................................................................... 11

     C.    The Act Does Not Reach Private Individuals And Consumer Boycotts. ... 12

     D.    Plaintiffs' Boycott Is Self-Generated And Not "In Compliance With
Or Adherence To" Others' Calls For Boycotts Of Israel........................... 12

     E.    If The Court Believes That The Act May Apply To Plaintiffs, It Should
Abstain Under *Pullman* Or Certify That Question Of State Law .............. 14

II.    PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL ..................................... 15

     A.    Plaintiffs' Claims Fail Under *Longshoremen* And *Briggs*......................... 15

     B.    The Act Neither Prohibits Nor Compels Any Actual Speech.................... 17

     C.    Plaintiffs' Desired Commercial Conduct Is Not Protected........................ 18

     D.    The State Could Preclude Boycotts Of Israel By Public Businesses
Through Direct Regulation ......................................................................... 22

          1.   *State Regulation of Commerce/General Police Power* ...................... 22

          2.   *State Interest In Prohibiting Discrimination*....................................... 23

          3.   *O'Brien* .............................................................................................. 25

     E.    Even If Plaintiffs Have A Right To Boycott Israel, The State Need Not
Subsidize Plaintiffs' Boycotts With Expenditures Of Public Monies ........ 25

i

     F.     Plaintiffs' Case Law Is Inapposite ................................................. 27

          1.   *Claiborne Hardware* ........................................................ 27

          2.   *Baird* ............................................................................... 29

          3.   *Pickering* ........................................................................ 29

          4.   *Alliance For An Open Society* ......................................... 30

     G.    Plaintiffs' Overbreadth Challenge Fails..................................... 30

III.   PLAINTIFFS' ALLEGED INJURIES ARE INSUFFICIENT TO JUSTIFY INJUNCTIVE RELIEF ...................................................................... 31

IV.   ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS ....... 32

V.    THE CLAIMS AGAINST THE ATTORNEY GENERAL MUST BE DISMISSED ....................................................................................... 33

CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*
  133 S. Ct. 2321 (2013) .................................................................. 3, 26, 30

*Airbnb, Inc. v. City & County of San Francisco*
  217 F. Supp. 3d 1066 (N.D. Cal. 2016) ........................................................ 24

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) .................................................................................. 8

*Baird v. State Bar of Arizona*
  401 U.S. 1 (1971) .................................................................................. 29

*Barbour v. Wash. Metro. Area Transit Auth.*
  374 F.3d 1161 (D.C. Cir. 2004) ................................................................ 28

*Barnes v. Glen Theatre, Inc.*
  501 U.S. 560 (1991) ................................................................................ 23

*Briggs & Stratton Corp. v. Baldrige*
  728 F.2d 915 (7th Cir. 1984) .............................................................. 2, 17

*Broadrick v. Oklahoma*
  413 U.S. 601 (1973) ................................................................................ 31

*Burwell v. Hobby Lobby Stores, Inc.*
  134 S. Ct. 2751 (2014) ............................................................................ 31

*Califano v. Yamasaki*
  442 U.S. 682 (1979) .......................................................................... 7, 33

*Chandler v. State Farm Mut. Auto. Ins.*
  598 F.3d 1115 (9th Cir. 2010) .................................................................. 8

*Christian Legal Soc'y v. Martinez*
  561 U.S. 661 (2010) ................................................................................ 27

*City of San Diego, Cal. v. Roe*
  543 U.S. 77 (2004) .................................................................................. 30

*Clapper v. Amnesty Int'l USA*
  568 U.S. 398 (2013) ................................................................................ 8

*C-Y Dev. Co. v. City of Redlands*
  703 F.2d 377 (9th Cir. 1983) .................................................................... 14

*E. & J. Gallo Winery v. Gallo Cattle Co.*
  967 F.2d 1280 (9th Cir. 1992) .................................................................. 33

*Elk Grove Unified Sch. Dist. v. Newdow*
  542 U.S. 1 (2004) .................................................................................... 8

*Equity Income Partners, LP v. Chicago Title Ins. Co.*
  828 F.3d 1040 (9th Cir. 2016) .................................................................. 15

*FTC v. Superior Court Trial Lawyers Ass'n*
    493 U.S. 411 (1990) ........................................................................ 28, 29
*Grove City Coll. v. Bell*
    465 U.S. 555 (1984) ............................................................................... 28
*Harris Cnty. Comm'rs Court v. Moore*
    420 U.S. 77 (1975) ................................................................................. 15
*Holcomb v. Iona Coll.*
    521 F.3d 130 (2d Cir. 2008) ................................................................... 24
*International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*
    456 U.S. 212 (1982) .......................................................................... 2, 16
*Locke v. Davey*
    540 U.S. 712 (2004) ............................................................................... 27
*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*
    460 U.S. 575 (1983) ............................................................................... 23
*NAACP v. Claiborne Hardware Co.*
    458 U.S. 886 (1982) ........................................................................ 28, 29
*National Endowment for the Arts v. Finley*
    524 U.S. 569 (1998) ............................................................................... 27
*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*
    762 F.2d 1374 (9th Cir. 1985) ............................................................... 32
*Pennhurst State Sch. & Hosp. v. Halderman*
    465 U.S. 89 (1984) ................................................................................. 33
*Pickering v. Bd. of Ed.*
    391 U.S. 563 (1968) ............................................................................... 30
*Pickup v. Brown*
    740 F.3d 1208 (9th Cir. 2014) ............................................................... 19
*Porter v. Jones*
    319 F.3d 483 (9th Cir. 2003) ................................................................. 15
*Regan v. Taxation With Representation of Washington*
    461 U.S. 540 (1983) ........................................................................ 26, 27
*Roberts v. U.S. Jaycees*
    468 U.S. 609 (1984) ............................................................................... 24
*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*
    547 U.S. 47 (2006)        ................................................................. *passim*
*S.D. Warren Co. v. Me. Bd. of Envlt. Prot.*
    547 U.S. 370 (2006) ........................................................................ 11, 25
*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*
    483 U.S. 522 (1987)   ............................................................................ 16

iv

*San Remo Hotel v. City and Cnty. of S.F.*
    145 F.3d 1095 (9th Cir. 1988) ................................................................. 14
*Takiguchi v. MRI Int'l, Inc.*
    611 F. App'x 919 (9th Cir. 2015) ............................................................ 32
*United States v. O'Brien*
    391 U.S. 367 (1968) ....................................................................... 25, 26
*United States v. Oakland Cannabis Buyers' Co-op.*
    532 U.S. 483 (2001) ............................................................................. 33
*United States v. Williams*
    553 U.S. 285 (2008) ............................................................................. 31
*Ward v. Rock Against Racism*
    491 U.S. 781 (1989) ............................................................................. 25
*Weinberger v. Romero-Barcelo*
    456 U.S. 305 (1982) ............................................................................. 32
*Winter v. NRDC*
    555 U.S. 7 (2008) ............................................................................ 7, 31

**Statutes**

19 U.S.C. § 4452 ............................................................................... 4, 23
50 U.S.C. § 4607 ................................................................................. 2, 4
A.R.S. § 12-1861 ................................................................................... 15
A.R.S. § 35-393 .............................................................................. *passim*
2016 Ariz. Sess. Laws. Ch. 46 (2d Reg. Sess.) ......................................... 4, 5, 9

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................... 18

**Other Authorities**

*How the Israel Anti-Boycott Act Threatens First Amendment Rights* (July 26, 2017) ..... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

Plaintiffs' motion for preliminary injunction and Amended Complaint invoke a dizzying array of doctrines and case snippets to gloss over critical problems that are fatal to their claims: (1) A.R.S. § 35-393 *et seq.* (the "Act") does not apply to Plaintiffs' desired conduct in the first place; and (2) even if it did, the Act does not violate the First Amendment because it regulates conduct that is not inherently expressive, and it imposes no penalty on anyone—instead only denying a public subsidy to those engaged in conduct contrary to state policy.

As an initial matter, this case can be resolved on the simple basis that the Act does not apply to Plaintiffs. The State agrees with Plaintiffs that the Act does not reach any actions taken by Plaintiff Jordahl in his personal capacity. The State also does not interpret the Act to prohibit Plaintiffs from associating with Jewish Voices for Peace ("JVP") by providing contributions or support. As long as Plaintiff Mikkel (Mik) Jordahl, P.C. ("Jordahl P.C.") is not itself engaged in a boycott of Israel, the Act does not apply. The State also interprets the Act's requirement not to engage in a "boycott of Israel" to mean that the boycott is actually a general boycott *of Israel—i.e.*, a broad or total boycott of Israel such as those called for by the Boycott, Divest and Sanctions ("BDS") movement, to which the Act is squarely addressed. Plaintiffs, however, appear to be perfectly willing to deal with a wide variety of Israeli companies and companies doing business with Israel. Jordahl's boycott thus differs wildly from the complete, BDS-type boycotts to which the Act is directed. And to the extent that this Court thinks that the Act might apply to Jordahl, it should either abstain under *Pullman* or certify that question of state law to the Arizona Supreme Court.

In any event, even assuming the Act did apply to Plaintiffs, their First Amendment claims fail. Indeed, while Plaintiffs cobble together pieces of various cases to amass a fractured argument, Plaintiffs amazingly ignore that federal courts have rejected fully assembled claims that are *all but identical* to Plaintiffs' here. For example, in *International Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212 (1982),

the Supreme Court considered whether there was any First Amendment right for a union to boycott goods from the Soviet Union on the basis of political disagreement with that country's policies.  Replace "union" with "lawyer," and "Soviet Union" with "Israel," and that effectively is this case.  The Court *unanimously* concluded there was no such right, rejecting the contrary contention.  *Id.* at 226.  Similarly, federal law since 1979 has prohibited all Americans from participating in any boycott of Israel led by foreign nations.  *See* 50 U.S.C. § 4607.  That law was challenged and uniformly upheld, including in *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984).  In the ensuing decades, the constitutionality of that Israel boycott ban has become settled law.

Even if *Longshoremen* and *Briggs* were swept aside, Plaintiffs' First Amendment challenge would still fail.  The Act regulates conduct, not pure speech or even expressive conduct.  The Act does not prevent Plaintiffs from *saying* anything.  Plaintiffs may, for example: (1) criticize Israel to their hearts' content, (2) call for changes in U.S or State policy, (3) advocate for others to boycott Israel, and (4) make abundantly clear that all business they do with Israelis is under their most vociferous protest.  No such speech is subject to any regulation *whatsoever*.

