# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C.,<br><br>                      Plaintiffs,<br>vs.<br><br>Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities,<br>                      Defendants. | Case No: 3:17-cv-08263-PCT-DJH |

## DECLARATION OF DREW C. ENSIGN

I, Drew C. Ensign, declare as follows:

1.      I am an attorney licensed to practice law in Arizona, California, and the District of Columbia. I am an attorney with the Arizona Office of the Attorney General, and represent Defendant Mark Brnovich in his official capacity as Attorney General and Proposed Intervenor-Defendant State of Arizona.

2.      Attached hereto as Exhibit A is a copy of the transcript from the Rule 30(b)(6) deposition of Plaintiff Mikkel (Mik) Jordahl, P.C., which was conducted on January 8, 2018.

3.      Attached hereto as Exhibit B is a copy of errata to the transcript of the deposition.

4.      Attached hereto as Exhibit C is a portions of the website BDSMovement.net, which lists and explains what companies the organization is boycotting. *See Know what to boycott*, BDSmovement.net, https://bdsmovement.net/get-involved/what-to-boycott (last visited Jan. 17, 2018) ("The Palestinian BDS National Committee (BNC) calls for a boycott of all Israeli products").

5.      Attached hereto as Exhibit D is a copy of the article "US Scholars' Group Votes in Favor of Academic Boycott of Israel." *See* Maria Shwayder, *US Scholars' Group Votes in Favor of Academic Boycott of Israel*, Jerusalem Post (December 16, 2013), *available at* http://www.jpost.com/International/US-scholars-group-votes-in-favor-of-academic-boycott-of-Israel-335178.

6.      Attached hereto as Exhibit E is a copy of the article "Palestinians hold local elections in West Bank but not Gaza" from Reuters which indicates that the President of the Palestinian Authority, Mahmoud Abbas, was 12 years into what was intended to be a 4 year term in 2017. *See Palestinians hold local elections in West Bank but not Gaza*, Reuters (May 13, 2017), *available at* https://www.reuters.com/article/us-palestinians-politics-election/palestinians-hold-local-elections-in-west-bank-but-not-gaza-idUSKBN189066.

7.  Attached hereto as Exhibit F is a copy of Congressional Research Service report "Taylor Force Act: Palestinian Terrorism-Related Payments and U.S. Aid" which indicates that the Palestinian Authority has promulgated laws for the compensation of "martyrs." *See* Congressional Research Service, IN10761, *Taylor Force Act: Palstenian Terrorism-Related Payments and U.S. Aid* (December 12, 2017).

8.  Attached hereto as Exhibit G is a copy of the U.S. State Department's list of Foreign Terrorist Organizations. *See Foreign Terrorist Organizations*, U.S. Department of State, https://www.state.gov/j/ct/rls/other/des/123085.htm (last visited January 18, 2018).

9.  Attached hereto as Exhibit H is a copy of the article "Palestinians form new unity government that includes Hamas" from the Washington Post. *See Palestinians form new unity government that includes Hamas*, Washington Post (June 2, 2014), *available at* https://www.washingtonpost.com/world/middle_east/palestinians-form-new-unity-government-including-hamas/2014/06/02/c681d5c6-ea46-11e3-9f5c-9075d5508f0a_story.html?utm_term=.785bf46359c6.

10.  Attached hereto as Exhibit I is the roll call vote in the Arizona House of Representatives for the Act.

11.  Attached hereto as Exhibit J is the roll call vote in the Arizona Senate for the Act.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, and that this declaration was issued on January 18, 2018, in Phoenix, Arizona.

<u>s/ Drew C. Ensign</u>
Drew C. Ensign

# Exhibit A

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | | |
|---|---|---|
| | ) | |
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No.: 3:17-cv-08263-PCT-DJH |
| Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta, Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

30(b)(6) DEPOSITION OF MIKKEL (MIK) JORDAHL, P.C.,
BY MIKKEL JORDAHL

Phoenix, Arizona

January 8, 2018

Prepared by:
Gerard T. Coash, RPR, RMR
Certified Reporter
Certification No. 50503

**Coash & Coash, Inc.**
602-258-1440          www.coashandcoash.com

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

Page 2

```
 1                    I N D E X
 2  WITNESS                                    PAGE
 3  MIKKEL (MIK) JORDAHL
 4      Examination by Mr. Ensign              5
 5      Examination by Ms. Brody               157
 6      Further Examination by Mr. Ensign      176
 7
 8
 9                 EXHIBITS MARKED
10
    EXHIBITS          DESCRIPTION             PAGE
11
12  Exhibit 1     Defendant Brnovich's Amended Notice   7
                  of Deposition Pursuant to Fed. R.
13                Civ. P. 30(b)(6)
14  Exhibit 2     Declaration of Mikkel Jordahl        61
                  CV17-08263
15
16  Exhibit 3     Complaint for Declaratory and       119
                  Injunctive Relief
17  Exhibit 4     Email string ending from Matthew    163
                  Figueroa to Mikkel Jordahl dated
18                12-8-17
19
20
21
22
23
24
25
```

Page 3

```
 1      30(b)(6) DEPOSITION OF MIKKEL (MIK) JORDAHL, P.C.,
 2              BY MIKKEL JORDAHL
 3  was taken on January 8, 2018, commencing at 9:06 a.m., at
 4  the Offices of the Arizona Attorney General, 2005 North
 5  Central Avenue, Phoenix, Arizona, before Gerard T. Coash,
 6  a Certified Reporter in the State of Arizona.
 7
 8
 9                    *   *   *
10  APPEARANCES:
11      For the Plaintiffs:
            ACLU FOUNDATION OF ARIZONA
12          By:   Kathleen E. Brody, Esq.
                  3707 North 7th Street
13                Suite 235
                  Phoenix, Arizona  85014
14                602-650-1854
                  kbrody@acluaz.org
15
16      and
17          ACLU FOUNDATION, SPEECH, PRIVACY & TECHNOLOGY
            PROJECT
18          By:   Brian Hauss, Esq. (Telephonic)
                  Vera Eidelman, Esq. (Telephonic)
19                125 Broad Street
                  18th Floor
20                New York, New York  10004
                  212-549-2500
21                bhauss@aclu.org
                  veidelman@aclu.org
22
23
24
25
```

