# EXHIBIT 1

# EXHIBIT 1

Brian J. Schulman (SBN 015286), schulmanb@gtlaw.com
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone: (602) 445-8000
schulmanb@gtlaw.com

Gregory E. Ostfeld (pro hac vice application forthcoming)
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
ostfeldg@gtlaw.com

*Attorneys for Amicus Curiae American Jewish Committee*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., <br><br> Plaintiffs, <br><br> v. <br><br> Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities, <br><br> Defendants. | NO. 3:17-CV-08263-DJH <br><br> **BRIEF OF *AMICUS CURIAE* AMERICAN JEWISH COMMITTEE** |

# **TABLE OF CONTENTS**

INTEREST OF THE *AMICUS* ................................................................................................ 1

INTRODUCTION .................................................................................................................... 2

ARGUMENT ........................................................................................................................... 4

    I.    HB 2617 Does Not Impose Any Limits on Mr. Jordahl's Personal Participation in a Boycott, nor Does It Restrain His Expression or Association ................................................................................................ 4

    II.   HB 2617 Only Prevents the Firm from Engaging in an Invidious or Discriminatory Boycott Subsidized by the Government, and Does Not Limits Its Expression or Association ................................................... 8

CONCLUSION ..................................................................................................................... 12

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Agency for International Development v. Alliance for Open Society International, Inc.*,
570 U.S. 205 (2013) .................................................................. 7, 8, 10, 12

*Board of County Commissioners, Wabaunsee County v. Umbehr*,
518 U.S. 668 (1996) .................................................................. 10

*Cammarano v. United States*,
358 U.S. 498 (1959) .................................................................. 9

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .................................................................. 12

*Pickering v. Board of Education*,
391 U.S. 563 (1968) .................................................................. 10

*Regan v. Taxation With Representation of Washington*,
461 U.S. 540 (1983) .................................................................. 9, 12

*Rust v. Sullivan*,
500 U.S. 173 (1991) .................................................................. 9, 12

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ...................................................... 11

*United States v. Am. Library Ass'n, Inc.*,
539 U.S. 194 (2003) .................................................................. 9, 12

*Waters v. Churchill*,
511 U.S. 661 (1994) .................................................................. 10

**State Cases**

*Glazer v. State*,
242 Ariz. 391, 396 P.3d 627 (Ariz. App. 2017) ........................... 6

*Hosea v. City of Phx. Fire Pension Bd.*,
224 Ariz. 245, 229 P.3d 257 (Ariz. App. 2010) ........................... 6

*JHass Grp. L.L.C. v. Ariz. Dep't of Fin. Insts.*,
238 Ariz. 377, 360 P.3d 1029 (Ariz. App. 2015) ......................... 5

LAW OFFICES
**GREENBERG TRAURIG**
2375 EAST CAMELBACK ROAD, SUITE 700
PHOENIX, ARIZONA 85016
(602) 445-8000

*Powers v. Carpenter*,
  203 Ariz. 116, 51 P.3d 338 (2002) ................................................................................ 5

*Slayton v. Shumway*,
  166 Ariz. 87, 800 P.2d 590 (1990) ................................................................................ 5

*State v. Miller*,
  100 Ariz. 288, 413 P.2d 757 (1966) .............................................................................. 5

*Welch–Doden v. Roberts*,
  202 Ariz. 201, 42 P.3d 1166 (Ariz. App. 2002) ............................................................ 5

*Wright v. Gates*,
  243 Ariz. 118, 402 P.3d 1003 (2017) ............................................................................ 5

**Statutes**

A.R.S. §§ 35-301-35-393.03 ............................................................................................... 6

A.R.S. § 35-393 ........................................................................................................ 4, 5, 11

A.R.S. § 35-393.01 ..................................................................................................... 5, 6, 8

**Other Authorities**

*Black's Law Dictionary* 59 (7th ed.1999) ........................................................................ 11

## INTEREST OF THE *AMICUS*

The American Jewish Committee ("AJC") is a national organization with more than 125,000 members and supporters and 22 regional offices nationwide. It was founded in 1906 to protect the civil and religious rights of American Jews. Its mission is to enhance the well-being of Israel and the Jewish people worldwide, and to advance human rights and democratic values in the United States and around the world. AJC frequently speaks out on issues of public concern, including events in the Middle East, Israeli-Palestinian relations, and anti-Semitism.

