KEN PAXTON
  Attorney General of Texas
JEFFREY C. MATEER
  First Assistant Attorney General
BRANTLEY D. STARR
  Deputy First Assistant Attorney General
JAMES E. DAVIS
  Deputy Attorney General for Civil Litigation
DAVID J. HACKER (TX Bar No. 24103323)*
  Special Counsel for Civil Litigation
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Mail Code 001
Austin, Texas 78711-2548
(512) 936-1414
david.hacker@oag.texas.gov

*Attorneys for Amicus Curiae Texas*

ADAM PAUL LAXALT
  Attorney General of Nevada
JOSEPH TARTAKOVSKY (NV Bar. No. 13796)
  Deputy Solicitor General
STATE OF NEVADA, OFFICE OF THE ATTORNEY GENERAL
100 N. Carson Street
Carson City, Nevada 89701
(775) 684-1208
JTartakovsky@ag.nv.gov

*Attorneys for Amicus Curiae Nevada*

* Admitted *pro hac vice*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Mikkel Jordahl, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Mark Brnovich, Arizona Attorney General, et al., <br><br> Defendants. | Case No. 3:17-cv-08263-PCT-DJH <br><br> **BRIEF OF AMICI CURIAE THE STATES OF TEXAS AND NEVADA IN SUPPORT OF DEFENDANTS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

BACKGROUND: ANALOGUE LAWS IN TEXAS AND NEVADA ................. 2

1. Texas's H.B. 89 (2017) ............................................................................... 2

2. Nevada's S.B. 26 (2017) ............................................................................. 2

ARGUMENT ......................................................................................................... 3

I. State and local governments regularly place myriad lawful requirements and restrictions on independent contractors. .................... 3

II. A.R.S. § 35-393 is a classic anti-discrimination measure. ...................... 5

III. A.R.S. § 35-393 combines a State's power to spend its own money with its anti-discrimination interest. ............................................................. 7

    a. Debarment ................................................................................. 8

    b. Investment or divestment of public funds .................................. 9

CONCLUSION .................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Bd. of Cty. Comm'rs v. Umbehr*,
  518 U.S. 668 (1996) ............................................................................................... 3

*Briggs & Stratton Corp. v. Baldrige*,
  728 F.2d 915 (7th Cir. 1984) ............................................................................. 6–7

*Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*,
  456 U.S. 212 (1982) ............................................................................................... 6

*O'Hare Truck Serv., Inc. v. City of Northlake*,
  518 U.S. 712 (1996) ............................................................................................... 3

OFCCP v. Goya de Puerto Rico, Inc., Notice of Debarment, 67 Fed. Reg.
  53028-01 (Dep't of Labor Aug. 14, 2002) ....................................................... 9

OFCCP v. Pacific Coast Feather Co., Notice of Debarment, 61 Fed. Reg.
  56248-01 (Dep't of Labor Oct. 31, 1996) ........................................................ 9

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ............................................................................................. 10

*Trap Rock Indus., Inc. v. Kohl*,
  284 A.2d 161 (N.J. 1971) ..................................................................................... 4

**Statutes**

19 U.S.C. § 4452 .............................................................................................................. 5

50 U.S.C. § 4607 .............................................................................................................. 5

Ariz. Rev. Stat. § 35-392 ..................................................................................... 5, 9, 10

Ariz. Rev. Stat. § 41-2613 ............................................................................................ 8

Cal. Gov't Code § 7513.6 .............................................................................................. 9

Cal. Gov't Code § 7513.7 .............................................................................................. 9

Colo. Rev. Stat. § 24-103-910 ...................................................................................... 4

N.Y. State Fin. Law § 146 ............................................................................................ 4

Nev. Rev. Stat. § 118.100 .............................................................................................. 5

Nev. Rev. Stat. § 651.070 .............................................................................................. 5

Nev. Rev. Stat. § 332.810 .............................................................................................. 4

Tex. Gov't Code § 808.001 ........................................................................................... 2

Tex. Gov't Code § 2156.007 ............................................................................................... 4

Tex. Gov't Code §§ 2161.001–.003 ................................................................................... 4

Tex. Gov't Code § 2252.002 ............................................................................................... 4

Tex. Gov't Code § 2252.202 ............................................................................................... 4

