MARC A. GREENDORFER*
*Counsel of Record*
ZACHOR LEGAL INSTITUTE
5919 U.S. Highway 84
Red Level, Alabama 36474
(650) 279-9690
Info@ZachorLegal.org
*Admitted *pro hac vice*

*Attorney for Amicus Curiae Zachor Legal Institute*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C.,<br><br>     Plaintiffs,<br><br>vs.<br><br>Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Jail District Board of Directors Member; Lena Fowler, Coconino County Jail District Board of Directors Member; Elizabeth Archuleta, Coconino County Jail District Board of Directors Member; Art Babbott, Coconino County Jail District Board of Directors Member; Jim Parks, Coconino County Jail District Board of Directors Member, all in their official capacities,<br><br>     Defendants. | Case No: 3:17-cv-08263-PCT-DJH<br><br>**BRIEF OF *AMICUS CURIAE* ZACHOR LEGAL INSTITUTE** |

**Table of Contents**

I. STATEMENT OF INTEREST OF *AMICUS* ZACHOR LEGAL INSTITUTE ............................................................................................... 1

II. ARGUMENTS AND AUTHORITIES ............................................................ 1

   (A) HB 2617 APPLIES TO A LIMITED UNIVERSE OF EXPRESSION ........................ 1

   (B) THE FIRST AMENDMENT DOES NOT PROTECT BDS ACTIVITY ................. 2

   (C) THE HISTORY AND NATURE OF BDS AS A FRONT FOR TERROR ORGANIZATIONS ................................................................................................ 9

   (D) THE NATURE OF BDS UNDERMINES PLAINTIFFS' *PICKERING* ARGUMENT ............................................................................................................... 15

III. CONCLUSION ............................................................................................ 16

# Table of Authorities

## Cases

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ........... 5, 6

*Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996) .................................. 15

*City of San Diego v. Roe*, 543 U.S. 77 (2004) ......................................................... 16

*Claiborne's* .............................................................................................................. 6

*Connick v. Myers*, 461 U.S. 138 (1983) ................................................................ 16

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ................. 5, 6, 7

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ............................................................ 16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..................................... 14

*Koontz v. Watson*, Case No. 17-4099-DDC-KGS (D. Kan. Jan. 30, 2018) ............ 2

*Longshoremen v. Allied Int'l, Inc.*, 456 U.S. 212 (1982) .................................. 4, 7, 9

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 370 P.3d 272
     (Colo. App. 2015), *cert. granted*, 137 S.Ct. 2290 (2017). ................................... 5

*NAACP. V. Claiborne Hardware Co.*, 458 U.S. 886 (1982) .......................... passim

*Pickering v. Bd of Ed.*, 391 U.S. 563 (1968) .................................................... 15, 16

*Rankin v. McPherson*, 483 U.S. 378 (1987) .......................................................... 16

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006)
     ............................................................................................................................ 3

*Waters v. Churchill*, 511 U.S. 661 (1994) ............................................................. 16

## Statutes

29 U.S.C. § 158(b)(4) ............................................................................................... 4

50 U.S.C. § 4607 ....................................................................................................... 8

Arizona House Bill 2617, A.R.S. § 35-393.01 .................................................. passim

IOWA CODE § 12J.1 (2017) ....................................................................................... 6

## Other Authorities

Danielle Ziri, *Jewish Voice for Peace to Host Terrorist at Panel*, JERUSALEM POST (Feb. 27, 2017). ................................................................................. 14

*Governors United against BDS* ............................................................... 17

*Israel's War with Hamas Reinvigorates BDS Movement*, SCHOLARS FOR PEACE IN THE MIDDLE EAST (Sept. 11, 2014) ................................. 6

Lisa Khoury, *Palestinians In Lebanon: 'It's Like Living In A Prison'*, AL JAZEERA (Dec. 16, 2017) ....................................................................... 8

Marc A. Greendorfer, *Boycotting the Boycotters: Turnabout is Fair Play under the Commerce Clause and the Unconstitutional Conditions Doctrine*, 40 CAMPBELL L. REV. 29 (2018) ....................................................................... 1, 2, 9

Marc A. Greendorfer, *The BDS Movement: That Which We Call a Foreign Boycott, by Any Other Name, Is Still Illegal*, 22 ROGER WILLIAMS U. L. REV. 1 (2017) ................................................................................................ 1, 7

Marc A. Greendorfer, *The Inapplicability of First Amendment Protections to BDS Movement Boycotts*, 2016 CARDOZO L. REV. DE NOVO 112 ........................... 1, 4

*Samidoun meets with South African embassy on Palestinian political prisoners, G4S boycott*, SAMIDOUN website ....................................................... 14

Yitzhak Santis, *Jewish Voice for Peace whitewashes anti-Semitism in the anti-Israel movement*, JEWISH NEWS SERVICE (March 3, 2015). ............................... 14

**Constitutional Provisions**

U.S. CONST. amend. I .................................................................................... passim

U.S. CONST. amend. XIV .................................................................................... 6

## I. STATEMENT OF INTEREST OF *AMICUS* ZACHOR LEGAL INSTITUTE

*Amicus curiae* Zachor Legal Institute ("Zachor") is a non-profit legal foundation that focuses on constitutional and rights advocacy and scholarship.[1]  In particular, Zachor has published legal analyses of boycotts and the First Amendment with an emphasis on the status of federal and state laws that limit boycott activity.  Zachor has also undertaken original research and published works on the origin and operations of the so-called Boycott Divestment and Sanction movement ("BDS" or the "BDS Movement").  A number of states, federal agencies and advocacy organizations have relied either directly or indirectly on the scholarly works of Zachor in considering the legal status of laws limiting BDS activity.

