# EXHIBIT 1

Jonathan M. Rotter (admitted pro hac vice)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
jrotter@glancylaw.com

*Counsel for Amicus Curiae StandWithUs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., <br><br>                Plaintiffs, <br>v. <br><br>Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities, <br>                Defendants. | No. CV-17-08263-PCT-DJH <br><br>**AMICUS CURIAE BRIEF OF STANDWITHUS** |

394116.1

# TABLE OF CONTENTS

THE IDENTITIES AND INTERESTS OF THE AMICI CURIAE.......................................... 1

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.    The Act serves the State's compelling interest in combatting discrimination based on national origin and religious affiliation. ........................................... 2

    A.    The Legislature believed that the Act was necessary to combat the discriminatory nature of BDS. ............................................................. 3

    B.    The Act serves the State's compelling interest in combatting discrimination. ...................................................................................... 7

II.    The Act does not constrain Plaintiffs' expression of political views; it addresses non-expressive conduct not entitled to First Amendment protection. ............................................................................................................ 9

    A.    *Rumsfeld v. FAIR* establishes that the Act does not violate the First Amendment because it regulates conduct that is not inherently expressive............................................................................................... 9

    B.    *NAACP v. Claiborne Hardware Co.* does not give blanket First Amendment protection to boycotts. .................................................... 10

    C.    Plaintiffs' position changes the First Amendment from a shield for speech to a sword for cutting through generally applicable law. ...... 12

CONCLUSION ................................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Barlow v. Blackburn*,
   165 Ariz. 351 (Ct. App. 1990) .................................................................................................. 13

*Board of Directors of Rotary Intern. v. Rotary Club of Duarte*,
   481 U.S. 537 (1987) ..................................................................................................................... 8

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983) ..................................................................................................................... 8

*Emp't Div., Dep't of Human Res. of State of State of Or. v. Smith*,
   485 U.S. 660 (1988) ................................................................................................................... 10

*Feldman v. Arizona Secretary of State's Office*,
   208 F.Supp.3d 1074 (D. Ariz. 2016) .................................................................................... 9, 10

*Heart of Atlanta Motel, Inc. v. U.S.*,
   379 U.S. 241 (1963) ..................................................................................................................... 8

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ....................................................................................................................... 8

*Humanitarian Law Project v. Reno*,
   205 F.3d 1130 (9th Cir. 2000) .................................................................................................. 11

*Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*,
   456 U.S. 212 (1982) ................................................................................................................... 11

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*,
   968 F.2d 286 (2d Cir. 1992) ................................................................................................ 11, 12

*Koontz v. Watson*, No. 17-4099-DDC-K,
   GS, 2018 WL 617894 (D. Kan. Jan. 30, 2018) ...................................................................... 12

*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ....................................................................................................... 10, 11, 12

*Norwood v. Harrison*,
   413 U.S. 455 (1973) ..................................................................................................................... 8

*Potter v. Murray City*,
    760 F.2d 1065 (10th Cir. 1985) .......................................................................................... 13

*Reynolds v. United States*,
    98 U.S. 145 (1878) ............................................................................................................. 13

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ..................................................................................................... *passim*

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ............................................................................................................... 9

*Runyon v. McCrary*,
    427 U.S. 160 (1976) ............................................................................................................. 8

*State v. Fischer*,
    219 Ariz. 408, 199 P.3d 663 (Ct. App. 2008) ..................................................................... 13

*United States v. O'Brien*,
    391 U.S. 367 (1968) ............................................................................................................. 9

**Statutes**

19 U.S.C. § 4452(b)(4)-(5) ...................................................................................................... 12

A.R.S. § 35-393 ......................................................................................................................... 1

**Regulations**

49 C.F.R. § 21.7 ...................................................................................................................... 10

## THE IDENTITIES AND INTERESTS OF THE AMICI CURIAE

Amici submit this brief in support of the State's opposition to Plaintiffs' motion for a preliminary injunction, Dkt. No. 6.

StandWithUs is an international, non-profit Israel education organization. Founded in 2001, its staff and volunteers are inspired by their love for Israel and the belief that education is the road to peace. StandWithUs is dedicated to educating people of all ages about Israel and to combating the anti-Semitism and extremism that often distorts Israel-related issues. We believe that knowledge of the facts will correct common prejudices about the Arab-Israeli conflict, and will foster discussions and policies that help promote peace in the region.