As was the case in *Rumsfeld v. FAIR*, where law schools sought to boycott the military, the Act here only "regulates conduct, not speech.  It affects what [Plaintiffs] must *do* … not what they may or may not *say*."  547 U.S. 47, 60 (2006).  And the desired boycott does not enjoy protection as expressive conduct.  *See id.* at 58-65.  Instead, First Amendment protection extends only to conduct that is "inherently expressive."  *Id.* at 66. Much like *FAIR*, Plaintiffs' desired conduct—which here seemingly consists of declining to buy Hewlett-Packard ("HP") products, Jordahl Decl. ¶ 24—is minimally expressive at best.  To the vast majority of people, a company's selection of a Lexmark printer instead of one from HP would likely be perceived as a decision about price, features, service, warranty, etc.  Not a grand political statement.

Finally, even if Plaintiffs' desired conduct were entitled to any consideration under the First Amendment, it would be dramatically outweighed by the State's interests.  The

only things that the Act actually prohibits Jordahl's corporation from engaging in are particular forms of *commercial conduct—i.e.*, a classic form of permissible regulation of commerce. Moreover, the Act implements and augments the State's existing prohibition on discrimination based on national origin. And prohibiting invidious, status-based discrimination in the buying and selling of goods is a content-neutral and compelling government interest that has repeatedly been found to outweigh attempted invocations of the First Amendment in defense of the discrimination.

The Act would thus be constitutional even if it were a direct regulation of all commercial conduct in the State in general. But it is not. Instead, the Act's impact on conduct/purported expression is even more attenuated. The Act only imposes requirements on those seeking contracts with the State and its subdivisions—*i.e.*, those seeking state funds. The State thus only denies a *subsidy* to those engaged in particular commercial conduct with which the State disagrees, which does not violate the First Amendment. Even one of Plaintiffs' principal cases explains as much: "[I]f a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 133 S. Ct. 2321, 2328 (2013) (cited at 14-16 of Plaintiffs' motion).

For all of these reasons, Plaintiffs are not likely to prevail on the merits. But even if that were not the case, Plaintiffs' request for a broad preliminary injunction is still improper. Here, Plaintiffs' injuries are merely trifling and do not justify any injunctive relief. And even if they did, the balance of harms and public interests tip sharply in favor of a limited injunction that applies only to Plaintiffs.

## FACTUAL BACKGROUND

### Federal Law Regarding Anti-Israel Boycotts

The Arab-Israeli conflict began in 1948 and has yet to reach any final peace settlement. Israel is a close ally of the United States, and Congress and the President have repeatedly sought to protect Israel from economic warfare aimed at undermining it

3

as a state.  *See*, *e.g.*, 19 U.S.C. § 4452.

Since 1979, federal law has prohibited all U.S. residents from participating in certain boycotts of Israel.  Concerned that foreign nations were using economic coercion against Israel, Congress enacted the Export Administration Act of 1979.  Among other provisions, it directs the "President [to] issue regulations prohibiting any United States person … from taking or knowingly agreeing to ... support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States [*e.g.*, Israel]."  50 U.S.C. § 4607.  This federal prohibition on participating in foreign-state-led boycotts of Israel remains in place today.[1]

Congress has since set forth official U.S. policy regarding BDS boycotts.  19 U.S.C. § 4452.  In particular, Congress "opposes politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel, such as boycotts of, divestment from or sanctions against Israel [*i.e.*, BDS campaigns]" and explained that such boycotts "are contrary to the principle of nondiscrimination[.]"  *Id.* § 4452(b)(4)-(5).  Congress further directed that a "principal trade negotiating objectives of the United States" is "[t]o discourage politically motivated boycotts of, divestment from, and sanctions against Israel[.]"  *Id.* § 4452(c).

### The State's Enactment Of The Act

Concerned about the use of boycotts as "economic warfare" against Israel, the Arizona Legislature enacted, and the Governor signed, the Act.  *See* 2016 Ariz. Sess. Laws. Ch. 46 (2d Reg. Sess.).  The Act was passed by bipartisan supermajorities:  42-16 in the House and 23-6 in the Senate.  *See* Ensign Decl. Exs. I-J.  The Act has two operative provisions.  One generally prohibits the State from investing in companies engaged in boycotts of Israel.  *See* A.R.S. § 35-393.02.  That provision is unchallenged here.  Only the second is, which prohibits the State and its subdivisions from "enter[ing]

---

[1]  The Anti-Israel boycott regulations have been extended by each President since 1994 pursuant to their powers under 50 U.S.C. § 1701 *et seq*., and the regulations remain in force today.  *See* 50 U.S.C. § 4601 *et seq.*

into a contract with a company" unless the company provides "a written certification that the company is not currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel." A.R.S. § 35-393.01(A). By its terms, the Act applies to "boycott[s] of Israel," not boycotts "concerning" or "implicating" Israel. *See, e.g.*, A.R.S. §§ 35-393(1)(a), -393.01(A), -393.02. It also provides definitions for "boycott" and "company." *Id.* § 35-393.

The Legislature made several findings in the Act, including that "Companies that refuse to deal with … Israel, or entities that do business with or in [Israel], make discriminatory decisions on the basis of national origin[.]" *See* 2016 Ariz. Sess. Laws ch. 46, § 2(C). Those findings expressly reference federal policy of "examining a company's promotion or compliance with" BDS campaigns in "awarding grants and contracts" and in making investment decisions. *Id.* § 2(F). And the Act includes an express severability provision stating that if any part is invalidated, the "invalidity does not affect any other provision or application of this article that can be given effect without the invalid provision or application." A.R.S. § 35-393.03.

### *Enactments By Other States And Pending Federal Legislation*

The State is hardly alone in placing restrictions on BDS boycotts. Twenty-three other states have enacted legislation or issued executive orders to similar effect. *See* Appendix A. Congress is also considering legislation that would expand the existing federal ban on boycotts of Israel to include most BDS campaigns, S. 720 and H.R. 1697. *See* Appendix B. Both bills are co-sponsored by majorities in each house. *Id.*

### *Jordahl's Contract And Certification*

Jordahl's company first entered into a contract with the Jail District to provide legal services about 12 years ago. Jordahl Decl. ¶12. That contract has been renewed periodically ever since. The most recent extension extended the contract from July 1, 2016 to June 30, 2017. *Id.* Ex. 3.

Following passage of the Act, Coconino County asked Jordahl's company to sign a certification under the Act. *Id.* ¶¶15-19 & Ex. 1. Jordahl signed the required

certification on October 14, 2016.  *Id.* Ex. 1.  That same day, Jordahl wrote a letter to a Coconino County Deputy Attorney explaining that he was signing as his business and not "in [his] personal capacity unrelated to any government contract," and that he was "interpreting the term 'affiliate' in the addendum and the law to apply only to formal business relationships."  *Id.* Ex. 2.  No State or Coconino County official has ever objected to Jordahl's limitation and interpretation.  Ensign Decl. Ex. A, Jan. 8, 2018 30(b)(6) Deposition Jordahl P.C. (hereinafter "Dep.") 131:1-133:5.

In that same October 2016 letter, Jordahl expressed his view that the Act was an "unconstitutional violation of the 1st Amendment."  Jordahl Decl. Ex. B.  Jordahl did not file suit at that time, however.

The County subsequently sent Plaintiffs a proposed renewal of the Jail District legal services contract on November 17, 2017.  *Id.* ¶¶28-30.  The new contract would run from July 1, 2017 to June 30, 2018.  *Id.* Ex. 5.  The County also included another certification under the Act.  *Id.* ¶30.

Although Plaintiffs had previously signed the certification that Jordahl's company was not engaged in a boycott of Israel, Plaintiffs refused to sign the second certification. *Id.* ¶¶3, 24, 31-32.  Jordahl has continued performing work under the contract as if it had been renewed, and he expects that he will be paid for his services.  Dep. 167L21-169:5.

### *Jordahl's Boycott*

Jordahl is presently engaged in boycotting activity in his personal capacity, which he would like to extend to his business.  Jordahl boycotts companies whose policies he disagrees with.  Jordahl, for example, does not do business with the Trump Organization. Dep. 13:22-15:22.  Jordahl also refuses to travel to certain countries such as Syria and Myanmar based on his disagreements with the policies of the countries' governments.  *Id.* Israel is not one of those countries, however.  Instead, Jordahl has recently travelled to Israel and did business with a number of companies during his trip.  Dep. 147:25-148:9.

Although Jordahl states that he was inspired by other organizations' boycotts, his own boycott is unique and does not match any organization's.  Dep. 29:15-30:17; *see*

1    *also* Dep. 11:13-17, 27:4-16.  Jordahl's declaration indicates that he would like to boycott

2    Hewett Packard, based on HP's "provision of information technology services used by

3    Israel checkpoints throughout the West Bank."  Jordahl Decl. ¶24.  Plaintiffs' Complaint,

4    Motion for a Preliminary Injunction and supporting declaration do not mention any other

5    companies that Plaintiffs desire to boycott.

6         At a Rule 30(b)(6) deposition, Jordahl indicated "my boycott is a bit more limited,

7    and I don't necessarily want to boycott Israel."  Dep. 34:8-17; *accord* 33:13-19 ("My

8    personal boycott is limited.… There are others that … make it broader. … I don't go that

9    far."); 35:7-9 ("I'm not aware of boycotting Israeli companies per se …."); *see also*

10   40:22-41:9.  Instead, Jordahl's boycott is limited to "businesses that are involved in

11   perpetuating the occupation of the West Bank."  Dep. 13:18-21; *accord* 31:22, 33:14-15,

12   38:6-7, 53:19-20.  He further explained that he is not boycotting "companies based in

13   Israel that don't have connection to the settlements," and he is "sure there are" Israeli

14   companies that he would do business with.  Dep. 59:6-22, 97:7-19.

15                                   **LEGAL STANDARD**

16        "A preliminary injunction is an extraordinary remedy never awarded as of right."

17   *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction

18   must establish that he is likely to succeed on the merits, that he is likely to suffer

19   irreparable harm in the absence of preliminary relief, that the balance of equities tips in

20   his favor, and that an injunction is in the public interest."  *Id.* at 21.  Any injunctive relief

21   ordered "should be no more burdensome to the defendant than necessary[.]"  *Califano v.*

22   *Yamasaki*, 442 U.S. 682, 702 (1979).