Page 4

```
 1  For the Defendant Mark Brnovich in his official
    capacity as Attorney General:
 2      OFFICE OF THE ARIZONA ATTORNEY GENERAL
        By:   Drew C. Ensign, Esq.
 3            Oramel H. (O.H.) Skinner, Esq.
              Brunn (Beau) W. Roysden III, Esq.
 4            2005 North Central Avenue
              Phoenix, Arizona  85004
 5            602-542-5200
              drew.ensign@azag.gov
 6            o.h.skinner@azag.gov
              beau.roysden@azag.gov
 7
 8  Also present:  Jacob Richards
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Mr. Roysden is not yet present.)

2

3 MIKKEL (MIK) JORDAHL,

4 the witness herein, having been first duly sworn by the

5 Certified Reporter, was examined and testified as follows:

6

7 EXAMINATION

8 BY MR. ENSIGN:

9 Q. Could you please state and spell your full name

10 for the record?

11 A. Yeah, my full name is Mikkel Steen Jordahl,

12 Mikkel is spelled M-i-k-k-e-l, middle name Steen,

13 S-t-e-e-n, last name Jordahl, J-o-r-d-a-h-l. I go by Mik,

14 M-i-k.

15 Q. Have you ever been deposed in a civil case

16 before?

17 A. I believe I was deposed on one occasion many

18 years ago.

19 Q. Okay. And what kind of case was that?

20 A. It was a civil rights case in which I was a

21 witness as a law student. It was against the Tucson

22 Police Department.

23 Q. Okay.

24 A. And it was regarding their treatment of homeless

25 people.

**09:07:20-09:08:03**                                   Page 6

1  Q.  Okay.  And you are a licensed lawyer, correct?
2  A.  Yes.
3  Q.  And you're familiar with the standard ground
4  rules for depositions.  Is that correct?
5  A.  I should be, and I think I am.
6  Q.  Excellent.
7      One ground rule I'd like to emphasize is
8  that if you don't understand a question, please ask me
9  clarify.  If you answer a question, I'll assume that you
10  understood it.  Is that okay?
11  A.  Sure.
12  Q.  Okay.  Also, you can take a break whenever you'd
13  like.  But if a question is pending, I'd like you to
14  finish answering that, and then we can take a break after
15  that, if that works.
16  A.  Okay.
17  Q.  Is there any reason that you can't give your best
18  testimony today?
19  A.  I don't believe so.
20  Q.  Are there any medication, other substances you're
21  under?
22  A.  Just caffeine.
23  Q.  Fair enough.  And you are a plaintiff in the
24  litigation in the United States District Court titled
25  Jordahl, et al. v. Brnovich, et al., captioned 17-cv-8263?

---

**09:08:24-09:09:33**                                   Page 7

1  A.  Yes, both in an individual capacity and as my law
2  firm's.
3  Q.  Great.  And so as you just said, your company,
4  the PC, is a plaintiff in this litigation as well?
5  A.  Yes.
6  Q.  And I can refer to that as your PC going forward,
7  if that works?
8  A.  Sure.
9  Q.  You understand that your deposition relates to
10  this case, correct?
11  A.  Yes.
12  Q.  I'm handing you what I'd like to have marked as
13  Exhibit 1.
14      (Deposition Exhibit 1 was marked for
15  identification.)
16      BY MR. ENSIGN:
17  Q.  Do you recognize this document?
18  A.  Yes.
19  Q.  What is it?
20  A.  It's the Defendant Brnovich's Amended Notice of
21  Deposition Pursuant to the Federal Rule of a Civil
22  Procedure 30(b)(6).
23  Q.  And that -- this document is why you're here
24  today, correct?
25  A.  Yes.

---

**09:09:41-09:10:39**                                   Page 8

1  Q.  You are the CEO and sole director of your PC.  Is
2  that correct?
3  A.  Yes.
4  Q.  Because you're the CEO and sole officer and
5  director, is it fair to say that the PC -- the PC
6  possesses all knowledge that you do?
7  A.  Yes.
8  Q.  Throughout the rest of this deposition, when I
9  refer to "you," that will mean your PC, unless I indicate
10  otherwise or context makes clear that it's you in your
11  personal capacity.
12  A.  Okay.
13  Q.  If you're ever unclear about that, please ask me
14  to clarify.
15  A.  Sure.
16  Q.  What did you do to prepare for this deposition
17  today?
18  A.  I reviewed everything that I have filed.  I have
19  met with my attorneys.  And I have reviewed background
20  information on boycott and whatnot that's readily
21  available online.
22  Q.  Is there anything else you did to prepare today?
23  A.  I don't think so.
24  Q.  Okay.  About how long did you spend preparing?
25  A.  Probably two, three hours.

---

**09:11:03-09:12:08**                                   Page 9

1  Q.  So could you take a look at the topic 1a on the
2  exhibit?
3  A.  Sure.
4  Q.  And how long -- what did you do to prepare to
5  address topic 1a?
6  A.  I didn't so much focus on my organizational
7  structure.  I mean, I recall all that information.
8  Q.  Okay.  And about how long did you spend preparing
9  for that?
10  A.  I don't think I prepared at all in terms of
11  that subsection "a."
12  Q.  In terms of topic 1b, what did you do to prepare
13  for that one?
14  A.  I believe I reviewed the addendum that I was
15  asked to sign again, and that took just a matter of a few
16  minutes.
17  Q.  Okay.  Is there anything else that you recall
18  doing to prepare for that topic?
19  A.  Let me look here.
20      I don't think so.
21  Q.  Okay.  So how about topic 1c?  So what did you do
22  to prepare for that one?
23  A.  Nothing.  I have no business dealing with folks
24  under that category.
25  Q.  Okay.  And in terms of topic 1d, what did you do

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

09:12:27-09:13:45                                          Page 10

1  to prepare for that topic?
2  A.  Well, I did review the companies that I'm in
3  favor of boycotting and their activities, which would
4  include companies like Hewlett-Packard, Caterpillar,
5  Airbnb, companies like that that are on the boycott list
6  and the reasons why -- why they should be boycotted in my
7  opinion.  And I probably spent an hour on that.
8  Q.  And what documents did you review to prepare for
9  that?
10 A.  Well, I reviewed -- let's see, the EL- --
11 Evangelical Lutheran Church of America's position on Peace
12 Not Walls and various other literature that the Lutherans
13 have produced.  Also, I reviewed Jewish Voice for Peace,
14 of which I'm a member, and looked at the boycott
15 divestment sanctions issues that they're promoting.  And
16 I've also looked at other sources.  I looked at -- this
17 morning I reviewed Haaretz, an Israeli left-leaning
18 newspaper.  I have looked at other sources, one was
19 Mondoweiss, which is an electronic website that
20 specializes in that area.  I think I have reviewed -- what
21 is it?  There's a group called Electronic Intifada, which
22 I've looked at.
23 Q.  Are there any other groups -- documents that you
24 reviewed?
25 A.  I have looked at -- there is an Arizona Palestine

09:14:13-09:15:15                                          Page 11

1  solidarity network.  I know the folks that are involved
2  there in Tucson; I've reviewed their website.  I've
3  reviewed some literature on BDS.  I've certainly looked at
4  the ACLU website and their involvement in opposing the
5  anti-Israel boycott act, which would imprison people for
6  participating in boycotts.  So . . .
7  Q.  Okay.  And can you think of any other materials
8  you think you've reviewed?
9  A.  There are many other sources.  I can't think
10 of -- you know, I couldn't list them all, but just
11 mainstream press, New York Times.  I read every day and
12 certainly areas there.
13 Q.  Are there any particular documents that you, you
14 know, view as particularly useful in determining what
15 companies you boycott?
16 A.  I'm not sure I could mention any particular
17 document.
18 Q.  Then turning to topic 1e, what did you do to
19 prepare for -- to discuss that topic?
20 A.  Well, I reviewed the allegations in the
21 complaint.  I reviewed my statement of facts -- or
22 whatever that was called, my affidavit, and I prepared
23 with my attorneys.
24 Q.  Okay.  And about how long did that -- did you
25 prepare for that?

09:15:39-09:17:04                                          Page 12

1  A.  I'd say probably at least two hours.
2  Q.  Okay.  And does that kind of capture topic 1f as
3  well?
4  A.  Yes.
5  Q.  Have you talked about this deposition with
6  anyone?
7  A.  I've mentioned to my wife that -- I mean, that's
8  why we're here.  So . . .
9  Q.  Yeah.
10 A.  And I have mentioned to my attorneys --
11 obviously, they know that.  I have mentioned to folks at
12 Jewish Voice for Peace and some of my Tucson connections
13 in the area, yes.
14 Q.  Okay.  And sorry, who -- who would that be?
15 A.  Well, it would be the Jewish Voice for Peace
16 folks, Abby Okrent; also Mohyeddin Abdulaziz, who is part
17 of the Arizona BDS network; also Thabet Khalidi, who is a
18 lawyer in Tucson; and also my son, Laiken Jordahl; my
19 wife, Sheila Nair, and that's probably about it.
20 Q.  Okay.  Okay.  And can you think of anyone else
21 that you talked to?
22 A.  I think I have mentioned to a relative or two on
23 the West Coast, my uncle and my cousin.
24 Q.  Okay.  And anyone else?
25 A.  Do you need their names?

09:17:21-09:18:14                                          Page 13

1  Q.  Sure.
2  A.  Well, Eric Skindrud, S-k-i-n-d-r-u-d, Michael
3  Skindrud, same last name.  I think that's about it.
4  Q.  And can you think of anyone else?
5  A.  Not offhand.  I mean, I may have shared that, I
6  just don't -- I'm not sure.  So . . .
7  Q.  So I'd like to turn to the -- your personal
8  boycotts.
9  A.  Sure.
10 Q.  So many of the "yous" in this section will be you
11 in your personal capacity.  But to the extent you're ever
12 unclear, please let me know.
13 A.  Okay.
14 Q.  Are you currently engaged in any boycotts in your
15 personal capacity?
16 A.  Yes.  I would -- as a human being, not as a
17 corporation, you know, I would be -- I am boycotting, and
18 I urge the boycott -- of Hewlett-Packard, certainly
19 Caterpillar, and also Airbnb because they are businesses
20 that are involved in perpetuating the occupation of the
21 West Bank.
22 Q.  Are you currently engaged in -- and don't worry
23 about the companies right now -- but are there any other
24 boycotts that you're engaged in right now, other than
25 the -- other than the boycott at issue in this suit?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  A.  I certainly -- I mean, just as a moral political
2  belief, I would not travel to Egypt at this time because
3  of the gross human rights abuses that are there.
4  Q.  Okay.
5  A.  And of course, there are many other places too,
6  you know, like Myanmar, Syria, et cetera.
7  Q.  Okay.  And sorry, can you give -- can you give
8  those examples -- or, sorry -- can you list the -- those
9  countries that you wouldn't travel to?
10  A.  Well -- well, I wouldn't go to Syria, probably
11  mostly for safety reasons.
12  Q.  Yeah.
13  A.  But also not want to spend money to support the
14  Assad regime.  Egypt is one, of course, and I fully
15  support the reduction of U.S. military aid to Egypt, which
16  has occurred, and I think the same should happen to Israel
17  until it evacuates from the West Bank.  Probably Myanmar
18  at this time, I wouldn't go there because of the Rohingya
19  ethnic cleansing.  I don't want to support their colonies.
20      I'm sure there are others I could think of,
21  but -- you know, if you want to -- I probably won't be
22  going to Crimea.
23  Q.  Okay.  Are there any domestic boycotts that
24  you're currently engaged in?
25  A.  Other than those companies involved in this

1  issue, no.
2  Q.  Okay.
3  A.  I don't believe so.
4  Q.  Why don't we take a minute and -- besides the
5  countries you've listed or areas, can you give me more
6  examples where you wouldn't -- you wouldn't travel there
7  or you're engaged in a boycott of that country?
8  A.  Actually, let me backtrack.  I would probably not
9  knowingly spend money on Trump-owned family businesses
10  because of my own personal political beliefs.
11  Q.  Okay.  Can you think of any other domestic
12  boycotts that you'd be engaged in?
13  A.  I can't.
14  Q.  Okay.  So in terms of what you've spoken about
15  with Egypt, would you consider your unwillingness to
16  travel there to be a boycott?
17  A.  I would, yeah.
18  Q.  Okay.  And same with Myanmar?
19  A.  Yes.  I mean, it's not in response to a call for
20  a boycott or whatever, but it is my own personal belief
21  because I don't want to support -- have any way of
22  supporting those governments.
23  Q.  Okay.  So you listed a couple companies -- I
24  believe HP, Airbnb, and Caterpillar -- as companies that
25  you're engaged in a boycott of.  Can you think of any

1  other companies that you are boycotting?
2  A.  In -- in this -- the context of this lawsuit?
3  Q.  That's correct.
4  A.  Yeah.  Well, one would be -- I believe it's --
5  SodaStream is another company that produces bottled water
6  and it was on West Bank and it was using -- it was an
7  Israeli-owned company on the West Bank.
8  Q.  Okay.  Can you think of any other companies?
9  A.  Those are the ones that I would target.  There
10  are -- sometimes you go into, like, Safeway, pick out a
11  bottle of wine, and you will see wines listed from -- they
12  say it's from Israel, but it turns out they're from
13  settlements on the West Bank and so they're mislabeled,
14  and I would not buy those.
15  Q.  Okay.  So you wouldn't buy wines that were made
16  and grown in Israel or --
17  A.  No, I'm not saying that.  I would not buy wines
18  that were produced and -- from vineyards or whatever -- on
19  the illegal settlements in the West Bank --
20  Q.  Okay.
21  A.  -- and mislabeled as a product of Israel.
22  Q.  Okay.  Would you purchase wine grown by
23  Palestinians in those areas?
24  A.  I've never had that opportunity, so I don't know.
25  Q.  Okay.  And backtracking for just a little bit.

1  In terms of what you've stated with regards to Egypt and
2  Myanmar, would your boycott extend beyond not traveling
3  there or are there any other -- are there any products
4  from those companies that you're engaged in a boycott of?
5  A.  I'm not specifically aware of any products that
6  I've seen that have been labeled from either of those
7  countries, so I'm not sure.  I'm not sure.  But I
8  certainly would not travel to those places.
9  Q.  Okay.  Have you ever declined to buy a product
10  from Egypt?
11  A.  I have not seen a product from Egypt, that I'm
12  aware of, in the last several years.  So --
13  Q.  Okay.  So you haven't -- you haven't --
14  A.  I haven't had that opportunity.
15  Q.  And same with respect to Myanmar?
16  A.  Yeah.  I mean, Myanmar, how often do we see
17  products in our consumer shelves, whatever -- I haven't
18  seen one, so I don't know.  And I don't know.  I don't
19  know.
20  Q.  And just as a clarification, so Myanmar is often
21  known as Burma as well?
22  A.  Right.  Yes.
23  Q.  All right.  And you had provided a list of
24  companies that you're boycotting and -- including HP and
25  SodaStream, for example.  Can you think of any other

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

09:24:04-09:24:57                                    Page 18

1  companies that you're --
2  A.  Well, I mentioned, you know, wines produced on
3  the West Bank by colonies.  They're Israeli colonies.  And
4  SodaStream I mentioned as well.
5     I have no opportunity to buy a Caterpillar
6  tractor so I'm not sure I'm actively doing it.  But if I
7  was asked to buy a Caterpillar tractor, I'd probably
8  decline for a variety of reasons, one of which would be
9  political.
10  Q.  Okay.  And are there any other companies that you
11  can think of that you're boycotting?
12  A.  I'm not aware -- those are the ones that I'm
13  focused on that I've mentioned, so -- I'm sure there are
14  others that -- I know a lot of the -- the illegal Israeli
15  settlements on the West Bank will export a lot of fruits
16  and vegetables, things like that, but I don't think they
17  reach our American markets.
18  Q.  Okay.  So with respect to produce made in either
19  Israel or what you view to be Palestinian lands, what
20  would you be boycotting?
21  A.  Well, you're asking a hypothetical question
22  because I haven't had that opportunity.
23  Q.  Right.
24  A.  But if they were specifically in the -- what the
25  international community recognizes as illegal Israeli

09:25:07-09:26:09                                    Page 19

1  settlements on the West Bank, I would not buy them.
2  Q.  Okay.
3  A.  If they were produced in Israel itself, I may
4  well buy them.
5  Q.  Okay.  So if it was produced in Israel, for
6  example, and it's a pre-1967 borders, you -- you would buy
7  it?
8  A.  Sure, if it -- if it looked like good produce, of
9  course, yeah.
10  Q.  Okay.  And when you referenced "international
11  community," what did you mean by that term?
12  A.  Well, I mean basically the whole world except for
13  the U.S..  countries -- almost the whole world, I mean,
14  look at -- whether it's Europe, Middle East, all -- all
15  around the world basically.
16  Q.  Okay.  Are there particular countries or
17  institutions you're referring to or --
18  A.  Well, I mean, you can just look at the recent UN
19  vote on -- you know, the U.S. moving its embassy to
20  Jerusalem, it was something like -- I think the U.S. was
21  only joined by countries like Togo and whatnot, very small
22  countries, nine countries, the rest either abstained or
23  voted against the U.S..
24     But I think almost every country on Earth
25  views colonization -- I mean, it violates international

09:26:28-09:27:49                                    Page 20

1  law to colonize and occupy a territory, so -- and almost
2  every country in the world recognizes that law.  So . . .
3  Q.  Okay.  So aside from boycotting the companies
4  we've talked about and the produce that we've talked
5  about, what other activities does your boycott involve?
6  A.  I'm not sure it involves other activities,
7  but it -- it certainly involves -- I'm networking with
8  other people involved in the boycott movement.  I've a
9  been asked to speak about it, and it also involves writing
10  and objecting to those companies.  It involves -- recently
11  wrote an op-ed piece on the issue.
12  Q.  In terms of writing to those companies, what --
13  what have you written to them?
14  A.  Well, I've just joined in on -- what do you call
15  it?  I've signed my name to petitions that have been sent
16  forward to those companies.
17  Q.  Okay.  And can you think of which companies that
18  you've signed petitions?
19  A.  Sure.  One was Hewlett-Packard.  Another was
20  Airbnb.  I don't believe I did that with Caterpillar.
21  Q.  Okay.  And can you think of any other companies
22  that you've done that for?
23  A.  I don't -- I don't think so, on this issue, no.
24  Q.  Okay.
25  A.  And I've written my legislators, both on Israel

09:28:05-09:29:11                                    Page 21

1  and Egypt, objecting to what U.S. policy is.
2  Q.  And which legislators?
3  A.  Well, both of our senators.
4  Q.  Okay.  And anyone else?
5  A.  I have -- yeah, talked to my own representative.
6  And I'm blocking on his name right now, a Democrat --
7  Q.  Okay.  But that --
8  A.  -- on the issue.
9  Q.  -- that's U.S. congressional representative?
10  A.  Yes.
11  Q.  And for those petitions that you signed, who
12  drafted them?
13  A.  I think one was Jewish Voice for Peace -- I think
14  perhaps both of them.
15  Q.  So your boycott consists of boycotting companies,
16  produce, networking, writing to companies, drafting an
17  op-ed.  Is there anything else that it consists of?
18  A.  I think that takes care of most of it.  I mean,
19  maybe I'm leaving something out, but I think that takes
20  care of it.
21  Q.  Okay.  You can't think of anything else right
22  now?
23  A.  Right offhand, no.
24  Q.  Okay.  Do you have any plans to change the scope
25  of your boycott in the future?

1 A. Yes. When -- when we win this lawsuit -- and I'm
2 being presumptuous here -- I want my firm to assist in
3 promoting the boycott issues and doing -- my first check
4 will be written to Jewish Voice for Peace from my firm
5 and -- which will support things like their annual float
6 in the Tucson All Souls parade and other boycott
7 activities.
8 Q. Okay.
9 A. And perhaps also providing clerical assistance to
10 those efforts.
11 Q. We'll turn to your firm in a bit.
12    In terms of your personal boycott, do you
13 have any plans to change the scope of it?
14 A. Well, I think after -- yes, after my recent trip
15 to Palestine and Israel last spring, I mean, it really
16 impacted me very much. And so -- and that's really made
17 me resolve to end the suppression of speech in this area,
18 which is what the statute is about, I think, is
19 suppressing speech. And so I want to speak out more about
20 it, about the issues.
21 Q. In terms of companies or products that you're
22 boycotting, do you have any plans to change that?
23 A. Well, I'll change it if they change their
24 practices.
25 Q. Sure.

1 A. I probably will investigate more and see what --
2 how else I can support those boycott efforts. And it may
3 be in terms of providing legal assistance, whether it's
4 pro bono or otherwise, to those causes.
5 Q. Okay. When did you first start engaging in this
6 boycott that's at issue in this suit here?
7 A. Well, I think always -- I mean, when I was -- I
8 think 19 years old, 20 years old, I spent a fair amount of
9 time in the West Bank. My father was a Lutheran
10 theologian, and he spent a year of his sabbatical in a
11 place called Tantur, which is between Jerusalem and
12 Bethlehem on the West Bank. And, you know, I became very
13 aware of the colonization movement and the land
14 expropriation of the Palestinians -- Palestinian land on
15 the West Bank and the creeping expansion of Israel into
16 the West Bank and the imprisonment of many Palestinians,
17 the loss of their lands, their resources, et cetera.
18    So I became very aware of that. And
19 certainly at that time I wouldn't -- I'm not sure I termed
20 it so much as -- the term "boycott" at that time was
21 not -- not a -- in sort of the linguist currency of the
22 day, but I certainly would have not purchased products
23 from settlements there that I was aware of that were
24 getting started on expropriated lands.
25 Q. Okay. In terms of your boycott of companies

1 that's at issue in the suit, when would you say that
2 started?
3 A. Probably at least -- I didn't become aware of
4 activities of, like, Hewlett-Packard, Caterpillar, these
5 companies now, until perhaps maybe -- really fairly
6 recently, like a year and a half ago or so.
7 Q. Okay. So have you been engaged in boycott of
8 those companies continuously for the last year and a half
9 or so?
10 A. I would say probably.
11 Q. When you say "probably," what do you mean by
12 that?
13 A. Well, I don't have -- I don't have a definite
14 start date for you.
15 Q. Okay.
16 A. Yeah.
17 Q. But approximately about a year and a half ago?
18 A. Year, year and a half, yes.
19 Q. Okay. So we'll call it around summer of 2016?
20 A. I guess I'm uncomfortable in, you know,
21 estimating that and being nailed down to an estimate.
22 Q. So were you engaged in a boycott of companies
23 three years ago?
24 A. I'm not sure I recognized it as a boycott at that
25 time, but I certainly would not have bought, say, wines at

1 that time that I knew were produced in illegal
2 settlements.
3 Q. Okay.
4 A. Whether I termed it a boycott or not -- it
5 probably was, but -- you know, I wouldn't have bought
6 those products.
7 Q. So kind of -- let's separate them out a little
8 bit: In terms of products produced in settlements, when
9 would you say your boycott related to that began?
10 A. I don't think, going back to 1977, I would have
11 bought a bottle of wine that was produced in an illegal
12 settlement. I didn't term it as a boycott, it would just
13 be a preference of, like, I'm not going to support this.
14 Q. Let's not get hung up on the terminology and --
15 A. Okay.
16 Q. -- you know, when -- when would you have made a
17 purchasing decision --
18 A. Yeah.
19 Q. -- you know, relevant to these considerations.
20 A. Sure.
21 Q. So similarly, would you say that you were engaged
22 in a boycott of companies related to this case three years
23 ago?
24 A. Not the companies that I specify because I wasn't
25 aware of it. I became super conscious of this after my

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  trip to Palestine and Israel.  I would say just six months
2  ago.
3  Q.  Okay.  So you wouldn't have been engaged in a
4  boycott of these companies three years ago then?
5  A.  I wasn't -- yes.  I was not aware of the
6  Hewlett-Packard thing.  I think I was aware of
7  Caterpillar.  But, again, I don't have much of a need to
8  buy tractors, so --
9  Q.  How long do you plan to continue your boycott?
10  A.  Well, if some equitable peace agreement is
11  reached, I would love to spend money on -- for all those
12  folks there, whether it's Israeli settlements,
13  Palestinians.  I mean, there's so much potential there for
14  those two peoples.  But, unfortunately, the road it's
15  going down is one that guarantees that there will never be
16  peace, that current direction.
17  Q.  Okay.  So assume that a peace agreement is not
18  reached; how long would you plan to continue your boycott
19  under those circumstances?
20  A.  Well, as long as Israel continues its policy of
21  never allowing a two-state solution, which I believe is --
22  has happened, or in their one-state vision does not allow
23  equal rights for all of its people, Palestinians or Jews
24  or Israelis, then I would continue boycott -- my boycott.
25  Q.  Okay.  So put it a different way, absent a change

1  in Israeli policy, you would plan to continue your boycott
2  indefinitely?
3  A.  Yes.
4  Q.  I think we touched on this earlier, but has the
5  scope of your boycott been informed by particular
6  resources and documents?
7  A.  I think I already answered that pretty -- I mean,
8  is there something you didn't understand in my answer?
9  Q.  Are there particular documents or resources that
10  you would look to to inform you as to what you can and
11  can't -- should and should not buy?
12  A.  I'm not aware of documents.  I've looked at
13  Internet resources.  I've looked at --
14  Q.  Okay.
15  A.  -- the New York Times.  I've looked at all kinds
16  of things.  So . . .
17  Q.  Are there particular lists, for example, that you
18  might look to?
19  A.  I have seen on Jewish Voice for Peace there have
20  been certain things identified.  That's probably my main
21  source for identifying what products.
22  Q.  Okay.  And do they have a list available of
23  companies that they're boycotting?
24  A.  There have been specific -- I believe on their
25  website they show you specific things.  Like, I know one

1  was Hewlett-Packard, I believe another was Caterpillar --
2  I might be wrong about that.  But there's also, like,
3  SodaStream and other companies.
4  Q.  Okay.  Are there any other organizations' lists
5  that you've -- that you've researched or looked at at any
6  point?
7  A.  Well, as I said -- I mean, I've read many
8  different things.  One is Mondoweiss, which is a Internet
9  news, which there have been various lists.  I know there
10  have been articles on -- on HP.  I read the Israeli
11  newspaper Haaretz, which also goes into those issues.
12  Q.  Okay.  And can you think of other resources that
13  you've looked to?
14  A.  Yeah, Electronic Intifada is another website, and
15  just the mainstream media as well.  So . . .
16  Q.  Okay.
17  A.  The Lutheran ELCA and various religious websites
18  too.  There are many -- most mainstream Protestant
19  denominations also endorse the boycott in some form or
20  another.
21  Q.  Okay.  What other denominations' materials have
22  you looked at or been an influence on you?
23  A.  I've looked at Presbyterians, I believe
24  Mennonites.  I've looked at Amnesty International, that's
25  not a religious denomination, whereas the Lutherans -- I'm

1  forgetting what other denominations I might have looked
2  at.
3  Q.  Okay.  Can you think of any others at this point?
4  A.  I can't think of any others right now.
5  Q.  Okay.  Would you change your boycott if any of
6  those organizations changed the companies that they
7  thought should be boycotted?
8  A.  I may if I get more information and that I trust,
9  you know, I may change it, sure.
10  Q.  What organizations do you trust in terms of
11  providing information about your boycott?
12  A.  Well, I think Jewish Voice for Peace has been
13  very good on that and -- it's -- it's always a matter of
14  fact-checking too.  We're all lawyers here -- almost all
15  of us.  And so I don't want to just go on one source, I
16  want to check it too and say -- because there's a lot of
17  misinformation out there on all sides.  You know, you want
18  to make that you're accurate.
19  Q.  Sure.  So what organizations, then, would you
20  consider to be more trustworthy?
21  A.  Well, I think -- I think the New York Times is
22  pretty good on that.  I think JVP, Jewish Voice for Peace,
23  again.  As I said, I think the ELCA.  And those would be
24  the main sources I would look to.
25  Q.  Okay.

1  A.  And various other -- yeah, I'll leave it at that.
2  Q.  So those are the more trustworthy sources that
3  you would look to?
4  A.  Well, I'm not sure that I can give -- it's just
5  my personal opinion, obviously, what is trustworthy or
6  what is not, but it's the ones that I would tend to give
7  more credibility to.
8  Q.  Okay.  Are there individuals that you've
9  talked -- that have informed the scope of your boycott?
10  A.  I don't think so.  I don't think we've talked
11  about -- specifically talked about the companies.  It's
12  all been through my own research.
13  Q.  Okay.
14  A.  Almost entirely.  So . . .
15  Q.  Okay.  Can you think of any instance where you've
16  changed the scope of your boycott as a result of talking
17  with someone?
18  A.  No.
19  Q.  Okay.  Who have you spoken about -- spoken to
20  about your boycotts?
21  A.  I mean, I've spoken to family members.  I've
22  talked to my lawyers.  I've talked to some of my contacts
23  in Tucson that I previously mentioned.  I talked to --
24  there's another legal group called Palestine Legal, I've
25  had a conversation with their director.

1  Q.  Can you think of anyone else that you ever talked
2  to?
3  A.  About my personal boycott, you're saying, or what
4  I would boycott and things like that?  Is that your
5  question?
6  Q.  That's correct.
7  A.  Beyond that, not really.
8  Q.  Okay.  So you can't think of anyone else that
9  you've talked to about your boycott?
10  A.  There may have been.  I'm not going to be
11  pigeonholed on that.  But those are the individuals I can
12  think of.
13  Q.  So at this point you can't recall other
14  individuals that you've talked to?
15  A.  Well, I have spoken -- I'm thinking of one public
16  event that I went to, it was on -- it was at the Jewish
17  congregation in Sedona.  And there was a Anti-Defamation
18  League person there, and I spoke -- and I just
19  mentioned -- I was in the audience, and there were
20  questions back and forth, and then I said that I
21  personally supported the boycott of companies that
22  perpetuate the occupation.
23  Q.  Okay.
24  A.  So I mean -- and there were probably 30 people in
25  the room.  So . . .

1  Q.  Okay.  So aside from that event and the others
2  you listed, can you think of anyone else that you talked
3  to about your boycott?
4  A.  Specifically about what I am boycotting,
5  et cetera, no, I can't think of any.
6  Q.  Or that the -- the fact that you're engaged in a
7  boycott?
8  A.  I think I may have mentioned, like, to a public
9  defender in Cottonwood, Mike Shaw.  Someone in Flagstaff
10  who's on the city council, Eva Putzova -- I don't know how
11  to spell her name -- and her husband, Joe Bader.
12  Q.  Okay.  And can you think of any others at this
13  time?
14  A.  If we sat here for a long time, I probably could.
15  But, you know, I -- those are the people off the top of my
16  head that I can think of.  So . . .
17  Q.  Okay.  So you just mentioned an event that you
18  attended related to this.  Can you think of any other
19  events or telephone calls that you've -- let's start with
20  events.  Can you think of any events that you've attended
21  relating to your boycott?
22  A.  Like, public events?  No, I can't think of any.
23  Q.  Okay.  And can you think of any phone conferences
24  or other discussions that you may have had regarding your
25  boycott?

1  A.  I got together with friends in Tucson.  I know
2  that we talked about it a bit, and those are the
3  individuals that I mentioned before.  And it wasn't so
4  much on the mechanics of boycotting, but it was on, you
5  know, the possibility of this lawsuit.
6  Q.  Okay.  Do you know of others that are engaged in
7  similar boycotts?
8  A.  Sure.
9  Q.  Okay.  Can you -- can you list those individuals
10  or companies?
11  A.  I think it's a nationwide -- it's a worldwide
12  movement to boycott -- to one degree or another.
13      My personal boycott is limited to those
14  businesses that perpetuate the occupation of the West
15  Bank.  There are others that are -- make it broader.  They
16  have an academic boycott, and they extend it to all of
17  Israel, saying that, you know, Israel's economy should
18  take a hit as long as they're going to continue to
19  colonize the West Bank.  I don't go that far.
20  Q.  Okay.
21  A.  It's worldwide.  It's, you know, Norway.  You
22  have -- and you have also many countries around the world
23  even, and individuals.  And here in Arizona there are
24  various movements, you know, that are doing that.  Many
25  states.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

09:47:13-09:48:34                                      Page 34

1  Q.  Okay.
2  A.  It's a broad movement.  And it's very mainstream,
3     all these churches, religious groups.
4  Q.  Okay.
5  A.  Human rights groups.
6  Q.  Would you say that your boycott matches the
7     boycott of any other organization in terms of its scope?
8  A.  I think some of the church denominations are --
9     my -- my boycott is a bit more limited because a group