In accordance with its mission and values, AJC opposes the use of public funds to support the so-called Boycott, Divestment, and Sanctions ("BDS") movement, which markets itself as a non-violent movement to boycott, divest from, and sanction Israel with the putative goal of getting it to withdraw to its pre-1967 borders, but whose leadership in fact seeks and has actively promoted the elimination of Israel as a Jewish state. AJC has actively sought to rally elected officials to reject the BDS movement. AJC has also spearheaded legislation to ensure that no unit of government is compelled to subsidize a contractor's decision to boycott Israeli goods or services. To that end, AJC supports the certification requirement contained in House Bill 2617, A.R.S. § 35-393 *et seq.* ("HB 2617" or the "Act"), which the present lawsuit seeks to enjoin and declare unconstitutional.

Plaintiffs misconstrue and mischaracterize HB 2617 as a restraint on personal boycotts, as well as related acts of expression and association. That is not the Act's scope or effect. Though AJC vocally and vigorously opposes the BDS movement, it fully supports each citizen's right to engage in personal boycotts as an expression of his or her individual social, political, religious, or moral beliefs. The Act is not intended to reach, and should not reasonably be construed to reach, such personal conduct. Rather, the Act expresses the State's legitimate interest in ensuring that public funds are not used to subsidize a contractor's engagement in boycotts or other BDS activities that either impair the State's commerce with Israel or are carried out in a manner that

discriminates on the basis of nationality, national origin or religion and that is not based on a valid business reason. The State is not obliged to expend public resources to subsidize such activities.

HB 2617 protects the State's legitimate government interest by requiring State contractors to certify that they are not participating in such boycotts of Israel with respect to the contracted goods or services they are supplying. Protecting this interest need not and does not impede individual expression or association. The Act cannot be construed to prevent individuals from participating in boycotts in their personal capacities. And it cannot be construed to prevent individuals from expressing their personal views regarding boycotts or associating with others who share their views. AJC therefore respectfully submits this *amicus curiae* brief to clarify the legitimate and constitutional scope of the Act.

## INTRODUCTION

Plaintiffs challenge the constitutionality of HB 2617, which requires government contractors to certify in their capacity as contractors that they are not engaged in boycotts of Israel. Plaintiff Mikkel Jordahl ("Mr. Jordahl") states that he personally participates in a political boycott of consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories. (Dkt. No. 1 at 6-8; Dkt. No. 6 at 1). His law firm, Plaintiff Mikkel (Mik) Jordahl, P.C. (the "Firm") has contracted with the Coconino County Jail District for the past twelve years to provide legal services to incarcerated individuals, with annual renewals. (Dkt. No. 1 at 8; Dkt. No. 6 at 1). After the Act took effect on August 6, 2016, Mr. Jordahl signed a certification on behalf of the Firm, under protest, certifying that the Firm is not currently engaged in a boycott of Israel as defined by the Act. (Dkt. No. 1 at 8-9; Dkt. No. 6 at 1). Mr. Jordahl made clear that he was signing the certification solely on behalf of the Firm, and not in his personal capacity, and has been careful to separate his personal boycott participation from the operation of his Firm. (Dkt. No. 1 at 9-10; Dkt. No. 6 at 1-2).

Plaintiffs allege that, notwithstanding this separation, the Act has chilled

2

Plaintiffs' expression and association. With respect to Mr. Jordahl, Plaintiffs allege he fears that vocal advocacy about his personal boycott participation would lead to suspicion about the Firm's compliance with the certification, and that he has felt pressure not to promote or discuss his personal boycott participation in public. (Dkt. No. 1 at 11; Dkt. No. 6 at 2). As to the Firm, Plaintiffs allege the Act has prevented it from affiliating with organizations that participate in political boycotts of Israel, and from refusing to purchase Hewlett Packard printers it otherwise would not buy. (Dkt. No. 1 at 10-11; Dkt. No. 6 at 1-2). Plaintiffs seek to enjoin enforcement of the Act and to have it declared unconstitutional. (Dkt. No. 1 at 12-14; Dkt. No. 6).

AJC respectfully submits that Plaintiffs have misconstrued and mischaracterized HB 2617 as applied to each Plaintiff, and that their fears about it are consequently misplaced. Mr. Jordahl is correct that the Act does not apply to his personal participation in a political boycott, nor does it restrain or limit his activities of expression or association relating to his personal participation in such a boycott. Accordingly, his fears about his personal, vocal advocacy are ill-founded; he is free to continue to express himself. The Firm, for its part, is incorrect in its view that the Act in any way limits its expressive or associative activities. The Act only requires that a government contractor, in its capacity as a contractor, certify that it is not currently engaged in a boycott that impairs the State's commerce with Israel or is carried out in an unlawfully discriminatory manner. The State has the right to seek such a certification in furtherance of its legitimate interest in ensuring that it is not forced to subsidize invidious or discriminatory political boycotts at taxpayer expense. The enforcement of this legitimate interest does not prevent contractors from continuing to express their political views or to associate with organizations sharing their political views. The Firm remains free to express itself and to associate itself politically with other organizations.