Tex. Gov't Code § 2252.901 ............................................................................................... 4

Tex. Gov't Code § 2258.023 ............................................................................................... 4

Tex. Gov't Code § 2270.001 ............................................................................................... 2

Tex. Gov't Code §§ 2270.001–.002..................................................................................... 5

Tex. Gov't Code § 2270.0001–.0253 .................................................................................. 9

W. Va. Code § 5A-3-57 ....................................................................................................... 4

**Regulations**

48 C.F.R. § 9.406-2............................................................................................................. 9

**Legislative Material**

A.B. 106, § 24, 2017 Leg., 79th Sess. (Nev. 2017) ............................................................ 4

A.B. 280, § 5, 2017 Leg., 79th Sess. (Nev. 2017) .............................................................. 4

A.B. 2941, § 1, 2006 Leg., Reg. Sess. (Cal. 2006) ........................................................... 10

H.B. 89, S.J. of Tex., 85th Leg., R.S. 1332 (2017) ............................................................. 2

H.J. of Tex., 85th Leg. R.S. 1749–50 (2017) ...................................................................... 2

House Comm. on State Affairs, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017) .................................................................................................................... 2

S.B. 26, Final Passage Votes............................................................................................... 2

S.B. 26, 2017 Leg., 79th Sess. (Nev. 2017) ............................................................... 3, 5, 8

**Other Authorities**

Constance A. Hamilton, *Effects of the Arab League Boycott of Israel on U.S. Businesses*, U.S. Int'l Trade Commission, Pub. 2827 (Nov. 1994) ...... 1

Exec. Order No. 11246, §§ 212 & 301, 30 Fed. Reg. 12319 (Sept. 24, 1965) .................................................................................................................. 9

Israel Central Bureau of Statistics, Press Release, "65th Independence Day—More than 8 Million Residents in the State of Israel," Apr. 14, 2013 .......................................................................................................... 7

Pres. Barack Obama, Statement on Signing the Trade Facilitation and Trade Enforcement Act of 2015, 2016 Daily Comp. Pres. Doc. 1–2 (Feb. 24, 2016) ...................................................................................... 5

Steven Levingston, *Kennedy and King: The President, the Pastor, and the Battle over Civil Rights* 43 (2017) ........................................................... 6

**INTRODUCTION**

A counter-boycott law like Arizona's may appear an innovation, but in fact it is only the latest stage in an effort to resist the economic warfare that has targeted Israel for over half a century. The first boycotts against Israel began with the country's creation in 1948 and were aimed not at Israeli policy but Israeli existence. These embargoes were institutionalized as early as 1951, in the Arab League's Central Boycott Office in Damascus.[1] In 1994, the U.S. International Trade Commission found that the Arab League Boycott—the prototype of the nationality-based boycott that this Act seeks to repel—cost Israel's economy $2 billion a year.[2] This decades-long commercial campaign against an isolated democracy is the background of a lawsuit that now invokes a principle of free society shared by few of the boycotts' historical instigators.

Arizona's law, like those in Texas and Nevada, does not concern mere criticism of Israel or its laws, leaders, or policies. It concerns economic boycotts that target Israelis, all Israelis, *on the basis of nationality or national origin*. This law, like many of the non-discrimination laws that undergird our society, counters the use of economic coercion to strike not at Israeli actions but at the mere fact that a company *is* Israeli or does business with one—the most extreme mode of anti-Israel boycott. More importantly, the Act does not even *prohibit* such boycotts. As this brief demonstrates, boycott supporters, outside of their voluntary commercial relations with the State, may act as they wish.

So can those who *oppose* such boycotts: Arizona's refusal to spend its money in ways that countenance this form of boycott, like similar laws passed in other states, is simply an application of two well-established doctrines.

---

[1] Constance A. Hamilton, *Effects of the Arab League Boycott of Israel on U.S. Businesses*, U.S. Int'l Trade Commission, Pub. 2827 (Nov. 1994) at 5, https://goo.gl/dRm4w1.

[2] *Id.* at vi.

1

First, States can place conduct-based conditions or qualifications on independent contractors who seek to obtain the business of those States. And second, States, among these restrictions, may disallow contractors from engaging in discrimination on the basis of certain well-defined protected characteristics. For these reasons, the Court should uphold Arizona's law.