As a leading legal think-tank with expertise in both the history of boycott activity under the Constitution and the nature of the boycott movement at issue in this case, Zachor is uniquely situated to provide this Court with important background on relevant caselaw cited by the Plaintiffs as well as a full and factual history of the BDS Movement.

The arguments that follow summarize legal analyses in Zachor's founder's recently published law review articles: Marc A. Greendorfer, *The Inapplicability of First Amendment Protections to BDS Movement Boycotts*, 2016 CARDOZO L. REV. DE NOVO 112 ("*Cardozo Article*"); Marc A. Greendorfer, *The BDS Movement: That Which We Call a Foreign Boycott, by Any Other Name, Is Still Illegal*, 22 ROGER WILLIAMS U. L. REV. 1 (2017) ("*RWU Article*"); and Marc A. Greendorfer, *Boycotting the Boycotters: Turnabout is Fair Play under the Commerce Clause and the Unconstitutional Conditions Doctrine*, 40 CAMPBELL L. REV. 29 (2018) ("*Campbell Article*").  The last two articles were the lead articles in the respective law review volumes.

## II. ARGUMENTS AND AUTHORITIES

**(a) HB 2617** APPLIES TO A LIMITED UNIVERSE OF EXPRESSION

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1    As an initial matter, Arizona House Bill 2617, A.R.S. § 35-393.01 ("HB 2617")

2 applies to a limited universe of expression: boycotts against Israel that have been called

3 for by third parties and boycotts of Israel that are discriminatory even if they are not part

4 of an organized boycott call. As Plaintiffs note, the first type of boycott relates to the

5 activities of the so-called "Boycott, Divestment and Sanction" movement ("BDS" or the

6 "BDS Movement") and is the type of boycott they purport to engage in.

7    To the extent a person chooses to boycott Israel outside of BDS (or other

8 organized discriminatory campaigns) in an individual and non-discriminatory nature, he,

9 she or it can truthfully execute the certification called for by HB 2617. Thus, HB 2617

10 affects a very limited scope of boycott activity against Israel and is not, as Plaintiffs

11 allege, a "blanket" restriction on expression. *Plaintiffs' brief in support of motion for*

12 *preliminary injunction* at 10. Rather, the State of Arizona, acting as a market participant

13 for goods and services, presents potential vendors with a choice to make if the vendor

14 desires to engage in either discriminatory BDS Movement activity or individual

15 discriminatory boycotts: if you engage in such activity, the taxpayers of the State of

16 Arizona will not engage in commercial activity with you. *See* the *Campbell Article* at 37-

17 42 and 54-65, respectively, for a full discussion of how the market participant exception

18 applies to HB 2617 and why the unconstitutional conditions doctrine is inapplicable.

19 Indeed, 23 other states have enacted laws or executive actions similar to HB 2617 and a

20 number of additional states are currently considering adopting such legislation. *See* the

21 *Campbell Article* at 30 for a list of state laws relating to BDS activity. Since Plaintiffs

22 allege that HB 2617 limits their right to boycott, Plaintiffs implicitly acknowledge that

23 they are either acting in concert with BDS or in an independent discriminatory manner.

24 **(b) THE FIRST AMENDMENT DOES NOT PROTECT BDS ACTIVITY**

25    Plaintiffs' First Amendment argument rests in large part on their misinterpretation

26 of *NAACP. V. Claiborne Hardware Co.*, 458 U.S. 886 (1982).[2] In order to discern the

---

[2] This misinterpretation has been compounded by a recent preliminary injunction memorandum and order in *Koontz v. Watson*, Case No. 17-4099-DDC-KGS (D. Kan., Jan. 30, 2018), a challenge to a law in Kansas similar to HB 2617. In *Koontz*, the Kansas

1    scope of *Claiborne*, it is important to understand the background of the boycotts in that

2    case, as the court's opinion was clearly fact specific.  The boycotters in *Claiborne* were

3    African-Americans whose constitutional rights were being infringed by local government

4    actors, most of whom were also business owners in the local communities.  The

5    infringement of rights was a continuation of a long pattern of discrimination in violation

6    of Reconstruction-era constitutional amendments.  In response to the deprivation of their

7    own rights, the boycotters in *Claiborne* employed a primary boycott directly against

8    those responsible for the unlawful deprivation.

9          The core of the Plaintiffs' First Amendment claim in this case is based on a

10   misreading and distortion of *Claiborne*.  In its memorandum in support of the motion for

11   preliminary injunction, the Plaintiffs claim that *Claiborne* established a black letter legal

12   proposition that "…the First Amendment protects the right to engage in politically

13   motivated boycotts" and that in this case the Plaintiffs' boycott activities "… are fully

14   protected by the First Amendment rights to free expression and free association."