Israel Allies Foundation and the Israel Project join StandWithUs as amici curiae. Each believes that the interests of the United States and Israel are aligned and are opposed to efforts to discriminate against the State of Israel, Israelis, or Jews.

Amici have a long history of submitting amicus briefs in cases that affect religious liberty and anti-Semitism, and submit this brief as advocates for the civil and religious rights of their constituents in Arizona and the United States.

## INTRODUCTION

The United States has a long and honorable history of resisting anti-Semitism. Our country was founded on the principles of civil liberty and freedom from oppression and discrimination. In a letter to the Hebrew Congregation of Newport, George Washington wrote that the United States has a "Government . . . which gives to bigotry no sanction, to persecution no assistance . . . ."[1] The Legislature, in passing A.R.S. § 35-393 et. seq. (the "Act"), aspired to Washington's lofty ideal.

As the State's brief demonstrates, Plaintiffs' preliminary injunction motion implicates the State's compelling interest in condemning and confronting discriminatory conduct based on national origin and religious affiliation. Amici write to emphasize two points.

---

[1] George Washington, *Letter to the Hebrew Congregation at Newport*, August 21, 1790, http://teachingamericanhistory.org/library/document/letter-to-the-hebrew-congregation-at-newport/.

1

First, the Act would be constitutional even if this Court were to find that it infringed on Plaintiffs' First Amendment rights because it serves the State's compelling interest in combatting discrimination based on national origin and religious affiliation. Plaintiff Mikkel Jordahl declares that his boycott is inspired by, among other things, the Boycott, Divestment, and Sanctions movement ("BDS"). (Pl.'s Dec. 7, 2017 Decl., Dkt. 6-1 ¶¶ 10-11). The Arizona legislature (the "Legislature") had BDS in mind in enacting the Act, and it recognized that BDS is intended to coerce Israelis and Jews by means of economic sanctions. Evidence of the anti-Semitic nature of BDS is described below.

Second, the Act does not curtail Plaintiffs' First Amendment freedoms of expression and association. The Act prevents the State of Arizona from spending money to support those who engage in discriminatory *conduct* that is not inherently expressive. Were Plaintiffs' First Amendment argument to prevail, *all* conduct intended to advance any policy change would be protected by the First Amendment. But that is not the law, and accepting Plaintiffs' argument would give rise to substantial mischief wholly apart from this case.[2]

## ARGUMENT

**I. The Act serves the State's compelling interest in combatting discrimination based on national origin and religious affiliation.**

The Act is an anti-discrimination measure. The Legislature understood it as such, and believed that it was necessary to help prevent the discriminatory goals and conduct of BDS and allied organizations. And the Legislature's belief that BDS is invidious discrimination is amply supported by the facts showing that it is a modern-day manifestation of anti-Jew bigotry and vitriol, resurrecting the same stereotypes and demonization that Jews have met for centuries. Therefore, even if the Court were to hold that Plaintiffs' desired economic coercion is expressive conduct protected by the First Amendment (which it is not, see Part II below), the Act would be constitutional because it furthers the State's compelling interest in

---

[2] Amici agree with the State's contention that Plaintiffs' motion can be properly denied without reaching any First Amendment issue, but are addressing the First Amendment issues in case the Court is inclined to decide them.

2

combating discrimination.

### A. The Legislature believed that the Act was necessary to combat the discriminatory nature of BDS.

Arizona legislators have repeatedly stressed that one of the Act's central purposes was to combat the discriminatory goals of the boycott Israel movement. For example:

> "I just want to make sure you understand why we're doing this . . . nobody should be doing things for bigotry, honestly."[3]

> "Anti-Semitism is on the rise across the globe and that's why I think this bill is extremely important."[4]

> "When the nature of boycott is rooted in anti-Semitism . . . it is rooted in hatred. If you are going to boycott somebody because you are anti-Semitic, it's rooted in not a political thought or philosophy or an economic action . . . it's a position rooted in hatred . . . . if you are going to align yourself with somebody who is going to boycott one because they *hate* somebody, I don't think that falls in the same comparison with criticizing . . . . When you have a worldwide boycott solely rooted in a hatred for a people . . . [o]vertly racist . . . [t]hat takes it to a whole different level."[5]

In passing the Act, Arizona joined 23 other states and the federal government in enacting similar measures to combat discriminatory conduct against Israel and Jews. The Legislature recognized that the BDS campaign is fundamentally anti-Semitic, targeting Jews and Israelis based on their religion and their nationality. The BDS campaign's anti-Semitic character is evidenced by its objective of eliminating the Jewish State; its financial supporters; the hateful anti-Semitic tropes, images and chants it employs; the harassment in which its members engage; and the double standard it applies.