23        "To survive a motion to dismiss, a complaint must contain sufficient factual

24   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

25   *v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Dismissal is appropriate under

26   Rule 12(b)(1) where Plaintiffs lack standing or the case is unripe.  *Chandler v. State*

27   *Farm Mut. Auto. Ins.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

28

**ARGUMENT**

**I.     PLAINTIFFS DO NOT FALL WITHIN THE ACT'S NARROW SCOPE**

As an initial matter, none of Plaintiffs' First Amendment claims are actually presented here because this case can be resolved on simple statutory grounds:  Plaintiffs' desired conduct notably does not fall within the narrow scope of the Act.  As a result, this Court should decline to reach Plaintiffs' constitutional arguments.  *See*, *e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 16 (2004) (Federal courts have a "'deeply rooted' commitment 'not to pass on questions of constitutionality' unless adjudication of the constitutional issue is necessary.").  Moreover, for the same reasons, Plaintiffs lacks standing to challenge the Act and will suffer no irreparable injury absent an injunction. *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411, 422 (2013) (Article III standing to challenge statute lacking where the act "target[ed] other individuals.").

**A.  The Act Only Addresses "Boycott[s] Of Israel," Which Plaintiffs' Boycott Is Not**

This case can be resolved for the simple reason that Plaintiffs' pertinent conduct is not "a boycott of Israel" under the Act.  *See* A.R.S. § 35-393.01(A).  The Act does not apply to all boycotts that may conceivably implicate Israel.  Instead, a company must only certify that it is not engaged in, and will not engage in, "a boycott *of Israel*."  A.R.S. § 35-393.01(A) (emphasis added); *accord* A.R.S. § 35-393(1)(a) (defining "boycott" with specific reference to "a boycott of Israel").  Indeed, the Act repeatedly uses the phrases "boycott of Israel" and "boycott Israel."  *See id.* §§35-393(1)(a) ("boycott of Israel"); 35-393(7) ("boycott Israel"); 35-393.01(A) ("boycott of Israel"); 353-393.01(B) ("boycott Israel");  35-393.02(B)(3) ("boycott of Israel"), (D) (same).

The State reads "boycott of Israel" in accord with its plain text:  the boycott must either be directed at the Israeli government itself or at companies solely because they are either located in Israel or do business with/in Israel.  If a company is engaged in a different type of boycott—*e.g.*, a general boycott of companies whose practices it disagrees with—that is not "a boycott *of* Israel," regardless of whether Israel may be

1   implicated in some attenuated manner.  A company engaged in a boycott of all products

2   made in sweatshops would not fall within the scope of the Act, even if some sweatshops

3   in Israel were boycotted along with other sweatshops—that is a general boycott of

4   sweatshops that might implicate Israel, but not a boycott of Israel.  Instead, the legislature

5   intended "a boycott of Israel" to mean just that—a general boycott of Israel *qua* Israel.

6       This interpretation is supported by the legislative findings.  The findings twice

7   refer to boycotting/divestment/sanctions, *See* 2016 Ariz. Legis. Serv. Ch. 46  §2(6),

8   which advocate complete or near-complete boycotts of *all* Israeli companies (and

9   sometimes those doing business with/in Israel) solely because of the connection to Israel.

10  *See*, *e.g.*, Ensign Decl. Ex. C ("The Palestinian BDS National Committee (BNC) calls for

11  a boycott of all Israeli products").[2]  This reiterated reference to BDS-related activities

12  underscores the legislature's focus on deterring such boycotting campaigns.  Such

13  complete boycotts of Israel are the "boycotts of Israel" at which the Act is directed.

14      Jordahl's boycott by his own admission does not meet this definition. Jordahl

15  testified "my boycott is a bit more limited … and ***I don't necessarily want to boycott***

16  ***Israel***."  Dep. 34:8-17 (emphasis added); *accord* 33:13-19 ("My personal boycott is

17  limited.… There are others that … make it broader.… I don't go that far."); 35:7-9 ("I'm

18  not aware of boycotting Israeli companies per se …."); 40:22-41:9 ("The BDS campaign

19  is not limited to the settlements, but addresses all of Israel. Is that your understanding?

20  That's my understanding….  [A]gain … my personal belief on that, that is [my boycott

21  is] more limited…. I look at it in a more limited fashion."); *see also* 37:19-24 ("[T]he

22  wider [BDS] movement is calling for a boycott of—essentially the Israeli economy … in

23  an effort to pressure Israel to agree to a two-state solution or at least equal rights.").

24      Instead, Jordahl's boycott is limited to "businesses that are involved in

25  perpetuating the occupation of the West Bank."  Dep. 13:18-21; *accord* 31:22, 33:14-15,

26

27  ---
    [2]  Indeed, some even go so far as boycotting all academic and artistic interactions with
    Israeli institutions, without regard to political positions of the individual academics or
28  artists boycotted.  Ensign Decl. Ex. D; Dep. 37:19-24.

38:6-7, 53:19-20; *see also* Dep. 69:9-12 (agreeing with paragraph 3 of his declaration that he "participate[s] in a political boycott of consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories").  And Jordahl stated that he will take companies off of his boycott list if they change their practices.  Dep. 22:23-24.  He also stated that he is not boycotting "companies based in Israel that don't have connection to the settlements," and he is "sure there are" Israeli companies that he would do business with.  Dep. 59:6-22, 97:7-19.

Instead of engaging in "a boycott of Israel," Jordahl boycotts those companies he has political disagreements with.  For example, he is boycotting Trump-owned family businesses because of his disagreements with the President (which presumably may include policy vis-à-vis Israel).  Dep. 13:22-15:22.  That does not fall within the Act.  He similarly is boycotting HP personally not because HP does business with and in Israel at all, but because he disagrees with particular business deals in which HP has engaged.  Dep. 13:18-21.  There is no reason to believe that Plaintiffs' boycott of HP would be any different if the HP business dealings to which Plaintiffs objected related to Myanmar or Syria, rather than Israel.  *Cf.* Dep. 13:22-15:22.

Indeed, Jordahl is perfectly willing and eager to deal with Israeli companies and companies doing business in Israel with which he has no political disagreements.  Dep. 147:25-148:9 (during recent trip to Israel, he purchased things from Israeli companies).  Indeed, while there are entire countries that he will not visit based on his disagreement with the government's policies (including Egypt, Myanmar and Syria)—Israel is not one of them.  Dep. 13:22-15:22 (identifying countries he would not visit); *see also* 149:14-18 (stating that he encouraged his son to take advantage of a Birthright Israel trip).  And Jordahl admitted that his boycott would extend to companies simply "advocat[ing] for Israel's policies in settlements" and Palestinian companies if they were "cooperating with" Israeli settlements on the West Bank, Dep. 66:2-5; 65:7-12, 64:4-7—showing this is about political disagreement, not doing business in Israel.  That differs substantially from the BDS boycotts the Act targets, and not a "boycott of Israel" under the Act.

## B.  The Act Does Not Regulate Any Speech Or Prohibit Contributions To Those Engaged In Boycotts

The State also does not read the Act to address any pure speech.  "Boycott" is defined to mean "[(1)] refus[ing] to deal, [(2)] terminating business activities or [(3)] performing other actions" with respect to Israel.  *Id.* § 35-393(1).  The first two clearly refer to conduct alone.  And the third refers to "actions," rather than any sort of speech or communication by its plain terms.  Moreover, "other actions" must be read under the *noscitur a sociis* canon, and thus given a similar meaning as "engaging in a refusal to deal" and "terminating business activities"—*i.e.*, also referring to types of commercial conduct, not speech.  *See, e.g., S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 378 (2006) ("The canon, *noscitur a sociis*, reminds us that a word is known by the company it keeps, and is invoked when a string of statutory terms raises the implication that the words grouped in a list should be given related meaning." (internal quotation marks omitted)).  For these reasons, the Act is not triggered by any speech; only economic conduct.[3]

Nor does the Act require that a company not associate with or support those engaged in a boycott of Israel.  Instead, the Act imposes a single certification requirement, *i.e.*, that the company certifies that it "is not currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel."  A.R.S. § 35-393.01(A).  The sole requirement is that the company itself not boycott Israel.[4]

---

[3]  The State does not interpret "other actions" to reach speech for two additional reasons. *First*, any such "other actions" must satisfy either subsection (a) or (b) of § 35-393(1). Subsection (b) refers only to "discriminat[ion]"—which is conduct, not speech.  *See infra* at 20, 24-25. And subsection (a) similarly refers to conduct, *i.e.*, "compl[ying] with" or "adher[ing] to" foreign-led boycotts. *Second*, if there is any residual doubt, the canon teaching that statutes are to be construed to avoid constitutional issues should resolve it in favor of "other actions" referring to conduct alone.  *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563 (2012) ("'[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (citation omitted)).

[4]  The State is also mindful that contributions can qualify as speech.  *See generally Citizens United v. FEC*, 558 U.S. 310 (2010).  And, as explained above, the Act does not reach any speech, only conduct.  Indeed, contributions are just one of the many actions that Plaintiffs could take without implicating the Act.  *See infra* Section II.B.

11

For that reason, the Act does not apply to Plaintiffs' desire to contribute or provide office support to JVP.  *See* Complaint ¶ 44; Jordahl Decl. ¶ 25.  Moreover, in the case of Jordahl and his P.C., it is well-established that "[a] lawyer's representation of a client … does not constitute an endorsement of the client's political, economic, social or moral views or activities."  Model Rules of Professional Conduct 1.2(b).  Therefore, consistent with longstanding rules about attorneys, an attorney simply providing legal and support services to those boycotting Israel would not be a "boycott of Israel" any more than providing legal representation to a person accused of murder would constitute supporting murder.  Put differently, the Act does not require Jordahl to boycott boycotters; he merely must not be one himself.  Instead, as long as Jordahl P.C. is not itself boycotting Israel, it may truthfully sign the Act's certification requirement.

**C.  The Act Does Not Reach Private Individuals And Consumer Boycotts.**

The State notably agrees with Plaintiffs that the Act does not apply to Jordahl "'in [his] personal capacity unrelated to any government contract,'" and that "'affiliate' … [refers] only to formal business relationships."  Complaint ¶ 35.  Because the Act only applies to government contracts with "compan[ies]," and the contract here is with Jordahl's corporation (Jordahl P.C.), the Act cannot be fairly read to apply to Jordahl in his personal capacity.  A.R.S. § 35-393.01.