10    like Jewish Voice for Peace endorses the entire sort of
11    BDS platform.  I'm more limited, and I don't necessarily
12    want to boycott Israel.  I think Israel certainly has a
13    right to exist, as well as Palestine, and secured
14    borders that respect everyone.
15       So my focus is on the colonial effort --
16    settler/colonial effort on the West Bank that's currently
17    in progress.
18       I don't know if that answers your question,
19    but . . .
20 Q.  So your boycott differs in some way from JVP
21    then?
22 A.  I embrace their call for boycott.  I'm just
23    saying my -- and I'm doing in response to their call for
24    boycott.  It's just my focus is more limited.
25 Q.  Okay.  So --

09:48:48-09:49:56                                      Page 35

1  A.  And some of the churches and denominations really
2     look at what's going on in the West Bank and limit it to
3     that.
4  Q.  So just to be clear then, you have initiated your
5     boycott in response to a call from JVP to boycott in some
6     scope Israeli companies or relating to Israeli policies?
7  A.  I'm not aware of boycotting Israeli companies per
8     se, but I am boycotting multinational companies that are
9     helping perpetuate the occupation.
10 Q.  Okay.
11 A.  I'm sorry, maybe --
12 Q.  No, it was a con- -- it was a convoluted
13    question.
14       Would you say -- is it fair to say that your
15    boycott was initiated in response to a call from JVP to
16    boycott, even if the scope of your boycott might differ
17    from JVP's?
18 A.  Yes.  Yeah, and others as well.
19 Q.  Okay.  And who would -- what are those others
20    that you would say --
21 A.  The larger BDS movement.  I agree with a lot of
22    what they are saying.  My focus, again, is limited to the
23    colonial effort on the West Bank.  But, you know, I agree
24    with a lot of what -- what they are promoting, and then
25    responding to that call for boycott as well.

09:50:03-09:51:14                                      Page 36

1  Q.  Okay.
2  A.  In a more limited fashion.
3  Q.  Can you think of any particular BDS organizations
4     that you responded to the call or --
5  A.  Well, it's a very widespread movement.  There is
6     a -- I believe he's an Israeli Arab man who has sort of
7     started it, Barghouti is his last name.
8  Q.  Okay.  Can you think of his first name?
9  A.  I forget his first name.
10 Q.  Okay.  Are there other BDS movements or
11    individuals within -- sorry, BDS organizations or
12    individuals involved in the BDS movement that you are
13    responding to the call of?
14 A.  It's such a diffuse movement.  I'm not sure what
15    organization is what.  But I know that there are movements
16    in Europe, in Scandinavia, Italy, France, who have called
17    for similar types of boycotts such as -- you know, the
18    boycott of mislabeled Israeli -- so-called Israeli wines
19    that are produced on the West Bank; I'm responding to that
20    call.
21 Q.  Okay.
22 A.  I do not want to, you know, buy those wines.  I'm
23    not going to buy them.  If -- if my law firm hosts a
24    reception, I'm put in a little quandary.  You know, must I
25    buy this wine or not this wine?  What if it costs a

09:51:35-09:52:52                                      Page 37

1     quarter less?  It's all kind of crazy things that it sets
2     up.
3  Q.  So this should be fairly obvious given our
4     discussion.  But you're familiar with the BDS movement
5     then, correct?
6  A.  Yes.
7  Q.  Can you describe what you believe the BDS
8     movement to be?
9  A.  As far as I understand it, it's a non-violent
10    movement that's based on the boycott of South Africa and
11    apartheid.  And it has -- as far as I recall, it has three
12    central paradigms.  One is for the equal treatment of Arab
13    citizens of Israel, another is the right of return for
14    Palestinian refugees, and a third is an end to the
15    colonization of the West Bank.
16 Q.  So those are the object -- sorry, the objectives,
17    you believe, of the BDS movement.  What are -- what
18    conduct do you believe they're calling for?
19 A.  My understanding is the wider movement is calling
20    for a boycott of -- essentially the Israeli economy, and
21    there are also parts of that that call for an academic
22    boycott, artistic boycotts, in an effort to pressure
23    Israel to agree to a two-state solution or at least equal
24    rights.
25 Q.  Would Jordahl, PC like to support one or more BDS

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

09:53:08-09:54:31                                              Page 38

1  campaigns?
2  A.  Sure.
3  Q.  And similarly, would you like to -- are you
4  supporting any BDS campaigns in your personal capacity?
5  A.  Yes.  And I think I've mentioned my focus is
6  limited to the West Bank because that's what I -- what I
7  know, and I think it's best to apply pressure there first.
8  But I agree a refugee resolution has to be found.  It
9  would probably likely be bringing refugees back to a new
10 Palestinian state on the West Bank instead of -- you know,
11 it's unrealistic to think that, you know, millions of
12 Palestinian refugees will be allowed to resettle in
13 Israel.  You know, that just won't work.  So, yeah, I
14 fully agree on equal rights for Arab Israelis.
15    Right now there's a PEW research poll
16 conducted in 2015 that said some 45 percent of Jewish
17 Israelis would like to see their Palestinian citizens
18 deported, which is just outrageous to me.  I'm sure both
19 populations would like to just blink and not see the
20 other, but they exist, and they're going to have to
21 co-exist with some semblance of equal rights.  Or at least
22 if they have to do a divorce, there's some sort of
23 security guarantee.
24 Q.  So you believe that Israeli accords equal
25 treatment to its Arab citizens within its pre-1967

09:54:39-09:55:52                                              Page 39

1  borders?
2  A.  No.
3  Q.  Okay.  And in what respect do you think that's
4  not the case?
5  A.  Well, it's -- in many.
6     If you look at education funding, there's
7  just a fraction of funding that goes -- public funding
8  that goes to Arab citizens of Israel.  There are whole
9  cities that Arabs cannot live in legally because they're
10 basically -- have cities with HOAs, essentially,
11 homeowners association, and the Israeli Supreme Court has
12 said social compatibility is one factor that they can use
13 to discriminate.  And so there -- there are towns of, you
14 know, many thousands where there's not a single Arab
15 citizen that is allowed in, so -- there are a whole litany
16 of laws that discriminate against Arabs in Israel.
17 Q.  Can you think of examples of those laws?
18 A.  Well, sure.  There's right -- well, land
19 expropriation is one.  You can look at -- there are whole
20 Bedouin communities now that are being uprooted and
21 destroyed, even though they were forced to live in certain
22 areas many years ago.  Now they're being forced to move
23 again to create room for new exclusively Jewish
24 communities.
25    Yes.  And Palestinian communities in Israel

09:56:16-09:57:20                                              Page 40

1  are prohibited from teaching their own history, what they
2  call the Nakba, which was the events of 1948 where some
3  700,000 Palestinians were -- either fled or were forced to
4  leave.  And what -- what those municipalities will do
5  is -- pursuant to Israeli laws -- is lose funding,
6  municipal funding, if they teach their children their own
7  history.
8  Q.  Okay.
9  A.  So there are many laws like that.  They're --
10 they're, you know -- I remember seeing a list.  And
11 there -- there are human rights groups in Israel itself,
12 and -- I'm forgetting the names, but I did also research
13 that.
14 Q.  Okay.  Turning back to the BDS campaigns.  How
15 does the scope of your boycott differ from what you view
16 to be a typical BDS campaign or boycott?
17 A.  Well, I don't know what a typical boycott is.  I
18 mean, it's a diffuse thing.  I know there are those three
19 principles that are articulated.  So . . .
20 Q.  Do you understand -- and I think you were saying
21 earlier -- that a typical -- Scratch that.
22    The BDS campaign is not limited to the
23 settlements, but addresses all of Israel.  Is that your
24 understanding?
25 A.  That's my understanding.

09:57:36-09:58:42                                              Page 41

1  Q.  Given that, do you believe there is any
2  differences between the scope of your boycott and the
3  boycott called for by the BDS movement?
4  A.  Well, again, I think my personal belief on that,
5  that is more limited.
6  Q.  Okay.  And so how --
7  A.  I am responding to the call to boycott, but that
8  is very broad.  And people look at it in different ways,
9  and I look at it in a more limited fashion.
10 Q.  Okay.  So how is your personal boycott more
11 limited?
12 A.  Well, I'm -- I'm -- I'm not sure I believe in the
13 artistic or academic boycott.  I had dinner with a lovely
14 professor from Hebrew Union College, and his wife, and
15 he's an academic in archeology in Jerusalem.  And my son
16 and I were there.  You know, he was saying, you know, "I
17 agree with a lot of the boycott stuff, but the academic
18 one, I'm not so sure that's good because most academics
19 are fairly liberal.  They want equal rights with the
20 Palestinians.  And if we can't go abroad, then you're not
21 going to get that message."
22    So that kind of resonated with me.  I think,
23 well, why are we doing that?  But they need to advocate
24 for their counterparts, Palestinian academics, who are
25 often prohibited from traveling abroad because of the

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

09:58:57-10:00:06                                          Page 42

1  occupation, are not allowed the leave.  They need to
2  advocate for them.
3  Q.  Okay.  In addition to the academic context, are
4  there other ways that your boycott is more limited than a
5  BDS boycott?
6  A.  Well, I'm not so sure about the artistic boycott.
7  And again, I'm just -- I'm focused on the West Bank stuff,
8  so I don't think there's a whole lot of artistic stuff.
9      There are issues around, like, FIFA, the
10  World Cup -- I don't know if you're aware of that or not.
11  But Israeli settlements want to send their teams as a part
12  of Israel, even though they're on occupied territory.  So
13  there's an issue there.  So I would not support them being
14  allowed to do that.  You know, if they want to go as
15  Palestine, that's fine.
16  Q.  In terms of scope of companies being boycotted,
17  is there any difference between the scope of your boycott
18  and the scope of a BDS boycott?
19  A.  I'm just not sure what companies they are focused
20  on that are in addition.  I'm sure -- I think they're
21  probably -- just about any company in Israel they might
22  boycott.  I'm not sure.  There are large pharmaceutical
23  companies.  So I'm not sure.  But I know that they're
24  targeted as well.
25  Q.  Do you understand the BDS boycott to extend to

10:00:26-10:01:23                                          Page 43

1  all companies in Israel?
2  A.  I'm not sure.  I'm not sure about that.  I don't
3  want to speak without knowledge.  But I know that there's
4  an effort to make them be targeted.  You know, instead of
5  just a wide scattershot, let's focus on certain things.
6  Q.  Okay.  In terms of the JVP list of companies they
7  boycott, what do you understand the rationale for
8  inclusion of companies?
9  A.  Well --
10  Q.  For their criteria?
11  A.  My understanding is they were looking at the main
12  companies that are involved in perpetuating the occupation
13  of the West Bank, and that's where I really agree with
14  them.
15  Q.  Okay.
16  A.  And that was Caterpillar, SodaStream, HP, in
17  particular.  So . . .
18  Q.  Okay.  Do you understand their list to include
19  companies that may be based in Israel, but don't have a
20  specific connection to the settlements or occupation?
21  A.  I'm just not sure.
22  Q.  Can you think of any examples where your boycott
23  is more limited than any BDS boycott that you're familiar
24  with?
25  A.  I'm not sure it's more limited than any BDS

10:01:38-10:02:38                                          Page 44

1  boycott.  Number one, I don't know what -- what those --
2  their limitations are.  It's worldwide, so I don't know.
3  Q.  Can you think of a specific example where a
4  company is being boycotted by someone in the BDS movement
5  that you are -- that you would not boycott?
6  A.  I can't think of one.  There's probably some that
7  exist.  I don't know.
8  Q.  Okay.
9  A.  So . . .
10  Q.  Why do you think such a difference might occur?
11  A.  Well, because I think the general BDS movement is
12  to boycott all of Israel as a way of, you know, forcing
13  them to give equal rights to Palestinians or -- and also
14  to end the occupation.
15  Q.  Okay.  And do you view your personal boycott as
16  more limited than boycotting all of Israel?
17  A.  Yes.
18  Q.  Do you have any personal objections to one or
19  more BDS campaigns?
20  A.  Well, like I said, I'm not so sure about the
21  academic and artistic boycott.  I just don't know.  I have
22  some reservations.
23  Q.  Do you believe any BDS campaigns are motivated in
24  part by anti-Semitism?
25  A.  It's certainly possible.  I think the main thrust

10:03:03-10:04:35                                          Page 45

1  of it, it's not.  And anti-Semitism is a very real
2  scourge, and so I think all of us need to be vigilant
3  about it.  But -- but the fear of anti-Semitism does not
4  justify the violation of civil rights or human rights.
5  Q.  Okay.  So what products have you declined to buy
6  as a result of your boycott?
7  A.  Well, I -- my personal -- one, I've refused to
8  buy mislabeled Israeli wines, as I've said.  I have
9  refused to book Airbnb.  I have -- for personal boycott,
10  I've tried to stay away from HP products.  I've recently
11  had to buy one, but that was for my law firm, and I'll
12  explain why.  But . . .
13  Q.  Are there any -- are there other examples of
14  purchasing decisions, aside from HP, Airbnb, and wine,
15  that you can think you specifically made a different
16  purchasing decision as a result of your boycott?
17  A.  Yeah.  I think there was -- I'm remembering when
18  I left Israeli, I declined to buy this product, it was a
19  Dead Sea something.  And I believe that was within the
20  West Bank, and so I didn't buy it.
21  Q.  Okay.  Can you think of any other purchasing
22  decisions that were specifically made as a result of your
23  boycott?
24  A.  I think those would be the main ones.  I mean,
25  it's kind of hard being here in the United States.  There

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  are few opportunities to buy these products or whatever,
2  so -- but those are the ones I recall.
3  Q.  Okay.  So you can't recall any others right now?
4  A.  Not right now.
5  Q.  Okay.  Would your boycott extend to companies
6  owned or operated by Palestinians in what you believe to
7  be Palestinian lands?
8  A.  Well, if -- if -- it depends.  I mean, if they
9  were in conjunction with, you know, products that they
10  produce in the illegal Israeli settlements, yes, I would
11  boycott those.
12  Q.  Okay.
13  A.  And -- and to clarify, I'm not a fan of the
14  Palestinian Authority.  That's the main governmental body.
15  I think it's very corrupt.  I think it's failed its youth.
16  I don't have much of an opportunity to buy their --
17  whatever they produce, so I don't know.
18  Q.  So turning to your PC, what purchasing decisions
19  have you made as a result of your boycott --  Sorry, let
20  me -- scratch that.
21      In terms of your PC, what purchasing
22  decisions have you made that would have come out
23  differently if you had been able to extend your personal
24  boycott to your PC?
25  A.  Right.  Well, one is -- and I brought up this

1  printer.  I've been in desperate need of a mobile printer
2  because I'm going between work sites, one in Cottonwood,
3  one in Clarkdale.  And my wife is back from her four-month
4  sabbatical so I needed to bring that printer back for her
5  to use.  And so I went to my local Staples store in
6  Sedona, and they had one mobile printer there.  And it was
7  a very nice model on sale and it was an HP.  And I asked
8  if they had any others, and they said no, that was all
9  they carried.  I didn't buy it.  I went home, went online
10  to see what I could find, and really it was the best in
11  its class and it was the cheapest that I could find.  And
12  I felt, to comply with the certification, that I was
13  essentially forced to buy that if I wanted to buy
14  anything.
15      So I went ahead and purchased it.  But, you
16  know, I consulted with my attorneys and told them I was
17  going to do this, and -- you know, I don't want to get
18  into communications, but I said that I felt like -- you
19  know, I would jeopardize my contract if I got into that
20  situation and I declined to buy it when I really needed it
21  or I bought some inferior product.
22  Q.  Okay.
23  A.  So I did it.
24      There was another issue of, like, I
25  desperately need a -- I have a Dell computer.  It's -- and

1  I have my own laptop, of course -- but the Dell computer
2  is probably seven, eight years old, and it's giving me
3  problems.  I would like to buy another desktop, but I
4  don't want to be forced into the same situation I was with
5  the printer.  So I'm going to forego that decision until
6  this lawsuit is over with one way or the other.  And so I
7  feel like I cannot go ahead with that purchase.  And I
8  haven't researched between HP and others right now, but I
9  don't want to get into the same situation where the State
10  of Arizona is telling me which -- which computer I have to
11  buy if I want to work.
12  Q.  Okay.
13  A.  There are other issues too, like with Airbnb.  I
14  had to go to Los Angeles last year, part business, part
15  pleasure.  And I do not recall if -- and we rent a place,
16  I believe it was VRBO.  Are you familiar with that site?
17  Q.  Vaguely.
18  A.  Okay.  It's like Airbnb, but it's an alternate.
19  And I do not recall if it was through VRBO or Airbnb.  I
20  think I was becoming aware of the Airbnb issues that I
21  objected to, but I was put into a position there.  If that
22  were to occur now -- and, in fact, it did -- I would have
23  to look at that very carefully.
24      Just this weekend I was supposed to have a
25  meeting Friday at the ACLU.  And we, of course, had this

1  deposition Monday, so I researched where am I going to
2  stay?  And I was thinking of staying those three days
3  because I was thinking why drive down twice.  And so I
4  looked on various websites for -- for, you know, temporary
5  housing, and I did look on Airbnb.  And there was a great
6  place for, like, 61 bucks a night, very close to where I
7  needed to be -- I could have walked to your various
8  offices -- and I just couldn't click the yes button on
9  that one.
10      What I decided to do is just spend one night
11  in Phoenix, so I booked the Clarendon hotel just up the
12  road here.  So -- and I looked at VRBO site,
13  alternatively, and there was nothing quite as good there.
14      So I'm, again, put into a situation of is it
15  State of Arizona telling me that if I book one over the
16  other I'm going to lose my right to work, essentially, on
17  these contracts.
18      So I just aborted that decision and I said,
19  "I'm staying one night, I'm going to stay at a hotel."
20  Kind of similar to the desktop computer thing.  I'm not
21  going to buy one until this is done.  And I don't know, am
22  I boycotting?  I'm not sure in that context.  I just don't
23  know.
24  Q.  Okay.
25  A.  And then even my personal decisions, am I an

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1 affiliate of my corporation where the prohibition on my
2 expression is as an individual?  Does that -- I've taken
3 the position that no, it does not.  The law says any
4 affiliate as well.  What is that?
5     I mean, I am my corporation.  I mean, it's a
6 fiction.  We all know that it's a fiction that the state
7 sets up for good reasons, you know, corporate fiction.
8 But, you know, I'm unclear about that.  I honestly don't
9 know.  I'm maintaining the position that it doesn't apply
10 to me as a human being, as an individual.  But I can't
11 guarantee that every judge is going to look at it that
12 way, or that we might, you know, any of us.  So I don't
13 know.
14 Q.  And so I think we're going to turn to the
15 affiliate issue later.
16 A.  Okay.
17 Q.  But returning to the purchasing decisions, can
18 you think of any other purchasing decisions that your PC
19 would like to make or has made that would come out
20 differently if you could extend your -- your personal
21 boycott to your PC?
22 A.  Right.  Well, I talked about the two Airbnb
23 things.  I talked about the two HP things.  I think those
24 are the only direct things that -- from the past till
25 now -- that I could think of.

1 Q.  Okay.  Can you think of any others on the
2 horizon?
3 A.  Well, again, if I need a tractor, I might have to
4 revisit that.
5 Q.  Aside from that, can you think of any others?
6 A.  Well, SodaStream, the wines that I mentioned.
7 Q.  And is that it?
8 A.  That's all I can think of now, but I don't have
9 some complete generic list of -- I know you're asking
10 about that, but I just don't know.
11     I know that the Lutherans are in the process
12 of looking at that, they're gathering a list.  I know
13 that -- I think the UN is, but their list is not out.  And
14 I'm not responding to, you know, governmental bodies for
15 that, but I want to verify on my own.
16 Q.  Okay.  In terms of that computer purchasing
17 decision, assume for a second that you did some research
18 and concluded that the best computer for your PC was
19 actually a Dell or Lenovo.  In that case, do you think
20 your -- what would you do in that circumstance?
21     MS. BRODY: I'm going to object to form.
22 Foundation.
23     THE WITNESS: Where do we go from here?
24     MR. ENSIGN: I'll restate the question.
25     THE WITNESS: Okay.

1     BY MR. ENSIGN:
2 Q.  So assume for purposes of this question that you
3 research what computer to buy and you conclude that the
4 best computer for your PC is a Dell.  What would you do in
5 that circumstance?
6 A.  Well, I imagine I'd probably buy it.
7 Q.  Okay.  And do you believe that your boycott would
8 influence that decision in that scenario?
9 A.  I think that I would probably go online and I
10 would hope that the HP would not be the best option.
11 Q.  Okay.
12 A.  If I'm being honest to myself.
13 Q.  Okay.  And if it wasn't the best option, you
14 would just --
15 A.  Well, that's what I'm doing right now with my
16 desktop.  I'm just pushing that decision off.
17 Q.  Okay.  Are there any companies where you're
18 boycotting less than all of their products and services or
19 is it all or nothing for each company?
20 A.  Well, of the companies I mentioned, it's all or
21 nothing.
22 Q.  Okay.  And can you think of any instances where
23 it's more limited?
24 A.  I mean, I can't think of any that I'm aware of.
25 No, I can't think of any.

1 Q.  Okay.  Are there any services or resources that
2 you provide in your personal capacity to others boycotting
3 Israel?
4 A.  I have made offers for pro bono legal assistance
5 on issues.  And I don't think -- as a lawyer, you know, we
6 separate ourselves from, you know, the person or the
7 thing, of course, that we're representing, and I don't
8 think that would be a violation of that -- the
9 certification procedures.  But . . .
10 Q.  Sorry.  Just to clarify, if you were to do so in
11 your personal capacity, do you believe that would violate
12 the certification requirement?
13 A.  If I were to do what now?
14 Q.  Let's take it one by one.  If you were to donate
15 to an organization engaged in the boycott of Israel and
16 that donation was in your personal capacity -- first of
17 all, are you -- have you made any such donations?
18 A.  Well, you're saying "boycott of Israel."  Again,
19 my boycott would be against the companies that perpetuate
20 the occupation.  That's where I've taken the position
21 that, on a personal level, I could engage in that, but I'm
22 not sure.  I might be an affiliate, so I may have some
23 risk there.
24 Q.  Okay.  If you weren't an affiliate, do you
25 believe you could make a contribution in your personal

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1 capacity?
2 A. Pursuant to the statute here?
3 Q. Yeah.
4 A. Without running -- I think so.
5 Q. Do you have any reason to believe as long as --
6 as long as you're not an affiliate that you could not do
7 so?
8     MS. BRODY: Object to form.
9     MR. ENSIGN: You can answer.
10     THE WITNESS: I'm sorry, can you ask the
11 question again?
12     BY MR. ENSIGN:
13 Q. Sure. Are you aware of any restrictions on your
14 ability to donate to organizations engaged in
15 Israel-related boycotts, assuming that you, in your
16 personal capacity, are not an affiliate of your PC?
17 A. I'm not aware of restrictions under that law for
18 that -- if I'm not an affiliate, that I, as a human being,
19 can engage in that.
20 Q. Do you believe you could provide pro bono
21 services in your personal capacity?
22 A. I don't think I could because I'm -- you know, of
23 malpractice issues. My corporation is covered and that's
24 what covers me.
25 Q. Okay.

1 A. I don't think I could do that.
2 Q. Could you -- do you believe you could set up a
3 separate PC?
4 A. For what? Well, of course I can set up a
5 separate PC. For what though? I'm not sure what you're
6 getting at.
7 Q. I guess we'll start with could you set up a
8 separate PC to perform legal services?
9 A. I assume so.
10 Q. Okay. We'll return to that later actually.
11     MS. BRODY: Is now a good time for a health
12 break?
13     (A recess ensued.)
14     BY MR. ENSIGN:
15 Q. So just kind of recapping, is it fair to say that
16 your boycott is not a perfect match for any other
17 organization's boycott?
18 A. Well, again, I think it -- I'm responding to the
19 call of boycott from not only JVP, but also BDS; the
20 Lutheran church has issued restrictions too. My personal
21 focus is more limited.
22 Q. Okay. So --
23 A. I'm not sure if I could characterize it as a
24 perfect fit or not. It's like my focus is on a subset of
25 that.

1 Q. Can you think of any organization's boycott whose
2 scope matches the scope of your boycott?
3 A. Yeah. Some of the Protestant denominations. And
4 I forget who they are exactly, but I know that they are
5 not boycotting Israel per se, but, you know, companies
6 that perpetuate the occupation.
7 Q. Okay.
8 A. And I'm responding to that call too.
9 Q. Sure. So what do you understand the scope of
10 JVP's boycott to be?
11 A. Well, my understanding is that -- I think there
12 are members that are all over the place there, but the
13 general common theme is they certainly all want to boycott
14 the businesses that are helping perpetuate the occupation.
15 Some of that goes beyond that, too, to the regular BDS
16 boycott of all of Israel and certain targeted companies.
17 Q. And your own personal boycott differs in scope
18 from that?
19 A. No. I think, as I've said, some of the JVP
20 people are really focused on the West Bank, and I am too.
21 But I'm not sure I can pigeonhole it down to it's all one
22 or all the other.
23 Q. Okay.
24 A. But I think it's a broad spectrum.
25 Q. To the extent that JVP is engaged in a boycott of

1 companies not because they are involved in the occupation
2 but solely because they're located in Israel, does your
3 own boycott differ from such a boycott?
4     MS. BRODY: Object to form.
5     THE WITNESS: I can answer, right?
6     MR. ENSIGN: Yeah.
7     THE WITNESS: To that extent, my -- again,
8 my focus is not that of those Israeli companies. It's on
9 the West Bank.
10     BY MR. ENSIGN:
11 Q. Are there any Israeli companies other than
12 SodaStream that you're boycotting?
13 A. Israeli companies?
14 Q. Yeah.
15 A. Well, if given the opportunity, yes. You know,
16 I'd probably boycott the Israeli bus line. It's called
17 Egged. Because they provide all the transportation to all
18 these colonies on the West Bank. I don't know, whatever
19 other -- I don't get a chance to use those busses here in
20 Arizona, but -- so that's one I think of.
21 Q. Okay. And can you think of any others?
22 A. Certainly any of the providers of agricultural
23 products that are grown and sold from the Israeli colonies
24 on the West Bank.
25 Q. Okay.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  A. I don't know the names of the companies.
2  Q. Okay. Any others?
3  A. Well, if -- I would need a complete list of what
4  the economic output is from those colonial settlements.
5  And I could tell you, I would boycott every one of them.
6  I don't know what they are though.
7  Q. Okay. And any others that you can think of right
8  now?
9  A. I think that includes the entire economic output
10  of those colonies. That's everything. So of that -- of
11  course it would be any business also that might be
12  American businesses there that are profiting from the
13  occupation.
14  Q. Okay. Are you boycotting any companies that are
15  located in Israel in its pre-1967 borders on that basis
16  alone?
17  A. On what basis alone?
18  Q. That they are located in Israel in its pre-1967
19  borders.
20  A. Well, sure, if they're providing -- they're
21  profiting from the occupation, yes.
22  Q. Okay.
23  A. And by -- and I mentioned the bus company. That
24  would be true of HP as well. I'm sure they provide
25  services within Israel itself. But I'm going to boycott

1  the whole company becuase of the -- they're profiting from
2  their activities in the settlements. Airbnb, I'm going to
3  boycott the whole -- them nation- -- worldwide. I'm not
4  going to voluntarily use their services because of their
5  profiting there.
6  Q. Okay. Would you boycott any companies based in
7  Israel that don't have a connection to the settlements?
8  A. I have not, and that's not my focus. And so I
9  would need to research that carefully.
10  (Mr. Brunn Roysden is now present.)
11  BY MR. ENSIGN:
12  Q. Okay. So you're --
13  A. But I would like -- say if they're supporting the
14  Israel military, something, or have contracts with the
15  military, and I knew that and I had an opportunity to
16  either buy or not buy those products, I would not buy them
17  because that military is enforcing the occupation and the
18  loss of rights of the indigenous people there. So . . .
19  Q. Okay. Is it fair to say, in terms of selecting
20  what companies you boycott, they have to have some sort of
21  nexus to the occupation?
22  A. That's my focus, yes.
23  Q. Is it fair to say that some BDS boycotts do not
24  require such a nexus?
25  A. I think that's -- that's probably fair. I mean,

1  there's a wide range, you know, it's all around the
2  planet, that movement, and some -- some focus on one
3  thing, some on another. So . . .
4  Q. So you understand some of them -- some of the BDS
5  boycotts would boycott a company solely because it's based
6  in Israel?
7  A. I believe so.
8  Q. Okay. Shifting gears for a second.
9  Do you own any stocks in your personal
10  capacity?
11  A. Yes.
12  Q. Okay. Have you made any decisions about what
13  stocks to buy or sell based on your boycott?
14  A. You know, I haven't -- I haven't researched that,
15  but I've not knowingly -- I'm not aware of any investments
16  in, say, Hewlett-Packard and those things. I haven't
17  reviewed that --
18  Q. Okay.
19  A. -- to be frank. I should. That's a good
20  reminder.
21  Q. Okay. But you haven't made any decisions that
22  have been influenced by your boycott as to what stocks to
23  buy or sell?
24  A. No.
25  Q. Similarly, do you own any mutual funds or

1  exchange-traded funds?
2  A. Well, I should clarify my last answer. I own
3  some, you know, retirement mutual funds. I don't own -- I
4  don't directly own stocks that are not part of mutual
5  funds.
6  Q. Okay.
7  A. Same answer.
8  (Deposition Exhibit 2 was marked for
9  identification.)
10  BY MR. ENSIGN:
11  Q. So we're showing you what has been marked as
12  Exhibit 2. Do you recognize the document?
13  A. Yes, it's my Declaration of Mikkel Jordahl.
14  Q. And have you read it?
15  A. Yes.
16  Q. Is there anything in the declaration that is no
17  longer true?
18  A. No. As far as I know.
19  There's one clarification I had when I
20  reread it. I'll find it here. I think there was a
21  reference to my -- after my son's bar mitzvah, promising
22  him this trip immediately. It sounded like it was right
23  after it, but it was years. For years I promised him
24  that, so it was a long period of time. He was bar
25  mitzvahed when he was about, I don't know -- he was a

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

10:48:03-10:49:04     Page 62

1 little later, like 14 or something like that. Now he's --
2 he was 25 when I took him over.
3 Q. Can you think of anything else that's not --
4 A. I think everything else is accurate.
5 Q. Take your time.
6 A. It's okay, yeah.
7 Q. So I'd like to direct you to paragraph 3.
8 A. Okay.
9 Q. And in it you state that you "participate in a
10 political boycott of consumer goods and services offered
11 by businesses supporting Israel's occupation of the
12 Palestinian territories." Is that correct?
13 A. Yes.
14 Q. What areas do you define the Palestinian
15 territories to be?
16 A. Well, the internationally recognized boundaries
17 from -- well, in 1967, at the end of -- before the
18 hostilities started, that was what I would define as
19 anything beyond that boundary -- they call it the Green
20 Line. I would call that occupied Palestinian territories.
21 There's some dispute now as to whether Gaza
22 is actually occupied or not. There are no Israeli
23 soldiers present, but a lot of people feel like it's an
24 open-air prison.
25 Q. Okay. So you would consider Gaza to be part of

10:49:18-10:50:01     Page 63

1 the Palestinian territories?
2 A. Yes. And also I think -- you know,
3 internationally, the Golan Heights is not recognized as
4 part of Israel even though they've annexed it. And as