For these reasons, AJC submits that this lawsuit is not grounded in the text, purpose, or scope of HB 2617 or any genuine restrictions it imposes, but rather in Plaintiffs' misreading of the Act and unnecessary self-imposed restraints that the Act

3

neither sought nor required. To grant preliminary injunctive relief under these circumstances, where a plain text reading of the Act is sufficient to avoid constitutional concerns, is injudicious. Moreover, a hasty ruling by this Court granting such injunctive relief would impact not only the legitimate aims advanced by HB 2617, but could also serve as adverse precedent with respect to the laws of the twenty-three other States that have adopted legislation or executive orders toward the same end of protecting the States' commerce with Israel and preventing governmental subsidies of discriminatory boycotts. (Dkt. No. 28, App. A). Plaintiffs' motion for preliminary injunction should therefore be denied.

## ARGUMENT

**I.  HB 2617 Does Not Impose Any Limits on Mr. Jordahl's Personal Participation in a Boycott, nor Does It Restrain His Expression or Association**

HB 2617 does not place any restrictions whatsoever on Mr. Jordahl's personal activities, including his personal decision to participate in a political boycott of his own design, as well as his expressive and associative activities in relation to that decision. This is clear from the Act's text, as well as its contextual placement in the chapter of Arizona law governing the handling and management of public funds. HB 2617 amends Title 35, Chapter 2 of the Arizona Revised Statutes—pertaining to "Handling of Public Funds"—to add a new article (Article 9) addressing Israel Boycott Divestments. A.R.S. § 35-393 *et seq*. Its scope is expressly limited to the activities of government contractors in their capacities as recipients of public funds, and thus requires a nexus to the government contract at issue. Because Mr. Jordahl has no such nexus in his personal capacity, the Act does not apply to him and imposes no limits on his decision to participate in a personal boycott or his related activities and expression.

The Act defines a "boycott" as "engaging in a refusal to deal, terminating business activities or performing other actions that are intended to limit commercial relations with Israel or with persons or entities doing business in Israel or in territories controlled by Israel, if those actions are taken either: (a) In compliance with or

4

adherence to calls for a boycott of Israel other than those boycotts to which 50 United States Code section 4607(c) applies [or] (b) In a manner that discriminates on the basis of nationality, national origin or religion and that is not based on a valid business reason." A.R.S. § 35-393(1). It then provides:

> A public entity may not enter into a contract with a company to acquire or dispose of services, supplies, information technology or construction unless the contract includes a written certification that the company is not currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel.

A.R.S. § 35-393.01(A). The Act further defines a "company" as "a sole proprietorship, organization, association, corporation, partnership, joint venture, limited partnership, limited liability partnership, limited liability company or other entity or business association, and includes a wholly owned subsidiary, majority-owned subsidiary, parent company or affiliate." A.R.S. § 35-393(2).

The Court's primary goal in interpreting a statute "is to give effect to legislative intent." *JHass Grp. L.L.C. v. Ariz. Dep't of Fin. Insts.*, 238 Ariz. 377, 384 ¶ 27, 360 P.3d 1029, 1036 (Ariz. App. 2015). Arizona follows the bedrock principle of statutory construction that a statute should be construed in accordance with its "plain language as the most reliable indicator of meaning." *Powers v. Carpenter*, 203 Ariz. 116, ¶ 9, 51 P.3d 338, 340 (2002). "A statute's words are 'given their ordinary meaning unless it appears from the context or otherwise that a different meaning is intended.'" *Wright v. Gates*, 243 Ariz. 118, ¶ 7, 402 P.3d 1003, 1005 (2017) (quoting *State v. Miller*, 100 Ariz. 288, 296, 413 P.2d 757, 763 (1966)). "In construing statutes, we have a duty to interpret them in a way that promotes consistency, harmony, and function." *Welch–Doden v. Roberts*, 202 Ariz. 201, ¶ 22, 42 P.3d 1166, 1171 (Ariz. App. 2002). Moreover, "where alternate constructions are available, we should choose that which avoids constitutional difficulty." *Slayton v. Shumway*, 166 Ariz. 87, 92, 800 P.2d 590, 595 (1990).