**BACKGROUND: ANALOGUE LAWS IN TEXAS AND NEVADA**

**1.    Texas's H.B. 89 (2017)**

Texas enacted House Bill 89 in 2017 by bipartisan margins. The law passed unanimously in the House, and 26-5 in the Senate.[3] Texas aims to "prevent taxpayer resources from supporting businesses which work to isolate Israel from global trade," because "Israel is a key ally and trading partner of the United States and Texas."[4] As a means to combat these "discriminatory practices," Texas does not contract with a company for goods or services if that company refuses to deal with, terminates business activities with, or takes other actions intended to penalize, inflict economic harm on, or limit commercial relations with Israel (or someone doing business with Israel). Tex. Gov't Code §§ 808.001 & 2270.001. Texas does not, however, consider business actions taken "for ordinary business purposes." *Id.* § 808.001. Thus, Texas targets discrimination based on national origin—discrimination against Israel and its people.

**2.    Nevada's S.B. 26 (2017)**

Nevada's Senate Bill 26, enacted in 2017 by a combined legislative vote of 58-2,[5] declares that boycotts can be a "tool of economic warfare" that

---

[3] *See* H.B. 89, S.J. of Tex., 85th Leg., R.S. 1332 (2017); H.J. of Tex., 85th Leg. R.S. 1749–50 (2017).

[4] House Comm. on State Affairs, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017); *see also* Senate Comm. on Bus. & Commerce, Bill Analysis, Tex. H.B. 89, 85th Leg., R.S. (2017).

[5] *See* S.B. 26, Final Passage Votes, https://goo.gl/jFHHtb.

2

threatens the "sovereignty and security of key allies and trade partners" like Israel and that such boycotts often are grounded in "discriminatory decisions on the basis of national origin." Nevada's response to this is to make it state policy to consider a company's participation in such efforts in (1) "awarding grants and contracts" or in (2) receiving state investment.[6] S.B. 26 applies strictly to refusals to do business with Israel, or persons or entities doing business in Israel, "on the basis of nationality, national origin or religion."[7] The Nevada law excludes from its purview actions that, for instance, are based on a "bona fide business or economic reason" or that are pursued in a "nondiscriminatory manner."[8] In short, Nevada's law concerns only the most categorical, nationality-based boycotts of Israeli citizens and companies. With these extreme boycotters, alone, Nevada will not "enter into a contract."[9]

## ARGUMENT

**I. State and local governments regularly place myriad lawful requirements and restrictions on independent contractors.**

"The Constitution accords government officials a large measure of freedom" "in the course of contracting for goods and services." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 724 (1996). Every State has enacted legislation imposing competitive-bidding requirements on various types of contracts with the government. In fact, the "examples of federal, state, and local statutes, codes, ordinances, and regulations could be multiplied to fill many volumes," and have been means of regulating government contracts "since the founding of the Republic." *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 693–94 (1996) (Scalia, J., dissenting).

---

[6] S.B. 26, 2017 Leg., 79th Sess. (Nev. 2017) ("SB 26"), prefatory clauses.
[7] S.B. 26, § 9(1).
[8] S.B. 26, § 9(2).
[9] *See, e.g.*, S.B. 26, §§ 5 & 11.

3

States impose requirements and prohibitions on such state contracts. Both Texas and Nevada, for instance, may expressly prefer contractors that reside within their states' borders. Tex. Gov't Code § 2252.002; A.B. 280, § 5, 2017 Leg., 79th Sess. (Nev. 2017). Texas encourages its agencies and institutions of higher education to increase the number of contracts awarded to historically underutilized businesses owned by women, veterans, and racial minorities. Tex. Gov't Code §§ 2161.001–.003. Texas and other States require that state contractors use iron or steel manufactured in the United States. Tex. Gov't Code § 2252.202; *see also* Colo. Rev. Stat. § 24-103-910; N.Y. State Fin. Law § 146; W. Va. Code § 5A-3-57. Texas also requires state contracts and subcontractors to pay a prevailing wage to workers employed in execution of the contract, Tex. Gov't Code § 2258.023, and Nevada requires state vendors to certify that they pay their employees equal pay for equal work without regard to gender, A.B. 106, § 24, 2017 Leg., 79th Sess. (Nev. 2017).