15   *Plaintiffs' brief in support of motion for preliminary injunction* at 8 and 16, respectively.

---

law is also being challenged on First Amendment grounds using substantially the same
First Amendment arguments as Plaintiffs make in the instant case (plaintiffs in the instant
case as well as *Koontz* are represented by ACLU entities). In responding to the *Koontz*
plaintiff's motion for preliminary injunction, however, the State of Kansas utterly failed
to brief the *Koontz* court on the infirmities with the *Koontz* plaintiff's First Amendment
arguments and instead responded solely with procedural arguments. The *Koontz* plaintiff
even noted this anomaly in its reply to the State of Kansas' response.  As a result, the
*Koontz* court was briefed only on the *Koontz* plaintiff's interpretation of First
Amendment caselaw.  That court granted the *Koontz* plaintiff's motion for preliminary
injunction in reliance on uncontested and erroneous First Amendment arguments.  The
*Koontz* memorandum and order, therefore, should be seen by this Court as akin to a
default judgment and that court's wholesale adoption of the *Koontz* plaintiff's First
Amendment theories should be disregarded by this Court. Because Defendants (and
*amici*) are presenting this Court with a full and balanced rebuttal to the nearly identical
First Amendment arguments made by plaintiffs in both *Koontz* and the instant case, this
Court should review the First Amendment claims (including, without limitation, the
interpretations of *Claiborne* as well as *Rumsfeld v. Forum for Academic and Institutional
Rights, Inc.*, 547 U.S. 47 (2006)) without the distortion and prejudicial impact created by
the insufficiently briefed *Koontz* memorandum and order.

1  The text quoted below, from *Claiborne* at note 49, is why the Plaintiffs in the instant case

2  are wrong:

3      We need not decide in this case the extent to which a narrowly tailored statute

4      designed to prohibit certain forms of anticompetitive conduct or certain types of

5      secondary pressure may restrict protected First Amendment activity. No such

6      statute is involved in this case. Nor are we presented with a boycott designed to

7      secure aims that are themselves prohibited by a valid state law."

8

9      Put simply, the Supreme Court stated that its decision did not apply to laws

10  restricting boycott activity when the boycotts had any of the following characteristics: (i)

11  boycotts in furtherance of anticompetitive behavior; (ii) secondary boycotts; and (iii)

12  boycotts that are the subject of otherwise valid state laws.

13      Some who wish to ignore the clear words of *Claiborne* will opine that the text

14  above is mere *dicta*.  Read alone in any other case, this may be true.  However, at

15  approximately the same time that the Supreme Court was deciding *Claiborne* it also

16  decided *Longshoremen v. Allied Int'l, Inc.*, 456 U.S. 212 (1982), another First

17  Amendment case dealing with boycotts that relied upon one of the exceptions enumerated

18  in *Claiborne*. The boycott in *Longshoremen*, unlike the boycott activity in *Claiborne*, was

19  nearly identical in substance to the types of boycotts at issue in the current case:

20  secondary boycotts related to a foreign conflict where no constitutional rights of the

21  boycotters are at issue. And in *Longshoremen*, the Supreme Court upheld the application

22  of a narrowly tailored statute (the prohibition on secondary boycotts at 29 U.S.C. §

23  158(b)(4)) prohibiting boycott activity directed at a political issue.

24      Since the Supreme Court was considering *Claiborne* at the time it was also

25  considering *Longshoremen*, and the opinions for the two cases were published less than

26  three months apart in the same term, we must therefore read the two cases together.

27  *Claiborne* enumerated its own exceptions and *Longshoremen* was decided based on one

28  such exception.  *See* the *Cardozo Article* at 117-119. Thus, *Longshoremen* can't be

1   limited as an isolated decision based on the nuances of the National Labor Relations Act;

2   rather, it is a direct implementation of the proclamation in *Claiborne* that a wide range of

3   boycott activity is not subject to the heightened protections that domestic civil rights

4   boycotts receive.

5         Like the federal statute at issue in *Longshoremen*, HB 2617 is the type of law that

6   is designed to secure valid aims: in this case, one that ensures the State of Arizona does

7   not use taxpayer funds to enter into contracts with parties engaging in discriminatory

8   boycotts of protected classes.  State anti-discrimination laws have a long history of being

9   held to be valid exercises of state power.[3]

10         Further, Plaintiffs reliance upon what Plaintiffs claim to be subsequent Supreme

11   Court cases that support their interpretation of *Claiborne* is without substance.  Plaintiffs

12   cite *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) and *Allied Tube &*

13   *Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988).

14         In fact, the cases cited support Defendants' position.

15         In *FTC*, the cited section of the opinion states "[o]nly after recognizing the well-

16   settled validity of prohibitions against various economic boycotts did we conclude in

17   *Claiborne* that 'peaceful, political activity such as that found in the [Mississippi] boycott'

18   are entitled to constitutional protection."  *FTC* at 428.  First, the *FTC* court explicitly

19   stated that is settled law that prohibitions on "various economic boycotts" are

20   permissible.  Then, the *FTC* court noted that in the particular case of *Claiborne*, the

21   boycott was protected speech based on its facts: i.e., the boycott in *Claiborne* was a

22   primary boycott by those whose constitutional rights were being infringed against those

23   who were infringing the rights.  This in no way supports Plaintiffs' claims that *FTC*

24   corroborates Plaintiffs' misreading of *Claiborne*.