Boycotts against Jews and Jewish-owned businesses have a long, pernicious history.

---

[3] Statement of Speaker David Gowan, *Hearing on HB2617 Before the H. Federalism and States' Rights Comm.*, 52nd Leg. 2nd Regular Sess. (Az. 2016) at 5:56, *available at* goo.gl/hXvFFE.

[4] Statement of Sen. Nancy Barto, *Hearing on HB2617 Before the S. Federalism, Mandates and Fiscal Responsibility Comm.*, 52nd Leg. 2nd Regular Sess. (Az. 2016) at 31:21 (explaining "aye" vote), *available at* goo.gl/FddSRK.

[5] Statement of Sen. Steve Smith, *Hearing on HB2617 Before the S. Gov't Comm.*, 52nd Leg. 2nd Regular Sess. (Az. 2016) at 24:30, *available at* goo.gl/5w55En.

In 1922, Arab leaders in the Palestine Mandate launched a boycott against Jews.[6]  In 1933, the Nazi regime in Germany boycotted Jewish-owned stores and businesses in an attempt to isolate and exclude Jews from all civic life.[7]  In 1945, prior to the creation of the Jewish state (and long before Israel obtained control of territories in the 1967 war), the Arab League Council called for a boycott of all *Jewish* and Zionist products.[8]

BDS, operating under the guise of human rights, has resurrected this form of anti-Semitism by calling for a global boycott of Israel and a secondary boycott against companies doing business with Israel.  BDS co-founder Omar Barghouti and other leaders have stated that BDS's goal is to eliminate the State of Israel.[9]  President Barack Obama acknowledged that BDS's agenda would end Israel's existence as a Jewish state, "and that's not an option."[10]  And the organization spearheading many of the BDS activities in the United States, Students for Justice in Palestine ("SJP") routinely chants at BDS rallies, "From the [Jordan] river to the [Mediterranean] sea, Palestine will be free"—a call for Israel to be erased from the map.[11]

The United States Department of State has determined that it is a form of anti-

---

[6] *See* http://jcpa.org/unmasking_img_1/

[7] United States Holocaust Memorial Museum Holocaust Encyclopedia, *Boycott of Jewish Businesses*, https://www.ushmm.org/wlc/en/article.php?ModuleId=10005678 (last visited February 7, 2018).

[8] Mitchell Bard, *Arab League Boycott: Background and Overview*, Jewish Virtual Library (Updated February 2017), http://www.jewishvirtuallibrary.org/background-and-overview-of-the-arab-boycott-of-israel.

[9] John Y. Jones, *Omar Barghouti – Strategies for Change*, Vimeo (September 2013), https://vimeo.com/75201955 at 5:54 ("we oppose a Jewish State in any part of Palestine . . . ."); *see also A Critique of Norman Finkelstein on BDS*, alakhbar english (February 17, 2012), http://english.al-akhbar.com/blogs/angry-corner/critique-norman-finkelstein-bds ("Finkelstein rightly asks whether the real aim of BDS is to bring down the state of Israel.  Here, I agree with him that it is.  That should be stated as an unambiguous goal.").

[10] Barack Obama, *Obama: Opposes 'Right of Return' Inside Israel*, YouTube (May 2, 2008), http://www.youtube.com/watch?v=Xatt3DmTXHo.

[11] *E.g.*, Rutgers SJP Chanting "From the River to the Sea, Palestine will be Free," YouTube, https://www.youtube.com/watch?v=ShWMwqHpO_I (last visited February 7, 2018).

4

394116.1

Semitism to delegitimize Israel through "[d]enying the Jewish people their right to self-determination, and denying Israel the right to exist."[12] Established international law holds that all people have a right to self-determination.[13] BDS's denial of this right only to the Jewish people discriminates not only against Israelis, but also against the Jewish people as a whole.