The State, like Plaintiffs, also does not read "affiliate" to include individual owners of companies that contract with the government or other companies also owned by the same individual.  *See* Dep. 50:9-10; 105:10.  Thus, if Jordahl were to create a separate company to perform legal services outside of his contract with the Jail District, by itself that new P.C. would not be an "affiliate" of his existing P.C. merely because they are both owned by Jordahl.

**D.  Plaintiffs' Boycott Is Self-Generated And Not "In Compliance With Or Adherence To" Others' Calls For Boycotts Of Israel**

Plaintiffs also do not fall within the scope of the Act because their conduct/desired conduct does not fall within either subsection (a) or (b) of the definition of "boycott."

1   *See* A.R.S. § 35-393(1).  Because Plaintiffs are willing to do business with Israelis

2   generally and have no apparent anti-Jewish animus at all, their conduct does not fall

3   within subsection (b).  And Jordahl's boycott is not "[i]n compliance with or adherence to

4   calls for a boycott of Israel," because he is not complying with or adhering to anyone

5   else's boycott.  Jordahl's boycott is, by admission, *sui generis*.  He develops his own list

6   of companies to boycott based on his own research, does not rely on any particular

7   organization's list, and has admitted that his campaign is "more limited" than JVP's and

8   others' BDS boycotts.  Dep. 29:15-30:17, 55:15-25.[5]

9        Plaintiffs' boycott is unique and admittedly differs from JVP's and others' BDS

10  boycotts.  He is thus not complying with/adhering to those boycotts; he is in fact violating

11  them by his more limited boycott and his trip to Israel.  As such, Jordahl's unique

12  boycott—which he created by himself and whose contours seemingly match no others—

13  cannot fall within subsection (a) either.  Nor has any State official ever told Jordahl that

14  his boycott falls within the scope of the Act.  Dep. 131:1-133:5.

15                             * * * * *

16       For all of these reasons, neither Jordahl nor his company falls within the scope of

17  the Act.  Plaintiffs accordingly lack standing to challenge the Act, and will not suffer any

18  irreparable harm absent injunctive relief regarding the Act.[6]

19

20  [5]  Jordahl thought his boycott might align with "[s]ome of the protestant denominations,"
    but "forgot who they are exactly."  Dep. 56:1-6.

21  [6]  Jordahl cannot rely on a nascent "chill" relating to his corporation promoting his
    personal boycott.  See Jordahl Decl. ¶ 27.  Any such claim would be unripe and Jordahl

22  would lack standing as no one is aware of any enforcement actions ever filed over a
    certification under the Act, leaving any such claim contingent on future counterfactual

23  events.  *See, e.g.*, Dep. 131:1-133:5; *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149
    (2009) ("the threat must be actual and imminent, not conjectural or hypothetical"); *see*

24  *also Lopez v. Candaele*, 630 F.3d 775, 789–90 (9th Cir. 2010) ("Mere '[a]llegations of a
    subjective 'chill' are not an adequate substitute for a claim of specific present objective

25  harm or a threat of specific future harm.'"); *Texas v. United States*, 523 U.S. 296, 300
    (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that

26  may not occur as anticipated, or indeed may not occur at all.'").  *Moreover,* such "chill"
    is inherent in the nature of all proscriptive statutes—a statute criminalizing cocaine might

27  chill speech advocating for cocaine legalization out of fear the government might
    investigate the speaker, but that does not mean the statute violates the First Amendment.

28

### E.  If The Court Believes That The Act May Apply To Plaintiffs, It Should Abstain Under *Pullman* Or Certify That Question Of State Law

If the Court thinks that the Act might reach Plaintiffs' conduct or speech, it should either abstain under *Pullman* or certify the question of the scope of the Act to the Arizona Supreme Court.  A stay based on *Pullman* abstention is appropriate where a state law is challenged on federal constitutional grounds, sensitive issues are raised, and a "definitive ruling in the state courts on the state law questions" would either render the federal constitutional question moot, or narrow the contours of the federal litigation.  *San Remo Hotel v. City and Cty. of S.F.*, 145 F.3d 1095, 1104 (9th Cir. 1988).  *Pullman* abstention serves the principles of federalism and comity through "avoiding unseemly conflict between two sovereignties, the unnecessary impairment of state functions, and the premature determination of constitutional questions."  *C-Y Dev. Co. v. City of Redlands*, 703 F.2d 377 (9th Cir. 1983) .  *Pullman* abstention is particularly appropriate where the federal constitutional challenge is against a state statute and the meaning of the statute is unclear.  *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 84 (1975).

Here, the elements of *Pullman* abstention are met. *See Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003).  First, it is self-evident that this case touches on a sensitive area of social policy.  Arizona must have the ability to set rules for its own government contractors and ensure they are not undermining state policies or engaging in discrimination.  Second, as noted in Part I, *supra*, if the Act does not cover Plaintiffs, then they lack standing and the Court need not reach their constitutional arguments.  And the proper resolution of the statutory construction is uncertain to the extent that this Court does not itself conclude the statute excludes Plaintiffs.

Alternatively, if the Court declines *Pullman* abstention, then it should certify the legal question of the scope of the Act to the Arizona Supreme Court.  Because the scope of the Act is a jurisdictional question here, it is an appropriate question for certification. *See* A.R.S. § 12-1861 *et seq.*; *Equity Income Partners, LP v. Chicago Title Ins. Co.*, 828 F.3d 1040, 1045 (9th Cir. 2016) (certifying question to Arizona Supreme Court).

14

## II.     PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL

Plaintiffs' Complaint and motion fail to allege/prove any violation of Plaintiffs' First Amendment rights.  Plaintiffs accordingly are not likely to prevail on the merits and their Complaint should be dismissed.

### A.     Plaintiffs' Claims Fail Under *Longshoremen* And *Briggs*

Plaintiffs' invocation of a smorgasbord of doctrines and case snippets might at first blush make the case seem complicated.  But it actually is quite simple.  Much of that apparent complexity results from Plaintiffs ignoring two directly-on-point precedents— *Longshoremen* and *Briggs*—with which Plaintiffs' claims are utterly irreconcilable.  The former is outright controlling authority and is a *unanimous* decision of the Supreme Court, while the latter is highly persuasive authority that has become settled law and gone unchallenged for 33 years.  Plaintiffs' request for a preliminary injunction can be denied, and their Complaint dismissed, on the basis of these two cases alone.

*Longshoremen* rejected a First Amendment claim strikingly similar to this case.  In *Longshoremen*, a union "stop[ped] handling cargoes arriving from or destined for the Soviet Union … to protest the Russian invasion of Afghanistan." 456 U.S. at 214.  The "'[u]nion's sole dispute [wa]s with the USSR over its invasion of Afghanistan,'" which the Court acknowledged was necessarily political in nature.  *Id.* at 223-26.  When the union faced a claim by companies transporting Russian goods that its actions were an unlawful secondary boycott, the union attempted to raise a First Amendment defense.  To no avail.  The Court had little difficulty *unanimously* rejecting the purported "right" to engage in a political boycott against the U.S.S.R.:  the prohibition against the union's boycott did "not infringe upon the First Amendment rights of the [union] and its members."  *Id.* at 226.  Indeed, while there were "many ways in which a union and its individual members [could] express their opposition to Russian foreign policy," their boycott was not among them.  *Id.* at 226-27.  Thus, as here, the parties were free to *say* anything they wanted about the occupation they opposed.  Only their commercial conduct

was proscribed.[7]  Moreover, *Longshoremen* even reiterates that "secondary picketing" is not "protected activity under the First Amendment."  *Id.* at 226.  And picketing is *far* more expressive than Plaintiffs' selection of computers and printers.

Plaintiffs' claim is also foreclosed by *Briggs*.  Plaintiffs inexplicably fail to address the fact that federal law has prohibited particular forms of boycotts against Israel since 1979 and that law was upheld against First Amendment challenges, most notably in *Briggs*.  Indeed, the federal prohibition is enforceable both civilly *and criminally*, and extends to *all* Americans—not merely government contractors.  And Plaintiffs' counsel's website specifically discusses that federal law and case law upholding it, but Plaintiffs' motion is not so forthcoming.[8]

In *Briggs*, businesses sought to engage in actual speech in violation of the federal statute, in the form of answering questionnaires from boycotting states about "their relationship with Israel, Israeli firms, and other companies that do business with Israel."  *Id.* at 916-18.  But even though the companies desired to speak truthful information, the

---

[7]  There are two potential differences between this case and *Longshoremen*, but neither makes any difference.  Specifically, Plaintiffs (1) are an attorney and solo-practitioner firm rather than a union, and (2) \seek to boycott Israel rather than the Soviet Union, and their disagreement is with the occupation of Palestinian lands rather than Afghanistan.

As to the first, both unions and lawyers possess full First Amendment rights in this context and both of them are subject to extensive regulation of their conduct.  Plaintiffs cannot lay claim to any special First Amendment solicitude for attorneys or particular First Amendment antipathy towards unions that could justify a different outcome.

The second distinction actually hurts Plaintiffs.  The *Longshoremen* union at least sought to boycott an avowed enemy of the United States, thus complementing U.S. foreign policy.  Similarly, the United States unequivocally condemned the Soviet Invasion of Afghanistan, going so far as to boycott the 1980 Moscow Olympics itself.  *See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 551-52 (1987) (Brennan, J., dissenting).  By contrast, Plaintiffs' seek to direct their economic coercion against one of the United States's closest allies, thereby directly undermining the foreign policy of the United States.  *Supra* at 3-4.  Plaintiffs' claim thus brings additional governmental interests to bear in support of restricting Plaintiffs' boycott and makes Plaintiffs' claim even weaker here than in *Longshoremen*.  *See infra* Part II.D (discussing State interests).

[8]  *See* ACLU, *How the Israel Anti-Boycott Act Threatens First Amendment Rights* (July 26, 2017), https://www.aclu.org/blog/free-speech/how-israel-anti-boycott-act-threatens-first-amendment-rights (section 6, "Why doesn't the ACLU challenge the original law?").

1   Seventh Circuit concluded that the statute and regulations were constitutional.[9]

2       *Briggs* has effectively become the authoritative and final word on the

3   constitutionality of anti-Israel boycott prohibitions.  Since *Briggs* was decided in 1984,

4   no one has challenged the federal statute since—even though virtually every First

5   Amendment argument that  Plaintiffs raise now would apply at least equally (if not more

6   so) to the federal statute.  The decades of consensus following *Briggs* regarding the

7   constitutionality of the federal statute/regulations belies Plaintiffs' present contention (at

8   11, 15 n.8) that there are "glaring First Amendment concerns" and "manifest

9   unconstitutional[ity]" with any statute prohibiting boycotts of Israel.[10]  And the State here

10  merely seeks to deny subsidies to those engaged in boycotts that the State deems

11  discriminatory and contrary to federal policy.  *See infra* Sections II.D, II.E.