5 well as East Jerusalem --
6 Q. Okay.
7 A. -- would be part of that Palestinian territory.
8 Q. And how about the West Bank?
9 A. Well, all of the West Bank beyond the Green Line
10 I would consider Palestinian territories.
11 Q. Okay. Any other areas?
12 A. I don't think so. Golan, beyond the Green Line,
13 Gaza, yeah.
14 Q. So I would like to direct to you paragraph 9.
15 A. Okay.
16 Q. There you state that you have been moved by the
17 Peace Not Walls campaign?
18 A. Uh-huh.
19 Q. And that it "calls on individuals to 'invest in
20 Palestinian products to build their economy and to utilize
21 selective purchasing to avoid buying products made in
22 Israeli settlements' in the occupied Palestinian
23 territories."
24 A. That's right.
25 Q. Is that correct?

10:50:23-10:51:52     Page 64

1 Would your boycott extend to companies owned
2 or operated by Palestinians operated in Palestinian
3 territories?
4 A. I think I answered that. I mean, if they were
5 cooperating with Israeli colonial settlements on the West
6 Bank, I wouldn't want to buy those products even if they
7 were, you know, collaboratively produced by Palestinians.
8 Q. Okay.
9 A. And also anything if it's produced by the
10 Palestinian Authority, which I view as corrupt. So . . .
11 Q. Okay. So would your boycott extend to all
12 Israeli companies in the settlements?
13 A. They would likely be perpetuating the occupation,
14 so yes, I would.
15 Q. In your view, is being located in the settlements
16 sufficient to perpetuate the settlements?
17 A. Basically, yes. Well, they would be in violation
18 of international law by setting up residences.
19 International law has said, you know, the
20 law of conquest is no longer applicable in this day and
21 age and that you can't transfer parts of your population
22 to conquered territories.
23 Q. Okay. If you could take a look at paragraph 11.
24 A. Uh-huh.
25 Q. You state that you "personally boycott consumer

10:52:02-10:53:10     Page 65

1 goods and services offered by businesses supporting
2 Israel's occupation of the Palestinian territories." Is
3 that correct?
4 A. Yes.
5 Q. Would you be boycotting anyone beyond the scope
6 of that?
7 A. Well, it depends. If there are, say, speakers
8 that are advocating the forced transfer of Palestinians
9 outside of Israel or whatever, I would want to boycott --
10 I'd be out with my protest sign, I would boycott their
11 books -- you know, I don't want to participate in that
12 form of racism. So . . .
13 Q. Okay. Can you think of any other elements
14 that -- or any other aspects where your boycott might be
15 broader?
16 A. Well, I think it would be for advocates of things
17 that I view as apartheid-related or racist, and that would
18 be people or organizations that promote that. I would be
19 very against that. I would not be involved in supporting
20 that, whether financially -- I'd probably protest it --
21 Q. Okay.
22 A. -- in some form or another.
23 Those would be the main things that I can
24 think of right now.
25 Q. Okay. So if there was -- if there were a company

1 that had a policy of supporting Israel's -- Scratch that.
2  If there were a company that advocated for
3 Israel's policies in settlements, would you boycott them
4 based on that advocacy?
5 A. If I were aware of that, yes, I would.
6 Q. Okay. So I'd like to shift gears a little bit to
7 your professional background and your public company.
8 A. Okay.
9 Q. How long have you been a licensed attorney in
10 Arizona?
11 A. Let's see, I think 1988 I was sworn into the bar.
12 Q. Okay.
13 A. Older than you guys.
14 Q. And what kind of law do you practice?
15 A. Well, right now I've limited to only governmental
16 contracts. So I am the town prosecutor for misdemeanors
17 in both Cottonwood and Clarkdale, and I provide public
18 defender services in Sedona. I wear different hats. I'm
19 also a Criminal Justice Act attorney -- and I'm not sure
20 if you're aware of that, what that is. We call it CJA,
21 appointments in federal court, so I defend -- I receive
22 appointments -- public defender in federal court in
23 Flagstaff.
24 Q. Okay.
25 A. And of course the jail contract too. So that's

1 basically it.
2 Q. When was your PC formed?
3 A. I believe it was 2003.
4 Q. And what -- and what did -- what law did you
5 practice before then?
6 A. Before then -- I mean, I was -- I was not
7 incorporated, but I was active for about a year, something
8 like that, before that as a Schedule C -- I don't know
9 what you call it -- independent contractor or whatever. I
10 had -- did my own cases without a corporate umbrella.
11  Before that, I was the director of Coconino
12 Legal Services, which was merged with DNA-People's Legal
13 Services, which provided free legal services to indigent
14 people in the areas of civil law. Practiced a lot in the
15 Native American courts, but also Flagstaff and other
16 courts in the area. Did an awful lot in the area of
17 domestic violence in terms of representing domestic
18 violence victims; part of that involves even lobbying the
19 legislature to change laws. Did housing, all kinds of
20 things. And that was my basic thing.
21  Before that, I did criminal law. I worked
22 with a Tucson attorney, Robert Hirsh, at that time, in
23 Tucson, and couple of other fellows, and that was right
24 out of law school. So that's -- that's about it.
25 Q. Okay. In terms of --

1 A. In reverse.
2 Q. Okay. In terms of your current practice, aside
3 from your contract with the Coconino Jail District, is it
4 fair to say that all the rest of your practice is criminal
5 law?
6 A. Well, both prosecuting and defending, yes.
7 Q. Okay.
8 A. I would say so, yeah, right now.
9 Q. And your criminal law practice consists of being
10 a prosecutor, being a public defender, and accepting CJA
11 appointments?
12 A. That's right, yeah.
13 Q. Does it involve anything else?
14 A. Right now -- occasionally, I'll take on a civil
15 rights case. I've done -- was involved in striking out
16 three state statutes recently in the last -- I think
17 three -- three years or so. Maybe you were on the
18 opposite end of some of these, I don't know. But I'll get
19 involved in that type of thing. And I kind of consider
20 that an extension -- this case is an extension of that,
21 but in a very unique situation of being a plaintiff for
22 me.
23 Q. So what are the public entities that you have
24 contracts with, then?
25 A. Well, I have a contract with the City of Sedona

1 and also with Clarkdale and Cottonwood.
2 Q. Can you think of any other contracts?
3 A. I had a contract with the Town of Jerome, but I
4 resigned from that.
5 Q. Okay. And why did you resign from that?
6 A. Well, because Jerome was a little too close to
7 Clarkdale, and I was getting the same cops involved in
8 different cases.
9 Q. Okay.
10 A. And so that created a very -- I realized I
11 couldn't do that.
12 Q. Okay.
13 A. It didn't pass my gut test in terms of conflict
14 of interest. So . . .
15 Q. That makes sense.
16 A. Yeah.
17 Q. So in terms of Sedona, Clarkdale, and Cottonwood,
18 have you been requested to sign a certification pursuant
19 to the Act at issue here?
20 A. My Cottonwood contract predated the 2016 law, so
21 no was the answer to that one. And that's probably, I'd
22 say, like 60 percent of my income.
23 Q. Okay.
24 A. Clarkdale, yes, it had that certification.
25  Sedona, I do not recall if it had it or not.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1    I think it did.
2  Q.   So did you sign a certification for Clarkdale?
3  A.   For Clarkdale, what I did is I called the city
4    manager and I said I thought that this is
5    unconstitutional.  I don't like signing this.  I went
6    ahead and signed it basically under protest.
7  Q.   Okay.
8  A.   I didn't document that in writing, but -- the
9    city manager is Gayle Mabery.
10  Q.   And do you remember when that was?
11  A.   That would have been probably a year and a half
12    ago or so.
13  Q.   Okay.  Do you remember if that was before or
14    after the Coconino Jail District certification?
15  A.   The first time?  Well, when I objected, you mean?
16  Q.   Yes.
17  A.   I think -- when was that, 2016?  Yeah.
18    I'm not sure.  I think it was around the
19    same time, maybe a little after.  I think I just got tired
20    of having to pay attention to this and -- you know, so I
21    just did it -- went ahead and did it orally.  So . . .
22  Q.   Okay.  And did they accept your certification in
23    Clarkdale?
24  A.   Yeah.  Yeah.
25  Q.   Have you had any further correspondence with them

1    about it?
2  A.   No.
3  Q.   Did you communicate your same understanding of
4    what "affiliate" means to Clarkdale?
5  A.   I don't think so.
6  Q.   And you don't recall if Sedona has asked you for
7    a certification like this?
8  A.   I don't recall.  I thought it was in there, but I
9    would have to review that.
10  Q.   Okay.  Has anyone else ever held an ownership
11    interest in your PC?
12  A.   Well, I mean, I'm married.  And to the extent my
13    wife has some interest, that would be the only person.
14  Q.   Okay.  Has your PC ever employed anyone else?
15  A.   It's -- well, I -- I don't have an employee, but
16    I have an independent contractor that I hire for services.
17    She lives in San Antonio.  We communicate.  She does work
18    for me.  So . . .
19  Q.   Okay.  And what's -- what is her name?
20  A.   Her name is Hannah, H-a-n-n-a-h, last name
21    Sturgis, S-t-r-u-i-g [sic].
22  Q.   And so in your role as a prosecutor, are you
23    employed by the cities or by counties?
24  A.   Well, I'm not an employee, but it's a contractor
25    position, and it's by those municipalities:  Clarkdale,

1    Cottonwood, Sedona.
2  Q.   Okay.  I'm sorry, just backing up.
3    For Cottonwood, did they request that you
4    certify?
5  A.   I don't believe so.  I think it's probably in
6    their new contracts, but this is a contract that goes on
7    until one of us gives notice that we want to discontinue
8    it, so 30 days' notice.
9  Q.   Okay.
10  A.   Yeah.
11  Q.   So there's not a specific renewal period?
12  A.   There's not a renewal period that I'm aware of.
13  Q.   Okay.
14  A.   I mean, I'd have to review it, but I don't think
15    so.
16  Q.   And have you discussed the certification
17    requirement with anyone in Cottonwood?
18  A.   No.
19  Q.   Have you discussed the certification requirement
20    with anyone in the government of Sedona?
21  A.   I believe I brought it up with someone there.  It
22    might have been their prosecutor or something.
23    And then I need to backtrack.  In
24    Cottonwood, you asked if I had talked about the
25    certification requirement to anyone in Cottonwood, and as

1    I mentioned previously, the public defender, Mike Shaw.
2  Q.   Okay.  So you mentioned that you talked to
3    someone in the government in Sedona about the
4    certification requirement?
5  A.   I believe so.  And I can't remember -- I mean, I
6    really -- I don't say because I don't want to speculate.
7    And I'm pretty sure it's in the contract.  I thought that
8    I brought that up with their prosecutors.
9  Q.   Okay.  But you don't recall if you'd signed a
10    certification for them?
11  A.   I just don't recall.  I may have --
12  Q.   Okay.
13  A.   -- because I know it's required.  And I know they
14    kept on -- they've told me for the last year, "Oh, we need
15    to reissue on an annual basis," but I haven't received it.
16    I've been waiting forever, you know.  And in some ways I'm
17    glad because otherwise I'd have to join them in this
18    lawsuit, assuming my attorneys were okay with that.
19  Q.   So if you don't mind, how long have you been
20    employed with each of these cities?  And we can just go
21    through one by one.  So for Sedona?
22  A.   Sedona, it's just a guess, but I've probably done
23    this for, I don't know, two and a half, three years or so.
24  Q.   Okay.  And Clarkdale?
25  A.   Clarkdale, I believe it's been about a year and a

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1    half.
2    Q.   Okay.  And Cottonwood?
3    A.   Cottonwood, it's probably coming on -- because I
4     subbed for the previous contract holder -- probably three
5     and a half years or so.
6    Q.   Okay.  And what --
7    A.   Four years.
8    Q.   And what were the dates that you worked for
9     Jerome?
10   A.   That was just very limited.  It was -- you know,
11    periodically I would get a court appointment on, say, a
12    DUI or something.  So that probably was a year and a half,
13    two years ago, something like that.  And I've probably
14    done maybe five cases there all told.  They get over in
15    essentially one day, you know.  I rarely go back twice.
16   Q.   Okay.  And when do you think your first case with
17    them would have been?
18   A.   Couple of years ago probably.
19   Q.   Okay.  Does your employment with any of these
20    cities limit what other business you can do?
21   A.   Well, again, it's not employment, but a contract.
22   Q.   Right.
23   A.   That I'm aware of now, I don't think it limits
24    what I do.
25        However, I do feel that if I were to, in

1    those communities, speak about my concerns about this
2     issue, that that would draw attention to the contracts and
3     might -- may result in the various city managers or
4     whatever looking at them, "Hey, is Mik in violation of
5     this or not," drawing suspicion to me.  So I feel like I
6     can't really -- or I don't want to speak there because
7     of -- for fear of potentially having those contracts
8     examined -- reexamined and questions raised.
9    Q.   Okay.  In terms of your contracts with the cities
10    we've discussed, is that contractual relationship with
11    your PC in all of those cases?
12   A.   Yes.
13   Q.   Are you employed or have a contract with anyone
14    in your personal capacity?
15   A.   I'm not sure.  I would have to look at each of
16    the contracts and make sure it just didn't say Mik
17    Jordahl, period, and then contracting, or not.  But my
18    understanding is it's with the PCs.  I think sometimes in
19    drafting these things get confused, you know, is it with
20    Mik or is it with the corporation, all that stuff.
21   Q.   Okay.  But your intent would be for the PC to be
22    the contracting party for these relationships, right?
23   A.   Well, I mean, it doesn't matter to me as long as
24    I get paid and we have a contract that's enforceable.  But
25    I think that's the intent, is for it to go through the PC.

1    I'm not sure, on my appointments out of
2     federal court, whether they -- I think they have listed me
3     in my individual capacity --
4    Q.   Okay.
5    A.   -- as an attorney.
6    Q.   So those representations would not be through
7     your PC, but rather --
8    A.   I believe so.  I would have to double-check
9     though.
10   Q.   Okay.
11   A.   Because, I mean, the paychecks I get, you know,
12    just say "Mik Jordahl" on them.  So they don't say "PC."
13    And some of the other ones, I think, say that as well.  So
14    there's a mixing of those identities.  So . . .
15   Q.   Aside from your contractual relationships with
16    these cities and your CJA appointments, do you have any
17    other clients?
18   A.   Right now, I don't.  It's a blessing.  You know,
19    I don't have to deal with a trust account.  I -- I'm --
20    I've very intentionally tried to limit it to governmental
21    contracts and then certain civil rights issues potentially
22    that arise.
23   Q.   Aside from your legal practices, do you have any
24    other significant sources of income?
25   A.   Well, my wife earns a pretty good salary as a

1    professor.
2    Q.   Okay.  Any others?
3    A.   Nope.
4    Q.   Have you performed any pro bono work in the last
5     three years?
6    A.   I've done a fair amount of pro bono in, you know,
7     advising people and whatnot.  I always do some pro bono,
8     yes.
9    Q.   Okay.  Who have your pro bono clients been?
10   A.   Well, there's a -- a lady on the reservation that
11    I've given services to, either reduced fee or -- she was a
12    domestic violence victim that I represented for years and
13    that really suffered a lot.
14   Q.   Okay.
15   A.   And so I was compelled -- I felt compelled to do
16    that.  That would probably be the major one that I can
17    think of right now.  But I've been awarded, you know, top
18    50 pro bono attorney in the state at least a couple of
19    times --
20   Q.   Okay.
21   A.   -- in last, I don't know, 10, 15 years.  So . . .
22   Q.   And so can you think of any other major pro bono
23    clients that you've had?
24   A.   Not major ones recently that would . . .
25   Q.   Okay.  And when you perform pro bono work, do you

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

11:09:43-11:10:55                                          Page 78

1   do that in your individual capacity or through your PC?
2   A.   Well, it's always -- in the pleadings it will say
3   "Mik -- Mikkel Jordahl, PC" on it.  So it's through --
4   any -- any representation that I do is through my
5   corporation, and that's so that malpractice will apply and
6   it's clear what it is.
7   Q.   What's your approximate net income for the last
8   three years?
9   A.   You're talking about net?  Gee, I'm going to have
10  to guess here.
11  Q.   Okay.
12  A.   I think this year it will probably gross -- well,
13  gross is around 170,000.  When I take out voluntary
14  contributions for retirement, which are taken out of, you
15  know, the total thing -- it ends up about some $54,000,
16  business expenses, et cetera -- it whittles it down to
17  about 100,000 or so.  And in two previous years, probably
18  a bit less, because the Clarkdale contract, it boosted my
19  income.  So . . .
20  Q.   Okay.  How much of your net income is derived
21  from your PC?
22  A.   I'd say a hundred percent.
23  Q.   Are there any limitations on your ability
24  to transfer funds belonging to your PC to your personal
25  accounts?

11:11:07-11:11:54                                          Page 79

1   A.   Well, just what the IRS would impose, you know,
2   reporting requirements and things.
3   Q.   Any other restrictions?
4   A.   Well, I mean, I can't go over what the bank
5   limits are, what they have.  But no, nothing specifically
6   that is out of the ordinary, if that's what you're saying.
7   Q.   Okay.
8   A.   I have to comply with, you know, bank laws, IRS,
9   et cetera, but I -- I am my corporation.  So . . .
10  Q.   All right.  Does your PC pay taxes itself or is
11  it a flow-through company?
12  A.   It's -- it's one of those -- we're hearing a lot
13  about pass-throughs, that's what it is.
14  Q.   Okay.
15  A.   So I'm hoping I'll get a tax break, but I'm not
16  sure.
17  Q.   Okay.  So do you pay taxes in Arizona?
18  A.   Yes.
19  Q.   Do you pay taxes in any other state?
20  A.   No.
21  Q.   Does your PC have an office?
22  A.   Actually, I have a home office.
23  Q.   Okay.
24  A.   And that was one of the benefits of having these
25  government contracts is I was able to close my office in

11:12:10-11:13:09                                          Page 80

1   Flagstaff.
2   Q.   Okay.  When did you have an office in Flagstaff?
3   A.   Most of my professional life.  I mean, when I
4   worked with DNA-People's Legal Services, Coconino Legal
5   Aid, I had an office there.  I had my own private practice
6   office since 2003.  It was in a couple of different
7   locations in Flagstaff.
8   Q.   Okay.
9   A.   I would say about two and a half, three years
10  ago, I -- my wife and I moved to Sedona, and from then on
11  I've had a home office.
12  Q.   Okay.  Do clients ever come to your home office?
13  A.   No.
14  Q.   Okay.
15  A.   Not a single one has.
16  Q.   Okay.
17  A.   And hopefully they won't.  Especially in criminal
18  law.
19  Q.   That makes sense.
20       Does your PC have any debt?
21  A.   No.
22  Q.   What are the major assets of your PC?
23  A.   Well, I'd like to think me.  But other than that,
24  I guess it would just be equipment.  I suppose there's a
25  certain amount of goodwill.  I'm not sure how these things

11:13:23-11:14:38                                          Page 81

1   are valid in terms of, you know, business valuation.  I
2   think that's about it, yeah.
3   Q.   Okay.  What kind of equipment?
4   A.   Well, you know, as we talked about before,
5   computers, scanners, technology, things like that,
6   printers.  And then, of course, furniture, all kinds of
7   things, files.  You know, I have all my files from years,
8   and all that.  It has no inherent value whatsoever, I'm
9   sure, but it's there.
10  Q.   Could you ballpark the value of the tangible
11  assets owned by your PC?
12  A.   I don't think it's worth that much.  We have -- I
13  mean, what's a seven-year-old Dell worth?  Probably almost
14  nothing.  My laptop, my printers, all that.  I mean, the
15  technology, I don't know, 6-, $7,000 total.
16  Q.   Okay.
17  A.   Something like that.  Furniture may be a similar
18  amount.  I mean, we're not dentists, so it's a lot
19  easier --
20  Q.   Sure.
21  A.   -- to set up.  So you can quote me on that.
22  Q.   So your PC has a contract with the Coconino Jail
23  District --
24  A.   Yes.
25  Q.   -- correct?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1      Is a copy of that contract attached as
2  Exhibit 3 to your declaration?
3  A.   It looks like it, yes.
4  Q.   What kind of services do you perform for the jail
5  district?
6  A.   It's an interesting and fairly unique contract.
7  Basically, instead of the county jail being on the hook
8  for a law library, case law -- it comes out of Arizona, in
9  fact -- allows services to be contracted for in lieu of
10  the law library.  So I provide services -- when an inmate
11  requests my services, they have to check a form on which
12  three basic areas it is, whether it's -- extradition is
13  one area --
14  Q.   Okay.
15  A.   -- habeas corpus is another, and conditions of
16  confinement is the third.
17      And then if someone is unrepresented, I also
18  provide services of helping research and draft documents
19  for them since they don't have access to a law library
20  without representation.
21      So basically the scope is I get that
22  request; I will go, then, visit the inmate.  I usually
23  lump together two or three of them, inmates, and then I
24  will address their issues.  A lot of it deals with
25  advising inmates pursuant to the -- what is it?  Prison

1  Reform Litigation Act.  They have to exhaust their
2  internal remedies, and tell them they need to do that.
3  They need to file grievances.  And then a lot of it is --
4  frankly, is running interference with the jail and
5  resolving problems.  So that's what it is.
6  Q.   When did you first bid on the contract with the
7  jail district?
8  A.   You know, I don't recall the exact year, but I
9  think it's been -- I know I've been through at least three
10  contract renewals, maybe four.  And they're either three-
11  or four-year terms.  So my best guess is about 12 years.
12  So -- and before that, I actually represented the inmates
13  in a class action lawsuit that was down here, and that's
14  how this kind of came about, through that, the idea of
15  this contract.  And so . . .
16  Q.   Okay.  Can you describe the bidding process for
17  those contracts?
18  A.   Yeah.  Every -- it's every four years.  They put
19  out a bid, and it's a call to attorneys in the
20  communities -- I think it goes to the bar -- Coconino Bar
21  Association, and each time I've been the guy.  So --
22  Q.   Okay.
23  A.   That's been chosen.  It's a competitive
24  situation.  Every four years the annual addendum is --
25  that's not a bid situation, it's just a certification, I

1  guess.  So it's not thrown out to annual bids.
2  Q.   Okay.  When you submit a bid every four years
3  then, what's involved with your submissions to the jail
4  district?
5  A.   Well, it's a very exhaustive and -- and thank God
6  I've got it on my computer.  I can just update it.  But it
7  talks about my philosophy and how I would approach the
8  contract.  I think what the jail folks like is that my
9  focus is on solving problems, and I view myself as sort of
10  an ombudsperson for the inmates and dealing with their
11  issues.  And if I feel like there's something to it -- an
12  awful lot of the requests are somewhat -- I mean, in my
13  opinion -- somewhat frivolous, you know, it's a lack of
14  understanding of what civil rights an inmate may or may
15  not have.  I mean, it's as you can imagine.  You know,
16  people complaining about no chunky peanuts in the peanut
17  butter.  So, you know, things -- it could be that bad.
18      But then it could be also things like the
19  right to religious worship, things that are legitimate
20  issues.
21      I know there's one fellow -- we're talking
22  about religion a bit here.  There's a Muslim inmate that
23  just wanted to know what direction Mecca was and what time
24  of day to pray, and we were able to work that out.  You
25  know, online I was able to find, for Flagstaff, what times

1  of day, five times a day, it would be.  The jail was able
2  to put a clock where he could see it outside of his -- and
3  then give him the direction for Mecca.  And, you know,
4  that was one thing.
5      There have also been Jewish inmates about
6  food, you know, kosher diets, things like that, where we
7  go into it.  And these are all -- I'm sure you're aware of
8  constitutional rights that even inmates retain.  So those
9  are just a couple of issues.  There are all kinds of
10  issues.
11  Q.   So like RLUIPA?
12  A.   What's that?
13  Q.   So like RLUIPA?
14  A.   What's RLUIPA?
15  Q.   Religious liberties --
16  A.   For incarcerated people?
17  Q.   Yeah.
18  A.   Yeah, I haven't heard it termed that way.
19  Q.   Are there interviews as part of the bidding
20  process?
21  A.   No.  It has always been just written submissions.
22  Q.   Okay.
23  A.   As far as I know, yeah.
24  Q.   When do you typically get paid for the services
25  you provide?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1 A. I get paid on a monthly basis. I submit an
2 invoice at the beginning of the month, and they pay me for
3 that entire month.
4 Q. Has your PC been involved in providing services
5 to the jail district continuously since your first
6 contract?
7 A. Yes.
8 Q. Okay. So it's never lapsed?
9 A. Right.
10 Q. When was the last time the contract was bid out?
11 A. Well, it would have been this -- 2016, whenever
12 that -- okay, I signed -- let's see here.
13 This one says January of 2017. I probably
14 was notified of my acceptance maybe a month or so before
15 that.
16 Q. Okay. Do you know if there were any other
17 bidders the last time?
18 A. Oh, I know there were, yes. I don't know who
19 they were, but I was told there were several. So . . .
20 Q. Who are the primary decision makers for awarding
21 the contract?
22 A. Well, I would think the primary one now would be
23 Commander Figueroa, and then his various lieutenants.
24 There is a jail district -- Coconino County Jail District,
25 and they have a board there that is comprised of -- I

1 believe it's a Board of Supervisors, County Board of
2 Supervisors, and probably the Sheriff, and they make the
3 ultimate decision, I think.
4 Q. Okay. Do you know any of them?
5 A. Yeah. I know some, yeah.
6 Q. Okay. How long have you known them?
7 MS. BRODY: Object to form.
8 THE WITNESS: Well, we can go down the list
9 if you want.
10 MR. ENSIGN: Sure.
11 THE WITNESS: Of the defendants listed here,
12 Matt Ryan, I've known him for at least 12 years; Lena
13 Fowler I have met, but I don't -- can't say that I really
14 know her; Liz Archuleta, I have known for probably
15 20 years; Art Babbott, I've known him for many years,
16 maybe 10 years; Jim Parks I know a little bit. I don't
17 know the county treasurer here, but that wasn't your
18 question. I don't really know the current sheriff, Jim
19 Driscoll; and -- okay.
20 BY MR. ENSIGN:
21 Q. Have you ever discussed the Act with any of them?
22 A. I've discussed it with Matt Figueroa and a couple
23 of his lieutenants. Because when I first saw this, I was
24 just so surprised, saying "What the heck is this doing in
25 my contract?" You know, I had -- I didn't know where it

1 came from.
2 And so Matt is -- it's Matt Figueroa -- was
3 wondering why I wasn't returning the contract. And I said
4 "Well, it's the addendum. And, you know, I'm having a
5 real problem with that." And we didn't discuss it in
6 detail then, but he had no idea the addendum was in there
7 because it was something that was added, I think, to the
8 contract by -- I don't know if it was the county attorney
9 or someone that was trying to bring the county into
10 compliance with the new law.
11 And so then we finally discussed it, we met.
12 And I said it's Israel anti-boycott stuff. You know, I
13 was like, "I have a problem with that. I think it
14 violates my rights, constitutional rights."
15 And he was, "Oh, well" -- you know, he was
16 thinking it was a problem with the scope of the contract
17 and things like that.
18 And so I don't know if you want me to
19 expound or go get into --
20 Q. Sure.
21 A. -- this, but you'll probably ask anyway so let me
22 get it out there.
23 But basically, I said I have a real problem
24 with this and, if I sign, it's going to be under protest,
25 and I wanted to reserve my rights to challenge this law.

1 Q. And when did that conversation occur?
2 A. Well, it would have been right before I
3 ultimately signed my letter of protest, whenever that was,
4 but probably within, you know, three or four weeks before
5 that time.
6 Q. Okay.
7 A. You know, so it would have been the end of --
8 what is that? 2016, I think.
9 Q. Okay. Aside from that conversation, did you have
10 any other conversations or email exchanges regarding the
11 Act?
12 A. Meaning -- with -- with whom?
13 Q. Let's start with Matt Figueroa.
14 A. I have, yeah, since -- since filing this lawsuit,
15 you know, because I was concerned that I could lose the --
16 the contract. You know, I wanted to continue providing
17 services. So there is email correspondence. I'm happy to
18 provide that to you.
19 And basically he was thankful for bringing
20 up the idea. I talked with the county attorney, Bill
21 Ring, he's an old friend of mine from Coconino County.
22 You know, we talked on the phone just little bit. Not
23 about the case, because I didn't want to get him in
24 trouble because I'm actually the plaintiff. I just let
25 him know that this is coming down the pike. And he hadn't

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

| 11:25:14-11:26:26 | Page 90 |
|---|---|

1 seen it yet, so I put him in touch with my attorney,
2 Kathy.
3      And I think they were very relieved to know
4 that I would continue providing the services and -- you
5 know, I expect to get paid on those. But they are not
6 able to pay me at this time. So I'm providing the
7 services, I'm submitting the invoices, and I'm not getting
8 paid. I think I will get paid. I think we'll win this
9 lawsuit -- no disrespect -- but -- so that's the status of
10 things.
11      So it did -- yeah, there is communication --
12 recent communication over my actions now. I didn't want
13 them to freak out. I was saying it's not about the
14 County, it's about -- you know, the County has no role in
15 this really, other than the State, as it -- as it has want
16 to do, preempt every area of, you know, local control
17 practically, whether it's plastic bags or boycotting a
18 foreign country, you know. So I don't hold them
19 responsible for this. I hold your clients responsible.
20 So . . .
21 Q. So aside from the conversation with Matt Figueroa
22 you were discussing earlier, did you have any other
23 conversations or email exchanges with Matt Figueroa prior
24 to the filing of this lawsuit that relates to the Act?
25 A. I think a few days before filing I sent Figueroa

| 11:26:50-11:27:45 | Page 91 |
|---|---|

1 an email -- and also Bill Ring, the county attorney. And
2 I said I'm -- thanks for your patience on not -- I had
3 received an email, I think from Figueroa -- and you'll get
4 this if you want it. Oh, I had submitted my bill for
5 December, and he said, "Hey, we can't pay you until we get
6 this back in, you know. Can you sign the darn thing?"
7 And then I responded later saying, "I'm having a problem
8 with this certification, and bear with me. I'm looking
9 into it." And then we filed suit a few days later.
10 Q. Okay.
11 A. Long answer, short question.
12 Q. Can you think of any other conversations or email
13 exchanges?
14 A. With those folks --
15 Q. Yeah.
16 A. -- about the certification?
17      I'm sure in 2017, when I filed the thing,
18 there was some clarification. There was -- I think I
19 spoke about that, about my objections to this, and that I
20 would be signing it under protest.
21 Q. Okay.
22 A. And that seemed to appease them. All they want
23 is my signature. I don't think they care, you know,
24 personally, but that's my speculation.
25 Q. Okay. So what's involved with a -- when your

| 11:28:06-11:29:08 | Page 92 |
|---|---|

1 contract gets renewed?
2 A. Gee, I've got to jump through a bunch of hoops
3 annually too. I've got to show that I have all these
4 different types of insurance. They need, believe it or
5 not, car insurance, even though there's not a chance in
6 hell that I will give an inmate that I'm providing
7 services to in the jail a ride in my car. So they need a
8 certain amount. They need a certain amount of malpractice
9 insurance, that are all quite high. And you guys are
10 government attorneys, you know about this. I mean, all
11 these things they make you do. I think there was various
12 unemployment insurance things. What else? I'm sure I'm
13 leaving some things out, but there's a lot of different --
14 different things that end up costing a fair amount of
15 money to cover. So . . .
16 Q. Okay. Aside from proof of insurance, can you
17 think of any other requirements for the annual renewals?
18 A. I think that's about it, various types of
19 insurance. And then I don't think there's anything extra
20 that I have to renew, other than now this anti-Israel
21 stuff.
22 Q. Okay.
23 A. Yeah. And I don't know -- well, let's take a