Here, a simple, plain language reading of this statute quickly dispels whatever concerns Mr. Jordahl may have that it could possibly be understood to reach his

5

decision to participate personally and individually in a political boycott of Israel, or his expressive or associational activities in connection with such a boycott. By its own language, HB 2617 only applies to contracts entered into between a "public entity" and a "company" to "acquire or dispose of services." A.R.S. § 35-393.01(A). Mr. Jordahl is not a "company," and according to his own allegations, he does not have any "contract" with a "public entity" in his individual capacity; the only contract is between the Firm and the Coconino County Jail District. (Dkt. No. 1 at 8; Dkt. No. 6 at 1). As to Mr. Jordahl's personal activities, therefore, at least three textual requisites of the Act— "contract," "company," and "public entity"—are not met. His personal decision to participate in a boycott, to express his vocal support of the boycott, and to associate with other persons or organizations sharing his views cannot bring him within the scope of the Act under any reasonable textual construction of the statute.[1]

The context of the Act's placement in the chapter of Arizona law pertaining to "Handling of Public Funds" further reinforces the point that it does not apply to Mr. Jordahl's personal activities. In construing an Arizona statute, this Court should give attention not only to its language, but must also "construe the statute in context with other related provisions and its place in the statutory scheme." *Glazer v. State*, 242 Ariz. 391, 394 ¶ 11, 396 P.3d 627, 630 (Ariz. App. 2017) (citing *Hosea v. City of Phx. Fire Pension Bd.*, 224 Ariz. 245, 250 ¶ 23, 229 P.3d 257, 262 (Ariz. App. 2010)). The Arizona Legislature placed HB 2617 as a new article in the body of law dealing with handling and management of public funds. *See* A.R.S. §§ 35-301 to 35-393.03. Mr. Jordahl, in his personal capacity, is not a recipient of public funds from any Arizona public entity. And, as discussed below, the legitimate public interest to which the Act is directed is the Legislature's determination to protect the State's commerce with Israel and not to allow public funds to be used to subsidize an invidious or discriminatory

---

[1] The State's Combined Response to Plaintiffs' Motion for a Preliminary Injunction and Motion to Dismiss (Dkt. No. 28) (the "State's Response") further argues and offers testimonial support for the conclusion that Mr. Jordahl's personal boycott does not meet the statutory definition of a "boycott of Israel." (Dkt. No. 28 at 6-10, 12-13).

boycott. *See* § II, *infra*. Because Mr. Jordahl's personal boycott and personal expressive and associational activities have no nexus to the State's commerce with Israel, or to the handling or management of public funds, they are outside the scope of the Act and not reasonably subject to any legal restraint.

Thus, whatever fears Mr. Jordahl may have, and whatever limitations he may have placed on his own expressive and associational activities, are self-imposed and are not grounded in the text or context of HB 2617. His constitutional claim as directed to his own personal activities requires neither injunctive nor declaratory relief. At most, the Court need only reiterate what is already plain on the face of the Act: It does not apply to Mr. Jordahl or his personal boycott.

Indeed, Mr. Jordahl acknowledges repeatedly that he has expressly assumed the Act's certification requirement does ***not*** apply to his individual boycott activities, and states that the Firm does ***not*** participate in his personal boycott. (Dkt. No. 1 at 9-10; Dkt. No. 6 at 15; Dkt. No. 6-1 at 4-5). But Plaintiffs argue that, because Mr. Jordahl and the Firm are "closely identified," the "apparent inconsistency between the company's stated position and the owner's personal activities muddies the message." (Dkt. No. 6 at 150). In support of that position, Plaintiffs cite *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205, 219 (2013), which found that an unconstitutional funding restriction obligating recipients to have an affirmative policy "explicitly opposing prostitution" was not cured by "affiliate guidelines" permitting funding recipients to work with affiliated organizations that do not abide by the same condition. That case is inapposite for two reasons.

First, the problem the Court identified in *Alliance for Open Society* is that the funding recipient is obliged to "espouse a specific belief as its own." 570 U.S. at 219. Here, neither Mr. Jordahl nor the Firm is required to "espouse" any "belief" under HB 2617. The Act obliges the Firm only to certify that "is not currently engaged in" a boycott of Israel as defined by the Act, while Mr. Jordahl is required to make no certification at all. As Mr. Jordahl concedes, he had little difficulty arranging his

7

actions, and those of the Firm, to comply with this certification. (Dkt. No. 1 at 9-10; Dkt. No. 6 at 15; Dkt. No. 6-1 at 4-5). The only restraints on espousal of "belief" by Mr. Jordahl are the wholly needless restrictions he has chosen to place on himself.