States also restrict the speech and conduct of contractors to protect against conflicts of interests and bribery. Nevada prohibits bidders for state contracts from offering future employment or business opportunities to the governing body offering the contract. Nev. Rev. Stat. § 332.810. And Texas prohibits state agencies from entering into employment, professional services, or consulting contracts with a former or retired employee of the agency for one year from that person's last date of employment. Tex. Gov't Code § 2252.901.

States even impose moral requirements on contractors. Texas considers a bidder's "character, responsibility, [and] integrity," among other things, when deciding whether to award a contract. Tex. Gov't Code § 2156.007. In New Jersey, "the legislative mandate that a bidder be 'responsible' embraces moral integrity just as surely as it embraces a capacity to supply labor and materials." *Trap Rock Indus., Inc. v. Kohl*, 284 A.2d 161, 166 (N.J. 1971).

4

1    Arizona, like Texas, Nevada, and many others, have now added, to this
2 long preexisting list of qualifications, a requirement that state contractors
3 refuse to participate in nationality-based boycotts of Israel. *See* Tex. Gov't Code
4 §§ 2270.001–.002; S.B. 26, § 5, 2017 Leg., 79th Sess. (Nev. 2017); Defs.'
5 Combined Resp. to Pls.' Mot. for Prelim. Inj. & Mot. to Dismiss, App. A, ECF
6 No. 28. By doing so, the States are merely following the example set by the
7 federal government since 1979. 50 U.S.C. § 4607.
8    A State may exercise its power, with respect to state contracting, to
9 advance public policy goals—whether in promoting the hiring of the less
10 privileged, supporting local businesses, or, as here, eliminating invidious
11 discrimination based on historically protected characteristics.

12 **II.    A.R.S. § 35-393 is a classic anti-discrimination measure.**

13    Arizona's Act is a classic anti-discrimination measure. American law
14 teaches that it is wrongful to lay burdens on individuals on the basis of
15 immutable characteristics like race, sex, or (as here) nationality, national
16 origin, or religion. This Act prohibits a business only from taking boycott
17 actions "[i]n a manner that discriminates on the basis of nationality, national
18 origin or religion and that is not based on a valid business reason." Ariz. Rev.
19 Stat. § 35-393(1)(b). (The U.S. government, too, opposes categorical boycotts of
20 Israel as "contrary to the principle of nondiscrimination."[10])
21    Such laws frequently operate in commercial contexts like this one. For
22 instance, Nevada (like most states) makes it unlawful for home owners to
23 refuse to sell to someone on account of their origin, Nev. Rev. Stat. §
24 118.100(1), or for hotels categorically to deny lodging to nationals of a certain
25 country, Nev. Rev. Stat. § 651.070. These direct restrictions on private

---

27 [10] 19 U.S.C. § 4452(b)(4)-(5); *see* Pres. Barack Obama, Statement on Signing the Trade Facilitation and Trade Enforcement Act of 2015, 2016 Daily Comp.
28 Pres. Doc. 1–2 (Feb. 24, 2016)

5

1 business decisions pose no First Amendment problems. This Act is milder yet.
2 Here, companies *can* decline to do business with a company simply because it
3 has an Israeli board member or sells products in Tel Aviv. This Act just says:
4 very well, but we can decline to do business with *you*.

5 Merely labeling something a "boycott" does not itself sanctify conduct as
6 "protected" speech. For example, a credit union does not have a free speech
7 right to "boycott" Guatemalans by systematically withholding jobs or loans
8 from them. Mr. Jordahl concedes this point, when, in his complaint, he writes
9 that the Act prevents contractors like him from participating in "*protected*
10 *political boycotts.*"[11] By using the word "protected," he acknowledges that not
11 all boycotts are, in fact, protected. Their lawfulness depends on their purpose.
12 Martin Luther King, Jr., saw White Citizen's Councils boycott black businesses
13 in Alabama,[12] but courts today look askance on boycotts meant to bolster race
14 segregation. Boycotts that *oppose* discrimination, by contrast, *are* lawful,
15 because of their quite different purpose: they target businesses not because of
16 their owners' nationality (improper), but because of their owners' conduct
17 (proper). Arizona's Act only concerns this former type of illegitimate
18 "boycott."