---

[3] Tellingly, counsel for Plaintiffs recently argued before the United States Supreme Court in support of a state anti-discrimination law that goes as far as the state compelling affirmative conduct by a business, rather than just imposing a narrow restriction on expressive conduct, even if such conduct is offensive to the business owners' deeply held beliefs.  *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 370 P.3d 272 (Colo. App. 2015), *cert. granted*, 137 S.Ct. 2290 (2017).

1    In the current case, Plaintiffs' civil rights are not being infringed by either Israel or

2    companies doing business with Israel and its boycotts are of a secondary or tertiary

3    nature.  In *Claiborne* as well as *FTC*, the boycotts were of a primary nature.

4    Examined substantively, Plaintiffs' boycotts are actually economic, not political,

5    in nature.  As Scholars for Peace in the Middle East noted, BDS activity is best

6    characterized as a form of "economic warfare"[4] rather than political speech.

7    Indeed, the court in *FTC* labeled the boycott activity in that case as non-political

8    speech and noted that the boycotters in that case could resort to many other means to

9    communicate their political agenda and the boycott activity itself wasn't the type of

10   conduct that deserved First Amendment protection.  *FTC* at 431-432. As in *FTC*,

11   Plaintiffs in the current case retain robust panoply of expressive activities, including

12   actual speech, rather than expressive economic conduct, to communicate their opinions of

13   Israel.

14   Similarly, in *Allied Tube*, the court explicitly described the boycott in *Claiborne* as

15   one where the boycotters were acting against those who infringed the boycotters'

16   constitutional rights:

17        In that case, we held that the First Amendment protected the nonviolent elements
18        of a boycott of white merchants organized by the National Association for the
19        Advancement of Colored People and designed to make white government and
20        business leaders comply with a list of demands for equality and racial justice.
21   *Allied Tube* at 508.  Plaintiffs here try to conflate *Claiborne's* call for domestic justice

22   with the BDS Movement, which is a foreign call to economic warfare against a foreign

23   sovereign based on acts that occur entirely offshore.

24   *Allied Tube* and *FTC* reiterate that the *Claiborne* court specifically tied First

25   Amendment protections for boycott activity to the effect that the underlying boycott

26   would have on the demand for protection of Fourteenth Amendment rights of those

27   engaging in the boycotts. Whatever one may think of the conflict between the State of

28   Israel and Palestinian Arabs, it is not an issue governed by the Fourteenth Amendment or

---

[4] *Israel's War with Hamas Reinvigorates BDS Movement*, SCHOLARS FOR PEACE IN THE
MIDDLE EAST (Sept. 11, 2014).  The State of Iowa also described BDS as a form of
economic warfare when it adopted its version of HB 2617.  IOWA CODE § 12J.1 (2017).

1    any other provision of the United States Constitution; the rights of the parties involved

2    are outside the scope and reach of United States' laws. Thus, BDS boycott activity in the

3    United States is not covered by the protections afforded under *Claiborne*.

4         Moreover, BDS boycott activity such as that which the Plaintiffs engage in is not a

5    primary boycott activity.  *Claiborne* was a classic example of a primary boycott – the

6    boycotters refusing to do business with those who are in control of the subject matter of

7    the grievance.  Secondary or tertiary boycotts, on the other hand, are ones where the

8    boycotters put pressure on persons or entities in order to affect a third party.  *See* The

9    *RWU Article* at 82-83 and 100-101 for a further discussion of the legal status of

10   secondary and tertiary boycotts.

11        Examples of secondary and tertiary boycotts are those employed by the Arab

12   League against Israel.  In the Arab League boycott, Arab countries refused to do business

13   with anyone or any company that did business with Israel.  This is exactly how Plaintiffs'

14   BDS boycott activity works. *Claiborne* not only doesn't cover Plaintiffs' secondary

15   boycott activity, *Claiborne* explicitly noted that laws regulating secondary and tertiary

16   boycotts are not covered by *Claiborne* and *Longshoremen* was decided precisely on that

17   exception.  In fact, existing federal law prohibits participation in the Arab League boycott

18   and that law has been upheld in the face of First Amendment challenges.  *See* the *RWU*

19   *Article* at 52.

20        Plaintiffs make the conclusory statement that BDS boycott activity is political

21   speech under *Claiborne* but that conclusion is baseless. As *FTC* noted and *Longshoremen*

22   found, not all boycott activity is protected political speech, especially when other more

23   effective means of communication remain available.  BDS boycotts, including Plaintiffs',

24   should not be viewed as political speech.  Rather, they are economic boycotts that are

25   often, though never inextricably, linked to the political positions being advocated by

26   adherents vis-á-vis U.S. foreign policy.  The boycotts are aimed entirely at third parties to

27   the dispute—parties that have no power to provide redress to the boycotters.  Thus, while

28   some boycotts, such as those in *Claiborne*, are expressive conduct that cannot be

1    separated from the underlying protected political speech, Plaintiffs' boycotts can be

2    separated from the associated political speech.