Moreover, the Jewish people's connection to the land of Israel dates back thousands of years. Jewish liturgy repeatedly underscores the intimate relationship between Jews and Israel.[14] And Jerusalem is the holiest site in Judaism.[15] There is no question that by targeting Israel, BDS is targeting Jews and Judaism.

BDS is particularly prevalent on college campuses, sparking an uptick in anti-Semitism against Jewish college students. In the wake of the BDS campaign, Jewish students have been repeatedly harassed with derogatory anti-Semitic slurs and have faced discrimination on the basis of their Jewish identities.[16] The anti-Semitic tropes, images and

---

[12] *See Defining Anti-Semitism*, U.S. Department of State (January 20, 2017), https://www.state.gov/s/rga/resources/267538.htm. This definition of Anti-Semitism has broad acceptance and mirrors that articulated by the International Holocaust Remembrance Alliance (IHRA), an organization with 31 member countries. *See* https://www.holocaustremembrance.com/node/196 (last visited February 7, 2018). The IHRA's working definition of anti-Semitism has been adopted by Austria, Bulgaria, Germany, Romania, the United Kingdom, and the European Union Parliament. *What is Antisemitism?*, Campaign Against Antisemitism, https://antisemitism.uk/definition/ (last visited February 7, 2018).

[13] *Charter of the United Nations*, http://www.un.org/en/sections/un-charter/chapter-i/index.html (last visited February 7, 2018).

[14] *See, e.g., Liturgical References to Zion*, 1-4 (2015), https://israeled.org/wp-content/uploads/2014/08/Liturgical-References-to-Zion.pdf.

[15] Rachel Avraham, *The 5 Holiest Places in the Jewish Faith*, Jerusalem Online (January 24, 2017, 10:45 AM), http://www.jerusalemonline.com/culture-and-lifestyle/the-5-holiest-places-in-judaism-26166.

[16] Adam Nagourney, *In U.C.L.A. Debate Over Jewish Student, Echoes on Campus of Old Biases*, NYTimes.com (March 5, 2015), http://www.nytimes.com/2015/03/06/us/debate-on-a-jewish-student-at-ucla.html?_r=0; Anthony Berteaux, *In the safe spaces on campus, no Jews allowed*, Washington Post.com (September 15, 2016), https://www.washingtonpost.com/news/acts-of-faith/wp/2016/09/15/in-the-safe-spaces-on-campus-no-jews-allowed/?utm_term=.d533bdbace71; Margaux Gundzik, *Letter to the*

chants that BDS employs, and the hatred that accompanies many BDS protests and demonstrations, cannot be adequately described in the limited context of this brief.[17] Examples include spreading Nazi-like cartoons that dehumanize Israelis by portraying them as a malicious octopus, applying age old anti-Semitic slurs about Jewish greed to Israelis, and spreading modern day forms of the medieval blood libel.[18]

These tropes and memes are directly traceable to BDS's leaders.  A BDS co-founder has outrageously claimed that Israel engaged in "medical experimentation" against Palestinian women.[19]  Hatem Bazian, who cofounded Students for Justice in Palestine and is Chairman of American Muslims for Palestine, each a leading member the BDS movement, has spread claims about organ harvesting and claimed that the "Israel lobby manufactured [the] UK Labour Party's anti-Semitism crisis . . . ."[20]  In November 2017, he was forced to apologize for spreading blatantly anti-Semitic images on social media.[21]

---

*Editor: A Hollow Victory for the Jewish Community*, The Bottom Line (April 17, 2015), https://thebottomline.as.ucsb.edu/2015/04/letter-to-the-editor-a-hollow-victory-for-the-jewish-community; Jennifer Medina, *Student Coalition at Stanford Confronts Allegations of Anti-Semitism*, NYTimes.com (April 14, 2015), http://www.nytimes.com/2015/04/15/us/student-coalition-at-stanford-confronts-allegations-of-anti-semitism.html.

[17] *See, e.g., Hate Spaces: The Politics of Intolerance on Campus (Trailer)*, YouTube (November 23, 2016), https://www.youtube.com/watch?v=IvxYazOSeys.