12      *Longshoremen* and *Briggs* thus conclusively foreclose Plaintiffs' First Amendment

13  claims, eliminating any prospect of Plaintiffs prevailing on the merits.  These cases

14  themselves provide a sufficient basis for denying a preliminary injunction and dismissing.

15      **B.    The Act Neither Prohibits Nor Compels Any Actual Speech**

16      Although Plaintiffs repeatedly use the term "First Amendment" generically, it is

17  useful to focus on the actual constitutional guarantee at issue here, "freedom of *speech*."

18  U.S. Const. amend. I (emphasis added).  Plaintiffs do not raise any Establishment, Free

19  Exercise, Freedom of the Press, Peaceable Assembly or Petition Clause arguments; only

20  the Speech Clause.  That distinction is important because the Speech Clause

21  unsurprisingly deals with *speech*.  And, as discussed above, *no actual speech* is

22  prohibited or mandated here.  *See supra* at 11-12.

23

---

24  [9] Two challenges were consolidated before the Seventh Circuit, which squarely upheld
    the statute/regulations.  That decision affirmed both *Briggs & Stratton Corp. v. Baldrige*,
25  539 F. Supp. 1307 (E.D. Wis. 1982), and *Trane Co. v. Baldrige*, 552 F. Supp. 1378
    (W.D. Wis. 1983), and adopted the opinion of the former.  *Briggs*, 728 F.2d at 916.

26  [10]  As is the case here, *Briggs* did not involve any prohibition on speech regarding the
    actual political issues involved:  "The appellants [we]re free to communicate their views
27  about the relative merits of the Arabs' political decisions"; they merely could not engage
    in particular conduct, including "furnish[ing] information about businesses relationships
28  with boycotted countries or blacklisted persons in violation of the Act."  *Id.* at 917.

It is therefore useful to note what Plaintiffs can do notwithstanding the Act: Plaintiffs may, for example:

- Criticize any and all policies of the government of Israel with which Plaintiffs disagree, as softly or as loudly and as politely or profanely as they desire.
- Criticize the policies of the United States government vis-à-vis Israel, and call for a change in those policies.
- Develop and publish official positions regarding what U.S. or Israeli governmental policy should be.
- Support vocally and/or through contributions the election of candidates for Congress that would align U.S. policy towards Israel more to Plaintiffs' liking.
- Advocate for candidates for the Israeli Knesset that will support changes to Israeli policy and criticize candidates supporting the status quo.
- Criticize the Act, advocate for its repeal, and support candidates for state office pledging to do so.
- Call for others to boycott Israel, and explain why boycotts are appropriate.
- Explain as loudly as they wish that any business dealings Plaintiffs have with Israel or (in their view) those supporting the occupation of the West Bank, such as HP, are solely due to the Act and performed under their vigorous protest.
- Maintain total silence regarding their positions on Israeli government policy and U.S. policy vis-à-vis Israel.

In sum, Plaintiffs may *say absolutely anything* they desire about Israel.  Or they may maintain *complete and absolute silence* regarding their beliefs about the policies of Israel.  The Act does not infringe on Plaintiffs' ability to say anything they wish or nothing at all.  Instead, the Act only regulates commercial conduct.

## C.    Plaintiffs' Desired Commercial Conduct Is Not Protected

Plaintiffs' desired conduct here—*i.e.*, engaging in coordinated economic coercion against Israel—does not remotely qualify as "inherently expressive" and therefore is not protected under the First Amendment.  Conduct—particularly non-economic conduct—

18

1   that is "inherently expressive" sometimes falls within the ambit of the First Amendment

2   and is protected because of its expressive components.  But "[t]he Supreme Court has

3   made clear that First Amendment protection does not apply to conduct that is not

4   'inherently expressive.'"  *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014) (quoting

5   *FAIR*, 547 U.S. at 66).  Here, Plaintiffs' desired (i) economic, (ii) minimally-expressive,

6   and (iii) discriminatory conduct does not enjoy such protection.

7          Plaintiffs tellingly ignore the Supreme Court's seminal decision in *Rumsfeld v.*

8   *FAIR*, in which virtually every sentence of the Supreme Court's First Amendment

9   reasoning cuts against Plaintiffs here.  *FAIR* addressed the Solomon Amendment, which

10  coerced law schools into engaging in conduct with which they disagreed—allowing the

11  military equal access to their campuses for recruiting purposes—on pain of losing federal

12  funds.  547 U.S. at 51-55.  The law schools desired to exclude the military based on their

13  political disagreement with then-U.S. policy regarding homosexuals in the military, but

14  were unwilling to forego the federal funding.  *Id.* at 51-52.  The law schools therefore

15  challenged the statute on First Amendment grounds, raising arguments against the

16  Solomon Amendment that are *strikingly* similar to those at issue here.  And in resolving

17  those arguments, the Supreme Court took pains to explain how the First Amendment

18  protects—and does not protect—conduct that is allegedly expressive, as well as what

19  allegedly "compelled speech" is prohibited.  In doing so, the Supreme Court had little

20  difficulty dismantling all of the law schools' arguments unanimously, concluding that

21  Congress could even have imposed the requirements as a direct mandate, rather than as a

22  condition of receiving federal subsidies.  *Id.* at 58-70.

23          Plaintiffs' claims here cannot be reconciled with *FAIR* in at least four ways.

24  *First*, the Court made clear that no actual compelled speech was at issue:  "The Solomon

25  Amendment neither limits what law schools may say nor requires them to say anything.

26  Law schools remain[ed] free … to express whatever views they may have," and

27  "remained free to dissociate [themselves] from those views" with which they disagree.

28  *Id.* at 60, 65.  There was "nothing … approaching a Government-mandated pledge or

19

1   motto[.]"  *Id.* at 62.  Instead, "the Solomon Amendment regulate[d] conduct, not speech.

2   It affect[ed] what law schools must *do*—afford equal access to military recruiters—not

3   what they may or may not *say.*"  *Id.* at 60.  So too here.  The Act does not require

4   Plaintiffs to *say* anything; it only requires what they must *do*—*i.e.*, not boycott Israel.

5       *Second,* the Court made clear that incidental burdens on speech arising from

6   regulations of conduct do not implicate the First Amendment:  "Congress, for example,

7   can prohibit employers from discriminating in hiring on the basis of race.  The fact that

8   this will require an employer to take down a sign reading 'White Applicants Only' hardly

9   means that the law should be analyzed as one regulating the employer's speech rather

10  than conduct."  *Id.* at 62.  Here, the State has the power to regulate economic conduct

11  within the State as commerce—including by banning conduct that it has concluded

12  constitutes national origin discrimination.  *See supra* at 5.  As in *FAIR*, any incidental

13  burdens on Plaintiffs' speech resulting from that regulation of economic conduct do not

14  implicate the First Amendment.

15      *Third*, the Court rejected the law schools' freedom of association claim that the

16  "law schools' ability to express their message that discrimination on the basis of sexual

17  orientation is wrong is significantly affected by the presence of military recruiters on

18  campus and the schools' obligation to assist them."  *Id.* at 68.  The Court disagreed:

19  "Students and faculty [were] free to associate to voice their disapproval of the military's

20  message; nothing about the statute affects the composition of the group by making group

21  membership less desirable."  *Id.* at 69-70.  So too here.  Plaintiffs are free to associate

22  with anyone they want to "voice their disapproval" of Israel's policies.  What Plaintiffs

23  may not do is engage in particular economic conduct.

24      *Fourth*, as to conduct, the Court made clear that "First Amendment protection

25  [extends] only to conduct that is inherently expressive."  *Id.* at 66.  Excluding the military

26  from campus did not qualify:  "An observer who sees military recruiters interviewing

27  away from the law school has no way of knowing whether the law school is expressing

28  its disapproval of the military, all the law school's interview rooms are full, or the

1    military recruiters decided for reasons of their own[.]"  *Id.*  Instead, "[t]he expressive

2    component of a law school's actions is not created by the conduct itself but by the speech

3    that accompanies it."  *Id.*  And, "[i]f combining speech and conduct were enough to

4    create expressive conduct, a regulated party could always transform conduct into 'speech'

5    simply by talking about it."  *Id.*  The Court thus held that the law schools' conduct was

6    not expressive conduct enjoying any First Amendment protection.

7         The same result should obtain here.  Nothing about Plaintiffs' desired conduct is

8    inherently—or even particularly—expressive.  Suppose Plaintiffs elect to buy an Apple

9    iPad instead of an HP tablet—and say nothing about it.  A reasonable observer would

10   very likely suspect that Plaintiffs prefer Apple's ease of use, app ecosystem or other

11   features.  Just about the last thing any observer is likely to think is:  "You have an iPad;

12   that must be because you oppose the policies of the government of Israel."  Nor are there

13   likely to be many observers of Jordahl's companies' purchases at all—Jordahl has

14   admitted that no client ever sees his office.  Dep. 79-80.

15        Similarly, if clients see an HP printer on Jordahl's desk, they are likely to suspect

16   that the printer's purchase was made on the basis of price, features, or warranty.  But they

17   are hardly likely to think:  "Jordahl has an HP printer; he must be an ardent supporter of

18   Israel and its policies in Palestine."  And they certainly are unlikely to equate selection of

19   a Lexmark printer instead to burning a U.S. flag, where the expressive conduct is

20   "'overwhelmingly apparent.'"  *FAIR*, 547 U.S. at 66 (citation omitted).

21        Only by talking about why Plaintiffs purchased an iPad or an HP printer would

22   any observer discern any connection between that purchasing decision and Israeli

23   governmental policies.  Indeed, Plaintiffs have outright admitted as much.  Dep. 100:3-

24   13; see also Ensign Decl. B (State's notice of errata).  And so, just as in *FAIR*, the

25   "actions [at issue] were expressive only because [plaintiffs] accompanied their conduct

26   with speech explaining it."  547 U.S. at 66.  And "[t]he fact that such explanatory speech

27   is necessary is strong evidence that the conduct at issue here is not so inherently

28   expressive that it warrants protection[.]"  *Id.*

* * * * *

The upshot is that, as in *FAIR*, Plaintiffs here "ha[ve] attempted to stretch a number of First Amendment doctrines well beyond the sort of activities these doctrines protect." *Id.* at 70.  As in *FAIR*, Plaintiffs' conduct does not enjoy any protection under the First Amendment, whether as speech, association, or expressive conduct.[11]

### D.  The State Could Preclude Boycotts Of Israel By Public Businesses Through Direct Regulation

Even assuming that Plaintiffs' desired conduct had any First Amendment value, the State has multiple interests present that sustain the Act against *any* level of scrutiny that might apply.  Here, there are at least two relevant government interests that are sufficient to sustain the Act:  (1) the State's power to regulate commerce and general police power and (2) the State's interest in prohibiting discrimination.