24 look at the addendum. Is that in here?
25 Q. I believe it is.

| 11:29:33-11:30:59 | Page 93 |
|---|---|

1 A. It should be. I think it's the last page.
2      Insurance -- yeah, commercial general
3 liability. Even though I have a home office, never see an
4 inmate, let alone a client, I have to have all this stuff,
5 auto -- auto policy, worker's comp, professional
6 liability. Naming the County as additional insured. So
7 it's all CYA insurance of the County. But there's also
8 this -- the boycott thing that goes on for page and a
9 half.
10 Q. Okay. Is Exhibit 3 to your declaration the last
11 contract that you signed with the jail district?
12 A. It looks like it, yes.
13 Q. Did that contract expire on June 30th, 2017?
14 A. Looks like it, yeah, just under Term of
15 Agreement.
16 Q. And you've continued to work for the jail
17 district after the expiration of this contract?
18 A. Oh, let me see. Yes.
19 Q. Are you performing the same scope of work for the
20 jail district that you provided before the contract
21 lapsed?
22 A. Yeah, exactly the same.
23 Q. What's the last month that you were paid for?
24 A. I was paid -- I was paid in November for the
25 month of November. And I submitted my December invoice,

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  that's when Figueroa contacted me and said, "Hey, where is
2  your contract? We need you to get it in," that's when we
3  had the whole correspondence about this.
4      And then also he responded saying, "We can't
5  pay you until you sign it." Because they had to have a --
6  some sort of requisition from the county to get the funds
7  to do that. They couldn't do it until they have the
8  signed addendum. So . . .
9  Q.  Okay.
10 A.  And I'm still submitting the invoices. I've
11 submitted one for January of this month, with the
12 understanding that they say that they're unable to pay me
13 until this is resolved.
14 Q.  Okay. Has anyone offered to help get you paid?
15 A.  No.
16 Q.  Has anyone told you that you can expect to be
17 paid?
18 A.  I think that's the understanding, that either I
19 will be forced to sign the addendum after the legal
20 process goes through, even the parts that I object to, if
21 I want to keep the contract, or we'll win at this and I
22 won't have to sign. We'll delete that portion of the
23 con- -- the addendum.
24 Q.  Okay. So is it your understanding that you will
25 be paid for these months of service if you sign the

1  certification?
2  A.  That's my belief, yeah.
3  Q.  Roughly, what percentage of your gross income
4  comes from this contract?
5  A.  Well, I think -- oh, gross income. It's -- I
6  think my -- it's approximately 10 percent.
7  Q.  Is this contract profitable to you relative to
8  the other work you perform?
9  A.  Yes.
10 Q.  How does this contract compare to the other
11 contracts you have in terms of hourly compensation?
12 A.  I haven't broken -- none of the contracts are by
13 hour. But what I -- maybe the best way to explain is -- I
14 think with the jail contract, currently it's about -- ends
15 up being over $18,000 per year; the Cottonwood contract
16 gross is about $94,000, and, of course, you know, I have
17 to pay that assistant and whatnot. There are other
18 expenses. Clarkdale, I believe it's in the neighborhood
19 of $45,000. And then the public defending contracts are
20 per client; I think in Sedona it's $550 per misdemeanor
21 client. The CJA contract is by the hour, that's, I
22 believe, up to about -- I don't know if you're aware --
23 but about $130 an hour.
24 Q.  Okay. So in terms of time that you expend for
25 these various contracts, how does this jail district

1  contract compare with your other contracts in terms of
2  compensation you receive per hour that you work?
3  A.  Well, I'd say I probably do a similar amount of
4  work on the jail contract as I do for the Clarkdale
5  contract. That might be perhaps a little less, maybe like
6  25 hours a month or something for Clarkdale. It's
7  probably less in terms of the jail. But I'm thinking at
8  least 10, 15 hours a month. These are guesses.
9  Q.  Sure. Would you say the Clarkdale contract is
10 more profitable to you then?
11 A.  Yes.
12 Q.  Have you made any efforts to secure alternative
13 work if you could no longer perform the contract?
14 A.  No.
15     I take that back. I did see a notice from
16 the ACLU that they were looking for three different
17 attorneys, and I was happy to receive that. And I thought
18 that would be interesting. That was about it. So I
19 didn't go beyond that.
20 Q.  Okay.
21     MR. SKINNER: This might be a good time to
22 take a break for lunch. Or no? That work for you guys?
23     MS. BRODY: How much longer are you
24 expecting to go?
25     MR. SKINNER: I'm not sure. We'll have to

1  look and talk. But certainly -- certainly we'll be
2  continuing after lunch for some period of time.
3      MS. BRODY: Okay.
4      (An off-the-record discussion ensued.)
5      (The lunch recess was taken.)
6  BY MR. ENSIGN:
7  Q.  So kind of returning to the topic of your
8  boycott. Are there Israeli companies that you would do
9  business with?
10 A.  I'm sure there are. I can't think of any right
11 offhand.
12 Q.  Okay.
13 A.  Because that hasn't been a focus of mine.
14     In my trip, I certainly, you know, booked
15 hotels in -- with Israeli hotel owners, you know, traveled
16 around the country, all that. So yeah. The answer is
17 yes, there are companies that I would still purchase
18 products from, whether it's, you know, in that category, in
19 particular.
20 Q.  Okay. And how would you determine which ones you
21 would do business with?
22 A.  Well, they were almost all little local shops or
23 whatever, restaurants, hotels. None of them were -- that
24 I was aware of -- had any direct links to perpetuating the
25 occupation.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

12:55:42-12:56:36                                     Page 98

1  Q.  Okay.  Shifting gears slightly.  Do you take that
2  HP mobile printer you referenced earlier with you on trips
3  to the jail district?
4  A.  I may have to -- Well, I'm not going to print
5  anything out in the jail.  But there are occasions when I,
6  yes, have to draft something for an inmate, and it would
7  be very helpful for me as I just go to the coffee shop
8  nearby, print it out, and then bring it back to the
9  jail --
10 Q.  Okay.
11 A.  -- and give it to the inmate.
12 Q.  You're not allowed to take that --
13 A.  I don't think I could take it into the jail, you
14 know, because it's not set up that way.  I'm still through
15 a glass booth when I interview inmates.
16 Q.  Okay.  How did anyone know that you're engaged in
17 a boycott?
18 A.  Well, probably from me either telling them or me
19 speaking about it or communicating it via writing about
20 it, I would think.
21 Q.  Okay.
22 A.  Or I guess this case has gotten a little bit of
23 coverage in the press, not that much, so that way people
24 might read it.
25 Q.  Okay.

12:57:04-12:58:00                                     Page 99

1  A.  In fact, I went to my uncle's funeral Friday, in
2  Sun City, and one of these old friends of his father came
3  up, "I want to hear all about this lawsuit."  So he knew
4  about it.  So . . .
5  Q.  Okay.
6  A.  I was surprised.
7  Q.  Would anyone be able to perceive that you're
8  engaged in this boycott unless you told them?
9  A.  Certainly, through -- by reading the pleadings,
10 by, you know, looking at the press.  Yeah, there are a
11 multitude of ways.
12 Q.  So prior to this lawsuit being filed, how would
13 someone perceive that you were engaged in this boycott
14 aside from you telling them or some of your prior
15 statements about the boycott?
16 A.  I think that would be the way of me just sharing,
17 you know, my thoughts and -- at that point, because I
18 don't think I -- it was really the trip to Palestine,
19 Israel last spring that really convinced me that I really
20 needed to ramp this up and oppose the law.  And that --
21 that really motivated me because I was so kind of shocked
22 with what I'd seen and heard and the people I talked to.
23     So before that, I wasn't that vocal about
24 it.  I mean, in college I was somewhat vocal.  I started a
25 chapter of the Palestine Human Rights Campaign, and that

12:58:26-12:59:15                                     Page 100

1  was looking at advocating what was then a radical notion
2  of two-state solution, was securing for both peoples.
3  Q.  Would someone looking at just your purchasing
4  decisions alone be able to perceive your boycott?
5     MS. BRODY: Object to foundation.
6     THE WITNESS: Well, I mean, if you looked at
7  my credit card statement, I don't think you would deduce
8  that, you know.
9     I think you would have to define that, and I
10 think that would be pretty impossible.  Like to say, "I
11 notice there's no Caterpillar here," you know, or, "I
12 notice there's no HP," even, you know.  There's so many
13 thing that one purchases.
14 BY MR. ENSIGN:
15 Q.  Do you think someone seeing your HP printer would
16 discern that you were engaged in a boycott?
17     MS. BRODY: Object.  Foundation.
18     MR. ENSIGN: You can answer.
19     THE WITNESS: I think it would probably go
20 the opposite way.  If they see an HP printer and they know
21 that I filed this lawsuit, they would probably say, "What
22 the heck are you doing?  I thought you were boycotting."
23 And then I would have to explain to them that I felt like
24 I was forced by the certification that I had to buy this
25 thing.

12:59:25-13:00:25                                     Page 101

1  BY MR. ENSIGN:
2  Q.  Okay.  If you had purchased a Lexmark printer
3  instead, do you think they would be able to perceive that
4  that was as a result of your boycott?
5     MS. BRODY: Object.  Foundation.
6     THE WITNESS: I don't see how they would
7  know just by -- I mean, you could ask me that about --
8  "Well, I see you have an Apple computer here," or -- you
9  know, that would be pure speculation.
10 BY MR. ENSIGN:
11 Q.  Do you own any computers with Intel processors?
12 A.  I do.  Yeah, I think the Dell has -- has one.
13 Q.  Have you used Google?
14 A.  Yes.
15 Q.  Have you ever used Google Maps?
16 A.  I have.  I prefer another one, but I have used
17 it.
18 Q.  Okay.  What sort of telecommunication equipment
19 do you have for your PC?
20 A.  I have Safari.  Is that what you're taking about?
21 Q.  No.  And so kind of confusing.
22 A.  I'm not sure what --
23 Q.  By "your PC," I meant your public company.
24 A.  Okay.
25 Q.  I realize that's pretty confusing --

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  A.  Yeah, right.
2  Q.  -- immediately following the last question.
3      MS. BRODY: Excuse me, you mean the
4  professional corporation?
5      MR. ENSIGN: Exactly.
6      THE WITNESS: So can you ask that again,
7  then?
8      BY MR. ENSIGN:
9  Q.  Sure.  What telecommunication equipment does your
10  public company have?
11  A.  Yeah.  Well, I use Verizon for my telephone, and
12  I still have a Yahoo account for email, which should
13  probably be changed.  I have also a Gmail, which I use for
14  my Clarkdale cases.  And I have -- I use some company that
15  provides faxes over the Internet.  I forget the name.
16  Q.  Okay.
17  A.  And for any of these companies you've asked me
18  questions about, I'm not aware of if they have connections
19  with, you know, the occupied territories.  I mean, I have
20  no idea.
21  Q.  Okay.  Are you aware of any officials in state
22  government taking actions to enforce the Act?
23  A.  I'm not -- I'm not aware of it.  I know it has
24  the chilling impact on people speaking.  So -- but I'm not
25  aware of any specific things.  I know that there's

1  supposed to be a list, a sort of blacklist of companies
2  that is collected by one of the agencies of Arizona.  I
3  had been thinking about doing a public records request to
4  see if there is anybody on there.  I just don't know.
5  Q.  Are you aware of anyone taking enforcement action
6  based on a certification that's submitted under the Act?
7  A.  Under the Arizona Act, no, I'm not aware of it.
8  Q.  Are you aware of the attorney general taking any
9  actions with respect to the Act before December 7, 2017?
10  A.  No, I'm not aware of that.
11      And if I may expound, I don't see the
12  primary purpose of the Act as catching people doing this
13  prohibited stuff.  I see it as a concerted effort to chill
14  speech and suppress any possibility of speech in this
15  area.  And I doubt we'll see many, you know, people losing
16  their contracts unless they make a public stand about it.
17      And I think, to this day, I risk -- you
18  know, the jail could easily just say, before we get our
19  preliminary junction, they could say, "Mik, we just can't
20  do this anymore.  We're terminating the contract."  So I
21  exposed myself to that.
22  Q.  Are you aware of any officials in Coconino County
23  government taking actions to enforce the Act?
24  A.  I don't think they have the right to enforce the
25  Act.  So the answer is no.

1  Q.  Are you aware of any officials in any political
2  subdivision of the state taking action to enforce the Act?
3  A.  I'm not aware.
4  Q.  Are you aware of any instant in which a state or
5  local official has questioned the truthfulness of any
6  certification submitted under the Act?
7  A.  I haven't heard of that, no.
8  Q.  Circling back a bit, I'd like to go back to
9  Exhibit 2.
10  A.  Okay.
11  Q.  And I'd like to direct you, confusingly enough,
12  to Exhibit 2.
13      (An off-the-record discussion ensued.)
14      BY MR. ENSIGN:
15  Q.  And if you can look at Exhibit 2 of Exhibit 2.
16  A.  Okay.  Okay.  Does that start out with my letter
17  of October 14th?
18  Q.  Yes.
19  A.  Okay.
20  Q.  So do you recognize this?
21  A.  Yes, I do.
22  Q.  What is it?
23  A.  It's my letter stating my objection to the
24  addendum provision requiring me to sign the objected-to
25  certification.

1  Q.  In that letter you state that you were signing
2  not in your personal capacity unrelated to any government
3  contract.  Is that correct?
4  A.  Right.
5  Q.  Is it your belief that the Act does not apply to
6  you in your personal capacity?
7  A.  That's the position I maintain.  However, I'm not
8  a hundred percent sure of that.  I don't know if I'm --
9  you know, it depends on your interpretation of the word
10  "affiliate."  And I just don't know.  Would I be an
11  affiliate of my company, as I'm an owner?  Same thing
12  would apply if I set up a separate nonprofit, you know,
13  that would clearly be an affiliate of the other one.  So I
14  just don't know a hundred percent sure, but that's -- I
15  was trying to carve out a little area for me to
16  participate in constitutionally protected speech as a
17  person.
18  Q.  Has anyone ever challenged your assertion that
19  the Act does not apply to you in your personal capacity?
20  A.  Nobody has challenged that.
21  Q.  Do you believe that anything in the Act prevents
22  you from saying anything in your personal capacity?
23  A.  Yes.  I think it -- one of the things is I feel
24  inhibited from speaking -- taking a prominent role in the
25  issue.  I guess I've thrown myself into the storm by this

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

13:06:52-13:08:03                                    Page 106

1  point. But I feel very reluctant to speak about it in the
2  communities where I have contracts because then I think it
3  will -- it might provoke a review of my contract to see if
4  I'm in compliance or not. So that's my answer.
5  Q. Do you believe that anything in the Act actually
6  prohibits any speech by you?
7      MS. BRODY: Object. Form.
8      THE WITNESS: What it does is it says you
9  can speak, but you can't earn a living if your sole source
10 is from these contracts. Basically, it's a government
11 litmus test for handing out public contracts, and we all
12 know those are illegal, unless it's really involved with
13 the -- you know, the scope of services.
14     BY MR. ENSIGN:
15 Q. Do you believe that anything in the Act forces
16 you to say anything in your personal capacity?
17     MS. BRODY: Object. Form.
18     MR. ENSIGN: What's the basis of your
19 objection?
20     MS. BRODY: Speculation, legal conclusion.
21     BY MR. ENSIGN:
22 Q. Is it your understanding that the Act forces you
23 to say anything in your personal capacity?
24 A. Well, it forces me to sign something I don't
25 believe in as a human being, that's for sure, and that's

13:08:21-13:09:44                                    Page 107

1  on behalf of my corporation. But it's also compelling me
2  to state something that I disagree with morally and
3  religiously and as a human being. So otherwise I don't
4  think it -- other than that, I'm not sure it forces me
5  that I must say something, but it does require me to do
6  that, and that violates my sense of justice and my moral
7  beliefs.
8      Q. Do you believe -- is it your understanding that
9  anything in the Act limits how you may participate in any
10 organization in your personal capacity?
11     A. I think I can probably join various
12 organizations. The problem is if me, as an individual,
13 gets associated with my legal practice and legal entity,
14 that can draw certain inferences and get me in
15 trouble with the contracts. So that's not something I've
16 taken on as a sort of central sort of role in promoting
17 the political issues that I would like to see addressed.
18         Hopefully, from my point of view, if the
19 lawsuit is successful, I fully intend to do that both in
20 my legal capacity and -- and as an individual.
21     Q. Is it your understanding that anything in the Act
22 mandates that you join an organization in your personal
23 capacity?
24     A. No.
25     Q. Is it your understanding that anything in the Act

13:10:05-13:11:14                                    Page 108

1  would prevent you from donating money to an organization
2  in your personal capacity?
3  A. Well, to the extent that it associates my firm
4  with me, it makes me cautious in doing so. I mean, I have
5  sent -- it was a $50 fee -- I think annual fee to Jewish
6  Voice for Peace for membership.
7      But, I mean, in terms of large -- a larger
8  donation or something like that that becomes more public,
9  I think that that could impact my work under contract.
10 So -- so I'm reluctant to do that at this point because of
11 the certification requirements.
12 Q. But is it your understanding that anything in the
13 Act actually prohibits you from doing so in your personal
14 capacity?
15 A. Nothing prohibits me from doing so. I'm
16 concerned about the impacts of doing that.
17 Q. Is it your understanding that anything in the Act
18 would prevent you from providing pro bono services to an
19 organization in your personal capacity?
20 A. Well, number one, I don't do that because it
21 wouldn't be covered by malpractice insurance. So I
22 guess -- I guess the premise of the question is -- is not
23 applicable. Or maybe you could rephrase it in a way that
24 would work.
25 Q. Sure. So understanding that there might be

13:11:37-13:13:07                                    Page 109

1  implications for malpractice, is there -- is it your
2  understanding that there is anything in the Act that
3  directly prohibits you from providing pro bono services to
4  an organization in your personal capacity?
5      MS. BRODY: Object to form.
6      MR. ENSIGN: You can answer.
7      THE WITNESS: I think I could, but I would
8  not because it would not be covered by insurance.
9      BY MR. ENSIGN:
10 Q. Do you believe you have any First Amendment right
11 to have the state subsidize your boycott?
12 A. No.
13 Q. If we could turn back to your declaration. And
14 we've largely already covered this.
15     But you say in paragraph 24, "Were it not
16 for the Act's certification requirement, I would extend my
17 personal boycott participation to my firm's consumer
18 choices." Is that correct?
19 A. Yes.
20 Q. Is that still the case today?
21 A. Yes.
22 Q. So I would like to direct you to Exhibit 1 of
23 your declaration.
24     MS. BRODY: That is Exhibit 1 of Exhibit 2,
25 right?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1     MR. ENSIGN: That's correct.
2     BY MR. ENSIGN:
3  Q.  Do you recognize this document?
4  A.  Yes.
5  Q.  What is it?
6  A.  It is the certification that I was surprised to
7  find attached to the 2016 contract for the jail services.
8  Q.  Is this the certification that you understand the
9  Act to require?
10 A.  Yes.
11 Q.  Is it your understanding that the Act requires
12 anything that is not covered in this certification?
13 A.  I would have to review the statute again to give
14 you a definitive answer, but I think it covered most
15 things there.  I mean, it's basically verbatim from the
16 statute, as I recall.
17 Q.  Do you see anything in this certification that
18 asks your PC about its beliefs?
19 A.  Well, yes.
20    I mean, it basically makes me set forth
21 about discrimination that I would not discriminate --
22 based on clause B here -- in a matter that discriminates
23 on the basis of nationality, national origin, religion,
24 not based on a valid business reason -- I have to sign off
25 on that.  So that it's basically saying I will not do, as

1  well section A, it forced me to say -- and of course in B,
2  I would never discriminate based on any of those
3  categories.  However, in section A, I would like to be
4  able to boycott the companies that support the resistance
5  to the occupation -- I'm sorry -- boycott companies that
6  foster the occupation.
7  Q.  Okay.  So the certification asks about the
8  conduct that your business might be engaged in.  Is that
9  correct?
10 A.  Yeah.  That's correct.
11 Q.  Where in there do you read it to be inquiring as
12 to your beliefs rather than your conduct?
13 A.  Well, I think, for me, I can't really separate
14 the two.  And to me this is belief and conduct.  And here
15 it's -- I'm being asked to suspend my -- my beliefs here
16 almost to go -- I really object to signing this because I
17 don't believe in it, and that's what it boils down to.
18    And I understand what you're getting at is,
19 does it make you believe something or not?  I don't think
20 I have to, say, be a Communist to object to a Communist
21 avowal that used to be in various certifications.
22 Q.  So to be clear then, do you know that the
23 certification requirement could deny you a State contract
24 where you were not engaged in any conduct that the
25 certification requirement prohibits, but that you

1  disagreed with the Act?
2  A.  No, I don't -- I don't believe that.  I think
3  if it -- it goes to conduct, but it really is intertwined
4  with belief in terms of people are forced to sign these if
5  they want to continue working.
6  Q.  Do you see anything in the certification
7  requirement that requires your PC to have any practitioner
8  beliefs?
9     MS. BRODY: Object to form.
10    THE WITNESS: Yes, I do in terms of the
11 nondiscrimination and all that.
12    I guess we went into this already a bit, but
13 I believe it's in terms of the nondiscrimination for sure.
14 And I know these things -- these aren't just acts, these
15 are beliefs too, I think.
16    BY MR. ENSIGN:
17 Q.  So other than nondiscrimination, is there
18 anything in the certification requirement that requires
19 you to have particular beliefs?
20    MS. BRODY: Object to form.
21    MR. ENSIGN: You can answer.
22    THE WITNESS: Again, I just don't see belief
23 and conduct as being separate, and I think it forces me to
24 adopt a position that I don't believe in.  And I'll leave
25 it at that.

1     BY MR. ENSIGN:
2  Q.  Do you understand the certification requirement
3  to say anything in particular?
4  A.  Sure.  It says what it says, which is that no
5  governmental entity -- and the state legislature again,
6  once again goes off and imposes this on cities, towns,
7  counties, any governmental body, and says that if my
8  entity participates in the boycott of companies that do
9  business in the territories that are occupied, that those
10 governmental entities cannot enter into a contract.  So I
11 think it very clearly says that.
12 Q.  Okay.  Leaving aside the certification itself, do
13 you understand the certification to require you to say
14 anything in particular as opposed to conduct that you
15 have -- engage in conduct that you believe has expressive
16 value?
17    MS. BRODY: I'm going to object to form.
18 You've asked the same question, like, five times now.
19    THE WITNESS: Yeah, it absolutely makes me
20 say that I will not engage in -- in these activities.  It
21 forces me to say that if I want to work.
22    BY MR. ENSIGN:
23 Q.  Do you understand anything in the certification
24 requirement to require your PC to join any organizations?
25 A.  I don't see anything there.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  Q.  Do you see anything in the certification
2  requirement that inquires about what organizations your PC
3  belongs to?
4  A.  No.
5  Q.  Is there anything in the certification
6  requirement that inquires about what organizations your PC
7  has previously belonged to?
8  A.  No, there's nothing there.
9  Q.  Is there anything in the certification
10  requirement that mandates that your PC join any
11  organization?
12  A.  I think you just asked that.  But no was the
13  answer again.
14  Q.  Sorry.  Do you see anything in the certification
15  requirement that mandates that your PC refrain from
16  joining any organization?
17  A.  And again, no.
18  Q.  Are you aware of anyone else in the state that is
19  objecting to this Act?
20  A.  I'm sorry, I was thinking of your previous
21  question.  I'm just reviewing this.
22      Okay.  Could you ask that question again?
23  Q.  Sure.  Are you aware of anyone else in the state
24  with a contract with the State or its subdivisions that is
25  objecting to this Act?

1  A.  Yes.
2  Q.  Okay.  And who is that?
3  A.  Well, after this lawsuit was filed, I received an
4  email completely out of the blue -- and I forget this
5  person's name -- but he had a contract with -- I believe
6  it was the Phoenix police to provide tape for them, you
7  know, the tape that goes around crime scene zones.  And he
8  said he was refused a contract because he refused to sign
9  that certification.  He objected to it.
10  Q.  Are you aware of anyone else?
11  A.  I am aware of -- yes.
12      There is an architect in Tucson that had to
13  sign one or two of these contracts.  I believe his name is
14  Corky Poster.  And he had a couple of these contracts, but
15  he has employees and he didn't want to jeopardize
16  challenging it because he had employees.  He was active in
17  the issue.
18  Q.  Okay.  Are you aware of anyone else?
19  A.  I think that those are the people that I -- I
20  know there are many other people out there because almost
21  every contract in Arizona has this clause for business
22  services.  But those are the two that I can think of right
23  now.
24  Q.  So I'm going to hand you what I'd like to have
25  marked as Exhibit 3.

1      (Deposition Exhibit 3 was marked for
2  identification.)
3      BY MR. ENSIGN:
4  Q.  Do you recognize this document?
5  A.  Yes.
6  Q.  What is it?
7  A.  It's the complaint in this case.
8  Q.  Have you read the final version of this complaint
9  prior to filing?
10  A.  Yes.
11  Q.  Is everything in the complaint accurate, to the
12  best of your knowledge?
13  A.  Well, if this is what was filed -- and it looks
14  like it has the federal court caption on it -- yes, it
15  should be accurate.
16  Q.  Can you read paragraph 17 of your complaint?
17  A.  Yeah, it just recites the statute.
18  Q.  Okay.  Do you have any reason to believe that the
19  text of the Act is not accurately set forth here?
20  A.  Well, I hope it's accurate.  I mean, I don't have
21  the actual statute in front of me, but hopefully that's
22  accurate.  That was the intent, and it looks the same.
23  Q.  Okay.  So I want to direct you to Section
24  35-393.01.A.
25  A.  Uh-huh.

1  Q.  Which states, "A public entity may not enter into
2  a contract with a company to acquire or dispose of
3  services, supplies, information technology or construction
4  unless the contract includes a written certification that
5  the company is not engaged in, and agrees for the duration
6  of the contract to not engage in, a boycott of Israel."
7  A.  Uh-huh, yes.
8  Q.  Do you believe that anything in that section
9  would prevent the State from entering into a contract with
10  an individual rather than a company?
11      MS. BRODY:  Object to form.
12      BY MR. ENSIGN:
13  Q.  Is it your understanding that anything in the
14  section would prevent the State from entering into a
15  contract with an individual rather than a company?
16  A.  I'm looking at the previous section to see
17  exactly what was defined here.
18      Well, the term "company" is defined, and
19  that includes -- and again, it includes an affiliate of
20  companies, and then we get back to the thing about am I,
21  as a sole owner of a company, an affiliate.  I maintain
22  no.  However, I'm not sure, as you know.
23      But sole proprietorship, that is -- that
24  would be outside of a corporate structure, which means
25  just me as an individual if I'm a sole proprietor.  That's

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

13:27:05-13:27:57                                    Page 118

1  absent a corporate entity.  And so I think it would apply
2  to, say, me, Mik Jordahl, as an attorney outside of my
3  corporation.  I would be the sole -- any income that came
4  in not in the corporate umbrella would be a Schedule C
5  type of thing with the IRS, so business income, and I
6  would be a sole proprietor.  So I think it would apply in
7  that case.
8  Q.  All right.  So I'd like to direct you to Section
9  35-393.1.
10  A.  393 -- oh, 1, up above?
11  Q.  Yeah.
12  A.  Okay.  Got it.
13  Q.  Does that provide a definition of "boycott" for
14  purposes of the Act?
15  A.  Yes.
16  Q.  Do you believe the definition of "boycott"
17  prohibits any actual speech as opposed to conduct?
18  A.  I believe it chills speech.  I think it's focused
19  on conduct, and I think that's by intent to try to pass a
20  constitutional test.  But I think its primary purpose is
21  to chill the speech that would go along with it.
22  Q.  Okay.  Leaving aside chill for the moment, do you
23  believe that anything in the definition of "boycott"
24  outright prohibits any speech?
25      (An off-the-record discussion ensued.)

13:28:20-13:29:26                                    Page 119

1      (Deposition Exhibit 3 was re-marked for
2  identification.)
3      THE WITNESS: I'm sorry, I lost the question
4  long ago.  So . . .
5      BY MR. ENSIGN:
6  Q.  Leaving aside the concept of chill, do you see
7  anything in the definition of "boycott" that outright
8  prohibits any speech?
9  A.  I think it's focused on conduct.  I think its
10  impact, again, is to chill speech, and it forces me to
11  sign something I don't believe in.
12  Q.  But do you understand it to prohibit outright any
13  speech?
14      MS. BRODY: Object to form.
15      THE WITNESS: It doesn't say it's illegal to
16  say X, Y, or Z.
17      BY MR. ENSIGN:
18  Q.  Do you believe the definition -- is it -- Excuse
19  me.
20      Is it your understanding that the definition
21  "boycott" mandates any speech?
22  A.  Yes.  It mandates that I sign something that I
23  don't believe in and that I disagree with.  And just like
24  those old-fashioned anti-Communist loyalty oaths that have
25  been struck down, it makes me sign something that violates

13:29:44-13:30:53                                    Page 120

1  my political beliefs and moral sense- -- sensibilities.
2  Q.  Aside from the certification itself, do you
3  believe that the definition of "boycott" mandates any
4  speech?
5      MS. BRODY: Object to form.
6      MR. ENSIGN: What's the nature of the
7  objection?
8      MS. BRODY: You asked the question already.
9      MR. ENSIGN: I just added the caveat in the
10  beginning that makes it a different question.
11      THE WITNESS: Okay.  I'm completely lost
12  now.
13      BY MR. ENSIGN:
14  Q.  Aside from the certification itself, do you
15  understand the definition "boycott" to mandate any
16  particular speech?
17  A.  I don't think other than having -- forcing me to
18  sign the certification that I don't believe in, no.
19  Beyond that, no.
20  Q.  Shifting gears a little bit.
21      Are you a member of the group Jewish Voice
22  for Peace?
23  A.  Yes.
24  Q.  How long have you been a member of the
25  organization?

13:31:07-13:32:33                                    Page 121

1  A.  I joined after I got back from my trip to
2  Palestine and Israel, and I don't remember the exact
3  month.
4  Q.  I'd like to direct you back to your declaration,
5  which is marked as Exhibit 2.
6  A.  I have it here.
7  Q.  In paragraph 25 you state that "JVP" -- dot, dot,
8  dot -- "has asked my firm to contribute office support and
9  financial contributions."
10  A.  Yes.
11  Q.  Do you believe that the Act would preclude you
12  from contributing to JVP in your personal capacity?
13  A.  I think I've answered that before.  It certainly
14  inhibits me from doing so because the association, you
15  know, creates problems for my firm.
16  Q.  But do you understand the Act to be outright
17  prohibiting such donations?
18  A.  I've maintained the position that it does not in
19  my personal capacity, but again, I can't be sure without
20  the definition of "affiliate."
21  Q.  Are you aware of any other law that might prevent
22  you from donating to JVP in your personal capacity?
23  A.  Well, I know there's discussions in Congress now
24  about -- actually, there's something called the
25  anti-Israel boycott Act, I don't know if you're familiar

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  with it. But it basically is -- it's fairly outrageous
2  and it would call for imprisonment of people like me that
3  would respond to the call -- international call for a
4  boycott of Israel. I know about that. But that's going,
5  you know, way beyond Arizona.
6  Q. Can you think of any other law currently in
7  effect that might prevent you from donating to JVP in your
8  personal capacity?