Second, the Court acknowledged in *Alliance for Open Society* that where the funding recipient is "distinct" from the affiliate, the constitutional concern is confined to the funding recipient, because "the arrangement does not afford a means for the *recipient* to express *its* beliefs." 570 U.S. at 219 (emphases in original). Here, insofar as Mr. Jordahl acknowledges that he has been able to keep his own activities distinct from those of the Firm, the only issue in this case is whether the Firm is able to express its beliefs. That question is taken up below, *see* § II, *infra*, but as to Mr. Jordahl personally, his interests are not implicated.

## II. HB 2617 Only Prevents the Firm from Engaging in an Invidious or Discriminatory Boycott Subsidized by the Government, and Does Not Limits Its Expression or Association

HB 2617 requires the Firm, in its capacity as a government contractor, to certify that it is not "currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel," as defined by the Act. A.R.S. § 35-393.01(A). Plaintiffs seek to cast this certification requirement as an unconstitutional prohibition on a government contractor's freedom of expression and association. Ample precedent, however, supports the government's legitimate interest in imposing funding conditions to avoid subsidizing a government contractor's personal politics. That is precisely what the Act accomplishes, and it is narrowly tailored to that end. HB 2617 requires the Firm to certify that it is not engaged in a boycott of Israel as specifically defined by the Act, which would impair the State's own commerce with Israel or place the State in the position of subsidizing invidious or discriminatory boycott activities with public funds. The Act places no ancillary restrictions on the Firm's expressive or associational activities. Contrary to Plaintiffs' mistaken assertions, the Firm remains free to express its views on Israel and to align itself with groups like Jewish Voice for Peace that are themselves engaged in boycott activities.

It is well-settled that a recipient of public funds is not entitled to have its political expression "subsidize[d]" with those public funds, and "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (quoting *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) (internal citation omitted)). "Within broad limits, 'when the Government appropriates public funds to establish a program it is entitled to define the limits of that program." *Id.* at 211 (quoting *Rust*, 500 U.S. at 194). In *Rust*, for example, Congress had appropriated federal funding for family planning services and forbidden the use of such funds in programs that provided abortion counseling. 500 U.S. at 178. The Supreme Court upheld the restriction, finding that it did not compel the recipients to relinquish their constitutional right to engage in abortion counseling, but only insisted on public funds being spent "for the purposes for which they were authorized." *Id.* at 196. Similarly, in *American Library Association*, the Court affirmed that Congress could impose a restriction on its Internet assistance programs to public libraries, requiring them to install filtering software on Internet-accessible computers. 539 U.S. at 212. The Court held that the restriction "simply reflects Congress' decision not to subsidize" libraries choosing not to install such software, while leaving the libraries "free to do so without federal assistance." *Id.* And in *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546 (1983), the Court upheld a restriction limiting tax exemption status to nonprofit organizations that do not engage in substantial lobbying activities, and rejected the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." (quoting *Cammarano v. United States*, 358 U.S. 498, 515 (1959)) *see also id.* at 549 ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny.").

These holdings establish as a "general matter" that "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds," and "[t]his remains true when the objection is that a condition may affect the recipient's

exercise of its First Amendment rights." *Alliance for Open Society*, 570 U.S. at 214. The only limitation on this general rule is that a funding condition may not be used specifically to impose an "unconstitutional burden on First Amendment rights." *Id*. The "relevant distinction," the Court had held, "is between conditions that define the limits of the government spending program" and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id*. at 214-15.

Plaintiffs' *Pickering* line of authority does not alter these principles, though it frames the question somewhat differently in the inapposite context of termination of government employees or contractors for exercise of their First Amendment rights. In *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the Court held that a public teacher should be permitted to express his opinion on a matter of public concern— whether the school system requires additional funds—without fear of retaliatory dismissal, while acknowledging that government employees' protected exercise of their First Amendment rights depends upon the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." The Court extended this balancing test to termination of government contractors in *Board of County Commissioners, Wabaunsee County v. Umbehr*, 518 U.S. 668, 675-76 (1996), adding that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer," and therefore acknowledging that courts "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." (quoting *Waters v. Churchill*, 511 U.S. 661, 675 (1994)). Accordingly, even if these authorities pertaining to the termination of government employees and contractors applied in the context of funding conditions (though they do not), they afford deference to the government's imposition of conditions that are designed to avoid harmful

10

conduct, particularly where they impose only incidental limits on speech or expression.