19 The Supreme Court, in *International Longshoremen's Association, AFL-*
20 *CIO v. Allied International, Inc.*, 456 U.S. 212, 224-25 (1982), held that a
21 boycott, though based on "political disputes," was not immunized under the
22 First Amendment against Congress's commerce power. "Illegal boycotts," the
23 Court recognized, "take many forms." *Id.* (quotations and brackets omitted).
24 Likewise, the Seventh Circuit, in the context of the Arab boycott of Israel,
25 rejected an attempt by companies wishing to honor the boycott to "color their

---

[11] Compl. ¶ 46 (emphasis added).

[12] Steven Levingston, *Kennedy and King: The President, the Pastor, and the Battle over Civil Rights* 43 (2017).

6

communications with a protected interest in political speech." *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915, 917 (7th Cir. 1984). These cases establish that commercial boycotts are not inherently protected speech. (And here, by contrast to the laws in *Longshoremen* and *Briggs*, Arizona's statute does not regulate conduct everywhere in the private sector; it regulates conduct *only* insofar as a company seeks the benefit of contractual relations with Arizona.)

The real irony of Mr. Jordahl's attempt to label categorical boycotts of Israel a political act is that nationality-based boycotts like the one he seeks constitutional sanction for are based not on politics but on incidents of birth. And the problem with such discrimination on the basis of immutable characteristics is that it punishes membership in a class, often with absurd results. An Israeli company might be boycotted though it diverts 50% of profits to Palestinian human rights efforts, or even though it is owned by Palestinians who happen to be citizens of Israel. (Israel's census bureau estimates the Israeli-Arab population at more than 1.6 million.[13])

### III. A.R.S. § 35-393 combines a State's power to spend its own money with its anti-discrimination interest.

Mr. Jordahl has a near absolute right to express his views on Israel by declining to do business with Israeli companies. He can even do so for no better reason than the fact that those businesses are domiciled in Israel or run by Israeli-born CEOs. But Arizona has an equally valid right to express the views of other individuals—the constituents who democratically govern expenditures as a policy matter—that Arizona *should* do business with those companies. And it can express this view by declining to do business with boycotters.

---

[13] Israel Central Bureau of Statistics, Press Release, "65th Independence Day—More than 8 Million Residents in the State of Israel," Apr. 14, 2013, https://goo.gl/uFaFcm.

7

Mr. Jordahl says that his speech rights are "chilled" because he "fears the loss of his firm's government contracts."[14] What he means is that he wants to engage in a nationality-based boycott and experience no consequences from it. But the Free Speech Clause lets government spend its own money to promote public interests, even when doing so works to the disfavor of some citizens. It happens all the time.

### a.   Debarment

The best analogy may be debarment laws. Debarment is the exclusion of a contractor from the privilege of obtaining government contracts for a certain period. Such laws, for instance, deny state contracts to companies who are found systematically to have refused to hire blacks or Hispanics. The government in doing so does not "chill" the right of companies to express the racial views or hiring preferences of its managers. It simply sends a counter-message that the state will not join hands economically with businesses who behave in this way.

Debarment is not taken lightly, and due process attaches, but the power to debar reflects the basic legal fact that there is no *right* to receive government business. (Hence state contracts are often denominated, statutorily, as "awards."[15]) Arizona, in fact, has broad discretion to refuse to do business with a contractor for any "cause" related to its "responsibility" as a contractor. Ariz. Rev. Stat. § 41-2613(5). The privilege of beneficial commercial partnerships, as noted above, has always been hedged by conditions—and one of the leading conditions has for decades been non-participation in race- or nationality-based discrimination.

---

[14] Compl. ¶ 45 (chills) & ¶ 1 (fears the loss).

[15] *See, e.g.*, S.B. 26, § 13(2) ("A contract may not be awarded to a bidder who does not comply with the requirements set forth").

8

The United States has long vigorously exercised its debarment power against contractors on this ground; it will even move to debar companies based on their failure to adhere to or provide an affirmative-action policy.[16] Companies can take controversial positions and use their dollars toward that end; but government, in turn, can decide that it will not subsidize discrimination by contributing *its* dollars to those companies. Debarment laws, in the end, are not understood to "suppress" a First Amendment right to engage in discriminatory practices. They are understood, rather, to entail that, as a result of such conduct, the company may forfeit state business. If a company can exert its economic leverage to try to injure Israel, Arizona can exert a counter-force to try to mitigate that injury.