3           The conduct in Plaintiffs' boycotts is actually entirely unrelated to the purported

4    message of Plaintiffs.  That is, Plaintiffs claim that their speech is meant to protest the

5    government of Israel, yet the boycott activity is against third parties, including a number

6    of American companies, that have no control over the actions of the Israeli government.

7    When Congress enacted the federal prohibition against participation in boycotts of Israel

8    in 50 U.S.C. § 4607, it did so in large part to prevent American commerce, consumers

9    and companies from being drawn into foreign conflicts,[5] something Plaintiffs now want

10   to promote.

11          Indeed, if the BDS Movement's and Plaintiffs' concerns for Palestinian self-

12   determination were the true motivation for their actions, they would also be boycotting

13   companies affiliated with the Hashemite Kingdom of Jordan, a country that, like Israel,

14   was founded on lands historically known as Palestine and a country in which roughly

15   50% of the people are of Palestinian origin, yet one that is ruled by Hashemites, rather

16   than Palestinians.  Or, if oppression of Palestinians was the concern, one could also ask

17   why BDS and the Plaintiffs are silent in the face of Palestinian oppression that comes

18   from Lebanon, where Palestinians are denied basic rights and are prohibited from owning

19   property and businesses.[6]  That the BDS Movement and Plaintiffs focus solely on Israel

20   and completely ignore Lebanon and Jordan demonstrates that their true agenda has

21   nothing to do with the rights of Palestinians.  Their boycott activity is not rights

22   advocacy.

---

[5] *See* the *RWU Article* at 76-80 (chronicling the legislative intent of the Export
Administration Act's anti-boycott provisions, with a focus on the desire of Congress to
insulate American commerce from the Arab-Israeli conflict).

[6] Lisa Khoury, *Palestinians in Lebanon: 'It's Like Living in A Prison'*, AL JAZEERA (Dec.
16, 2017) ("Palestinians cannot own businesses in Lebanon and are banned from most
decent-paying professions, including medicine and law. An estimated two-thirds live in
poverty. The government will not give citizenship rights to Palestinian refugees, for fear
it could make them stay forever.").

1    Nonetheless, it is not against the law for anyone to have blind hatred for Israel.

2    Plaintiffs can assert their political positions against Israel through protests, through public

3    speech, and through any number of other means of communication that do not involve

4    the two types of boycotts enumerated in HB 2617, all without running afoul of HB 2617.

5    Because of this, Plaintiffs' boycott activity can be severed from political speech critical

6    of Israel.  In other words, the secondary and tertiary boycotts engaged in by Plaintiffs are

7    properly characterized as a form of commercial boycott and, thus, a form of commercial

8    speech, which has less expansive constitutional protections than political speech.

9    *Claiborne* clearly set forth the types of laws that are not subject to its reach and

10   cases cited by Plaintiffs reinforce this delineation. Laws regulating secondary boycotts

11   and laws that are otherwise within a state's authority, such as anti-discrimination laws,

12   are not limited by *Claiborne*.  The facts in the current case, a secondary boycott directed

13   at a foreign conflict are, in fact, closer to the facts of *Longshoremen* rather than those in

14   *Claiborne*. The Supreme Court upheld the anti-boycott law facing First Amendment

15   challenge in *Longshoremen*.

16   **(c) THE HISTORY AND NATURE OF BDS AS A FRONT FOR TERROR ORGANIZATIONS**

17   The impetus for the enactment of HB 2617 was the rise of the BDS Movement and

18   its discriminatory campaign against Israel and Jews generally.  Arizona, and the other 23

19   states that have enacted laws similar to HB 2617, had ample reason to deem BDS activity

20   discriminatory.  Under the most charitable version of its history, the BDS Movement is

21   the child of the longstanding Arab League boycott of Israel, the toxic anti-Semitism of

22   Iran and radical elements of the Arab world.[7]  Former Congressman Tom Lantos, the

23   founder of the Congressional Human Rights Caucus, was present at the conference that

24   led to the creation of the BDS Movement and described it as "an anti-American, anti-

25   Israeli circus" at which there were "transparent attempt[s] to de-legitimize the moral

26   argument for Israel's existence as a haven for Jews."

_____

[7] Unless otherwise cited, the contents of this Section (c) have been derived from the *Campbell Article*, a law review article authored by the founder of *amicus*. All citations to support the statements made in this Section are in the *Campbell Article* at 45-54.

1    The goal of the BDS Movement is not, as Plaintiffs and others claim, to promote

2    civil rights.  Rather, the BDS Movement was created to complement Arab state military

3    action to destroy Israel as a Jewish state.  Omar Barghouti, the co-founder of the BDS

4    Movement, has made public statements that suggest the goal of BDS is to create a "one-

5    state" solution that "end[s] Israel's existence."   The BDS Movement openly and

6    repeatedly rejects the right of Israel to exist as an independent state, and even prominent

7    critics of Israel, such as Norman Finkelstein, concede that the goal of the BDS Movement

8    is the destruction of Israel:

9       They don't want Israel.  They think they're being very clever.  They call it their
10      three tiers . . . . We want the end of the occupation, we want the right of return,
11      and we want equal rights for Arabs in Israel.  And they think they are very clever,
12      because they know the result of implementing all three is what?  What's the
13      result?  You know and I know what's the result: there's no Israel.