[18] Adam Levick, *Anti-Semitic Cartoons on Progressive Blogs*, Jerusalem Center for Public Affairs (September 2, 2010), http://jcpa.org/article/anti-semitic-cartoons-on-progressive-blogs/; Petra Marquardt-Bigman, *Rutgers Prof Insists Her Updated Version of the Blood Libel is Not Anti-Semitic*, the tower.org (March 20, 2016, 7:34 PM), http://www.thetower.org/3117-rutgers-prof-insists-her-updated-version-of-the-blood-libel-is-not-anti-semitic/.

[19] *Omar Barghouti @ USC 1.12.2012*, YouTube (January 19, 2012), https://www.youtube.com/watch?v=gYwPyc4t7U0.

[20] Tikva: Students for Israel, Facebook (December 4, 2017), https://www.facebook.com/tikvah.berkeley/posts/1718193621544633.

[21] *See* Yair Rosenberg, *Co- Founder of Students for Justice in Palestine Shares Insanely Anti-Semitic Memes, Offers World's Least Convincing Apology*, Tablet (November 28, 2017), http://www.tabletmag.com/scroll/250354/co-founder-of-students-for-justice-in-palestine-shares-insanely-anti-semitic-memes-offers-worlds-least-convincing-apology   (the meme displayed the image of a stereotypically Jewish looking man with the words "MOM

6

Amici are not suggesting that Plaintiffs share the vile views espoused by many BDS adherents. Amici's point is just this: the Legislature had good cause to believe that anti-Israel boycotts, including boycotts promoted by BDS, are discriminatory because they single out one country and nationality, and by extension, one religious group for discrimination. The Legislature believed that such boycotts were rooted in anti-Semitism, and the evidence strongly indicates that the Legislature was correct.

### B. The Act serves the State's compelling interest in combatting discrimination.

The Supreme Court has long held that rights protected by the First Amendment are not absolute; those rights can be infringed to further a sufficiently compelling state interest. *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), is illustrative. The Jaycees argued that the state law's requirement that the Jaycees admit women as full members violated its members' freedom of association. The Court agreed that the act to some extent infringed on the Jaycees' First Amendment rights: "Such a regulation may impair the ability of the original members to express only those views that brought them together." *Id.* at 623. But, the Court held, "[t]he right to associate for expressive purposes is not . . . absolute." *Id.* "Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Id.* The Court concluded that it was "persuaded that Minnesota's *compelling interest in eradicating discrimination* against its female citizens justifies the impact that application of the statute to the Jaycees may have on the male members' associational freedoms." *Id*. (emphasis added).

In reaching this conclusion, the Court took note of the long history of discrimination against women "based on archaic and overbroad assumptions about the relative needs and capacities of the sexes" and "stereotypical notions that often bear no relationship" to the

---

LOOK! I IS CHOSEN! I CAN NOW KILL, RAPE, SMUGGLE ORGANS & STEAL THE LAND OF PALESTINIANS *YAY* ASHKE-NAZI").

7

1  facts. *Id.* at 625. Such discrimination "both deprives persons of their individual dignity and
2  denies society the benefits of wide participation in political, economic, and cultural life."
3  *Id*;.[22] *accord, Board of Directors of Rotary Intern. v. Rotary Club of Duarte*, 481 U.S. 537,
4  549 (1987) (holding that infringement on Rotary Club members' freedom of association "is
5  justified because it serves the State's compelling interest in eliminating discrimination
6  against women.").

7  And in other cases, the Supreme Court has rejected First Amendment challenges to
8  anti-discrimination statues and civil rights laws without conducting a compelling interest
9  analysis, simply holding that "the Constitution . . . places no value on discrimination," and
10 that "while [i]nvidious private discrimination may be characterized as a form of exercising
11 freedom of association protected by the First Amendment . . . it has never been accorded
12 affirmative constitutional protections." *Runyon v. McCrary*, 427 U.S. 160, 176 (1976)
13 (quoting *Norwood v. Harrison*, 413 U.S. 455 (1973)). *See also Hishon v. King & Spalding*,
14 467 U.S. 69, 78 (1984) (upholding Title VII of the Civil Rights Act against a First
15 Amendment freedom of expression and association challenge); *Bob Jones Univ. v. United
16 States*, 461 U.S. 574, 604 (1983) (prevention of race discrimination in education is a
17 compelling government interest in the free exercise context).