#### 1.  *State Regulation of Commerce/General Police Power*

It is "beyond dispute" that even those engaged in inherently expressive activities, such as publishing newspapers, may still be subject "to generally applicable economic regulations[.]"  *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983).  Newspapers can thus be subjected to antitrust laws, labor laws, and investigatory subpoenas even though such laws might incidentally burden expression.  *Id.* (collecting cases).

---

[11]   Indeed, Plaintiffs' conduct here is even less worthy of First Amendment protection for two reasons.  *First*, Plaintiffs' desired conduct ultimately is designed not to persuade, but to coerce Israel into acquiescing to policies more to Plaintiffs' liking.  It is "even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment."  *Longshoremen*, 456 U.S. at 226.

  *Second*, the Act addresses purely economic conduct of a business engaged in commerce with the general public.  It does not affect what Jordahl may do (or say) in his personal capacity.  In contrast, *FAIR* arose in the academic context, where the law schools could lay claim to academic freedom, which has a robust tradition of First Amendment protection.  *See*, *e.g.*, *Keyishian v. Bd. of Regents of the Univ. of N.Y.*, 385 U.S. 589, 603 (1967) ("[S]afeguarding academic freedom, which is of transcendent value … [is] a special concern of the First Amendment[.]").

Here the State has properly acted to regulate commercial activity to align commerce in the State with the State's policy objectives and values.  *See*, *e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991) ("The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals" and is a proper "basis for legislation.").  Israel is one of the precious few democracies in the Middle East and an ally of the United States.  *See* 19 U.S.C. § 4452.  The State has reasonably acted to prevent commerce within the state from being used as an economic weapon against Israel.  That is particularly true as the effect—and often goal—of BDS boycotts is to strengthen the hand of the Palestinian Authority ("PA") at the expense of Israel.  The PA is far less democratic (at best)—notably its President has stayed in power despite his term ending over 9 years ago.  Ensign Decl. Ex. E.  And the PA is a coalition government between the (1) Palestinian Liberation Organization, which pays cash stipends to the families of terrorists, *id.* Ex. F, and (2) Hamas, which is on the State Department's list of terrorist organizations, *id.* Ex. G.  *Id.* Ex. H.  The State has compelling interests in avoiding commerce in the State and State funds being used to support such activities.

 "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Airbnb, Inc. v. City & County of San Francisco*, 217 F. Supp. 3d 1066, 1076 (N.D. Cal. 2016) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)).  And that is precisely what the Act does here.

### 2. *State Interest In Prohibiting Discrimination*

Even if Plaintiffs' desired conduct was entitled to any First Amendment consideration at all, that interest is dramatically outweighed by the State's interests.  Here the statute expressly addresses national origin discrimination, with the legislature expressly finding that "[c]ompanies that refuse to deal with United States trade partners such as Israel, or entities that do business with or in such countries, make discriminatory

decisions on the basis of national origin[.]"[12]  This prohibition on secondary

discrimination (*i.e.*, boycotting companies that do business with Israel/Israelis) is hardly

unique to the Act, and in fact is a feature of federal civil rights law.  *See*, *e.g.*, *Holcomb v.*

*Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

Indeed, even if strict scrutiny somehow applied here, the State's compelling

interests in combatting invidious, status-based discrimination in the sale of goods is more

than sufficient to sustain the Act.  *See*, *e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623

(1984).  This goal is further "unrelated to the suppression of expression [and] plainly

serves compelling state interests of the highest order."  *Id.* at 624.  This anti-

discrimination statute thus "does not distinguish between prohibited and permitted

activity on the basis of viewpoint[.]"  *Id.* at 623.[13]  The State's compelling interest in

prohibiting invidious, status-based discrimination thus outweighs whatever (if any) First

Amendment interests Plaintiffs have here.[14]

---

[12]  *See* 2016 Ariz. Legis. Serv. Ch. 46; *see also* A.R.S. 35-393(1)(b) (prohibiting actions taken "[i]n a manner that discriminates on the basis of nationality [or] national origin").

[13]  Notably, the Act's prohibition on particular conduct applies regardless of the viewpoint of the regulated companies.  For example, the Act's prohibition applies equally to (1) those with political disagreements with Israel, (2) those who are simply and outright Anti-Semitic, and (3) those that, while privately supporting Israel, believe a boycott of Israel will curry favor with their customers.  *See Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (antidiscrimination laws "make[] no distinctions on the basis of the organization's viewpoint.'"); *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) ("[F]ederal and state antidiscrimination laws" are "*permissible content-neutral regulation[s] of conduct*."  (emphasis added)).

In *Briggs*, the plaintiff also sought to engage in conduct prohibited by the federal anti-Israel boycott statute not because he desired to boycott Israel—with whom he had no expressed political disagreement—but instead because he desired to engage in commerce with Arab states that were boycotting Israel.  *See* 728 F.2d at 917-18 ("[A]ppellants do not seek to answer the questionnaire in order to … enforce a trade boycott with Israel.").  But, as here, the statute applied regardless of Briggs's viewpoint, and was constitutional.

[14]  The Act is also supported by the State's interest in ensuring that public funds are spent in a manner consistent with the public policy objectives of the State.  *See*, *e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 192-93 (1991); *see also infra* Section II.E.  In addition, the State has an interest in aligning its expenditures and commerce within the State with federal foreign policy.  *See Faculty Senate of Florida Int'l Univ. v. Winn*, 616 F.3d 1206 (11th Cir. 2010) (holding that state may prohibit expenditure of public monies on academic travel to countries listed by U.S. State Department as state sponsors of terrorism).

### 3. *O'Brien*

Even if Plaintiffs' desired conduct were inherently expressive and protected under *United States v. O'Brien*, 391 U.S. 367 (1968), the Act would still be constitutional. As the Court explained in *FAIR*, "'an incidental burden on speech is no greater than is essential, and therefore permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" 547 U.S. at 67 (rejecting plaintiffs' arguments under the *O'Brien* standard in the alternative) (citation omitted). That is just the case here. Absent the Act's prohibitions, public monies will almost certainly be allocated to companies engaged in boycotts of Israel, thereby subsidizing those boycotts.[15]

Moreover, the Act is "within the constitutional power" of the State, "furthers … important … governmental interest[s]" identified above, and is "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377.[16]

### E. Even If Plaintiffs Have A Right To Boycott Israel, The State Need Not Subsidize Plaintiffs' Boycotts With Expenditures Of Public Monies

As explained above, the Act would be constitutional even if it applied to everyone as a direct, criminal prohibition of conduct—much as the federal ban does, as that ban has repeatedly been upheld against First Amendment challenge. *See supra* at 17. That alone is sufficient to sustain the Act against any "unconstitutional condition" argument.[17]

But the Act is not nearly so coercive. Instead, it merely affects those who may obtain public monies from the State and its subdivisions through government contracts. The Act thus merely denies a *subsidy* to those who wish to engage in conduct proscribed

---

[15] For similar reasons, the Act is narrowly tailored. *See Ward v. Rock Against Racism*, 491 U.S. 781, 783 (1989) (Statute is narrowly tailored if "the means chosen are not substantially broader than necessary to achieve that interest."). Notably, Plaintiffs do not even argue that narrow tailoring is required, however.

[16] The Act would survive strict scrutiny given the compelling governmental interests identified above, although Plaintiffs have not even argued that such scrutiny applies. Indeed, it is not clear what standard of review that Plaintiffs believe should apply here.

[17] "It is clear that a funding condition cannot be unconstitutional if it could be constitutionally imposed directly." *FAIR*, 547 U.S. at 59-60.

1  by the Act.  They are still free to engage in boycotts of Israel; they just cannot demand

2  financial assistance from the State in carrying out those boycotts.

3      One of Plaintiffs' own cases ably summarizes this general rule:  "[I]f a party

4  objects to a condition on the receipt of [government] funding, its recourse is to decline

5  the funds.  This remains true when the objection is that a condition may affect the

6  recipient's exercise of its First Amendment rights." *Open Society*, 133 S. Ct. at 2328

7  (cited at 14, 15).  Thus, "a legislature's decision not to subsidize the exercise of a

8  fundamental right does not infringe the right." *Regan v. Taxation With Representation of*

9  *Wash.*, 461 U.S. 540, 549 (1983).

10      *Regan* is particularly instructive.  It is undisputed that citizens and organizations

11  have a First Amendment right to lobby the government.  Congress, however, chose to

12  give non-profit organizations that engage in lobbying activities (501(c)(4) organizations)

13  less favorable tax treatment than those that do not (501(c)(3) organizations). *See id.* at

14  543-44.  That tax differential was challenged as placing an "unconstitutional condition"

15  on exercising the right to lobby. *Id.* at 545.  Unsuccessfully.  The Court unanimously

16  explained that "Congress has merely refused to pay for the lobbying out of public

17  monies.  This Court has never held that the Court must grant a benefit … to a person who

18  wishes to exercise a constitutional right." *Id.*  The Court "again reject[ed] the 'notion that

19  First Amendment rights are somehow not fully realized unless they are subsidized by the

20  State.'" *Id.* at 546 (citation omitted); *see also Open Society*, 133 S. Ct. at 2328-29

21  (discussing holding of *Regan*).  The Court further explained that the plaintiff organization

22  could "obtain [the more favorable tax treatment] for its non-lobbying activity by

23  returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-

24  lobbying activities and a § 501(c)(4) organization for lobbying." *Regan*, 461 U.S. at 544.

25      The same result should obtain here.  The State's decision not to subsidize

26  Plaintiffs' boycott by providing public funds to Plaintiffs "has not infringed any First

27  Amendment rights or regulated any First Amendment activity." *Id.* at 546.  And to the

28  extent that Jordahl would like to engage in his boycott outside of his contract, he may do

26

1  so either in his personal capacity or by setting up a separate P.C. that would provide legal

2  services to non-governmental entities.  *See also supra* at 12.