9  A. I can't think of any other Arizona law than this
10 one. And this one is -- marginally might apply to my
11 personal status.
12 Q. Do you understand anything in the certification
13 requirement or the Act that would prevent your PC from
14 providing office support to JVP?
15 A. Yes, I think it would. It would definitely call
16 it into question, because one of JVP's main central
17 platforms is its boycott. And if I'm actually supporting
18 that in my PC capacity, I think I come directly in
19 conflict with the law.
20 Q. So just so that I'm clear -- well, let's break
21 this into two different things.
22     Do you believe that there's anything in the
23 Act or certification requirement that would provide you --
24 that would prohibit you from providing office support to
25 JVP generally, not specifically directed at its boycott

1  efforts?
2     MS. BRODY: Object to form.
3     THE WITNESS: I think it would cross at
4  least a gray line there, because that's one of the central
5  purposes of JVP is the boycott. So I'm not sure how you
6  could separate it out necessarily.
7     BY MR. ENSIGN:
8  Q. And is the reason that you say that because
9  you're concerned that such -- actually, never mind.
10    Turning back in your declaration, if you
11 could look at paragraph 9.
12 A. Okay.
13 Q. You state that you've "been moved by the 'Peace
14 Not Walls' campaign of the Evangelical Lutheran Church
15 (ELCA)." Is that correct?
16 A. That's right.
17 Q. Are you a member of the Evangelical Lutheran
18 Church?
19 A. Certainly am historically. I mean, I'm not
20 belonging to a specific congregation right now. I take my
21 mother frequently to church -- she has Alzheimer's -- in
22 Flagstaff. I do what I can there. I have known the
23 Lutheran minister there very well and -- you know, so I
24 think to be an actual member you've got to, like,
25 officially sign and contribute. And I haven't done that,

1  but I've certainly participated a lot.
2  Q. Okay. Do you adhere to the doctrines of the
3  Evangelical Lutheran Church?
4  A. Some of them I do, some of them I don't. You
5  know, I'm somewhat of a wayward Lutheran, but I'm very
6  affected by and embrace a lot of what it stands for. I
7  mean, it's -- my whole lineage was this from, you know,
8  great-grandparent, both grandparents, uncles, my father,
9  you know, all have been Lutheran ministers, and that's had
10 a profound impact on me. And so I keep up with, you know,
11 what's going on within the Lutheran church.
12 Q. Okay.
13 A. And I find that it's often a moral guide. I
14 don't believe everything. I mean, I'm not hook, line, and
15 sinker with all of the religious doctrine, but much of it
16 I am.
17 Q. Have you played any role in the development of
18 the Peace Not Walls campaign?
19 A. No.
20 Q. Have you ever donated to ELCA?
21 A. Well, yeah, sure, contributions on Sunday.
22 Q. Anything else?
23 A. I might have donated past years to specific
24 programs to aid, like, the homeless and things like that,
25 you know. But, I mean, we're talking about a whole

1  lifetime here.
2  Q. Yeah. Have you ever donated to ELCA -- ELCA's
3  Peace Not Walls campaign?
4  A. No.
5  Q. Have you ever performed pro bono work for the
6  ELCA?
7  A. No.
8  Q. Has your PC ever donated to the ELCA?
9  A. No.
10 Q. Has your PC ever worked pro bono for the ELCA?
11 A. No.
12 Q. So turning to paragraph 16 of your declaration,
13 you indicate that during the 2016 renewal of your
14 contract, quote, an official from the County asked me to
15 sign not only the standard paperwork, but also a new form
16 entitled "Certification Pursuant to A.R.S. Section
17 35-391.01." Is that correct?
18 A. Paragraph 16? Yes.
19 Q. Were you aware of the statute before that time?
20 A. No, I wasn't.
21 Q. In paragraph 19 you state that, "On October 14,
22 2016, I signed the certification under protest. I
23 returned the signed certification to an official at the
24 County. I also sent a copy of the signed form to Rose
25 Winkeler" -- dot, dot, dot -- "along with a letter

1 entitled 'Regarding: Israel Boycott Addendum to Inmate
2 Civil Rights Advising Contract.'" Is that correct?
3 A. Yes.
4 Q. Is Exhibit 2 to your declaration a copy of that
5 letter?
6 A. Yes.
7 Q. Why did you send that letter to Ms. Winkeler?
8 A. Well, I believe she was the -- I'm trying to
9 remember. I don't recall exactly. But since she is a
10 deputy county attorney, I likely would have been directed
11 to her and because it was a legal type of thing. I wanted
12 to make sure -- the county jail folks aren't lawyers, you
13 know, so I wanted to make sure, as a lawyer too, that I
14 was corresponding with the people that would represent
15 them. So I signed it to her -- sent it her. And I don't
16 recall if that was in response to being told that she was
17 the person to send it to or not. I just don't recall.
18 Q. Did you have any other conversations or
19 communications with other officials in Coconino County
20 government about the Act in 2016?
21 A. Yes. I think I mentioned that before. I talked
22 with Commander Matt Figueroa, a couple of his lieutenants
23 about it. They were as surprised as I was about this.
24 They thought I was complaining about something in the
25 actual -- you know, a substantive part of the contract,

1 not the addendum.
2 Q. Okay. And that was in 2016?
3 A. That would have been in 2016, yeah, right towards
4 the end, just before I sent the letter.
5 Q. Did you have any conversations with any other
6 officials in Coconino County government about the Act in
7 2017 prior to November 14th?
8 A. I'm sorry, can you review the dates again?
9 Q. Sure.
10 A. Which ones?
11 Q. Did you have any conversations in -- with
12 Coconino County government officials in 2017 prior to
13 November 14th?
14 A. Well, just the ones that we were talking about
15 here. I don't believe -- I think what I did at that time
16 was I sent an email to Bill Ring, who was the county
17 attorney at that time, and realized -- I'm stretching here
18 in my memory.
19    He was the county attorney-elect, and I
20 never got a response, and I never was sure that that went
21 through to him. And I think Rose was the one that I ended
22 up communicating with after that because Bill wasn't --
23 sorry -- Bill wasn't in office yet. He was winding down
24 his stuff. And the email I had for him was a former
25 county attorney email, he had worked there before, and I

1 was never convinced that went through or not. So . . .
2 Q. Aside from this letter, did you have any
3 communications with Rose Winkeler regarding the Act?
4 A. I believe we may have had a phone call. You
5 should probably ask her. Is she counsel on this for the
6 County?
7 Q. She is.
8 A. Okay, good. I mean, you should ask her. I don't
9 recall. I think I may have had -- I think she was the one
10 telling me that Bill was out and he wouldn't be in for a
11 certain amount of time. And I expressed my objections.
12 And I might have said that I would probably sign under
13 protest.
14 Q. Do you recall saying anything else to her?
15 A. I don't recall. I'm sure there was more to it
16 than that, I just don't remember.
17 Q. If you can take a look at your letter.
18 A. Yeah.
19 Q. In it you state, "I do reserve my right to
20 challenge the law in the courts." Is that correct?
21 A. Yes.
22 Q. Why didn't you bring a challenge prior to
23 November 14th, 2017, when you received the second
24 certification request?
25 A. Right. Well, I think there were a couple of

1 reasons. Number one, I wasn't ready to do that yet. I
2 felt like I needed to investigate more. And I had planned
3 this trip to Israel and Palestine, promised it forever for
4 my son. If I had filed before then, it would have
5 sabotaged that trip, and I likely would not have been
6 allowed -- I would have been stopped at the border. They
7 likely would not have allowed me to enter. And I'm quite
8 sure that's the case right now after having filed.
9    This is such an important event for me and
10 my son, as a father-and-son thing, that I didn't want to
11 jeopardize that. Also, I wanted to look into -- I've
12 always been interested in the issue, obviously, you know
13 that from my background, but I wanted to get a more
14 current look at what was going on there.
15    And I was just not ready to -- and I don't
16 think the mechanics were up and running to file right
17 then.
18 Q. Okay.
19 A. And initially, frankly, I didn't want to be a
20 plaintiff. I wanted to be the lawyer. And so I think
21 some of the effort went into are there other people out
22 there affected that might be better suited to be a
23 plaintiff.
24 Q. Can you think of any other reasons?
25 A. Those are probably the main two, I would say.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  Q.  Okay.  Turning back for just a second, can you
2  recall anything that Rose Winkeler said to you in your
3  conversations?
4  A.  I'm just basing this on impressions.  I don't
5  hear it in my head, her saying this, but I thought she
6  mentioned, you know, about Bill being out, and he wouldn't
7  be available until a certain date thereafter.
8     I don't recall her saying anything
9  substantively.  I think I informed her what my issue was.
10  I'm not sure she was aware of it, and I may have briefed
11  her on that, you know, just in a few sentences, "I'm
12  having a problem with this."  I doubt that she responded
13  one way or the other.  I mean, she wouldn't as an
14  attorney, I don't think.  But I wanted to put her on
15  notice about my issue.
16  Q.  Okay.  Can you think of anything else that she
17  would have said to you?
18  A.  I just don't recall.  You would have to ask her.
19  So . . .
20  Q.  If you can take a look at your letter.  You say
21  that you were signing "not in my personal capacity
22  unrelated to any government contract"?
23  A.  Where is that?
24  Q.  Third substantive paragraph of the letter.
25  A.  Yes, I see it.  Yeah.

1  Q.  Do you have any reason to believe that the caveat
2  was not accepted by Coconino County officials?
3  A.  I don't have any reason to believe -- they don't
4  have a dog in this fight, you know, so they didn't -- they
5  didn't care.  They just wanted me to sign the darn thing.
6  Q.  Do you have any reason to believe that that
7  caveat would not be acceptable to officials in State
8  government?
9  A.  I think if the State forces me to sign that, they
10  could also care less.
11  Q.  Do you have any reason to believe that the caveat
12  would not be acceptable to officials in State government?
13  A.  I don't have any reason to believe that.  I --
14  you know, I don't know.  If I became more prominent in my
15  vocal support of boycott, it could draw some
16  attention.  People can complain.  People are very
17  passionate on this issue on all sides, and there's been
18  plenty of attempts to, you know, destroy the livelihood of
19  those who advocate for equal rights of these two peoples.
20  Q.  Has anyone ever told you that this caveat was not
21  compliant with the Act?
22  A.  I've never been specifically told that.
23  Q.  In that letter -- have you ever -- sorry.
24     Have you ever been generally told that --
25  A.  Generally told that my personal acts would not

1  comply with the statute?  I don't believe I've been told
2  that.
3  Q.  Or generally told that your caveat that you did
4  not read the Act to reach you in your personal capacity
5  would violate the Act?
6     MS. BRODY:  Object to form.
7     THE WITNESS:  I don't recall that.
8     BY MR. ENSIGN:
9  Q.  In your letter you also state, "I am also
10  interpreting the term 'affiliate' in the addendum and the
11  law to apply only to formal business relationships."  Is
12  that correct?
13  A.  Yeah, I put that in there.
14  Q.  Do you have any reason to believe that caveat was
15  not accepted by Coconino County officials?
16  A.  Again, no, I don't have any reason to believe it
17  wasn't accepted by them.  In fact, they did accept it.
18  They paid me.  No one objected to my little bit of First
19  Amendment complaint there.
20  Q.  Okay.  Do you have any reason to believe that the
21  caveat would not be acceptable to officials in State
22  government?
23  A.  I mean, I think I've already answered that.  But
24  I don't think -- directly or specifically, I don't think
25  they would object; although, it might heighten scrutiny of

1  my activities and whether they bleed over into the
2  corporate structure since I am my corporation.
3  Q.  Has anyone ever indicated to you that there were
4  any problems with your 2016 certification?
5  A.  No one's ever told me that.
6  Q.  Turn back to your declaration.  If you can look
7  at paragraph 28.  There you state, "On November 14, 2017,
8  I received a letter from the County regarding the regular,
9  annual renewal of the contract."  Is that correct?
10  A.  It likely -- I can't exactly say whether it was
11  the 14th, 13th, 12th or whatever.  But, yes, generally
12  that's correct.
13  Q.  Did that letter include a proposed one-year
14  renewal of the contract?
15  A.  Yes.
16  Q.  Did that letter include another certification
17  under the Act?
18  A.  Yes.
19  Q.  Prior to receiving that letter, had you discussed
20  the Act with anyone in Coconino County government in the
21  prior six months?
22  A.  I'm trying to think of some of the supervisors or
23  not -- no, I don't think I told them about -- I don't
24  think I discussed it with anyone in government.
25  Q.  Okay.  Do you recall discussing it with anyone

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  else?
2  A.  Yes.  Some of the people that I already listed
3  to -- I spelled all the names here.  You know, I could
4  read them out.
5     Are you talking about in government?
6  Q.  No.  Outside of government?
7  A.  Yeah.  I talked about my relatives.  I talked
8  about some people in Tucson.  I talked about Joe Bader,
9  Eva Putzova, who's on the city council up there in
10  Flagstaff.  You know, those folks.
11  Q.  Okay.
12  A.  I talked about the public defender in Cottonwood,
13  Mike Shaw.  People are generally interested in the issue.
14  Q.  Okay.  Was the certification included in that
15  2017 letter substantially the same as the one you signed
16  in 2016?
17  A.  I believe it was.  I'm not sure if it was
18  verbatim, but it was -- basically it asked me to do the
19  same thing.  So -- certify.
20  Q.  Had your PC engaged in any boycotting activity
21  relevant to the Act since your year 2016 signed
22  notification?
23  A.  Has my PC been involved in boycott activities
24  since then, did you say?
25  Q.  Yes, that was the question.

1  A.  I've tried to stay true to the certification, and
2  so I would -- I would say no.  I didn't engage in boycott
3  activities because I didn't want to lose my contracts or
4  run afoul to what I said I would do.
5  Q.  Okay.  Why did you object to signing the
6  certification again?
7  A.  Well, in part, because of my trip.  I was so very
8  upset when I saw what was going on in the West Bank.  And
9  you have to realize when you go to an occupied country,
10  you have people with big guns, tanks, occupying every
11  element of Palestinian society, and then slowly gobbling
12  up all their land.  There's been massive land alienation,
13  theft of land, there's been bulldozing of homes --
14  Palestinian homes.  And it's an overt plan to defeat a
15  two-state solution and take the land and deny the people
16  there of their civil rights.  We saw the same thing here
17  in this country, but it was in the 19th century.  But this
18  is going on right now, and what's more is we are paying
19  for it.  We Americans.
20     And so we're looking at $40 billion over the
21  next 10 years of aid to Israel in terms of military and
22  other things and without even a dime of it being withheld
23  to stop, you know, the -- the colonization efforts.  And
24  then you talk to people and 40 percent of the Palestinian
25  males on the West Bank has been in jails or prisons, it's

1  not crime, it's just resistance.  It might be rock
2  throwing, might be demonstrating, it might be -- so that
3  society has been jammed into smaller and smaller urban
4  areas, Ramallah, Hebron, various towns.  And their civil
5  rights are almost nonexistent.  They don't have a right to
6  vote.  They do in the small enclaves.  But 60 percent of
7  the West Bank is controlled by Israel through force of
8  might, and there are a hundred-plus settlements --
9  colonies peppered throughout the West Bank.
10     Those -- 40 percent of the male population
11  of Palestinians that have been in jails or prisons are
12  judged by military tribunals with an over 99 percent
13  conviction rate, where the Israeli settlers are judged by
14  Israeli civilian courts.
15     There are separate roads where Palestinians
16  are not allowed on.  There are whole towns where
17  Palestinians cannot enter.  And it's just getting worse
18  and worse.  So I was profoundly influenced by that.
19     And when it came time to signing another one
20  of these addendums, you know, my position was, "I've had
21  enough.  I'm not going to do this anymore."  And if Sedona
22  presents me with another certification, I'm going to ask
23  that they be joined as a defendant -- or any of the other
24  municipalities.  So that's a long-winded explanation, I
25  guess.

1  Q.  Do you understand there to be any difference in
2  the impact on your First Amendment rights between the 2016
3  and 2017 certifications?
4  A.  I think they're one and the same.  I think my
5  understanding of the issues has deepened considerably and
6  my belief in its wrongfulness.
7  Q.  Is the reason that you did not sign the 2017
8  certification so that you could bring this lawsuit?
9  A.  Yes.  And because I just don't believe in it.
10  Q.  So this will be hypothetical.
11     Assume for the moment that a final judgment
12  is entered in this action in favor of the State on all of
13  your First Amendment claims, and then assume further that
14  you're presented with a choice between signing a
15  certification or having your contract with the jail
16  district terminated, which would you choose?
17     MS. BRODY:  I'm going to object on
18  foundation.
19     THE WITNESS:  I -- I mean, as I'm standing
20  here right now, I'd probably say I would terminate it --
21  let it terminate.
22     BY MR. ENSIGN:
23  Q.  Have you had any conversation with members of the
24  Coconino County Board of Supervisors regarding the Act or
25  this lawsuit?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

13:56:52-14:19:41                    Page 138

1   A.   I -- I don't think so.  I know most of them well,
2   but I don't believe I've talked to them at all about the
3   issue.
4   Q.   Okay.  Have you had any conversations with their
5   staff regarding the Act or this lawsuit?
6   A.   I don't think so.
7        MR. ROYSDEN: I think we've been going for a
8   while.  Do you want to take a 10-minute break?
9        (A recess ensued.)
10       BY MR. ENSIGN:
11  Q.   Backing up for just a second.  Has your PC ever
12  purchased one?
13  A.   No.
14  Q.   And then turning to the Arab-Israeli conflict.
15  Do you believe that Israel is a democracy?
16  A.   I think its democracy is vastly eroding.  And I
17  think it's -- if you occupy another people for 50 years
18  and you don't give them the right to vote -- I'm not so
19  sure they can call themselves democratic with any real --
20  any real sense of the word.
21  Q.   Okay.
22  A.   I think it's a Jewish democracy.
23  Q.   And I think you said this earlier.  But you
24  believe that Israel has a right to exist?
25  A.   Yes, as -- as do we in the United States.  It

14:19:57-14:21:12                    Page 139

1   doesn't mean we have a right to engage in, you know,
2   forcing out our indigenous population and whatnot.
3   Q.   Are you aware that some individuals supporting
4   the BDS involvement don't believe that Israel has a right
5   to exist?
6   A.   There may be those individuals.
7   Q.   Do you believe an economic boycott of Israel will
8   weaken Israel as a state?
9   A.   I think that is the strategy to -- just as with
10  South Africa, that is the only thing that -- since our
11  government will not withhold aid, the strategy has become,
12  as looking at boycotts, to make it less appealing to the
13  Israeli government and population to continue the
14  colonization of the West Bank.
15  Q.   Do you believe that an economic boycott of Israel
16  will strengthen the bargaining position of the Palestinian
17  Authority versus -- vis-à-vis Israel?
18  A.   Perhaps not.  Because I think the Palestinian
19  Authority now is doing the bidding of Israel to -- in
20  terms of security and whatnot.  I think it's the general
21  population that it will assist.
22  Q.   Okay.  Do you believe that Israel is an apartheid
23  state?
24  A.   I'm not going to say categorically it's
25  apartheid.  I think there are definite features of

14:21:27-14:22:24                    Page 140

1   apartheid that are being employed now, and those are
2   separate legal systems, use of military tribunals for
3   Palestinians, separate roads, separate use of water,
4   discrimination in terms of issuance of buildings permits
5   in the occupied territories, in occupied portions of
6   Jerusalem, also the building issues and bulldozing
7   Palestinian places.
8        If you look at the UN definition of
9   "apartheid," it basically says it's one society imposing
10  itself over another society.  And I think that is
11  occurring and elements of that are occurring.
12  Q.   Okay.  Are you aware the Palestinian Authority
13  administers the Gaza Strip and parts of the West Bank?
14  A.   I know they've tried to.
15  Q.   Okay.
16  A.   I think recently there was an agreement
17  between -- I believe it was Hamas and the PA, Palestinian
18  Authority, where the Palestinian Authority was going to
19  start taking over.  I'm not sure that that's been
20  implemented though.
21  Q.   Okay.  And are you aware that Mahmoud Abbas is
22  the president of the Palestinian National Authority?
23  A.   Yes.
24  Q.   Are you aware that his term ended on
25  January 15th, 2009?

14:22:37-14:23:40                    Page 141

1   A.   I'm aware of that it's way overdue for elections.
2   And, you know, again, I'm no fan of the Palestinian
3   Authority.  I think they're corrupt.
4   Q.   Okay.  Do you believe that the Palestinian
5   Authority is a democracy?
6   A.   Well, I think that they had free and fair
7   elections the one time they occurred.  I think the Carter
8   Institute certified that they were free and fair at that
9   time.
10       And unfortunately, there was -- as I recall
11  from a reading of history, that there was -- the advances
12  of the other party, which was Hamas at the time, were
13  negated and it was sort of a -- somewhat of a coup in
14  their parliament.
15  Q.   And I think you just said this.  But you're aware
16  that the Palestinian National Authority operates as a
17  coalition government between the Palestinian Liberation
18  Organization and Hamas?
19  A.   I -- I believe there are some -- there is some
20  linkage.  I know there's been attempts to reconcile.  They
21  were openly hostile to one another for a long time.  I'm
22  not sure what the current status is right now.  I know
23  they've tried to reach agreements.  And I'm not sure.  And
24  I'm even less of a fan of Hamas.
25  Q.   And are you aware that Hamas is on the State

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

14:23:54-14:24:44                                         Page 142

1   Department list of terrorist organizations?
2   A.  I am, yeah.
3   Q.  Shifting gears a little bit.
4       So we've already covered some of this.  Do
5   you have a family?
6   A.  Yes.
7   Q.  Are you married?
8   A.  Yes.
9   Q.  Do you have any children?
10  A.  Yes.  I have one.
11  Q.  Okay.  Are any of your immediate family members
12  Jewish?
13  A.  My son.
14  Q.  Okay.  Are any of the extended family members --
15  excuse me.
16      Are any of your extended family members
17  Jewish?
18  A.  Well, let me explain.  I was married before to my
19  son's mother, and we split up when he was about age five.
20  She is Jewish.  And as her whole lineage, her -- my former
21  in-laws, who I still love dearly to this day, are very
22  active Jews in Nashville, and now in Florida.
23  Q.  Okay.
24  A.  And her grandparents, I knew them also well.
25  Q.  Okay.  And if you could take a look at your

14:24:58-14:25:58                                         Page 143

1   declaration.
2   A.  Yeah.
3   Q.  In paragraph 7 you say that, "My son was raised
4   Jewish."  Is that correct?
5   A.  Yes.
6   Q.  How old is your son?
7   A.  He's now 26.
8   Q.  And is your son still practicing Judaism?
9   A.  He's -- I don't know.  He's somewhat wayward on
10  that.  He identifies as, I think, both parts of his
11  lineage, which is also Norwegian.  I'm, like, a hundred
12  percent Norweigian background, Lutheran, and his mother of
13  course, Jewish-Russian, but he identifies with both.
14  Q.  Okay.
15  A.  But I think if he were to -- he's certainly
16  viewed by Judaism as being Jewish, coming from a Jewish
17  mother.
18  Q.  You discussed this previously.  But have you
19  traveled to Israel before?
20  A.  Yes.
21  Q.  How many times have you been?
22  A.  I've been on two separate occasions.
23  Q.  Okay.  And when were those trips?
24  A.  One was during college in 1977, during the
25  summer.  I was there almost the entire summer, mostly on

14:26:17-14:27:33                                         Page 144

1   the West Bank.  That's where my parents were.  And then I
2   also participated in an archaeological dig, it was in
3   Israel itself, about 15 miles east of Gaza.
4       And then the second trip was this last
5   spring, in March and April of 2017.
6   Q.  I'm sorry.  Did you say 15 miles east of Gaza?
7   A.  Apparently, yeah.
8   Q.  And is that in Israel proper?
9   A.  Yes.
10  Q.  For your 1977 trip, how did you get there?
11  A.  I'm sure I flew, yeah.
12  Q.  Do you remember who you flew with?
13  A.  I remember flying through Zurich, and -- I think
14  I flew a charter airline to Zurich, and I then I believe
15  it was Swissair after that.
16  Q.  And you've already started to cover this.  But
17  what did you do while you were in Israel, aside from the
18  activities that you just mentioned, for that 1977 trip?
19  A.  In '77, well, I toured all over.  You know, I
20  went with my parents various places, met with their
21  friends, you know.
22      They were just outside of Bethlehem, you
23  know, so we would go to Bethlehem a lot, go shopping, go
24  into Jerusalem, toured into -- went up into the Galilee
25  area in Israel itself, went to Tel Aviv, went to the beach

14:27:57-14:29:13                                         Page 145

1   in Ashkelon, which is south of Tel Aviv.  Traveled all
2   throughout Palestine to, like, Jericho, the Dead Sea, Ein
3   Gedi.  And then did all the normal things anyone would do:
4   go to the Western Wall, which is -- you know, some of us
5   call the Wailing Wall or whatever, and then also the
6   Al-Aqsa Mosque, the Muslim area on top of the Temple
7   Mount.  I don't know, just all kinds of things.
8   Q.  And what was that archeological dig about?
9   A.  It was -- we were looking at -- there were two
10  phases.  We were looking at the evidence of bone disease
11  in Bedouin tribes that were in the area.  It was like a
12  burial zone.  I don't know how I feel about this now, but
13  we basically dug up a graveyard and we studied the bones.
14  But underneath that was an early Bronze Age city.
15  Q.  Then shifting gears here.  2017 trip, how did you
16  get to Israel?
17  A.  We flew into Amman, Jordan and met with -- well,
18  that's the answer to your question.  So through Amman, and
19  then I flew out of Tel Aviv.
20  Q.  Okay.  And who did you fly with?
21  A.  I think it was Royal Jordanian flying in, and out
22  of Tel Aviv as well.
23  Q.  Okay.
24  A.  Yeah.
25  Q.  And who did you meet with while you were in

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  Jordan?
2  A.  Met with a journalist who is a friend of my
3  son's, and her name is Alisa -- and I'm forgetting her
4  last name right now.  But he was -- coincidentally, the
5  two of them went to high school together and -- but she
6  became a journalist for Al Jazeera.  And she's like a
7  stringer and would do stories about the Syrian conflict,
8  but also on the West Bank.  And so she sort of briefed us
9  about stuff that was going on in Jordan and also on the
10  West Bank and in Syria.  Pretty fascinating.
11  Q.  And what areas did you visit during that 2017
12  trip?
13  A.  We were all over, across the border, near
14  Jericho.  Came in, took the bus up to Jerusalem.  We
15  stayed in Jerusalem for about three days, I would say.
16  Met with various people there.  I can go into that later,
17  but these are the places.  And from there we went to
18  Ramallah, stayed about three days there.  That's on the
19  West Bank, sort of the center of Palestinian activity now.
20  And then from there, we went to a lovely spot called
21  Sebastia.  It's an old Arab town, just very picturesque,
22  and we hiked in the area and we met with people there.  We
23  talked to a lot of people.
24       From there, we took a bus north, went
25  through the security barrier there and went to Haifa.

1  Spent some time in Haifa.  And from there, we went into --
2  rented a car, went into the Galilee area and stayed at
3  a -- an Israeli -- it was a nature center, sort of a camp.
4  And a lot of kids were there too, in and out.  So we
5  rented a little cabin or whatever, and then we went hiking
6  around the area.  We also drove up into the Golan Heights,
7  which, quite interesting.  Saw the security barrier with
8  Syria, so we could actually see into Syria.  And then we
9  saw into Lebanon, talked with people there too.  It was
10  interesting.
11       Came back, dropped the car off in Haifa,
12  took the train down to Tel Aviv, and hung out there for a
13  couple days and, you know, toured around, talked to
14  people, whatnot, along the coast.  And then -- I then took
15  a taxi and left after -- I was there probably -- I don't
16  know, I'm thinking 16 days or so, total, including travel
17  time.  And then my son stayed on for a couple of months,
18  and he ended up doing some interesting things too.
19  Q.  Okay.  Did you go to the Gaza Strip at any point?
20  A.  No.
21  Q.  And I think you said the -- at some point you saw
22  the -- the wall that had recently been constructed?
23  A.  Oh, yeah.  Yeah.  I mean, you see it everywhere,
24  yeah.
25  Q.  Okay.  And while you were there, did you purchase

1  things from any Israeli companies?
2  A.  Oh, of course, yeah.  I mean, food, lodging, you
3  know, all kinds of things, yes.  Usually, again, it was
4  like low level, you know, buy lunch or whatever at a
5  restaurant or something.
6       I mean, I wasn't aware of buying anything
7  from large companies.  I guess the rental agency in Haifa.
8  But they have strict instructions, you can't bring the car
9  into the occupied territories.  So . . .
10  Q.  And you mentioned earlier that you started the
11  Oberlin College chapter of the Palestinian human rights
12  campaign?
13  A.  Right.
14  Q.  So what was involved with that?
15  A.  Well, it was just basically that was one of the
16  main organizations active in Palestinian rights in the
17  U.S. at that time.
18       You know, I came back.  I was all fired up
19  about the political situation.  And this is someone who --
20  you might recognize his name -- but it was James Zogby, he
21  was -- did the Zogby polls and things like that.  He's
22  very influential in the Democratic party.  But he
23  organized that nationwide.
24       And so I got together a group of people, of
25  like-minded folks, many of us were studying with a certain

1  professor at Oberlin who taught -- I think we took a course
2  in Islam class, it was pretty interesting.  And then he
3  taught about Judaism too, in Israeli, actually.  So we
4  organized that chapter.  And in fact, when I left Oberlin,
5  Zogby offered me a job in D.C.  I think my life would have
6  gone in a different trajectory if I had taken it, but I
7  turned it down.  So . . .
8  Q.  Okay.  Are you familiar with birthright Israeli
9  trips?
10  A.  Yes.
11  Q.  Was this trip kind of in lieu of that?
12  A.  You mean for my son?
13  Q.  Yeah.
14  A.  No, it wasn't.  Although I urged my son, "Hey,
15  why don't you take one of these trips?  It might be free
16  for you, and then you can go and volunteer in the West
17  Bank and plant olive trees or something."  I mean, we
18  talked about that.
19  Q.  Okay.
20  A.  You know, in theory I disagree with that unless
21  Palestinians also have the right to go back.  And I think
22  there ought to be a Palestinian birthright.  I think both
23  people should have that right.
24  Q.  And you alluded earlier to conversations that you
25  had during your 2017 trip.  Can we circle back to that?

Jordahl vs. Brnovich  
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC  
January 8, 2018

1  A.  Sure, yeah.
2  Q.  So what were those conversations?
3  A.  Well, one of the first people we met with was a
4  lady named Noga Kadman, K-a-d-m-a-n.  Noga is N-o-g-a.
5  And she had worked for probably one of the premier Israeli
6  human rights group, a Jewish woman.  And that group is
7  called B'Tselem, that's capital B, apostrophe, capital
8  T-s-e-l-e-m.  And she had written a book, it was about the
9  ethnic cleansing of Palestine in '48 or so.  And it was
10 focused on -- it was very extremely detailed.  It was
11 about 400-some-17 Palestinian villages were bulldozed in
12 that year and during the flight of some 700,000 people --
13 Palestinians.  And we talked to her about her research.
14 And they were talking about how many of the national parks
15 in Israel had been over places that were rubble from these
16 villages and whatnot.
17      And we talked to her quite a bit about that,
18 but also about the current political situation, hopes for
19 peace, whether she saw any, and, you know, about the
20 two-state solution, whether that was lost cause or not --
21 two states versus one state.  Should the Palestinian
22 struggle just turn into a struggle for equal rights in one
23 state or should they still hold out for their separate