Here, HB 2617 does not impose even incidental limitations on the Firm's expressive or associational conduct. At the outset, contrary to Plaintiffs' allegations, HB 2617 does not require the Firm to refrain from espousing its support for boycotts, nor does it by its plain terms prohibit the Firm from aligning itself with or even financially contributing to separate organizations that support and participate in boycotts of Israel, like Jewish Voice for Peace. The Act's definition of "company" is limited to the contractor entity itself, as well as "a wholly owned subsidiary, majority-owned subsidiary, parent company or affiliate." A.R.S. § 35-393(2). The ordinary meaning of "affiliate" in the context of a "company" is "a 'corporation that is related to another corporation by shareholdings or other means of control[.]'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting *Black's Law Dictionary* 59 (7th ed.1999)). It does not include separate organizations like Jewish Voice for Peace, with no common ownership or control. Like Mr. Jordahl, the Firm is free to express its views regarding boycotts and to associate itself with like-minded organizations supporting boycotts as it chooses, and any restrictions it has placed on its own activities in that regard are self-imposed, and unrelated to the plain meaning of the Act. The Firm's expressive and associational activities are thus wholly unencumbered by the Act.

Moreover, the only practical limitation the Firm alleges it has experienced as a consequence of its required certification under the Act is that it would like to refuse to purchase Hewlett Packard equipment for use in its contracted work, "based on Hewlett Packard's provision of information technology services used by Israeli security checkpoints throughout the West Bank." (Dkt. No. 1 at 10-11; Dkt. No. 6 at 6). Assuming, *arguendo*, that this falls within the Act's definition of a "boycott of Israel"— though the State has argued to the contrary (*see* Dkt. No. 28 at 6-10, 12-13)—it is within the State's legitimate interest to refrain to subsidize boycotts that would impede the State's commerce with Israel. Even if the Firm's proposed boycott of Hewlett Packard equipment were found to fall within the category of constitutionally protected

11

expressive boycotts under *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982), the Firm's ability to engage in such a boycott is not absolute.

Indeed, the State plainly has a legitimate interest in preserving its own commerce with Israel through its contracts, and in preventing the use of public funds to subsidize an invidious or discriminatory boycott. The States' Response provides ample discussion of the State's authority—under its power to regulate commerce, police power, and interest in prohibiting discrimination—to impose restrictions designed to prevent interference with commerce between the State and Israel or discriminatory conduct targeting the nationality, national origin, or religion of Israel and Israeli companies. (Dkt. No. 28 at 22-25). When these interests are coupled with the State's well-recognized authority to impose funding restrictions out of a refusal to use public funds to subsidize personal political activity, the State's legitimate interest in defining the limits of its public spending programs plainly outweighs a government contractor's interest in undertaking an invidious or discriminatory boycott against Israel. *See Alliance for Open Society*, 570 U.S. at 214; *Am. Library Ass'n*, 539 U.S. at 211-12; *Rust*, 500 U.S. at 193-94; *Regan*, 461 U.S. at 546. The Firm is free to boycott, but it is not free to demand that public funds be used to subsidize any and all boycotts it may desire to undertake, without regard to the State's interest in protecting commerce or preventing discrimination.

## CONCLUSION

HB 2617 does not impose any limitations on Plaintiffs' expressive or associational conduct, and does not preclude Mr. Jordah's personal boycott. Moreover, the State clearly has a legitimate interest in refusing to allow its public funds to be used to subsidize more invidious and discriminatory boycotts of the type not at issue in this case. Under these circumstances, a preliminary injunction is neither supported nor necessary, where a simple textual and contextual reading of the Act can avoid all constitutional concerns. Accordingly, for these reasons, Plaintiffs' demand for preliminary injunctive relief should be denied.

DATED this 2nd day of February, 2018.

GREENBERG TAURIG, LLP


By: */s/ Brian J. Schulman*
Brian J. Schulman
Gregory E. Ostfeld (*pro hac vice* application forthcoming)

*Counsel for Amicus Curiae*
*American Jewish Committee*

# CERTIFICATE OF SERVICE

☒ I hereby certify that on February 2, 2018, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and distribution to all registered participants of the CM/ECF System:

By: */s/ Amy L. Hershberger*
Employee, Greenberg Traurig, LLP