### b.  Investment or divestment of public funds

The Act is codified in Title 35 of Arizona's code, under the heading of "Handling of Public Funds." Quite expectedly: this law involves only the disposition of public money. In the same ARS chapter, for instance, Arizona declares that it will not invest state retirement money in companies illegally doing business with state sponsors of terrorism. Ariz. Rev. Stat. § 35-392. Texas does the same. Tex. Gov't Code § 2270.0001–.0253. California, similarly, makes it state policy to refrain from financial relations with (i.e., to divest from) companies complicit in the Darfur genocide. Cal. Gov't Code § 7513.6(b)(2)(B); *see also id*. at § 7513.7(b)(1) & (f)(3) (divestment from Iran's nuclear or defense sectors or companies linked to the Iranian government). In such cases, States, on matters on touching on foreign policy, engage in

---

[16] Exec. Order No. 11246, §§ 212 & 301, 30 Fed. Reg. 12319 (Sept. 24, 1965); 48 C.F.R. § 9.406-2 (vigorously exercised); OFCCP v. Goya de Puerto Rico, Inc., Notice of Debarment, 67 Fed. Reg. 53028-01 (Dep't of Labor Aug. 14, 2002); OFCCP v. Pacific Coast Feather Co., Notice of Debarment, 61 Fed. Reg. 56248-01 (Oct. 31, 1996) (debarment action regarding affirmative action policies).

1  government speech by the expedient of withholding the benefit of its money
2  from those whose conduct is, as a California bill put it, "inconsistent with the
3  moral and political values of the people."[17] The California law may "chill" the
4  expression of companies who wish to do business in, say, Khartoum—but a
5  State can spend its own money "to say what it wishes." *Rosenberger v. Rector*
6  *& Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Opponents of that law can
7  continue to invest in Sudanese oil. The pursuit of that opportunity just means
8  the loss of a different opportunity: the chance at getting investment from public
9  funds. Mr. Jordahl does not appear even to challenge this half of Arizona's law.

## CONCLUSION

The movement to boycott companies and citizens based on nothing more than the Israeli nationality listed on their articles of incorporation or passports is an attempt to cause economic isolation and injury to an American ally. Ariz. Rev. Stat. § 35-393, in response, simply provides that (1) if you choose to engage in this form of nationality-based discrimination, then (2) you may be choosing to forgo the privilege of receiving Arizona's public money. Arizona has the right to boycott boycotters. Doing so does not "suppress" political views; it *obeys* them, as they have been enacted in a democratic law. This law simply supports a long-established principle of non-discrimination. For these reasons, and those stated in Defendants' brief, the Act does not violate the First Amendment, and Plaintiffs' complaint should be dismissed.

---

[17] *See* A.B. 2941, § 1, 2006 Leg., Reg. Sess. (Cal. 2006).

Respectfully submitted this 8th day of February, 2018.

| | |
|---|---|
| ADAM PAUL LAXALT<br>Attorney General of Nevada | KEN PAXTON<br>Attorney General of Texas |
| JOSEPH TARTAKOVSKY<br>Deputy Solicitor General<br>NV Bar. No. 13796 | JEFFREY C. MATEER<br>First Assistant Attorney General |
| State of Nevada, Office of the Attorney General<br>100 N. Carson Street<br>Carson City, Nevada 89701<br>(775) 684-1208<br>JTartakovsky@ag.nv.gov | BRANTLEY D. STARR<br>Deputy First Assistant Attorney General |
| | JAMES E. DAVIS<br>Deputy Attorney General for Civil Litigation |
| **ATTORNEYS FOR AMICUS CURIAE NEVADA** | */s/ David J. Hacker*<br>DAVID J. HACKER*<br>Special Counsel for Civil Litigation<br>TX Bar No. 24103323 |
| | OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548, Mail Code 001<br>Austin, Texas 78711-2548<br>(512) 936-1414<br>david.hacker@oag.texas.gov |
| | **ATTORNEYS FOR AMICUS CURIAE TEXAS** |
| | * Admitted *pro hac vice*. |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2018, I filed the foregoing document with the Clerk of the Court via CM/ECF, which automatically sends notice of the filing to all counsel of record.

*/s/David J. Hacker*
DAVID J. HACKER