14

15   Middle East peace advocates also have disputed the claim that BDS is a rights

16   movement and have criticized the discriminatory aims of movement.  Scholars for Peace

17   in the Middle East noted ties between the BDS Movement and Hamas and concluded that

18      [a] careful look at the BDS movement and its methodology shows not legitimate
19      criticism but a movement that is racist and anti-Semitic. . . .Overall, the BDS
20      campaign is contrary to the search for peace, since it represents a form of
21      misguided economic warfare.  It is directly in opposition to decades of agreements
22      between Israeli and Arab Palestinians, in which both sides pledged to negotiate a
23      peaceful settlement and a commitment to a two state solution.

24   The BDS Movement was not only founded with the discriminatory goal of

25   eliminating the State of Israel because of its Jewish nature, it has been promoted and

26   supported by individuals and groups committed to the spread of hate and named as

27   designated terror organizations by the United States.  Founding members of the BDS

28   Movement include the Palestine Liberation Organization ("PLO") and five designated

1   terror organizations, including Hamas, the Popular Front for the Liberation of Palestine

2   (the "PFLP"), and Palestinian Islamic Jihad. Recent testimony before Congress shows

3   that supporters of Hamas are now those in leadership positions of BDS:

4   In the case of three organizations that were designated, shut down, or held civilly
5   liable for providing material support to the terrorist organization Hamas, a
6   significant contingent of their former leadership appears to have pivoted to
7   leadership positions within the American BDS campaign.

8

9   In subsequent testimony before Congress, additional information was provided

10  regarding funding and strategic ties between the BDS Movement and the PLO.  That

11  testimony demonstrated that the PLO's treasury is likely the key source of BDS

12  Movement funding and that the PLO coordinates BDS activity worldwide. The key

13  element of the Congressional testimony is contained in this excerpt:

14  "[The Palestinian National Fund] reportedly pays the salaries of the [PLO's]
15  members, as well as students, who received tens of millions of dollars in support
16  of BDS activities each year. . . . PLO operatives in Washington, DC are reportedly
17  involved in coordinating the activities of Palestinian students in the U.S. who
18  receive funds from the PLO to engage in BDS activism.  This, of course, suggests
19  that the BDS movement is not a grassroots activist movement, but rather one that
20  is heavily influenced by PLO-sponsored persons."

21

22  In the United States, the BDS Movement is an ideological umbrella under which

23  several affiliated groups operate.  Among those are Students for Justice in Palestine

24  ("SJP") and the Muslim Students' Association ("MSA").

25  **SJP**

26  SJP is a university-based group, co-founded by American Muslims for Palestine

27  ("AMP") chairman Hatem Bazian and former PFLP member Senan Shaqdeh.   SJP

28  promotes BDS activity across American university campuses.   Much of the leadership is

1   interconnected with AMP.  A study of SJP by NGO Monitor found that while individual

2   SJP chapters operate autonomously with their own constitutions and funding sources, and

3   frequently without carrying the SJP name, they nonetheless receive funding from AMP.

4   AMP also provides significant levels of support for the MSA.

5          These BDS Movement affiliates coordinate to propagate hate and discrimination

6   that is thinly veiled as anti-Israel activism.   SJP has extensive ties with former backers

7   and officials of the now-defunct Holy Land Foundation for Relief and Development

8   ("HLF"), an entity controlled by individuals who were convicted of providing material

9   support to Hamas—a designated foreign terrorist organization.   AMP functions both as a

10  direct promoter of BDS activity in the United States and as a quasi parent organization to

11  other BDS promoters.   In a 2013 report, the Anti-Defamation League chronicled the

12  numerous ties between former HLF officials and founding members of AMP:

13          AMP has its organizational roots in the now-defunct Islamic Association of
14          Palestine (IAP), an anti-Semitic group that served as the main propaganda arm for
15          Hamas in the United States.  AMP's inaugural conference in November 2006,
16          titled, "Palestine—A Just Cause," in Rosemont, Illinois featured several former
17          IAP leaders, including Rafeeq Jaber, a former IAP president; Kifa Mustapha, a
18          former IAP board member and head of the Holy Land Foundation's Chicago
19          office; Osama Abu Irshaid, an AMP board member and former editor of IAP's
20          official newspaper; Nihad Awad, former IAP public relations director and current
21          executive director of the Council on American-Islamic Relations (CAIR); and
22          Raed Tayeh, a former IAP member . . . .

23

24          IAP was prosecuted alongside the HLF and ultimately held civilly liable for

25  supporting Hamas.   In addition to Hatem Bazian, the leadership of AMP includes a

26  number of high profile extremists with ties to Hamas and other terrorist organizations.