18 Thus, even if the Court were to hold that Plaintiffs' boycott is an expressive activity
19 protected by the First Amendment, and that the Act applies to it, the Act should survive
20 because it "serve[s] compelling state interests, [is] unrelated to the suppression of ideas, that
21 cannot be achieved through means significantly less restrictive of [First Amendment]
22 freedoms." 468 U.S. at 623. Here, the Act serves the compelling interest of combating
23 "archaic" and "stereotypical" characterizations of Jews which "deprive[] them of their
24 individual dignity and denies society the benefits of [their] participation in political,
25

---

26 [22] *See also Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241 (1963), 292 (Goldberg,
27 J., concurring) ("[d]iscrimination is not simply dollars and cents, hamburgers and movies; it
   is the humiliation, frustration, and embarrassment that a person must surely feel when he is
28 told that he is unacceptable as a member of the public.…").

8

economic and cultural life." *Id.* at 625.  In Part II, next, we show that the Act is unrelated to the suppression of ideas.

## II. The Act does not constrain Plaintiffs' expression of political views; it addresses non-expressive conduct not entitled to First Amendment protection.

### A. *Rumsfeld v. FAIR* establishes that the Act does not violate the First Amendment because it regulates conduct that is not inherently expressive.

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47 (2006) ("*FAIR*"), involved the constitutionality of the Solomon Amendment, which Congress enacted when "law schools began restricting the access of military recruiters to their students because of disagreement with the Government's policy on homosexuals in the military."  547 U.S. at 51.  The Amendment sought to end schools' boycotts of military recruiters by withholding federal funding from colleges and universities that prohibited the military from recruiting on campus in a manner equal to other employers.  *Id.* at 54.  The Supreme Court rejected a First Amendment challenge, holding that denying access to military recruiters was *conduct*, not protected speech, and was not "inherently expressive" because "[t]he expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it." *Id.* at 66.  Where conduct is not *inherently* expressive, meaning that the message cannot be understood unless accompanied by explanatory speech, the First Amendment does not prohibit regulating the conduct, or conditioning the receipt of government funds on the conduct.

In short, *FAIR* "rejected the view that 'conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea.'"  547 U.S. at 65-66 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  Subsequent decisions have reached the same conclusion.  For example, in *Feldman v. Arizona Secretary of State's Office*, 208 F.Supp.3d 1074 (D. Ariz. 2016), the court rejected a First Amendment challenge to a law regulating who can possess another person's early ballot.  The challenge was based on the argument "that ballot collection is expressive activity." *Id*. at 1092.  The court disagreed, finding that while "many [Get Out The Vote] activities involve First Amendment

9

1 protected activity, there is nothing inherently expressive or communicative about receiving a
2 voter's completed early ballot and delivering it to the proper place." *Id.* at 1092. The court
3 further held that even if the law implicated protected associational rights, it would still be
4 constitutional because it left plaintiffs with many pathways to encourage voting. *Id.* at 1092-
5 93. Similarly, here, the Act leaves open many ways for Plaintiffs to express their views.

6 Further, courts have repeatedly upheld laws like Title II of the Civil Rights Act and
7 Title III of the Americans with Disabilities Act although the conduct in question implicated
8 some form of expression. *See* Part I.B, *supra*. Conditioning government funding on
9 compliance with law is routinely upheld, even when some First Amendment right is
10 implicated. *See Emp't Div., Dep't of Human Res. of State of State of Or. v. Smith*, 485 U.S.
11 660, 671 (1988) (upholding denial of unemployment benefits over First Amendment
12 challenge). And non-discrimination certifications are required as a matter of course for
13 many types of state funding and government contracts. *See, e.g.*, 49 C.F.R. § 21.7, Ariz.
14 Dept. of Transportation Title VI Assurances, https://azdot.gov/docs/business/title-vi-
15 assurances-for-sub-recipients-44-consultants-and-contractors.pdf?sfvrsn=0.