3      *Regan* is hardly an outlier.  Cases where governments have constitutionally

4  declined to fund activities they could not prohibit outright are numerous—often with

5  Plaintiffs' counsel filing amicus briefs in support of the government.[18]  In particular,

6  governments may condition public monies on acceptance of non-discrimination policies.

7  Thus, Congress could require a multi-state entity to refrain from discriminating against

8  disabled individuals and waive sovereign immunity regarding discrimination claims as a

9  condition of receiving funds.  *See Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d

10  1161, 1170 (D.C. Cir. 2004); *see also Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984)

11  (Congress could require universities to provide equal treatment to women as a condition

12  of federal funds).  There is no reason why the State cannot constitutionally condition

13  receipt of public funds through state contracts on non-discrimination against Israel.

14  **F.    Plaintiffs' Case Law Is Inapposite**

15      Rather than addressing the case law directly on point discussed above, Plaintiffs'

16  motion resorts to scattershot citation of a litany of case law addressing a broad range of

17  inapposite First Amendment concepts.  Plaintiffs' reliance on that case law is unavailing.

18      **1.    *Claiborne Hardware***

19      Plaintiffs' heavy reliance on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886

20  (1982), is sorely misplaced.  *Claiborne* is inapposite for four reasons.

21

22

23  _____

[18] For example, while the State of Washington could not ban the study of theology, it
24  could constitutionally deny scholarships to students who were theology majors.  *See Locke v. Davey*, 540 U.S. 712, 720-21 (2004) ("The State has merely chosen not to fund a
25  distinct category of instruction.").  Similarly, organizations could lawfully exclude
   individuals refusing to sign a statement of faith as members, but those groups "enjoy[ed]
26  no constitutional right to state subvention [i.e., subsidy] of its selectivity."  *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 669 (2010).  *See also National Endowment for the*
27  *Arts v. Finley*, 524 U.S. 569, 587-88 (1998) ("[T]he Government may allocate
   competitive funding according to criteria that would be impermissible were direct
28  regulation of speech or a criminal penalty at stake").

*First*, *Claiborne* addressed a *consumer* boycott by individuals, rather than a *commercial* boycott by businesses.  Consumers' personal choices about the companies to buy from implicate expression far more readily than business transactions.  And the governmental interest in regulating commerce is more pronounced with respect to commercial purchasing decisions by businesses.  Indeed, *Claiborne* "reaffirmed the government's 'power to regulate [such] [*i.e.*, boycott] economic activity.'"  *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990) (quoting *Claiborne*, 458 U.S. at 912-13) (first alteration in original); *see also Claiborne*, 458 U.S. at 912 ("This Court has recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association").

*Second*, *Claiborne's* central holding invalidated Mississippi's attempt to impose liability on the NAACP purely for *speech*.  The Court thus explained that Mississippi could "not award compensation for the consequences of nonviolent, protected activity," and "[t]he use of speeches, marches, and threats of social ostracism cannot be the basis for a damages award." 458 U.S. at 918, 933.  There "[t]he liability of the NAACP derived solely from the liability of Charles Evers," and the state pointed only to "Evers' speeches, … as justification for the … damages award."  *Id.* at 926-27, 929.  In stark contrast, the Act does not impose any liability on the basis of pure speech; only conduct.

*Third*, the boycott at issue in *Claiborne* "sought only the equal respect and equal treatment to which they were constitutionally entitled."  *FTC*, 493 U.S. at 426.  Indeed, "[e]quality and freedom are preconditions of the free market, and not commodities to be haggled over within it."  *Id.*  BDS boycotts, however, do not seek to vindicate anyone's constitutional rights.  Instead, they are both (1) directly contrary to federal law, *supra* at 3-4,[19] rather than complementing federal civil rights statutes, and (2) actually *proliferate* national original discrimination themselves.

_____

[19]  Plaintiffs also do not address the obvious consequences of accepting their arguments.  If Plaintiffs have a First Amendment right not to do business with Israel, why would they

1       *Fourth*, *Claiborne* was notably insufficient to provide First Amendment protection

2   for any of the boycotts in *FAIR*, *Longshoremen*, *FTC*, or *Briggs*—all of which were

3   decided after *Claiborne*.  In the 35 years since *Claiborne* has been decided, courts simply

4   have not read *Claiborne* anywhere near as broadly as Plaintiffs.

5           **2.**    ***Baird***

6       Plaintiffs' reliance (at 14) on *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) for

7   the proposition that that Act unconstitutionally "inqui[res] into protected political beliefs

8   and associations," is similarly misplaced.  In *Baird*, the Supreme Court prohibited the

9   Arizona Bar from inquiring into whether a prospective member "had ever been a member

10  of the Communist party" or a similar organization.  *Id.* at 5, 7-8.

11      Here, however, the Act and its implementing certification requirement do not

12  actually *inquire* into Plaintiffs' actual beliefs and associations at all.  Instead, the Act's

13  certification requirement only asks whether Plaintiffs are engaged in (or will engage in)

14  certain *conduct*—not beliefs or associations.  *See* Jordahl Decl. Ex. 1.  Parties may

15  believe whatever they wish under the Act:  they may (unlike Plaintiffs) even be virulent

16  Anti-Semites, Holocaust deniers, or Blood Libel believers and still obtain contracts with

17  the State and its subdivisions.  They simply may not act in one particular fashion:

18  engaging in prohibited boycotts of Israel.  Plaintiffs similarly may belong to any

19  organization they wish as long as they (but not necessarily the organization) are not

20  engaged in prohibited boycotts of Israel.

21          **3.**    ***Pickering***

22      Plaintiffs rely heavily (at 9-12, 14-15) on several cases applying *Pickering v. Bd.*

23  *of Ed.*, 391 U.S. 563 (1968).  That reliance is misplaced for three reasons.

24

25

---

26  also not have a right to do business *with* countries like North Korea, Iran, and Sudan?
    Certainly doing business with such countries would have far more obvious expressive
27  value than buying a Canon printer instead of an HP printer.  If there is any way to accept
    Plaintiffs' arguments without upending U.S. sanctions law, Plaintiffs certainly do not
28  provide it.

*First*, the *Pickering* line of cases recognizes that governmental employees and contractors have more limited First Amendment rights than members of the general public. *See*, *e.g.*, *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). Because the Act would be constitutional even as a direct regulation of all residents in the State as explained above, *Pickering* cannot save Plaintiffs' claim.

*Second*, *Pickering* is only triggered by "spe[ech] on matters of public concern." *Id.* at 80-84. As explained above, no actual speech is prohibited or compelled. And any conduct regulated is not inherently expressive so as to implicate the First Amendment. Thus, the prerequisite for applying *Pickering* is not satisfied here.

*Third*, *Pickering* provides for a balancing test even where speech "on matters of public concern" is at issue. *Id.* at 82-83. Because of the powerful government interests supporting the Act, *supra* at 22-25, the *Pickering* balancing that here requires upholding the Act.

### 4.    *Alliance For An Open Society*

In *Open Society*, unlike here, the federal government "require[ed] [government fund] recipients to profess a specific belief" and "adopt—as their own—the Government's view on an issue of public concern." 133 S. Ct. at 2330. The Act, however, does not require anyone to adopt a specific belief or constrain what views they may express. It simply requires that recipients of taxpayer funds not engage in particular conduct.

### G.    Plaintiffs' Overbreadth Challenge Fails

Plaintiffs' facial challenge relies on overbreadth doctrine, which is "strong medicine," applied "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). To apply the doctrine, "a statute's overbreadth [must] be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008).

To the extent that the Act applies to Plaintiffs at all, Plaintiffs are at the statute's periphery. The core of the Act is directed at typical BDS boycotts. Those boycotts

1   extend to all goods from Israeli companies simply because they are Israeli—and thus are

2   patent national origin discrimination that the State may constitutionally prohibit, *supra*

3   at 23-25.  The Act thus has "plainly legitimate sweep."  Similarly, even assuming the Act

4   was unconstitutional with respect to Plaintiffs' closely-held, professional corporation, it

5   has wide legitimate sweep as applied to large corporations and companies—which

6   Plaintiffs have not even challenged.  *Cf.  Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct.

7   2751, 2775 (2014) (extending protections under RFRA to "for-profit closely held

8   corporation[s]").

9   **III.  PLAINTIFFS' ALLEGED INJURIES ARE INSUFFICIENT TO JUSTIFY**
10           **INJUNCTIVE RELIEF**

11     "A preliminary injunction is an extraordinary remedy never awarded as of right."

12   *Winter*, 555 U.S. at 24.  Injunctions are not available "'to restrain an act the injurious

13   consequences of which are merely trifling.'"  *Weinberger v. Romero-Barcelo*, 456 U.S.

14   305, 311 (1982) (citation omitted).  Here, Plaintiffs' alleged harms are "merely trifling"

15   and insufficient to justify an injunction.

16     Jordahl P.C. has continued to perform under the contract with the Jail District and

17   Jordahl has admitted he expects to be paid for such work.  Dep. 167:21-169:8.  No

18   injunctive relief is necessary to allow Jordahl's company to continue working and

19   ultimately be paid.

20     Jordahl's declaration only identifies one company that his company would like to

21   boycott, HP.  Jordahl Decl. ¶24.  And Jordahl's company only identified a single

22   *potential* purchase of HP products on the horizon, a computer.  Dep. 48:1-11.  But

23   Jordahl admits that he has not performed the basic research to determine if an HP would

24   be the best computer provider for his business.  *Id.*  The First Amendment does not

25   relieve Jordahl from performing basic consumer research; nor are Plaintiffs entitled to the

26

27

28

1   extraordinary remedy of an injunction when it could easily be the case that Jordahl P.C.

2   would select a Dell, Lenovo or Acer computer after performing that research.[20]

3       Because Plaintiffs' motion and supporting declaration fails to set forth injuries

4   rising above the "merely trifling" level, no preliminary injunction is appropriate here.

5       Moreover, although Plaintiffs were fully aware of their First Amendment claim by

6   October 14, 2016, Jordahl Decl. Ex. 2, they delayed filing suit until nearly 14 months

7   later.  That delay further warrants denial of injunctive relief.  *See Oakland Tribune, Inc.*

8   *v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay

9   before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

10  **IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO PLAINTIFFS**

11      Even if any injunctive relief were appropriate, the statewide injunction sought by

12  Plaintiffs is dramatically overbroad.  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d

13  1280, 1297 (9th Cir. 1992) ("An overbroad injunction is an abuse of discretion.").  An

14  injunction limited to Plaintiffs pending resolution of this action would provide him

15  complete relief.  Moreover, in the absence of class certification, a preliminary injunction

16  may only properly address the harm to the named plaintiff. *Takiguchi v. MRI Int'l, Inc.,*

17  611 F. App'x 919, 920 (9th Cir. 2015).  No broader relief is needed or warranted.