24 state?  We were just there to listen and learn, so -- and
25 she was very interesting.

1  Q.  Okay.
2  A.  We also met with David -- he's a professor --
3  David -- I think his last name was Eckstein.  He was a
4  cousin of one of my best friends in Flagstaff.  And he is
5  one of the archeology professors at Hebrew Union College,
6  which is on the -- it's in Jerusalem.  And they had us
7  over to dinner, gave us a tour of -- I learned more about
8  archeology than I ever wanted.  I mean, he just went on ad
9  nauseam.  I mean, it was very fascinating, but just -- he
10 was just so excited about his research.
11      And then we met with his -- I don't think
12 they're married, but his partner of some, like 15 years or
13 something.  Had dinner with them.  We also talked about
14 the -- you know, any hopes for peace in the region.  He,
15 in particular, was super pessimistic about Jerusalem in
16 particular.  Apparently now it's something like 40 percent
17 Hasidic, sort of very religious, super conservative
18 Hasidic Jews that, you know, want nothing to do with Arabs
19 and just didn't see any hope for coexistence, and they're
20 expanding.  And the secular Jews like them were
21 contracting and now it was just you were left with, you
22 know, one side against the other.
23      Also, he said of note to me is that he
24 didn't see any hope that the settlements would ever be
25 evacuated, just because of the sort of religious Messianic

1  fanaticism that -- that was sort of his conclusion.  So we
2  were left with a great sense of pessimism from both of
3  those visits.
4      Then moving on to Ramallah, we met with
5  people -- it was less organized there, but we just met
6  with people.  And we talked with them, the people that ran
7  our -- the place we were staying, had long talks with
8  them.  And the thing that struck me is the inability of
9  Israelis and Palestinians to even talk or to know each
10 other.  Israelis are prohibited from going into what they
11 call zone C, which is, you know, the PA-controlled areas.
12 And those Palestinians can't get into Israel.  So there's
13 a concerted effort to keep these populations apart.  And I
14 really think if there was more contact, that there could
15 be hope of equal rights and equality.
16      But we took -- also took a tour of -- with a
17 person of Hebron.  Hebron is further south, and it's an
18 area where there are some, I don't know, few -- couple
19 hundred very religious Zionist settlers who were very
20 militant, lots of them are from Brooklyn.  And they have
21 embedded themselves in the center of Hebron and shut down
22 a lot of the place.  And we would walk in some of the main
23 streets of Hebron where there's all this commercial
24 activity in the Palestinian area, and they have had to
25 erect these nets above -- because the Jewish settlers are

1  above -- and you can see bottles of urine, excrement
2  that's thrown down, trash.  I saw that with my own eyes.
3  I can show you -- show you photographs.
4      And the checkpoints were just amazing.
5  People just, to go to their own homes in a particular area
6  near those settlers, had to go -- they couldn't ever have
7  a guest.  They had to present their ID cards, which
8  Hewlett-Packard is producing, all the biometrics, and go
9  through those checkpoints.
10      At one point a checkpoint was closed down,
11 we couldn't go through it.  So we had to hike around, got
12 to a place where there were three Israeli soldiers that
13 barred our way to go forward.  And, you know, my guide was
14 arguing with -- as it turned out, it was an Arab-Israeli
15 soldier.  And our guide was giving him a lot grief about,
16 "Why are you doing this," all that.  Finally, they let us
17 pass.  But they said that we, as Americans, could walk on
18 the paved road, but the Palestinians would have to walk on
19 this rugged path nearby.
20      And so we just all walked on the rugged path
21 and walked by.  And then we were able to go into some of
22 the Israeli areas too where our guide said, you know,
23 "Leave us here.  Go over there."  And we talked to Israeli
24 soldiers, and they were all pretty nice.  And, you know,
25 just saw some of the horrific situation there.

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1     And then when you go through the West Bank
2  you see there's, you know, some hundred settlements and
3  whole areas that are completely restricted to Palestinians
4  there.  And they're cut off from their fields, from their
5  economic well-being.  It's a bad situation.  I don't think
6  our country should support that.
7     I'm droning on here.  Just tell me, is there
8  anything in particular you want to hear?
9  Q.  No.  But that's quite useful.
10     Was your trip or any parts of it sponsored
11  or affiliated with any groups?
12  A.  No.  It was just all our own.  I'm thinking
13  unlike our politicians who get their way completely paid,
14  usually by Israel.  So . . .
15  Q.  So I think I can shift to hopefully the final
16  topic.
17     Is Kathy Brody here as your counsel in this
18  matter?
19  A.  Yes.
20  Q.  When did you retain Kathy or her organization as
21  your --
22  A.  I think I sent the retainer -- it was probably, I
23  don't know, three months ago or so.
24  Q.  Who else is counsel for you in this matter?
25  A.  Well, they're all listed here.  Brian -- Brian is

1  probably my main attorney, Brian Hauss, Vera Eidelman, Ben
2  Wizner, also Darrell Hill from Arizona ACLU.
3  Q.  Okay.
4  A.  I've got five attorneys.
5  Q.  Do you have any other attorneys other than those
6  listed on the --
7  A.  No.
8  Q.  Okay.  Does each of those counsel represent you
9  directly?
10  A.  As far as I know.
11  Q.  And do they represent you and your PC?
12  A.  Yes.
13  Q.  Okay.  Do you have a written agreement with --
14  A.  Yes.
15  Q.  When did you enter into that agreement?
16  A.  As I said, I think it was -- I don't know, maybe
17  three months ago.
18  Q.  And do you have any other agreements?
19  A.  Just those two agreements, both in my personal
20  capacity and as corporate capacity.  They're separate
21  agreements though.
22  Q.  Okay.  Do you have an agreement with the ACLU as
23  to the fees you are responsible for in connection with
24  their representation of you in this matter?
25  A.  I don't have to pay any attorneys' fees.  I

1  believe I'm on the hook for certain costs.  But I'd have
2  to review to be sure.  I mean, I'm not paying them by the
3  hour or anything like that.
4  Q.  Okay.  Can you think of any cost in particular
5  that you're responsible for?
6  A.  I'm just remembering off the top of my head, but
7  I thought it might have been costs, you know, such as
8  deposition costs or something like that.  I don't know if
9  I'm paying your bill now or not.  I don't think so.
10  Q.  When you were retained by the ACLU, did you have
11  any conversations regarding the total amount it would
12  cost -- Scratch that.
13     Have you received or you seen any bills in
14  this matter from the ACLU?
15  A.  No.
16  Q.  Have you paid any monies to any of your attorneys
17  related to this matter?
18  A.  No.
19  Q.  In the event that the Court does not award
20  plaintiffs attorneys' fees in this case, are you or anyone
21  on your behalf responsible for paying any money to your
22  counsel?
23  A.  I don't believe so.
24  Q.  In any of your -- of those two agreements, is
25  there any financial consequence if you withdraw as a

1  plaintiff in this matter?
2  A.  I don't recall.  I don't think so, but I just
3  don't recall.
4  Q.  Okay.  In terms of ACLU's representation of you
5  in this matter, are you being paid anything?
6  A.  No.
7  Q.  And do you have any expectation of a benefit?
8  A.  Yes, that I will not have to sign the
9  certification.
10  Q.  Any other expectation?
11  A.  No.
12     MR. ENSIGN:  Okay.  I think that may be it.
13     MS. BRODY:  I have a few questions if that's
14  okay.
15     MR. ENSIGN:  Sure.
16     MS. BRODY:  And I apologize for my condition
17  right now, so I'm going to try to ask the best questions
18  that I can, a few things before we close up.
19     (An off-the-record discussion ensued.)
20
21     EXAMINATION
22  BY MS. BRODY:
23  Q.  Mik, you testified that the issue of the Israeli
24  occupation of Palestine has been important to you
25  throughout your life.  Is that right?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

14:46:01-14:46:47          Page 158

1   A.   Well, I would say at least from 1977, yeah.
2   That's -- I was 19 then, so yes, the majority of my life.
3   Q.   And you said that you were all fired up when you
4   came back in 1977?
5   A.   Yes.
6   Q.   And that you were so fired up that you started
7   the Oberlin College chapter of the Palestine human rights
8   campaign?
9   A.   That's right.
10   Q.   And since that time, has it been important for
11   you to keep informed about the Israeli occupation of
12   Palestine?
13   A.   Yes. I've always kept up on -- that's been one
14   of my issues that I keep up on, yeah.
15   Q.   And I think you had testified earlier that you
16   regularly review available sources regarding that issue?
17   A.   Yes.
18   Q.   And that would information in the media?
19   A.   Yes.
20   Q.   Other information on the Internet?
21   A.   Yes.
22   Q.   And that's also including information that's
23   published by groups that call for boycotts of Israel and
24   Israeli companies that assist with the occupation?
25   A.   Yes.

14:47:08-14:48:12          Page 159

1   Q.   Why did you sign under protest when you were
2   presented with that Coconino County jail contract in 2016?
3   A.   Well, number one, the part of the statute that
4   really gets my goat -- well, all of it does. I think it's
5   an illegal political litmus test in the handing out of
6   government contracts that's clearly unconstitutional. I
7   think of the O'Hare case. And then, you know, boycotts
8   have been protected speech.
9     And when we talk about conduct versus
10   speech, boycotts are expressive conduct. And so
11   regardless of whether you split hairs on, well, does this
12   say you have to do this or not, but what it does, it
13   forces me to give up expressive conduct -- expressive
14   speech and conduct. So . . .
15   Q.   Were you afraid that you might lose your contract
16   if you didn't sign that certification?
17   A.   Well, I would have lost the contract. I mean,
18   there's no doubt about that unless I refused to sign and
19   filed and got some protection in a preliminary injunction,
20   which I do not have now. So . . .
21   Q.   I believe you testified, Mik, that you have been
22   boycotting companies that support the Israeli occupation
23   of Palestine at least since 2017 after you returned
24   from -- from your trip to Israel?
25   A.   Certainly.

14:48:25-14:49:28          Page 160

1   Q.   Excuse me, 2017, when you returned from your trip
2   in Israel?
3   A.   Yeah, certainly then.
4   Q.   And that is in response to calls to boycott from
5   Jewish Voice for Peace, ELCA, and other organizations?
6   A.   Yes.
7   Q.   Would you characterize your -- your boycott and
8   your conduct as refusing to deal and taking other actions
9   intended to limit commercial relations with companies
10   doing business in territories controlled by Israel?
11     MR. ENSIGN: Object to foundation.
12     THE WITNESS: Yes.
13     BY MS. BRODY:
14   Q.   Since you signed that certification in late 2016,
15   Mik, has that certification by your professional
16   corporation affected your personal activities in any way?
17   A.   I think it's chilled it, yes. I've been
18   reluctant to speak out on the issue before I filed this
19   lawsuit. And so it did impact me in that way, my personal
20   actions, yes.
21   Q.   When you signed the certification on behalf of
22   your professional corporation, did you expect your
23   personal speech to be chilled in that way?
24   A.   I don't think it would be, but it really ended
25   up being.

14:49:42-14:50:59          Page 161

1   Q.   How is that?
2   A.   Well, I mean, I could give you an example. I
3   think -- I think I mentioned before the Anti-Defamation
4   meeting at the synagogue in Sedona and how we were talking
5   about speech and how to talk to people, et cetera. I
6   mean, it was a stimulating conversation. Someone brought
7   up the issue of BDS and whatnot, so we talked about that a
8   bit. Things got a bit heated when I said that it's
9   important not to conflate BDS with anti-Semitism. And I
10   said that I'm very much against the occupation, I'm
11   against apartheid. Things got pretty -- you could just
12   feel the tension level go up in the room, you know, and I
13   got some support for that too. But what I realized was I
14   wanted to talk about out Arizona state law and how it
15   chills speech, and we're talking about how to talk to
16   people together, and I realized I better not even mention
17   this.
18   Q.   So you held yourself back from talking?
19   A.   I absolutely held myself back talking about that
20   and just said there was concerted effort among the most
21   right-wingers of pro-Israeli right-wingers to limit speech
22   and even to imprison speech in Congress.
23   Q.   You also just talked extensively about your trip
24   to Israel with your son in spring of 2017. And so there's
25   no need to go through that in detail again. But from your

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  testimony -- I guess I can ask you.  What was -- what were
2  your main takeaways from that trip?
3  A.  My main takeaway is that this is a horrendous
4  human rights situation here, and I do not want to be
5  supporting.  I want to work actively against it.  I want
6  to lend my support to opposing what's going on there,
7  whether it's through my professional means with my talents
8  as a lawyer, my -- individually.  I mean, I came back
9  feeling like the United States should not be involved in
10  perpetuating continued repression of a whole other society
11  and that we had to take steps in that direction.
12  Q.  Has the time -- since you signed in 2016 under
13  protest, has your view changed about your ability to
14  separate your personal political activities, including
15  your boycott, from your PC's activities?
16  A.  Yes.  Because I see them -- the more I had to
17  live under this restriction, I see it's very difficult to
18  separate the personal from the professional, like just
19  going on a business trip.  You know, if I'm paying for
20  lodging and -- do I have to look at Airbnb?  Do I have to
21  do Airbnb?  If it's in part a private trip but also a
22  business trip, if I pay half and half, can I discriminate
23  on the other half and not this half or what?  It sets up
24  an impossible situation essentially.  And I can see that
25  it's harder and harder now as I need more equipment.  My

1  equipment is getting old, some of it, you know, the
2  printer, the desktop.  I'm faced with choices that I
3  didn't have to make before.
4  Q.  So do you think it's fair to say that your speech
5  and associational rights were chilled more than you
6  expected when you signed under protest?
7  A.  Yes.
8      MR. ENSIGN: Objection.  Form.
9      THE WITNESS: Absolutely.
10      MR. ENSIGN: Foundation.
11      THE WITNESS: Sorry.
12      BY MS. BRODY:
13  Q.  I want -- I have an exhibit, Mik, that I'd like
14  to have marked here.
15      MS. BRODY: And I think it will be 4, Jerry.
16      (An off-the-record discussion ensued.)
17      (Deposition Exhibit 4 was marked for
18  identification.)
19      BY MS. BRODY:
20  Q.  So this is three-page exhibit that has just been
21  marked by the court reporter.  Can you take a look at
22  that, Mik?
23  A.  Yeah, I'm looking at it.
24  Q.  And do you recognize this?
25  A.  Yeah.

1  Q.  What is it?
2  A.  It's my correspondence with both the jail
3  commander, Lieutenant Figueroa, and also the county
4  attorney, Bill Ring, and I believe you were copied in,
5  Kathy Brody, my lawyer.
6  Q.  Okay.  And if you look at the very bottom of
7  page 2, this document says on December 5th, 2017 at 07:40
8  Mikkel Jordahl, and then it has -- and it has an email
9  address.  I think you testified earlier that you had a
10  Yahoo account.  Is mikkeljordahl@yahoo.com your email
11  address?
12  A.  Yes.
13  Q.  And then if you look to the top of page 3, it
14  says, "Hi Matt and Bill.  My apologies for delaying in
15  getting the contract addendum back to you for the annual
16  renewal of the Inmate Civil Rights Advising contract.  I'm
17  concerned about the Israel boycott prohibition (which
18  takes up about a third of the addendum ) and am looking
19  into its constitutionality.  I realize this has little to
20  do with the jail or county and is a condition imposed by
21  the state.  Please bear with me while I look into it.
22  Thanks! Mik Jordahl."
23      Did you send that email on December 5th?
24  A.  Yes.
25  Q.  And who is Matt?

1  A.  Matt is Matt Figueroa, the jail commander.
2  Q.  Okay.  And then who is Bill?
3  A.  Bill is Bill Ring, the county attorney.
4  Q.  Okay.  And then on Friday -- I'm looking toward
5  the bottom -- middle of page 2 -- there's an email that
6  says "On Friday, December 8, 2017, 9:39 a.m. MST, Figueroa
7  Matthew" -- and then it has an email address -- "wrote:
8  Thanks, Mik.  Because we don't have a renewed contract at
9  this point, we don't have an open purchase order to pay
10  your current invoices.  The last PO has expired.  We have
11  to renew the contract in order to create a PO that we pay
12  from the entire year.  Call me if you have questions.
13  Matt."  And then there's what looks like an email
14  signature of Matthew M. Figueroa, Commander, Detention
15  Services.
16      Do you recall getting that email from
17  Commander Figueroa on December 8th?
18  A.  Yes.
19  Q.  And is Commander Figueroa your main point of
20  contact for the contract -- the contracted jail services
21  that you provide?
22  A.  Well, for contract renewal issues, yes.  And he's
23  the highest level in the jail.  He's the director of the
24  jail, essentially.  But I interface with the inmate
25  relations officer, who is another individual at a lower

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1   level, and he funnels me the inmate complaints or
2   whatever.
3   Q.   Okay.  And going -- moving up a little bit
4   farther on the page, there is a "From" "Sent" "To" "CC"
5   "Subject" area.  And it appears that it is from Mik
6   Jordahl, you, and your Yahoo account again, sent on
7   Friday, December 8th, 2017 at 10:20 a.m. to Matt Figueroa,
8   cc Ring, comma, William, and Kathy Brody.  And it says
9   "Subject: Re: Jail civil rights advisor addendum issue."
10      And the email here says, "I understand Matt.
11  As you probably know, I have filed a federal lawsuit to
12  get a judicial determination on the Israel boycott
13  language in the jail contract addendum.  I understand that
14  that clause has little to do with the county or the jail
15  district and is something imposed by state law (which I
16  think is unfair to you folks).  I've also filed an
17  injunction request to prevent termination or non renewal
18  of the contract.  So I'd ask your patience until we
19  receive a ruling on that issue."
20      New paragraph, "I will plan on continuing to
21  advise inmates as the requests come through as usual.  If
22  you must stop or delay payments until we have a ruling,
23  that's fine, but I'll continue services unless you tell me
24  otherwise.  My ACLU attorney Kathy Brody put in a call to
25  Bill Ring late afternoon yesterday but apparently she

1   didn't get through and instead left a message.  I hope
2   that they can communicate.  I'm copying her here."
3       New paragraph, "Matt, can you communicate
4   this to Ms. Livingston?  I see she just sent me an email.
5   She has been patient in waiting for my signed addendum.
6   Thanks!  Mik."
7       Who is Ms. Livingston?
8   A.   She was the person -- she had also sent me an
9   email, I think it was that same day, saying, "Hey, we need
10  your addendum."
11  Q.   Okay.
12  A.   And she's an administrative person, either in the
13  county -- in the jail district or the county, I forget
14  which one.
15  Q.   And do you remember sending that email on
16  December 8th?
17  A.   I don't remember the exact date, but yes, I
18  remember sending it.
19  Q.   Okay.
20  A.   I'm sure it would have been that date.
21  Q.   Okay.  And then if you kind of flip back, going
22  forward in time to page 1, there is another email dated
23  Friday, December 8, 2017 at 10:29 MST.  And it looks like
24  it's from Matt Figueroa, again to you.  It would have been
25  just 10 minutes later or so.

1       And he says, "Sounds good Mik.  I will
2   update Kathleen.  As far as I know, all our County
3   contracts have that boiler plate language.  I was not
4   aware of the lawsuit but thanks for the heads up.  Our
5   plan is to renew but we cannot pay invoices at this point
6   because we do not have a signed and approved contract to
7   create a purchase order off of.  We will pay the invoices
8   once we have an agreed on, signed and BOS approved
9   contract, but hope you will continue to provide services
10  at this point.  Matt."
11      Do you remember getting that email?
12  A.   Yes.
13  Q.   Then just moving slightly up, it looks like just
14  a little later that morning, maybe even five minutes, you
15  sent an email to -- again to Matt Figueroa, copying
16  William Ring and me, Kathy Brody.
17      And you say to Matthew Figueroa, "Absolutely
18  will continue providing the services Matt!  Payments can
19  wait.  I've loved providing the services and don't want to
20  jeopardize that.  The suit does not name the jail as a
21  defendant but rather the State AG and the county as it
22  must to get a determination.  Bill can advise you on that
23  stuff.  But Matt, you and I can continue communicating on
24  any jail advising issues as they arise or inmate requests
25  as normal.  Sincerely, Mik?"

1       Do you remember saying that to Commander
2   Figueroa?
3   A.   I remember saying it, yes.
4   Q.   And then finally, it looks like Commander
5   Figueroa responds to you a little later that morning
6   saying, "No problem Mik.  Thank you."
7       Do you recall getting that email as well?
8   A.   Yes.
9   Q.   And, Mik, this -- this email,
10  mikkeljordahl@yahoo.com, is that the email that you use
11  for your communications in the context of your
12  professional corporation?
13  A.   Yes.
14  Q.   And do you store those emails in your regular
15  course of business?
16  A.   Yeah.  I mean, I just keep them on there.
17  Q.   Do you store, in particular, emails about your
18  contract with the Coconino County jail?
19  A.   I don't think I have separately.  This one I
20  have.  I've saved it separately and put it, you know, in a
21  file.
22  Q.   Okay.  And -- sorry, lost my train of thought
23  here.
24      Do you consider yourself the custodian of
25  these emails for your PC?

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1  A.  Yes.
2  Q.  These emails at -- using the email address
3  mikkeljordahl@yahoo.com, you have those under your custody
4  and control right now?
5  A.  Yes.
6  Q.  And so, Mik, following up on Exhibit 4, which we
7  just walked through -- and thank you for your patience --
8  do you believe that the Coconino County Jail District is
9  forcing you to sign the certification that you will not
10  engage in a boycott of Israel?
11     MR. ENSIGN: Object. Foundation and form.
12     THE WITNESS: I think they are forcing me to
13  not get -- if I want to get paid, I have to sign it.
14  BY MS. BRODY:
15  Q.  Are you going to sign the certification?
16  A.  No.
17  Q.  If the City of Sedona asked you to sign the
18  certification, would you sign it?
19  A.  No.
20  Q.  And if the City of Cottonwood asked to you sign,
21  would you do that?
22     MR. ENSIGN: Object. Foundation.
23     THE WITNESS: No, I wouldn't sign.
24  BY MS. BRODY:
25  Q.  And if the Town of Clarkdale asked you to sign

1  the certification in order to continue your contract,
2  would you do that?
3     MR. ENSIGN: Object. Foundation.
4     THE WITNESS: I wouldn't sign -- neither
5  Cottonwood nor Clarkdale requires some annual
6  certification, so it hasn't come up.
7     BY MS. BRODY:
8  Q.  But you understand, Mik, that the Coconino County
9  Jail District is not going to pay you until you sign this?
10     MR. ENSIGN: Object. Foundation.
11     THE WITNESS: I think it's pretty clear from
12  the emails that they will not pay me until I sign or get
13  some sort of judicial determination that I don't need to
14  sign.
15  BY MS. BRODY:
16  Q.  Can we just turn to Exhibit 2 really quickly?
17     And I'd like to turn you, Mik, to Exhibit 1
18  of Exhibit 2.
19  A.  Okay.
20  Q.  And I just want to point you, Mik, to the last
21  paragraph that is right above your signature line. Can
22  you read that please?
23  A.  "This Certification is hereby adopted as an
24  integral and substantive part of the Agreement, and
25  irrevocably supplements the terms thereof. Any violation

1  of this Certification by the Independent Contractor shall
2  constitute an event of material breach of the Agreement."
3  Q.  What does that mean to you?
4  A.  Well, it means that if I don't agree to sign,
5  then I'm in breach of the agreement, I can be terminated
6  at any time.
7  Q.  And what if you sign the certification and then
8  did engage in a boycott of Israel?
9     MR. ENSIGN: Object. Form.
10     THE WITNESS: Then I would be violating the
11  certification that I've signed, and I'd be violating
12  Arizona state law.
13  BY MS. BRODY:
14  Q.  Okay. Shifting gears a little bit, Mik.
15     When -- when you're making consumer -- when
16  you're making decisions to purchase goods or services in
17  response to the calls for boycott from JVP, ELCA, and
18  others, do you believe you're making a political statement
19  with those decision to purchase or not purchase?
20  A.  Of course.
21     MR. ENSIGN: Object. Form.
22     THE WITNESS: Yes, I do.
23     MS. BRODY: What's the basis, Drew?
24     MR. ENSIGN: Vague and also misleads.
25     THE WITNESS: I'm sorry?

1     MR. ENSIGN: The question is vague, and it
2  also misstates what you said earlier.
3     BY MS. BRODY:
4  Q.  You testified earlier, Mik, that you make
5  purchasing decisions in your personal capacity in response
6  to calls for boycotts by JVP, ELCA, and others, correct?
7  A.  Yes.
8  Q.  And those purchasing decisions included, for
9  instance, that in your personal capacity you would not
10  purchase HP products, correct?
11  A.  Yes.
12  Q.  And also in your personal capacity, you would not
13  use Airbnb?
14  A.  Yes.
15  Q.  And also in your personal capacity you would not
16  purchase SodaStream?
17  A.  Yes.
18  Q.  And are those -- do you believe that you're
19  making a political statement by making those decisions?
20  A.  Certainly.
21  Q.  In what way?
22  A.  Well, it's -- boycotts are peaceful acts of
23  protest and based on political beliefs.
24  Q.  Do you believe that your decisions not to
25  purchase those goods is an expression of speech on your

Jordahl vs. Brnovich
3:17-cv-08263-PCT-DJH

Mikkel Jordahl

30(b)(6) of Mikkel (Mik) Jordahl, PC
January 8, 2018

1   part?
2   A.   Absolutely.
3   Q.   Regarding the certification that you signed under
4   protest in 2016, Mik, do you read that to prohibit your
5   professional corporation to -- to prohibit its supporting
6   Jewish Voice for Peace with money?
7   A.   I'm not sure.  I'm not sure.  It may.
8   Q.   Okay.  Do you believe that the certification
9   prohibits or chills your providing Jewish Voice for Peace
10  with clerical assistance?
11  A.   Yes.  I think that that would be a direct
12  violation.
13  Q.   Why -- why is that?
14  A.   Because I would be supporting a boycott --
15  boycott as it is defined under the statute.
16  Q.   Has your signing that certification under protest
17  in 2016 chilled the ability of your professional
18  corporation to associate with JVP?
19  A.   I believe so, yes.
20  Q.   And just to follow up very quickly on some of the
21  questions towards the end of Mr. Ensign's examination,
22  your agreements with the lawyers in this case, you have a
23  personal -- an agreement in your personal capacity and a
24  separate agreement in your professional capacity, correct?
25  A.   Yes.

1   Q.   Have you paid any -- any costs so far in this
2   lawsuit?
3   A.   No.  Court costs or --
4   Q.   Any costs at all?
5   A.   No.
6   Q.   Did I pay for your lunch today?
7   A.   Yes, you did.  Not you, but your entity.  Not
8   personally.
9   Q.   And so you didn't pay the filing fees in this
10  case, right?
11  A.   No.
12  Q.   And have you ever gotten a bill from the ACLU of
13  Arizona?
14  A.   No, and I don't expect one.
15  Q.   Have you ever gotten a bill from the ACLU lawyers
16  who are in the New York office?
17  A.   No.
18       MS. BRODY: I think that's all I have, guys.
19       MR. ENSIGN: Could we go off the record for
20  one second?
21       (An off-the-record discussion ensued.)
22       MR. ENSIGN: Can we go back on?  I think
23  just one question.
24       THE WITNESS: Yeah.
25

1        FURTHER EXAMINATION
2        BY MR. ENSIGN:
3   Q.   I think when Ms. Brody was examining you just a
4   second earlier, there was a question about your -- your
5   boycott was in response JVP, ELCA, and others?
6   A.   Uh-huh.
7   Q.   Who are the others?
8   A.   Well, I think in general the BDS movement is one.
9   Again, my focus is more limited than their maximum boycott
10  level.  There are the other Protestant denominations that
11  I mentioned, several of which have adopted boycott
12  positions.  And so I'm in response to that call as well.
13  Those calls.
14  Q.   Okay.  And any others?
15  A.   Well, groups like Amnesty International.  There
16  are a variety of human rights groups that have called for
17  the same.  But I know Amnesty International is one in
18  particular.  I believe Human Rights Watch as well.
19  Q.   Okay.  And any others?
20  A.   If I had my computer, I could tell you -- I do
21  have my computer.  But I'm not -- it's a variety of
22  things, but those are the main ones.
23  Q.   You know, if you want, we can provide you a
24  computer.
25  A.   That's okay.  I mean, it's fine.  I'll leave my

1   answer at that.
2   Q.   Okay.  And so you don't recall any others right
3   now?
4   A.   Not right off the bat -- oh, yeah, Palestine
5   Human Rights Campaign is another.  I think Palestinian
6   Legal is one.  There are -- yeah, so . . .
7   Q.   Okay.  Could you indulge us and just check on
8   your computer and see any others there would be?
9   A.   I mean, I'd have to go on the Internet to -- to
10  research that.
11       MS. BRODY: I'm going to object to that,
12  guys.
13       MR. ROYSDEN: On what ground?  It was your
14  question.
15       MS. BRODY: It was my question?
16       MR. ROYSDEN: You said "and others," and
17  we're asking what your question --
18       MS. BRODY: He testified earlier and gave a
19  list --
20       MR. ROYSDEN: He didn't give his complete
21  testimony --
22       MS. BRODY: -- before you came in the
23  room --
24       MR. ROYSDEN: He just told us under oath
25  that he's going to give us --

15:11:02-15:11:21                                          Page 178

1            MS. BRODY:  He testified to a whole --

2            MR. ROYSDEN:  He testified about these

3  before?

4            MS. BRODY:  Yeah, he did.

5            MR. ROYSDEN:  You just told me that he can't

6  do it without his computer.  I want the complete list

7  right now.

8            THE WITNESS:  I don't have a complete list.

9            Why don't we just leave it at that is the

10 groups that I'm responding to, the ones that I mentioned,

11 and we'll leave it at that.

12           MR. ROYSDEN:  And that's your testimony

13 under oath?

14           THE WITNESS:  That's my testimony.

15           MS. ROYSDEN:  Under oath?

16           THE WITNESS:  I know I'm under oath.

17           MR. ROYSDEN:  So the answer is yes?

18           THE WITNESS:  Yes.

19        MR. ENSIGN:  I think that concludes things.

20        (The deposition was concluded at 3:11 p.m.)

21

22                    _____

                              MIKKEL (MIK) JORDAHL

23

24

25

---

                                                          Page 179

1  STATE OF ARIZONA     )

2  COUNTY OF MARICOPA   )

3            BE IT KNOWN the foregoing deposition was

4  taken by me pursuant to stipulation of counsel; that I was

5  then and there a Certified Reporter of the State of

6  Arizona, and by virtue thereof authorized to administer an

7  oath; that the witness before testifying was duly sworn by

8  me to testify to the whole truth; notice was provided that

9  the transcript was available for signature by the

10 deponent; that the questions propounded by counsel and the

11 answers of the witness thereto were taken down by me in

12 shorthand and thereafter transcribed into typewriting

13 under my direction; that the foregoing pages are a full,

14 true, and accurate transcript of all proceedings and

15 testimony had and adduced upon the taking of said

16 deposition, all to the best of my skill and ability.

17      I FURTHER CERTIFY that I am in no way related to

18 nor employed by any parties hereto nor am I in any way

19 interested in the outcome hereof.

20      DATED at Phoenix, Arizona, this 10th day of

21 January, 2018.

22

23                    _____

24                         Gerard T. Coash, RMR
                           Certified Reporter #50503

25

# Exhibit B



**Coash & Coash**
PHOENIX DEPOSITION REPORTERS

# ERRATA SHEET

DEPOSITION OF:    30(b)(6) of Mikkel (Mik) Jordahl, P.C.
                  by Mikkel Jordahl

DEPOSITION DATE:  01/08/2018

CAPTION:          Jordahl vs. Brnovich

---

| PAGE/LINE NO. | CHANGE AND/OR CORRECTION | REASON |
|---|---|---|
| 100/9 | "define" to "divine" | incorrect transcription |
| 138/12 | "one" to "wine" | incorrect transcription |

SIGNATURE: _Drew C. Ensign III_          DATE: 1/18/2018

1/18/2018

OFFICE USE ONLY
Page _____ of _____

**1802 N. 7th Street, Phoenix, AZ 85006**
**602.258.1440 (T)        602.258.2062 (F)**
**www.coashandcoash.com        staff@coashandcoash.com**

# Exhibit C

screenshot-bdsmovement.net-2018-01-18-16-00-20-382