27  **MSA**

28          The MSA was founded by the Muslim Brotherhood in 1963.   It now has nearly

1   600 chapters on North American campuses and is active in sponsoring conferences,

2   speakers, publications, and websites.   Part of its primary focus is the promotion of

3   radical Islamic ideology and BDS on university campuses.   After conducting a thorough

4   investigation, the New York Police Department issued a report that deemed the MSA an

5   "incubator" for radical Islamist activity.

6       In 2010, journalist Patrick Poole detailed deep ties between the MSA and terror

7   organizations, providing a list of individuals who had been active in MSA's university

8   chapters and later charged with or convicted for terrorist activities.   For instance,

9   Former University of Arizona MSA president, Wael Hamza Julaidan ". . . has the

10  distinction of being one of al-Qaeda's co founders and its logistics chief."   Anwar Al-

11  Aulaqi was another notable member who served as the chaplain for the George

12  Washington University MSA and "reportedly played a role in the Ft. Hood massacre, the

13  failed Christmas Day underwear bomber plot, and the recent attempted Times Square

14  bombing."   Aafia Siddiqui, who was "convicted . . . of attempted murder of a U.S. Army

15  captain while she was incarcerated and being interrogated by authorities at a prison in

16  Afghanistan," was active in the MSA and reportedly wrote a guide for the MSA to

17  distribute to its members.   And Omar Hammami, a top official of the al-Qaeda-linked

18  Somali terrorist group al-Shabaab, "served as president of the MSA chapter at the

19  University of South Alabama…."

20      In a 2015 Washington Times op-ed, journalist David Horowitz described the MSA

21  and SJP as the two leading campus organizations promoting BDS activity in the United

22  States.   While the groups claim to be rights-based organizations seeking peace and

23  justice, it is clear that their founders and leaders have ties to groups designated by the US

24  government as terrorist organizations and share a primary objective of normalizing

25  discrimination against Israel and those who support Israel.

26  **<u>Jewish Voice for Peace</u>**

27      The BDS organization with which Plaintiffs most closely associate, Jewish Voice

28  for Peace ("JVP"), is similarly implicated with ties to terror organizations. A number of

BDS organizations, such as AMP, MSA and SJP, use JVP as a strawman organization to defend against allegations that BDS is an anti-Semitic movement.  While JVP has a nominally Jewish makeup, it actively promotes BDS, advocates for the elimination of Israel, aligns almost exclusively with radical Islamist and Marxist organizations and partners with groups that rabidly support designated foreign terror organizations including Hamas and Hezbollah.[8]  JVP recently invited convicted terrorist and PFLP member, Rasmea Odeh, to speak at a conference[9] and in 2017, JVP was a co-sponsor of a program that brought American BDS activists to the Palestinian territories for meetings with designated foreign terror organizations including the PFLP.

In fact, one organization known as "Samidoun" has deep ties to both the PFLP and a number of BDS groups, including SJP.[10] The founder of Samidoun is a current PFLP official.

Clearly, one can support boycotts against Israel without being complicit in the BDS Movement's terror connections or discrimination, and HB 2617 includes allowances for this, but the vast majority of current boycott campaigns against Israel are affiliated with the BDS Movement.

One can analogize BDS Movement supporters to the activists in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).   In that case, a group sought to assist designated foreign terror organizations in developing advocacy and legal strategies to advance their goals. The assistance was, on its face, entirely non-violent.  Nonetheless, the Supreme Court found that federal law prohibiting material support (i.e., the provision of advisory support and engaging in activism favorable) to foreign terror organizations did not violate the constitutional rights of the activists, even if the support was intended

---

[8] Yitzhak Santis, *Jewish Voice for Peace whitewashes anti-Semitism in the anti-Israel movement*, JEWISH NEWS SERVICE (March 3, 2015).

[9] Danielle Ziri, *Jewish Voice for Peace to Host Terrorist at Panel*, JERUSALEM POST (Feb. 27, 2017).

[10] *Samidoun meets with South African embassy on Palestinian political prisoners, G4S boycott*, Samidoun website (May 27, 2016), *available* at http://samidoun.net/2016/05/samidoun-meets-with-south-african-embassy-on-palestinian-political-prisoners-g4s-boycott/.

1   to be used only for purportedly humanitarian activities of the foreign organization.   Just

2   as in *Humanitarian Law Project*, BDS activists may claim their support is intended only

3   for the non violent activities of the entities that serve as the éminence grise of the BDS

4   Movement, but that does not upend the constitutionality of the applicable law.

5   **(d) THE NATURE OF BDS UNDERMINES PLAINTIFFS' *PICKERING* ARGUMENT**

6          Building on their erroneous conclusion that BDS activity is protected First

7   Amendment expression, Plaintiffs then misapply the Supreme Court's test for

8   unconstitutional state action under *Pickering v. Bd of Ed.*, 391 U.S. 563 (1968).