16 **B.** ***NAACP v. Claiborne Hardware Co.* does not give blanket First Amendment protection to boycotts.**
17

18 This Court should reject Plaintiffs' claim that *NAACP v. Claiborne Hardware Co.*,
19 458 U.S. 886 (1982) establishes a blanket rule that boycotts are protected by the First
20 Amendment. In *Claiborne*, white merchants sued the NAACP for monetary damages,
21 alleging that a boycott organized by the NAACP had harmed their businesses. *Id.* at 889.
22 The boycott's purpose was to pressure merchants to comply with "the rights of equality and
23 of freedom" enshrined in the Fourteenth Amendment and in federal anti-discrimination
24 statutes. *Id.* at 899-900, 907, 914. The Supreme Court held that the non-violent *elements* of
25 the petitioners' activities—specifically the right to associate and support such association
26 with "speeches and non-violent picketing"—were protected by the First Amendment and
27 thus the boycotters' "speeches, marches, and threats of social ostracism [could not] provide
28 the basis for a damages award." *Id.* at 933. But the Court did not hold that all boycotts are

1    always protected by the First Amendment and inexorably immune from all regulation or
2    conditions.  To the contrary, its holding was limited in several important respects that are
3    significant for this case.

4    First, *Claiborne* involved only the damages available through a common-law tort
5    claim.  It did not address the constitutionality of a statute enacted by the Legislature after
6    measured deliberation—as the one here was—and it expressly left open the possibility that
7    "a narrowly tailored statute designed to prohibit . . . certain types of secondary pressure may
8    restrict protected First Amendment activity."  *Id.* at 915 n.49.  And in addition to *FAIR*,
9    numerous decisions both before and after *Claiborne* have rejected First Amendment
10   challenges to anti-boycott or sanctions statutes designed to achieve important governmental
11   interests, especially in the foreign policy arena.  *E.g.*, *Int'l Longshoremen's Ass'n, AFL-CIO
12   v. Allied Int'l, Inc.*, 456 U.S. 212 (1982); *Humanitarian Law Project v. Reno*, 205 F.3d 1130,
13   1133 (9th Cir. 2000) (upholding Antiterrorism and Effective Death Penalty Act's ban on
14   material support to terrorists, and rejecting analogy to *Claiborne*).

15   Second, *Claiborne* holds that a boycott's purpose is relevant.  The Court stressed that
16   the boycott was designed "to effectuate rights guaranteed by the Constitution itself" and that
17   the boycotters' "ultimate objectives were unquestionably legitimate."  458 U.S. at 914, 933.
18   The Court expressly did not decide whether "a boycott designed to secure aims that are
19   themselves prohibited by a valid state law" would be protected.  *Id.* at 915 n.49.  *See also id.*
20   at 933 ("At times the difference between lawful and unlawful collective action may be
21   identified easily by reference to its purpose"), 912 ("This Court has recognized the strong
22   governmental interest in certain forms of economic regulation, even though such regulation
23   may have incidental effects on rights of speech and association"); *Jews for Jesus, Inc. v.
24   Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 297-98 (2d Cir. 1992)
25   (First Amendment did not entitle religious group to boycott businesses transacting with Jews
26   for Jesus, where boycott's purpose contravened state legislation that prohibited
27   discrimination in commercial transactions based on religion; "Unlike the boycott in
28   [*Claiborne*], the threatened boycott and other concerted economic activity in the instant case

11

394116.1

. . . were designed to achieve an objective prohibited by valid state and federal statutes".).

Unlike the tort claim in *Claiborne*, the Act does not restrict the speech or expressive conduct elements of a boycott; it only impacts, indirectly, through loss of government funding, the ability of Plaintiff or other contractors to engage in the *act* of boycotting. Additionally, in contrast to the *Claiborne* boycotts, the boycotts at issue in the Act are not intended to effectuate the constitutional rights of the boycotters, or of any other Americans. Instead, they are aimed at punishing individuals and companies, solely because of their connection to the only country with a Jewish majority, in contravention of Congress's explicit foreign policy statements. *See* 19 U.S.C. § 4452(b)(4)-(5) (Congress "opposes politically motivated actions that penalize or otherwise limit commercial relationship specifically with Israel, such as boycotts of . . . Israel"). And the BDS movement's discriminatory goals are the exact opposite of the NAACP's goal of ending discrimination. *See also id.* (Congress finding that BDS boycotts "are contrary to the principle of nondiscrimination . . . .").[23]

### C. Plaintiffs' position changes the First Amendment from a shield for speech to a sword for cutting through generally applicable law.