18      That is particularly true as the balance of harms and public interest do not favor

19  Plaintiffs' request for a statewide injunction.  Here Plaintiffs' alleged harms are both

20  minor and contrived.  *See supra* Section III.  And Congress and the State Legislature

21  have already balanced the public interest, and determined that BDS boycotts are contrary

22  to that interest.  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497

23

24

25  ─────────────────────

    [20]   Jordahl's deposition also discussed other possible harms that were similarly trifling.
26  For example, Jordahl admitted that while he would boycott Caterpillar, Inc., his company
    is not in the market for combines or similar products.  Dep. 18:5-6; 50:3-4.  Jordahl
27  similarly said that he personally boycotts wine made in occupied territories, but admitted
    that his company has never purchased *any* wine from anywhere ever.  Dep. 138:11-13;
28  Ensign Decl. Ex. B (State's notice of errata).

1    (2001) ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately

2    expressed in legislation.'" (citation omitted)).

3         Moreover, if this Court concludes that any part of the Act unconstitutional, then it

4    should provide the State a subsequent opportunity to brief severability before issuing any

5    broad injunctive relief or final judgment.  The Act contains an express severability

6    provision that requires the Court to save as much of the statute as possible.  *See* A.R.S.

7    35-393.03; *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 506 (1985).

8    (severability is a question of state law).

9         This Court accordingly should not issue any statewide injunction where a tailored

10   injunction limited to him will provide complete relief to Plaintiffs.  *Califano*, 442 U.S. at

11   702 (Injunctive relief "should be no more burdensome to the defendant than necessary").

12   **V.      THE CLAIMS AGAINST THE ATTORNEY GENERAL MUST BE
             DISMISSED**

13

14        Plaintiffs' claims against Defendant Brnovich also fail for multiple reasons.  *First*,

15   the Attorney General enjoys state sovereign immunity.  Nor can Plaintiffs avail

16   themselves of the exception of *Ex parte Young*, which only applies where officials are

17   alleged to have acted in violation of federal law.  *See*, *e.g.*, *Pennhurst State Sch. & Hosp.

18   v. Halderman*, 465 U.S. 89, 102-06 (1984).  But the Attorney General is not alleged to

19   have taken *any* action here, let alone one in violation of federal law.  *See* Complaint ¶ 8.

20        *Second*, and for similar reasons, Plaintiffs lack standing to assert a claim against

21   the Attorney General, which would also be unripe.  Absent any actual conduct by the

22   Attorney General, there is no subject matter jurisdiction for a claim asserted against him.

23        *Third*, even if jurisdiction were present, the absence of any actual action by the

24   Attorney General vis-à-vis Plaintiffs prevents any finding of liability against him.[21]

25

26

27   _____
     [21]  The State is concurrently moving to intervene in this action to defend the
28   constitutionality of the Act.  This brief is filed on behalf of both Defendant Brnovich and
     Proposed Intervenor-Defendant the State of Arizona.

1

**CONCLUSION**

2    For the foregoing reasons, Plaintiffs' request for a preliminary injunction should

3    be denied and Plaintiffs' complaint dismissed.[22]

4    Respectfully submitted this 18th day of January, 2018.

5                                        MARK BRNOVICH
                                         ATTORNEY GENERAL
6

7                                        By:  s/ Drew C. Ensign
                                         Drew C. Ensign (No. 25463)
8                                        Oramel H. (O.H.) Skinner (No. 32891)
                                         Brunn (Beau) W. Roysden III (No. 28698)
9                                        Evan G. Daniels (No. 030624)
                                         Keith J. Miller (No. 29885)
10                                       Aaron M. Duell (No. 033450)
11

12                                       *Attorneys for Defendant Mark Brnovich in his*
                                         *official capacity as Attorney General and*
13                                       *Proposed Intervenor-Defendant State of*
                                         *Arizona*
14

15

16

17

18

19

20

21

22

23

24

25

26

---

27    [22]  LRCiv 7.2(e) provides 17 pages each for a motion to dismiss and response to a motion
      for a preliminary injunction.  This combined brief is filed with the 34 combined pages
28    allowed for such briefs.

1

**LOCAL RULE 12.1 CERTIFICATION**

2

Pursuant to Local Rule 12.1, I certify that before filing the instant motion

3  attorneys for the State conferred with Plaintiffs' counsel by telephone and informed them

4  of the State's intention to file this motion and the bases for it.   Plaintiffs' counsel

5  indicated that Plaintiffs would not be amending their Complaint to attempt to cure the

6  deficiencies identified by the State.

7

8   s/ Drew C. Ensign
Attorney for Intervenor-Defendant State of Arizona

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of January, 2018, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kathleen E. Brody
Darrell L. Hill
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
kbrody@acluaz.org
dhill@acluaz.org

Brian Hauss
Vera Eidelman
Ben Wizner
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org
bwizner@aclu.org
ACLU Foundation


  s/ Drew C. Ensign
*Attorneys for Defendant Mark Brnovich in his official capacity as Attorney General and Proposed Intervenor-Defendant State of Arizona*

# APPENDIX A

## STATES THAT HAVE ADOPTED PROHIBITIONS
## ON FORMS OF BOYCOTTS AGAINST ISRAEL

**Alabama**
-   SB 81, passed and signed into law in 2016
-   https://legiscan.com/AL/text/SB81/2016

**Arizona**
-   HB 2617, passed and signed into law in 2016
-   https://www.azleg.gov/legtext/52leg/2r/bills/hb2617p.pdf

**Arkansas**
-   SB 513 passed and signed into law in 2017
-   https://legiscan.com/AR/text/SB513/id/1551482

**California**
-   AB 2844, passed and signed into law in 2016
-   https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160AB2844

**Colorado**
-   HB 16-1284 passed and signed into law in 2016
-   http://www.leg.state.co.us/clics/clics2016a/csl.nsf/fsbillcont3/FFEE6B72C4AB699C87257F240063F4A6?open&file=1284_rer.pdf

**Florida**
-   SB 86 passed and signed into law in 2016
-   https://www.flsenate.gov/Session/Bill/2016/0086

**Georgia**
-   SB 327 passed and signed into law in 2016
-   http://www.legis.ga.gov/legislation/en-US/Display/20152016/SB/327

**Illinois**
-   SB 1761 passed and signed into law in 2015
-   http://www.ilga.gov/legislation/fulltext.asp?DocName=&SessionId=88&GA=99&DocTypeId=SB&DocNum=1761&GAID=13&LegID=&SpecSess=&Session=

**Indiana**
-   HB 1378 passed and signed into law in 2016
-   https://iga.in.gov/legislative/2016/bills/house/1378#document-916c8474

**Iowa**
- HF 2331 passed and signed into law in 2016
- https://www.legis.iowa.gov/legislation/BillBook?ga=86&ba=HF%202331

**Kansas**
- HB 2409 passed and signed into law in 2017
- http://www.kslegislature.org/li/b2017_18/measures/hb2409/

**Maryland**
- Governor Hogan signed an executive order in 2017
- https://content.govdelivery.com/attachments/MDGOV/2017/10/23/file_attachments/900819/Executive%2BOrder%2B01.01.2017.25.pdf

**Michigan**
- HB 5821 and HB 5822 were passed and signed into law in 2017
- https://trackbill.com/bill/mi-hb5821-state-financing-and-management-purchasing-prohibition-of-contracting-with-certain-discriminatory-businesses-that-boycott-certain-entities-provide-for-amends-sec-261-of-1984-pa-431-mcl-18-1261/1308784/

- https://trackbill.com/bill/mi-hb5822-state-financing-and-management-purchasing-prohibition-of-contracting-with-certain-discriminatory-businesses-provide-for-amends-1984-pa-431-mcl-18-1101-18-1594-by-adding-sec-241c-tie-bar-with-hb-582116/1308785/

**Minnesota**
- HF 400 passed and signed into law in 2017
- https://www.revisor.mn.gov/bills/bill.php?f=HF0400&y=2017&ssn=0&b=house

**Nevada**
- SB 26 passed and signed into law in 2017
- https://www.leg.state.nv.us/Session/79th2017/Reports/history.cfm?BillName=SB26

**New Jersey**
- A 925 passed and signed into law in 2016
- http://www.njleg.state.nj.us/2016/Bills/A1000/925_I1.PDF

**New York**
- Governor Cuomo signed an executive order in 2016
- https://www.governor.ny.gov/news/no-157-directing-state-agencies-and-authorities-divest-public-funds-supporting-bds-campaign

**North Carolina**
- HB 161 passed and signed into law in 2017
- https://ncleg.net/Sessions/2017/Bills/House/HTML/H161v0.html

**Ohio**
- HB 476 passed and signed into law in 2016
- https://www.legislature.ohio.gov/legislation/legislation-documents?id=GA131-HB-476

**Pennsylvania**
- HB 2107 passed and signed into law in 2016
- http://www.legis.state.pa.us/cfdocs/billInfo/BillInfo.cfm?syear=2015&sind=0&body=H&type=B&bn=2107

**Rhode Island**
- H 7736 passed and signed into law in 2016
- http://webserver.rilin.state.ri.us/billtext16/housetext16/h7736.pdf

**South Carolina**
- H 3583 passed and signed into law in 2015
- http://www.scstatehouse.gov/sess121_2015-2016/prever/3583_20150319.htm

**Texas**
- HB 89 passed and signed into law in 2017
- http://www.legis.state.tx.us/tlodocs/85R/billtext/html/HB00089I.htm

**Wisconsin**
- Governor Walker signed an executive order in 2017
- https://walker.wi.gov/sites/default/files/executive-orders/EO%20%23261_0.pdf

# APPENDIX B

## PROPOSED FEDERAL LEGISLATION PROHIBITING BDS BOYCOTTS

*SENATE*

- **<u>Israel Anti-Boycott Act:</u>**
  S.720 – (51 cosponsors)
  https://www.congress.gov/bill/115th-congress/senate-bill/720

*HOUSE*

- **<u>Israel Anti-Boycott Act:</u>**
  HR 1697 – (269 cosponsors)
  https://www.congress.gov/bill/115th-congress/house-bill/1697/all-actions