https://bdsmovement.net/get-involved/what-to-boycot
18.01.2018



**WHAT IS BDS?**     **GET INVOLVED**     **CAMPAIGNS**

## GET INVOLVED

# Know what to boycott

Targeted consumer boycotts are convincing retailers across the world to stop selling products from companies profiting from Israel's crimes. Many Israeli exporters complain that it is getting harder for them to export their products.

The Palestinian BDS National Committee (BNC) calls for a boycott of all Israeli products but we also target our boycotts to focus on a small number of companies and products for maximum impact. We focus on companies that play a clear and direct role in Israel's crimes and where we think we can have an impact.

Check with BDS organisations in your country for the brands being targeted in your community.



Not targeted consumer boycott

# Exhibit D

January 18, 2018  Thursday  2 Shevat 5778
16:03 IST



Print
Print

Select Language  ▼

# THE JERUSALEM POST



Israel boycott 370.(Photo by: REUTERS)

## US scholars' group votes in favor of academic boycott of Israel

By MAYA
SHWAYDER AND
JTA
12/16/2013

*American Studies Association endorses its national council's call for a boycott of Israeli universities.*

NEW YORK – The 5,000-member American Studies Association (ASA), which describes itself as "the nation's oldest and largest association devoted to the interdisciplinary study of American culture and history," announced on Monday that it had endorsed and would participate in a boycott of Israeli universities and academic institutions.

It is the second educational group in the US to adopt the boycott. The Association for Asian American Studies did so in April. Another academic group, the American Association of University Professors, recently reiterated its opposition.

In all, 1,252 members of the ASA participated in the vote on whether or not to endorse the boycott. Approximately 66 percent voted yes, 30% voted no and 3% abstained. The voting began on December 4 and ended on Sunday.

The membership-wide canvass was unprecedented. It was undertaken in part at the behest of boycott opponents who said at the ASA's annual conference last month in Washington that the matter was too sensitive to leave to the group's 20-member national council, which had unanimously endorsed a boycott.

"The National Council engaged and addressed questions and concerns of the membership throughout the process," the ASA statement said.

"During the open discussion at the recent convention, members asked us to draft a resolution that was relevant to the ASA in particular and so the Council's final resolution acknowledged that the US plays a significant role in enabling the Israeli occupation of Palestine."

The final resolution, which applies to the ASA as an organization, is not binding on its members.

It also targets institutions, not individuals.

In Monday's announcement, the ASA said it would still invite Israeli and Palestinian academics to its 2014 national meeting in Los Angeles.

Jewish groups in the US reacted strongly and immediately to the announcement.

The boycott was a "shameful, morally bankrupt and intellectually dishonest attack on academic freedom," said Abraham H. Foxman, national director of the Anti-Defamation League (ADL), in a statement.

"Targeting Israeli institutions solely because they are in Israel – the only democratic country in the Middle East, where scholarship and debate are encouraged and flourish – is based on a myopic and fundamentally distorted perspective of Israel and the conflict and is manifestly unjust," Foxman went on. "We commend those members of the ASA who boldly spoke out and voted against this shameful resolution."

Kenneth Stern, the American Jewish Committee's director for issues of anti-Semitism and extremism, called it "blatant discrimination against Israelis."

"Academic freedom is based on the principle that human civilization benefits from the free flow of ideas and knowledge," Stern said in an AJC statement. "This resolution – ghettoizing knowledge simply because it is tied to Israeli academic institutions – violates the core principles of the academy."

Ronald S. Lauder, president of the World Jewish Congress, had similar words for the ASA , saying that it was actions like this that caused "many Americans [to] dismiss the academy as deeply biased and disconnected with reality."

On the other side of the spectrum, the California-based Jewish Voice for Peace (JVP) issued a statement supporting the boycott, saying it represented a "significant milestone in the growth of the BDS (boycott, divestment and sanctions) movement in the United States."

"With its endorsement, the members of the ASA have voted to hold Israeli institutions accountable for their participation in human rights violations, bringing into sharp focus Israeli policies that severely limit the academic freedom of Palestinians within the occupied Palestinian territory and inside Israel," JVP said.

"While Jewish Voice for Peace takes no position on academic boycotts, we do not believe that boycotts to pressure Israel to abide by international law are inherently anti-Semitic."

The group Students for Justice in Palestine (SJP) also gave its "unqualified endorsement" of the boycott, saying the resolution would "move us one small step closer to a world of democracy, freedom, and justice."

The ADL included the two groups on the list it compiled this year of the 10 most anti-Semitic organizations in the United States.

 

JPost.com: [Arab-Israeli Conflict](#) | [Israel News](#) | [Diaspora](#) | [Middle East](#) | [Opinion](#) | [Premium](#) | [Blogs](#) | [Not Just News](#) | [Edition Francaise](#) | [Green Israel](#)

Copyright © 2014 Jpost Inc. All rights reserved •
[Terms of Use](#)  • [Privacy Policy](#)

# Exhibit E

 REUTERS     🔍

CyberRisk    The Trump Effect    North Korea    Iran    Technology    Myanmar    Investigations    Fut

#WORLD NEWS

MAY 13, 2017 / 1:28 AM / 8 MONTHS AGO

# Palestinians hold local elections in West Bank but not Gaza

Ali Sawafta, Nidal al-Mughrabi      

RAMALLAH, West Bank/GAZA (Reuters) - Palestinians held municipal elections on Saturday in the occupied West Bank, a first democratic exercise in years, but one that has also raised tensions between the rival Fatah and Hamas movements.



With no legislative or presidential elections in sight, the municipal ballot is seen as a popularity test for Western-backed President Mahmoud Abbas and his Fatah party, caught in a deep rift with Islamist Hamas.

Underlining the political schism, about 800,000 Palestinians were expected to vote for representatives in 145 local councils in the West Bank, but not in the Gaza Strip.

Months of political and legal wrangling preceded Saturday's elections. Abbas's Palestinian Authority, which governs in the West Bank, and Hamas, which runs Gaza, blamed each other for the vote not being held in the small coastal enclave.

"No doubt this is the democratic life we have promised our people," said Fatah Deputy Chief Mahmoud al-Aloul. "Unfortunately this joy is taking place in the West Bank alone because Hamas is preventing the people from practicing this right in Gaza."

Hamas said The Palestinian Authority had made a unilateral decision to go ahead with the vote before an agreement on a legal framework had been reached.

A Palestinian woman casts her ballot at a polling station during municipal elections in the northern West Bank town of Anabta, near Tulkarm May 13, 2017. REUTERS/Abed Omar Qusini

"The elections are happening without national consensus. Holding them in the West Bank alone, without Gaza, will cement division," said Hamas spokesman Fawzi Barhoum.

Hamas boycotted the previous municipal elections, held in 2012. But it has urged its supporters to vote for representatives running in the current race.

Slideshow (3 Images)

The last legislative election was held in 2006 and Hamas scored a surprise victory. That laid the ground for a political rupture - Hamas and Fatah fought a short civil war in Gaza in 2007, since when Hamas has governed the small coastal enclave.

Some polls show that if parliamentary elections were held now, Hamas would win them in both Gaza and the West Bank.

This week, Hamas's bloc won the student council elections in the prominent Palestinian university Bir Zeit, an indication of the group's support in the West Bank. Fatah came second.

Abbas, 82, is now 12 years into what was to be a four-year term and is an unpopular leader according to opinion polls. He has no clear successor and there are no steps being taken toward a presidential elections any time soon.

Chairman of the Palestinian Central Election Committee Hana Naser said Saturday's vote would be transparent with 1,400 local and international observers monitoring the process.

Editing by Maayan Lubell and Mark Potter

*Our Standards:*    *The Thomson Reuters Trust Principles.*

**SPONSORED**


Hire a Pro: Compare Top 3 Financial Advisors Near You
smartasset


China's ZTE to launch 5G smartphone in US by early 2019
South China Morning Post


Bill Gates Says This Will Be Worth "10 Microsofts"
The Motley Fool


Fastest Way to Pay Off $10,000 in Credit Card Debt
WiseBread.com


See How Some Retirees Use Options Trading As A Safe Way To Earn Income
TradeWins


My #1 Rule: Don't Buy Options
Investing Daily

Promoted by **Dianomi**

Apps      Newsletters      Reuters Plus      Advertising Guidelines      Cookies      Terms of Use      Privacy



All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

© 2018 Reuters. All Rights Reserved.

# Exhibit F

# Taylor Force Act: Palestinian Terrorism-Related Payments and U.S. Aid

December 12, 2017 (IN10761)

|

## Related Authors

- Jim Zanotti

- Jeremy M. Sharp

|

Jim Zanotti, Specialist in Middle Eastern Affairs (jzanotti@crs.loc.gov, 7-1441)
Jeremy M. Sharp, Specialist in Middle Eastern Affairs (jsharp@crs.loc.gov, 7-8687)

Some Members of Congress have increased their scrutiny of the Palestinian practice of providing payments to some Palestinians (and/or their families) who have been imprisoned for or accused of terrorism by Israel. Critics have asserted that because money is fungible, any aid that directly benefits the Palestinian Authority (PA) could indirectly support such payments. Congress may consider legislation—most of the bills are known as the Taylor Force Act—that could supersede existing provisions on the subject in annual appropriations legislation. The impact that the legislation could have on overarching U.S. priorities on Israeli-Palestinian matters is unclear.

Palestinian Payments for "Martyrs" and Prisoners

According to a 2016 article, the Palestinian practice of compensating families who lost a member (combatant or civilian) in connection with Israeli-Palestinian violence dates back to the 1960s. Palestinian payments on behalf of prisoners or decedents in their current form apparently "became standardized during the second *intifada* [uprising] of 2000 to 2005." Various PA laws and decrees since 2004 have established parameters for payments. Some lawmakers and the Trump Administration have condemned the practice, focusing particular criticism on an apparent tiered structure that provides higher levels of compensation for prisoners who receive longer

sentences.

Existing Law and Aid Reductions

Since FY2015, annual appropriations legislation has provided for "dollar-for-dollar" reduction of Economic Support Fund (ESF) aid for the PA in relation to terrorism-related payments. Section 7041(*l*)(3) of the Consolidated Appropriations Act, 2017 (P.L. 115-31), reduces ESF for the PA by the amount the Palestinians provide as "payments for acts of terrorism by individuals who are imprisoned after being fairly tried and convicted for acts of terrorism and by individuals who died committing acts of terrorism during the previous calendar year."

In practice, ESF aid for the West Bank and Gaza includes

**Budget support** for the PA that is provided directly to PA creditors (namely, Israeli utility companies and private hospitals) to defray PA debts.

**Project assistance** for various purposes including humanitarian aid, and improving infrastructure and other social services. This assistance is administered by non-governmental organizations and overseen by the U.S. Agency for International Development (USAID).

To date, executive branch reporting to Congress regarding reductions made to ESF aid for the PA in relation to these payments has been classified. In July 2017, former U.S. Ambassador to Israel Daniel Shapiro testified at a congressional hearing that, beginning in FY2015, the Obama Administration reduced "the overall [annual] assistance program from about $400 million to about $260 million."



Figure 1. U.S. Bilateral Assistance to the Palestinians, FY2011-FY2018

**Sources:** U.S. State Department and USAID, adapted by CRS.

**Notes:** All amounts are approximate. Amounts stated for FY2017 remain tentative. Amounts stated for FY2018 have been requested, with ultimate FY2018 appropriation and allocation amounts to be determined. NADR = Nonproliferation, Antiterrorism, Demining and Related Programs, INCLE = International Narcotics Control and Law Enforcement, DA=Development Assistance, ESF = Economic Support Fund, OCO = Overseas Contingency Operations. For FY2018, ESF is actually Economic Support and Development Fund (ESDF).

The Taylor Force Act

Congressional scrutiny of Palestinian terrorism-related payments increased in the wake of the March 2016 death of Taylor Force, a U.S. citizen and war veteran who, while studying abroad as a private civilian, was fatally stabbed by a Palestinian attacker. The incident was part of a larger wave of Israeli-Palestinian violence that periodically resurfaces. Two bills are known as the Taylor Force Act (H.R. 1164 and S. 1697). Another contains similar provisions (S. 474). The Senate Foreign Relations Committee (SFRC) reported S. 1697 in modified form (the "SFRC version") on September 6, 2017. As congressional deliberations have proceeded, Trump Administration officials have called upon Palestinian leaders to cease payments on behalf of Palestinians who have committed terrorist acts. Earlier versions of the Taylor Force Act were introduced in the 114th Congress.

Aid Conditions

In contrast to the "dollar-for-dollar" reduction to ESF in existing legislation, the different versions of the bill would either fully or partially suspend ESF unless and until the PA meets certain conditions. In their original versions, H.R. 1164 and S. 474 would condition all ESF aid for the West Bank and Gaza—both USAID-administered project assistance and PA budget support—on an end to specified terrorism-related payments. The SFRC version of S. 1697, per Section 4, would suspend means of assistance that "directly benefit" the PA unless and until the Secretary of State certifies to Congress that the PA, among other things

- has terminated payments for acts of terrorism against Israeli citizens and United States citizens to any individual, after being fairly tried, who has been imprisoned for such acts of terrorism and to any individual who died committing such acts of terrorism, including to a family member of such individuals; and
- has revoked any law, decree, regulation, or document authorizing or implementing a system of compensation for imprisoned individuals that uses the sentence or period of incarceration of an individual to determine the level of compensation paid.

These conditions would apparently apply to all budget support to PA creditors (except for the East Jerusalem Hospital Network). It is unclear to what extent some project assistance funds might also be construed to "directly benefit" the PA.

Additionally, under Section 5 of the SFRC version, all ESF for the West Bank and Gaza (whether or not construed to "directly benefit" the PA) would be subject to a continuous certification (every 180 days) that the PA is "taking credible and verifiable steps" to end violence perpetrated by those under its jurisdiction against U.S. and Israeli citizens.

The SFRC version also includes an amendment (Section 6) that would keep any withheld ESF funding for the West Bank and Gaza in a Palestinian Authority Accountability Fund (PAAF) for up to a year in order to allow the Palestinians time to conform their practices to the bill's requirements. If this does not happen, funds held in the PAAF would be reallocated away from the West Bank and Gaza.

As reported, S. 1697 would not permit the executive branch to waive its provisions on national security grounds, despite some discussion of a possible waiver during a July 2017 committee hearing. It would also (per Section 7) apparently require the executive branch to switch from classified to unclassified annual reporting (though a classified annex would be permitted) on payments made by the PA—including estimated amounts and related legal developments.

Incorporation into FY2018 Appropriations Legislation

On September 7, the Senate Appropriations Committee reported a version of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2018 (S. 1780) that included most of the SFRC version of S. 1697, but with a substantive change that appears to have gained the bill additional support. Per the change, the continuous certification requirement from Section 5 of the SFRC version [imported to S. 1780 as Section 7041(k)(3)(B)] would only apply to types of ESF deemed to "directly benefit" the PA.

House Version

On December 5, the House passed a revised version of H.R. 1164 (the "House version") as stand-alone legislation that is similar to the corresponding provisions in the Senate FY2018 appropriations bill (S. 1780). The House version would apply from FY2018 to FY2023, and specifically exempts the following additional types of aid from limitation: (1) assistance for wastewater projects and (2) activities providing vaccinations to children. Also, under the House version of H.R. 1164, funds withheld would remain available for up to two years (versus one under S. 1780) to allow the Palestinians time to conform their practices to the bill's requirements, before being reallocated elsewhere.

Israeli and Palestinian Perspectives

The modifications reflected in the SFRC version of S. 1697 (and later incorporated into S. 1780) appear to have garnered general acquiescence from some key Israeli security officials and analysts who were reportedly concerned that more stringent conditions on project assistance could endanger West Bank stability.

Facing domestic political challenges, Palestinian leaders have publicly denounced S. 1697, and it is unclear whether passage of the bill would enhance the PA's willingness to suspend payments or otherwise change how they are made in order to maintain U.S. budget support. According to PA financial statements from calendar years 2013 to 2016, U.S. budget support has averaged around 13% of the PA's annual external support and 3.5% of annual PA spending (calculated on a commitment basis) over that time. Clearance revenues (tax and customs amounts due to the PA that Israel collects on its behalf and transfers to it per a 1994 agreement) over the same period averaged around 50% of annual PA spending.

# Exhibit G

# U.S. Department of State
## Diplomacy in Action

# Foreign Terrorist Organizations
BUREAU OF COUNTERTERRORISM

Foreign Terrorist Organizations (FTOs) are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

| Designated Foreign Terrorist Organizations | |
| --- | --- |
| **Date Designated** | **Name** |
| 10/8/1997 | Abu Sayyaf Group (ASG) |
| 10/8/1997 | Aum Shinrikyo (AUM) |
| 10/8/1997 | Basque Fatherland and Liberty (ETA) |
| 10/8/1997 | Gama'a al-Islamiyya (Islamic Group) (IG) |
| 10/8/1997 | HAMAS |
| 10/8/1997 | Harakat ul-Mujahidin (HUM) |
| 10/8/1997 | Hizballah |
| 10/8/1997 | Kahane Chai (Kach) |
| 10/8/1997 | Kurdistan Workers Party (PKK) (Kongra-Gel) |
| 10/8/1997 | Liberation Tigers of Tamil Eelam (LTTE) |
| 10/8/1997 | National Liberation Army (ELN) |
| 10/8/1997 | Palestine Liberation Front (PLF) |
| 10/8/1997 | Palestinian Islamic Jihad (PIJ) |
| 10/8/1997 | Popular Front for the Liberation of Palestine (PFLP) |

| 10/8/1997 | PFLP-General Command (PFLP-GC) |
| --- | --- |
| 10/8/1997 | Revolutionary Armed Forces of Colombia (FARC) |
| 10/8/1997 | Revolutionary People's Liberation Party/Front (DHKP/C) |
| 10/8/1997 | Shining Path (SL) |
| 10/8/1999 | al-Qa'ida (AQ) |
| 9/25/2000 | Islamic Movement of Uzbekistan (IMU) |
| 5/16/2001 | Real Irish Republican Army (RIRA) |
| 12/26/2001 | Jaish-e-Mohammed (JEM) |
| 12/26/2001 | Lashkar-e Tayyiba (LeT) |
| 3/27/2002 | Al-Aqsa Martyrs Brigade (AAMB) |
| 3/27/2002 | Asbat al-Ansar (AAA) |
| 3/27/2002 | al-Qaida in the Islamic Maghreb (AQIM) |
| 8/9/2002 | Communist Party of the Philippines/New People's Army (CPP/NPA) |
| 10/23/2002 | Jemaah Islamiya (JI) |
| 1/30/2003 | Lashkar i Jhangvi (LJ) |
| 3/22/2004 | Ansar al-Islam (AAI) |
| 7/13/2004 | Continuity Irish Republican Army (CIRA) |
| 12/17/2004 | Islamic State of Iraq and the Levant (formerly al-Qa'ida in Iraq) |
| 6/17/2005 | Islamic Jihad Union (IJU) |
| 3/5/2008 | Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) |
| 3/18/2008 | al-Shabaab |
| 5/18/2009 | Revolutionary Struggle (RS) |
| 7/2/2009 | Kata'ib Hizballah (KH) |
| 1/19/2010 | al-Qa'ida in the Arabian Peninsula (AQAP) |

| | |
|---|---|
| 8/6/2010 | Harakat ul-Jihad-i-Islami (HUJI) |
| 9/1/2010 | Tehrik-e Taliban Pakistan (TTP) |
| 11/4/2010 | Jundallah |
| 5/23/2011 | Army of Islam (AOI) |
| 9/19/2011 | Indian Mujahedeen (IM) |
| 3/13/2012 | Jemaah Anshorut Tauhid (JAT) |
| 5/30/2012 | Abdallah Azzam Brigades (AAB) |
| 9/19/2012 | Haqqani Network (HQN) |
| 3/22/2013 | Ansar al-Dine (AAD) |
| 11/14/2013 | Boko Haram |
| 11/14/2013 | Ansaru |
| 12/19/2013 | al-Mulathamun Battalion |
| 1/13/2014 | Ansar al-Shari'a in Benghazi |
| 1/13/2014 | Ansar al-Shari'a in Darnah |
| 1/13/2014 | Ansar al-Shari'a in Tunisia |
| 4/10/2014 | ISIL Sinai Province (formally Ansar Bayt al-Maqdis) |
| 5/15/2014 | al-Nusrah Front |
| 8/20/2014 | Mujahidin Shura Council in the Environs of Jerusalem (MSC) |
| 9/30/2015 | Jaysh Rijal al-Tariq al Naqshabandi (JRTN) |
| 1/14/2016 | ISIL-Khorasan (ISIL-K) |
| 5/20/2016 | Islamic State of Iraq and the Levant's Branch in Libya (ISIL-Libya) |
| 6/30/2016 | Al-Qa'ida in the Indian Subcontinent |
| 8/16/2017 | Hizbul Mujahideen (HM) |
| **Delisted Foreign Terrorist Organizations** ||

| Date Removed | Name | Date Orginally Designated |
|---|---|---|
| 10/8/1999 | Democratic Front for the Liberation of Palestine -Hawatmeh Faction | 10/8/1997 |
| 10/8/1999 | Khmer Rouge | 10/8/1997 |
| 10/8/1999 | Manuel Rodriguez Patriotic Front Dissidents | 10/8/1997 |
| 10/8/2001 | Japanese Red Army | 10/8/1997 |
| 10/8/2001 | Tupac Amaru Revolution Movement | 10/8/1997 |
| 5/18/2009 | Revolutionary Nuclei | 10/8/1997 |
| 10/15/2010 | Armed Islamic Group (GIA) | 10/8/1997 |
| 9/28/2012 | Mujahedin-e Khalq Organization (MEK) | 10/8/1997 |
| 5/28/2013 | Moroccan Islamic Combatant Group (GICM) | 10/11/2005 |
| 7/15/2014 | United Self Defense Forces of Colombia | 9/10/2001 |
| 9/3/2015 | Revolutionary Organization 17 November (17N) | 10/8/1997 |
| 12/9/2015 | Libyan Islamic Fighting Group (LIFG) | 12/17/2004 |
| 6/1/2017 | Abu Nidal Organization (ANO) | 10/8/1997 |

## Identification

The Bureau of Counterterrorism in the State Department (CT) continually monitors the activities of terrorist groups active around the world to identify potential targets for designation. When reviewing potential targets, CT looks not only at the actual terrorist attacks that a group has carried out, but also at whether the group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

## Designation

Once a target is identified, CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. Upon the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the Federal Register, at which point the designation takes effect. By law an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit not later than 30 days after the designation is published in the Federal Register.

Until recently the INA provided that FTOs must be redesignated every 2 years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the redesignation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its

designation date (or in the case of redesignated FTOs, its most recent redesignation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a 5 year period with respect to a designation, then the Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

### Legal Criteria for Designation under Section 219 of the INA as amended

It must be a foreign organization.

The organization must engage in terrorist activity, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3) (B)),**[* (http://2001-2009.state.gov/g/ct/rls/fs/08/103399.htm)](http://2001-2009.state.gov/g/ct/rls/fs/08/103399.htm)** or terrorism, as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)),**[** (http://2001-2009.state.gov/g/ct/rls/fs/08/103401.htm)](http://2001-2009.state.gov/g/ct/rls/fs/08/103401.htm)** or retain the capability and intent to engage in terrorist activity or terrorism. The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

### Legal Ramifications of Designation

It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge.''

Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).

Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

### Other Effects of Designation

Supports our efforts to curb terrorism financing and to encourage other nations to do the same.

Stigmatizes and isolates designated terrorist organizations internationally.

Deters donations or contributions to and economic transactions with named organizations.

Heightens public awareness and knowledge of terrorist organizations.

Signals to other governments our concern about named organizations.

### Revocations of Foreign Terrorist Organizations

The Immigration and Nationality Act sets out three possible basis for revoking a Foreign Terrorist Organization designation:

The Secretary of State must revoke a designation if the Secretary finds that the circumstances that were the basis of the designation have changed in such a manner as to warrant a revocation;

The Secretary of State must revoke a designation if the Secretary finds that the national security of the United States warrants a revocation;

The Secretary of State may revoke a designation at any time.

Any revocation shall take effect on the date specified in the revocation or upon publication in the Federal Register if no effective date is specified. The revocation of a designation shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation.

---

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

# Exhibit H



**Middle East**

# Palestinians form new unity government that includes Hamas

By **William Booth** and **Anne Gearan**   June 2, 2014

JERUSALEM — Palestinians overcame last-minute squabbles to form a new "government of national unity" Monday, backed by the Islamist militant group Hamas, which the United States and Israel have branded a terrorist organization.

The announcement of the transitional government, led by the moderate Palestinian Authority Prime Minister Rami Hamdallah and with ministries run mostly by technocrats, represents a significant step toward ending a seven-year feud between the Palestinian political factions that separately control the West Bank and the Gaza Strip .

It also appears to skirt, barely, U.S. prohibitions on aid to a Palestinian government that has "undue" Hamas presence or influence. The Obama administration had worked behind the scenes to suggest terms for the new coalition government that would not trigger the U.S. ban, reasoning that the money helps preserve American leverage.

The reconciliation pact throws together two antagonistic camps with opposing visions: Hamas, the resistance movement that controls the Gaza Strip and does not recognize Israel, and the Palestine Liberation Organization and its political party, Fatah, which just concluded nine months of ultimately fruitless peace negotiations with Israel.

Mahmoud Abbas, the Palestinian Authority president and PLO leader, promised that the new government would continue a course of nonviolence. He said any peace talks with the Israelis would take place under the auspices of the PLO — not the interim government.

"Today we declare the end of the split and regaining the unity of the homeland," Abbas said in a recorded speech on Palestine TV. "This black page in our history has been closed forever."

Left undecided for now is whether Hamas and its military wing will allow the new government to run the security forces in the Gaza Strip and whether Hamas would be allowed to operate more freely in the West Bank — permitted, for example, to stage mass rallies or run social programs, which the group is now banned from doing.

The naming of the new reconciliation government almost fell apart Monday morning because Hamas officials balked at a decision by Abbas to dismantle the Ministry of Prisoner Affairs and put it under the PLO mantle. As a compromise, the two factions agreed that the ministry would continue to function but be overseen by the prime minister.

Meanwhile, Israeli Prime Minister Benjamin Netanyahu vowed that he would not conduct diplomatic negotiations with a government "backed by Hamas, a terrorist organization that calls for the destruction of Israel."

Expressing widespread sentiment on the Israeli right, Finance Minister Naftali Bennett called the makeup of the new Palestinian government "terrorists in suits."

Israel's security cabinet voted unanimously to authorize economic sanctions against the Palestinian Authority and hold it responsible for attacks that originate from the Gaza Strip, a frequent launchpad for rocket attacks against Israel.

Outside of Israel, reactions to the unity government were mixed. Arab countries have been pushing the two Palestinian factions to reconcile their differences and face Israel together. Russia and Europe have expressed cautious support for the new effort.

The Obama administration has chosen a wait-and-see approach.

"At this point, it appears that President Abbas has formed an interim technocratic government that does not include ministers affiliated with Hamas," State Department spokeswoman Jen Psaki said. "Moving forward, we will be judging this government by its actions. Based on what we know now, we intend to work with this government, but we'll be watching closely to ensure that it upholds the principles that President Abbas reiterated today."

Secretary of State John F. Kerry spoke Sunday with Abbas. The State Department said afterward that Kerry "expressed concern about Hamas's role in any such government and the importance that the new government commit to the principles of nonviolence, recognition of the state of Israel and acceptance of previous agreements with it."

Abbas assured Kerry that the new government would adhere to those principles, Psaki said.

Kobi Michael, former deputy director general of Israel's Ministry of Strategic Affairs, expressed doubt Monday that the unity government would last, citing the different agendas and personalities of Hamas and Fatah.

But Michael also said that regardless of Israel's insistence that it would not recognize the new government, its security forces will still collaborate with Palestinian police in the West Bank — if only to keep an eye on Hamas.

Israel withdrew in April from U.S.-brokered peace talks with the Palestinians after Hamas and Abbas announced their intent to form a unity government and then hold presidential and parliamentary elections within six months. At the time, President Obama called the reconciliation announcement "unhelpful."

In Washington, Republican Sens. Mark Kirk (Ill.) and Marco Rubio (Fla.) called for a suspension and review of U.S. aid, saying the Palestinian announcement shows that Israel "does not have a viable partner for peace."

The unity government is an "end run" around U.S. restrictions, they said.

But Rep. Brad Sherman (D-Calif.) was more cautious, saying that although the Palestinian agreement appears tailored to meet the letter of the U.S. law setting out terms for aid, Congress might attach further conditions for some assistance.

The Palestinians last held elections in January 2006, and Abbas has served for years without a full electoral mandate.

Hamas won the 2006 parliamentary elections and, after a violent confrontation, threw Fatah leaders out of the Gaza Strip in 2007. The Palestinian people and government have been divided by geography and politics for seven years.

*Gearan reported from Washington.*

 **228 Comments**

William Booth is The Post's London bureau chief. He was previously bureau chief in Jerusalem, Mexico City, Los Angeles and Miami. 🐦 Follow @boothwilliam

Anne Gearan is a White House reporter for The Washington Post. 🐦 Follow @agearan

# Exhibit I

## House Final Reading - HB2617 ✕

| Action Date | Action | Vote | |
|---|---|---|---|
| 03/14/2016 | Passed | 42-16-2-0-0 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACKERLEY | Y | COBB | Y | LAWRENCE | Y | PLUMLEE | N |
| ALLEN J | Y | COLEMAN | Y | LEACH | Y | PRATT | Y |
| ALSTON | Y | ESPINOZA | Y | LIVINGSTON | Y | RIOS | N |
| ANDRADE | N | FANN | Y | LOVAS | Y | RIVERO | Y |
| BARTON | Y | FARNSWORTH E | Y | MACH | N | ROBSON | Y |
| BENALLY | NV | FERNANDEZ | N | MCCUNE DAVIS | Y | SALDATE | N |
| BOLDING | N | FINCHEM | Y | MENDEZ | N | SHOPE | Y |
| BORRELLI | Y | FRIESE | N | MESNARD | Y | STEVENS | Y |
| BOWERS | Y | GABALDÓN | N | MEYER | Y | THORPE | Y |
| BOYER | Y | GONZALES | N | MITCHELL | Y | TOWNSEND | Y |
| BROPHY MCGEE | Y | GRAY | Y | MONTENEGRO | Y | UGENTI-RITA | |
| CAMPBELL | Y | HALE | N | NORGAARD | Y | VELASQUEZ | N |
| CARDENAS | Y | KERN | Y | OLSON | Y | WENINGER | Y |
| CARTER | NV | KOPEC | N | OTONDO | Y | WHEELER | N |
| CLARK | N | LARKIN | Y | PETERSEN | Y | GOWAN | Y |

# Exhibit J

## Senate Third Reading - HB2617

| Action Date | Action | Vote | |
|---|---|---|---|
| 03/10/2016 | Passed | 23-6-1-0-0 | Amended |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ALLEN S | Y | DIAL | Y | LESKO | Y | SHERWOOD | Y |
| BARTO | Y | DONAHUE | Y | MCGUIRE | Y | SHOOTER | Y |
| BEGAY | Y | DRIGGS | Y | MEZA | Y | SMITH | Y |
| BRADLEY | N | FARLEY | NV | MIRANDA | Y | WORSLEY | Y |
| BURGES | Y | FARNSWORTH D | Y | PANCRAZI | Y | YARBROUGH | Y |
| CAJERO BEDFORD | N | GRIFFIN | Y | PIERCE | Y | YEE | Y |
| CONTRERAS | N | HOBBS | N | QUEZADA | N | BIGGS | Y |
| DALESSANDRO | N | KAVANAGH | Y | | | | |