9          The *Pickering* balancing test has been described as a:

10          "[B]alance between the interests of the [employee], as a citizen, in commenting
11          upon matters of public concern and the interest of the State, as an employer, in
12          promoting the efficiency of the public services it performs through its employees"
13          … We have, therefore, "consistently given **greater deference to government**
14          **predictions of harm used to justify restrictions of employee speech than to**
15          **predictions of harm used to justify restrictions on the speech of the public at**
16          **large.**"

17   *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 676 (1996) (emphasis added).  HB

18   2617 was enacted to confront the pernicious spread of an organized and focused

19   discriminatory campaign and, in fact, does the minimum a state is empowered to do to

20   protest discrimination: forbid the state from contracting with or investing in companies

21   who choose to engage in discriminatory conduct.  HB 2617 makes a simple but powerful

22   economic statement to those who choose to discriminate, while leaving them otherwise

23   free to engage in that conduct.

24          Applying the *Pickering* balancing test to HB 2617, it is unlikely a business seeking

25   to contract with a state, including Plaintiffs, will be foreclosed from participating in

26   protest activity unless (i) the business refrains from engaging in actual speech in favor of

27   engaging in secondary boycotts and (ii) the business obtains a material portion of its

28   revenue from state contracts.  In such a rare case, however, and on the other side of the

1    *Pickering* balancing test, Arizona has a strong interest in not funding a business if it

2    believes that discriminatory BDS activity is incompatible with the interests of the citizens

3    of Arizona.  Furthermore, even if prohibited from contracting with Arizona, the business

4    remains free to engage in actual speech (rather than expressive conduct) to oppose Israel.

5          To elaborate on the first side of the *Pickering* balancing test, even if we ignore the

6    long history of discriminatory intent behind the formation and operation of the BDS

7    Movement and instead view it as a protest movement aimed at opposing a foreign nation,

8    there is still very little value in protecting "speech" consisting of boycotting third parties

9    to a conflict solely because of their dealings in the targeted foreign nation.  The typical

10   *Pickering* case involves individuals who are speaking on a matter of local (or, at least,

11   domestic) concern, such as the functioning of school districts, public hospitals, or local

12   law enforcement.[11]   Certainly, such speech is valuable and important to the functioning

13   of a vigorous and healthy democracy.   Economic attacks upon companies that do

14   business in a foreign nation to protest that foreign nation's policies, however, have

15   remote and nebulous connections to the interests of a state and its citizens.  Political

16   expressions relating to foreign disputes are more appropriately made through actual

17   speech, which remains unimpeded by HB 2617, than economic boycotts of third parties

18   that have a primary result of harming American consumers and spreading a message of

19   discrimination.

20   **III. CONCLUSION**

21          HB 2617 is a common sense, narrowly tailored anti-discrimination measure that

22   affects only a limited universe of secondary and tertiary economic boycotts relating to

---

[11] *See e.g.*, *Connick v. Myers*, 461 U.S. 138 (1983) (involving speech related to the functioning of a local district attorney's office); *Rankin v. McPherson*, 483 U.S. 378 (1987) (concerning a local government employee commenting on the attempted assassination of President Reagan); *Waters v. Churchill*, 511 U.S. 661 (1994) (concerning a nurse at a public hospital questioning the efficacy of the hospital's management); *City of San Diego v. Roe*, 543 U.S. 77 (2004) (concerning a city police officer's sale of pornographic videos in which he starred); and *Garcetti v. Ceballos*, 547 U.S. 410 (2006) (concerning a deputy district attorney disclosing misconduct in the local district attorney's office).

1   foreign affairs, completely divorced from the assertion of any constitutional rights

2   asserted by those engaging in the boycotts. The activity subject to the restrictions of HB

3   2617 is not protected under *Claiborne* and Plaintiffs retain an effective assortment of

4   expressive conduct and actual speech with which to voice their political beliefs about

5   Israel.

6        The BDS Movement was founded by a consortium of countries and organizations

7   devoted to the destruction of Israel, many of whom have been designated as foreign terror

8   organizations by the United States. The governors of all fifty states recently signed a

9   statement affirming opposition to BDS, stating that BDS's "single-minded focus on the

10  Jewish State raises serious questions about its motivations and intentions."  *Governors*

11  *United against BDS*, https://www.ajc.org/governors. This unified and universal

12  acknowledgement of the nature of BDS should be recognized when undertaking a legal

13  analysis of rights associated with BDS Movement activity.

14       Without HB 2617, Arizona could be compelled to enter into financial

15  arrangements with parties who promote discrimination.  It is entirely disingenuous to

16  mischaracterize a hate movement's agenda as legitimate political speech and then use that

17  mischaracterization as constitutional cover to force Arizona to provide financial support

18  for those who support discriminatory campaigns. Accordingly, *amicus* respectfully

19  requests that this court deny Plaintiffs' motion for a preliminary injunction.

20

21  DATED, this 8th day of February, 2018

22                                        By: <u>s/ Marc A. Greendorfer</u>
23                                        MARC A. GREENDORFER*
24                                        *Counsel of Record for Amicus Curiae*
25                                        ZACHOR LEGAL INSTITUTE
26
27                                        *Admitted pro hac vice*
28

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and distribution to all registered participants of the CM/ECF System.

By: <u>s/ Marc A. Greendorfer</u>
MARC A. GREENDORFER*
*Counsel of Record for Amicus Curiae*
ZACHOR LEGAL INSTITUTE
*Admitted *pro hac vice*