Adopting Plaintiffs' view of the First Amendment would leave countless laws subject to First Amendment challenge. Under Plaintiffs' expansive reading, a citizen's refusal to abide by nearly every law because of his or her political views would be expressive conduct protected under the First Amendment. For example, to someone who believes the government has protected too much forest, how better to amplify the point than by cutting down a protected tree and using it to make paper for the pamphlet publicizing the idea and the act? What better way to express disapproval of the federal government than by not

---

[23] As this Court is likely aware, another federal district court recently preliminarily enjoined enforcement of a Kansas law similar to the Act. *See Koontz v. Watson*, No. 17-4099-DDC-KGS, 2018 WL 617894 (D. Kan. Jan. 30, 2018). *Koontz* is of course not binding on this Court, nor is it persuasive. The *Koontz* court did not have the benefit of adversary briefing on the First Amendment issue at the heart of plaintiff's case—the constitutionality of the Kansas law was only addressed at a motion hearing. *Id.* at *10.

12

394116.1

1    paying taxes? Or a company that does not believe in climate change could argue that it
2    needs to ignore federal emission standards to make its point.

3          Plaintiffs' expansive view of the First Amendment would be an arrow in the quiver
4    for "sovereign citizens" and militiamen holding political beliefs contrary to the law. *See*
5    Kristina Goetz, *Sovereign Citizens challenge authority of law*, The Republic (April 14, 2014,
6    3:44 PM) ("sovereign citizen" adherent "refused to surrender to federal agents outside his
7    Seligman home because he was certain his legal arguments would prove correct. 'He
8    believed in his heart of hearts that day he was buying time until the paperwork came in and
9    he would be exonerated of all charges.'"), https://www.azcentral.com/story/life/az-
10   narratives/2014/04/12/sovereign-citizens-challenge-authority-law/7633147/.

11         Discriminatory boycotts are not the only evil combated by the State of Arizona as to
12   which objectors have invoked the First Amendment. The State has enforced its laws against
13   polygamy, a crime that is also a core belief of the Fundamentalist Church of Jesus Christ of
14   Latter-day Saints ("FLDS church"). State and federal courts have had no difficulty rejecting
15   First Amendment arguments in those cases. "Congress was deprived of all legislative power
16   over mere opinion, but was left free to reach actions which were in violation of social duties
17   or subversive of good order." *Barlow v. Blackburn*, 165 Ariz. 351, 356 (Ct. App. 1990)
18   (rejecting challenge to administrative proceeding by polygamous Colorado City deputy
19   sheriff who was member of FLDS church) (quoting *Reynolds v. United States*, 98 U.S. 145,
20   164 (1878)); *Potter v. Murray City*, 760 F.2d 1065 (10th Cir. 1985); *State v. Fischer*, 219
21   Ariz. 408, 199 P.3d 663 (Ct. App. 2008).

22         The First Amendment allows the Legislature set substantive conduct requirements,
23   but requires that the State allow dissenters to speak to advocate the opposite point of view.
24   The Act is fully in accord with that Constitutional structure.

25         **CONCLUSION**

26         "[A]cts of invidious discrimination . . . cause unique evils that government has a
27   compelling interest to prevent." 468 U.S. at 628. Amici applaud the Legislature's
28   commitment to that ideal, and respectfully submit that the Act achieves the Legislature's

purpose in complete consistency with the Constitution, in harmony with the ideal of a "Government . . . which gives to bigotry no sanction, to persecution no assistance . . . ."[24]

Dated: February 8, 2018                                         Respectfully submitted,

By: */s/ Jonathan M. Rotter*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  jrotter@glancylaw.com

Counsel for Amicus Curiae StandWithUs

---

[24] George Washington, *Letter to the Hebrew Congregation at Newport*, supra note 1.

14

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2018 I electronically filed the foregoing *Amicus Curiae* Brief with the Clerk's Office by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

| DATED this February 8, 2018 | By: */s/ Jonathan M. Rotter*<br><br>**GLANCY PRONGAY & MURRAY LLP**<br>1925 Century Park East, Suite 2100<br>Los Angeles, California 90067<br>Telephone: (310) 201-9150<br>Facsimile: (310) 201-9160<br>Email:  jrotter@glancylaw.com |
|---|---|

394116.1