EXHIBIT 1

Lawrence J. Zweifach
Akiva Shapiro
Matthew Greenfield
Vince Eisinger
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-3830

*Attorneys for* Amicus Curiae *The Louis D. Brandeis Center, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., | Case No: 3:17-cv-08263-PCT-DJH |
| Plaintiffs, | |
| v. | **Brief of *Amicus Curiae* The Louis D. Brandeis Center, Inc.** |
| Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Jail District Board of Directors Member; Lena Fowler, Coconino County Jail District Board of Directors Member; Elizabeth Archuleta, Coconino County Jail District Board of Directors Member; Art Babbott, Coconino County Jail District Board of Directors Member; Jim Parks, Coconino County Jail District Board of Directors Member, all in their official capacities, | |
| Defendants. | |

1

# TABLE OF CONTENTS

2

<u>Page</u>

3     INTERESTS OF *AMICUS CURIAE* ................................................................. 1

4     INTRODUCTION ............................................................................................... 2

5     ARGUMENT ....................................................................................................... 3

6     I.    It Is Commonplace and Appropriate for Federal, State, and Local
            Governments to Condition the Receipt of a Government Subsidy
7           or Contract on a Commitment Not to Discriminate. ............................... 3

8           A. Federal, State, and Local Governments Regularly Place Anti-
               Discrimination Conditions on the Receipt of Government
9              Subsidies and Contracts ...................................................................... 4

10          B. The First Amendment Permits the Government to Require that
11             the Recipient of a Government Subsidy or Contract Not Engage
               in Discriminatory Conduct. ................................................................. 6

12    II.   In Conditioning the Receipt of a Government Contract on a
13          Commitment Not to Engage in a Boycott of Israel, the Act
14          Appropriately Regulates Discriminatory Conduct—Not Speech......................... 9

15    CONCLUSION................................................................................................... 15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

Page(s)

3

4

**Cases**

5

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) .................................................................................................. 8

6

7

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ............................................................................................. 6, 14

8

9

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003) ..................................................................................... 6

10

11

*Contractors Ass'n of E. Pa. v. Sec'y of Labor*,
311 F. Supp. 1002 (E.D. Pa. 1970), *aff'd*, 442 F.2d 159 (3d Cir. 1971) ...................... 6

12

13

*CSX Transp., Inc. v. Alabama Dep't of Rev.*,
562 U.S. 277 (2011) ................................................................................................ 10

14

15

*Cutter v. Wilkinson*,
423 F.3d 579 (6th Cir. 2005) ..................................................................................... 6

16

*Cutter v. Wilkinson*,
544 U.S. 709 (2005) ................................................................................................... 6

17

18

*FTC v. Sup. Ct. Trial Lawyers Ass'n*,
493 U.S. 411 (1990) ................................................................................................ 12

19

20

*Grove City Coll. v. Bell*,
465 U.S. 555 (1984) ............................................................................................. 6, 7

21

22

*Illinois Builders Ass'n v. Ogilvie*,
327 F. Supp. 1154 (S.D. Ill. 1971), *aff'd*, 471 F.2d 680 (7th Cir. 1972) ...................... 6

23

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*,
968 F.2d 286 (2d Cir. 1992) ................................................................................. 13, 14

24

25

*Kroske v. U.S. Bank Corp.*,
432 F.3d 976 (9th Cir. 2005), *as amended* (Feb. 13, 2006) .......................................... 9

26

27

*LaSalvia v. United Dairymen of Ariz.*,
804 F.2d 1113 (9th Cir. 1986) ................................................................................. 13

28

*Lyng v. UAW*,
485 U.S. 360 (1988) ............................................................................................. 7, 8

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ...................................................................... 7, 12, 13, 14

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ........................................................................................ 7

*New State Ice Co. v. Liebmann*,
    285 U.S. 262 (1932) ...................................................................................... 12

*Pena-Rodriguez v. Colorado*,
    137 S. Ct. 855 (2017) .................................................................................... 14

*Regan v. Taxation with Representation of Wash.*,
    461 U.S. 540 (1983) ........................................................................................ 7

*Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ........................................................................................ 12

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ........................................................................................ 7

*Telesat Cablevision, Inc. v. City of Riviera Beach*,
    773 F. Supp. 383 (S.D. Fla. 1991) ................................................................. 6

*Truax v. Corrigan*,
    257 U.S. 312 (1921) ...................................................................................... 12

*United States v. Am. Library Ass'n, Inc.*,
    539 U.S. 194 (2003) ........................................................................................ 7

*United States v. O'Brien*,
    391 U.S. 367 (1968) ...................................................................................... 13

*Whitney v. California*,
    274 U.S. 357 (1927) ........................................................................................ 1

**Statutes & Legislative Acts**

20 U.S.C. § 1681 ................................................................................................. 5

22 U.S.C. § 7631(f) ............................................................................................. 8

775 Ill. Comp. Stat. Ann. 5/2-105 (West 2018) ................................................ 5

2016 Ariz. Sess. Laws ch. 46, § 2(C) ........................................................... 3, 10

Alaska Stat. Ann. § 36.30.040 (West 2017) ....................................................... 4

Arizona House Bill 2617 ................................................................................................ 2

Ariz. Rev. Stat. § 35-393(1) ...................................................................................... 2, 9

Ariz. Rev. Stat. § 35-393.01(A).............................................................................. 2, 9, 12

Cal. Pub. Con. Code § 2010 (West 2018) ............................................................... 4, 5

Civil Rights Act of 1964, Title II (codified at 42 U.S.C. § 2000a *et seq.*)........................ 10

Civil Rights Act of 1964, Title VI (codified at 42 U.S.C. § 2000d *et seq.*) ................... 1, 5

Civil Rights Act of 1964, Title VII (codified at 42 U.S.C. § 2000e *et seq.*) ..................... 10

Conn. Gen. Stat. Ann. § 4a-60 (West 2017) ................................................................ 5

Del. Code Ann. tit. 29, § 6519A (West 2017) .......................................................... 5

Del. Code Ann. tit. 29, § 6962 (West 2017) ............................................................. 5

Idaho Code Ann. § 67-5902(6)(a) (West 2017) ........................................................ 5

Ind. Code Ann. § 22-9-1-10 (West 2017) ................................................................. 5

Iowa Code Ann. § 12J.3(1)(a) (West 2017) .............................................................. 4

Iowa Code Ann. § 12J.3(2)(b) (West 2017) .............................................................. 4

Iowa Code Ann. § 19B.7 (West 2017) ...................................................................... 5

Kan. Stat. Ann. § 44-1030 (West 2017) ................................................................... 5

Ky. Rev. Stat. Ann. § 45.600 (West 2017) ............................................................... 5

Ky. Rev. Stat. Ann. § 45A.675 (West 2017) ............................................................. 5

Md. Code Ann., State Fin. & Proc. § 13-219 (West 2017) ....................................... 5

Me. Rev. Stat. Ann. tit. 5, § 784 (West 2017) ......................................................... 5

Mich. Comp. Laws Ann. 37.2209 (West 2018)......................................................... 5

Minn. Stat. Ann. § 181.59 (West 2017).................................................................... 5

Mont. Code Ann. § 49-3-207 (West 2017)................................................................ 5

N.C. Gen. Stat. Ann. § 147-86.80(4) (West 2017).................................................... 4

N.C. Gen. Stat. Ann. § 147-86.81(a)(1)(b) (West 2017)........................................... 4

N.J. Stat. Ann. § 10:2-1 (West 2017) ................................................... 5

N.Y. Lab. Law § 220-e (West 2018) .................................................... 5

Nev. Rev. Stat. Ann. § 338.125 (West 2017) ....................................... 5

Ohio Rev. Code Ann. § 125.111 (West 2017) ...................................... 5

Okla. Stat. Ann. tit. 25, §§ 1301-02 (West 2017) ................................ 5

Vt. Stat. Ann. tit. 21, § 495a (West 2017) ............................................ 5

Wis. Stat. Ann. § 16.765 (West 2017) .................................................. 5

**Regulations**

16 Pa. Code § 49.101 (West 2018) ....................................................... 5

34 C.F.R. § 100.3 ................................................................................. 5

34 C.F.R. § 106.21 *et seq.* .................................................................. 5

**Executive Branch Materials**

Ariz. Exec. Order No. 99-4/999 (1999), *amending* Ariz. Exec. Order No.
   75-5 (1975) .................................................................................... 4

Exec. Order No. 11246, 30 Fed. Reg. 12319 (Sept. 24, 1965), *amended by*
   Exec. Order No. 13672, 79 Fed. Reg. 42971 (July 21, 2014) .......... 4

Idaho Exec. Order No. 2004-05 Art. II (2004) .................................... 5

Mass. Exec. Order No. 246 (1984) ...................................................... 5

Mo. Exec. Order No. 87-6 (1987) ....................................................... 5

Wash. Exec. Order No. 66-03 (Aug. 2, 1996) ..................................... 5

**Other Authorities**

Barry A. Hartstein, *50 Ways from Sunday – Can a Corporation Have a
   Successful Nationwide Policy that Is Consistent with State and Local
   Laws: Survey of State EEO and Related Laws, Including Significant
   Recent Developments and Jury Verdicts* (2009), *available at*
   http://apps.americanbar.org/
   labor/eeocomm/mw/Papers/2009/data/papers/19.pdf ................................ 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Christy Mallory & Brad Sears, *An Evaluation of Local Laws Requiring Government Contractors to Adopt Non-Discrimination and Affirmative Action Policies to Protect LGBT Employees* (2012), *available at* http://williamsinstitute.law.ucla.edu/wp-content/uploads/Mallory-Sears-Govt-Contractors-Non-Discrim-Feb-2012.pdf ............................................................... 5

Fighting Anti-Semitism:  Hearing on H.B. 476 Before the Ohio H. Comm. on Gov't Accountability & Oversight (2016) (statement of Kenneth L. Marcus, President and General Counsel, Brandeis Center), *available at* http://brandeiscenter.com/wp-content/uploads/2017/10/16-06-09_Ohio_House_of_ Representatives_Testimony.pdf ................................................. 11

Kenneth L. Marcus, *The Definition of Anti-Semitism* (Oxford Univ. Press 2015) ............................................................................................. 11

National Conference of State Legislatures, *State Public Accommodation Laws* (July 13, 2016), http://www.ncsl.org/research/civil-and-criminal-justice/state-public-accommodation-laws.aspx ............................................. 10

Webster's Third New Int'l Dictionary (1976) ................................................. 10

vi

1

## INTERESTS OF *AMICUS CURIAE*

2    The Louis D. Brandeis Center, Inc. (the "Brandeis Center" or the "Center") is an

3    independent, non-partisan institution for public interest advocacy, research, and educa-

4    tion.  The Center's mission is to advance the civil and human rights of the Jewish people

5    and to promote justice for all.  The Center's education, research, and advocacy focus es-

6    pecially, but not exclusively, on the problem of anti-Semitism on college and university

7    campuses.

8    In fulfilling its mission, the Brandeis Center emphasizes the importance of clear,

9    comprehensive, and specific anti-discrimination policies for government entities, includ-

10    ing public universities.  The Center publishes guidance documents for organizations seek-

11    ing to adopt uniform definitions of anti-Semitism, which in some cases is manifested in

12    the form of anti-Israel boycotts, divestments, and sanctions.  The Center's attorneys also

13    advise and represent students in higher education who have been victims of anti-Semitic

14    conduct in violation of Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C.

15    § 2000d *et seq.*).

16    The Center maintains a network of affiliated student chapters at law schools

17    throughout the United States, which support the Center's work promoting Jewish civil

18    rights advocacy and international human rights law, and combating anti-Semitism and

19    anti-Israel sentiment.  The Center's chapters welcome students of any race, color, reli-

20    gion, sexual orientation, national origin, age, gender, or disability.

21    The Center believes that we must respect and actively safeguard our First

22    Amendment right to freedom of speech.  The Center affirms the statement of its name-

23    sake, Justice Louis D. Brandeis, in *Whitney v. California*, "If there be a time to expose

24    through discussion the falsehood and fallacies, to avert the evil by the processes of educa-

25    tion, the remedy to be applied is more speech, not enforced silence."  274 U.S. 357, 377

26    (1927) (Brandeis, J., concurring).  At the same time, the Center believes that the govern-

27    ment has the responsibility and authority to zealously protect the right of all citizens to be

28    free of discrimination on the basis of race, national origin, ethnicity, or religion.

1

**INTRODUCTION**

2   In requiring that state contractors refrain from "engag[ing] in a boycott of Isra-

3   el"—defined to include a "refusal to deal . . . with Israel or with persons or entities doing

4   business in Israel"[1]—the State of Arizona, through Arizona House Bill 2617 (the "Act"),

5   conditions the receipt of a government subsidy on the recipient's commitment not to en-

6   gage in discriminatory conduct.  This is a commonplace and entirely appropriate method

7   used by federal, state, and local governments across our Nation to promote equality under

8   the law, combat discrimination, and ensure that public funds are not used for illegal or

9   invidious purposes.  Indeed, as detailed below, federal, state, and local governments have

10  long required government contractors to refrain from discrimination on the basis of na-

11  tional origin, race, religion, and other classifications as a condition to receiving govern-

12  ment contracts.  Such conditions on contracting are a pillar of our nation's anti-

13  discrimination laws.  Any proposed rule that impugns the government's ability to pro-

14  mote equality under the law through such regulation of discriminatory conduct should be

15  viewed with great suspicion.

16  Despite what Plaintiffs suggest here, these measures are not constitutionally dubi-

17  ous under the First Amendment.  Such laws forbid only the act of discrimination—which

18  is non-expressive conduct under well-established constitutional principles.  The Act at

19  issue, in particular, regulates only the act of boycotting by state contractors—while per-

20  mitting contractors to speak and advocate openly on any subject, including on the boy-

21  cott.  It does not regulate speech at all.  Contractors remain free to believe what they wish

22  and to speak passionately about their views in any forum.  Contractors are also free to

23  forgo the contract if they wish to engage in the discriminatory conduct the law disincen-

24  tivizes; the State makes no threat of further penalty or sanction.  To find that such con-

25

26  _____

    [1]   Ariz. Rev. Stat. §§ 35-393.01(A), 35-393(1).  References in this brief to a
    boycott of Israel incorporate this statutory definition to mean "engaging in a refusal to
27  deal, terminating business activities or performing other actions that are intended to limit
    commercial relations *with Israel or with persons or entities doing business in Israel* or in
28  territories controlled by Israel."  *Id.* § 35-393(1) (emphasis added).

2

duct-focused conditions violate the First Amendment would undermine the very structure by which governments at every level have promoted and encouraged the diversification of America's schools and workforce, and rooted out discrimination in all its forms.

Finally, such laws are no less appropriate simply because they target discrimination against Israel and people who do business with Israel, rather than other forms of invidious discrimination.  Discrimination against Israel is too often a form of discrimination against the Jewish people on the basis of religion and race.  And states are in any case not limited to discouraging pre-existing classifications of discrimination.  A ruling suggesting otherwise would dangerously handicap the ability of federal, state, and local governments to extend our Nation's anti-discrimination laws to new forms of discriminatory conduct as our society moves towards ever greater and broader notions of equality. In any event, as the Arizona Legislature found, "Companies that refuse to deal with . . . Israel, or entities that do business with or in [Israel], make discriminatory decisions on the basis of national origin," 2016 Ariz. Sess. Laws ch. 46, § 2(C), which is one of the foundational categories of invidious discrimination that our Nation's laws have long appropriately targeted.

For all of these reasons, the State of Arizona's refusal to award state contracts to companies actually engaged in a discriminatory boycott of Israel and those who do business with Israel—while steering clear of any regulation of speech—was entirely appropriate.  The Act should not be enjoined.

## ARGUMENT

**I.  It Is Commonplace and Appropriate for Federal, State, and Local Governments to Condition the Receipt of a Government Subsidy or Contract on a Commitment Not to Discriminate.**

Setting conditions for government contractors to retain their contracts is a common practice.  In passing the Act, Arizona's legislature joined numerous other governments—federal, state, and municipal—in exercising its unquestionable authority to place conditions on the receipt of state subsidies that require the recipient of the contract not to

3

engage in discriminatory conduct.  Courts have consistently affirmed the constitutionality of such conditions.

The condition in the Act is that a contractor not engage in a boycott of Israel for the duration of the contract.  The consequence for violating the condition—by engaging in such a boycott—is termination of the contract.  Such a modest condition on Arizona's spending of its own funds in order to disincentivize discrimination is entirely appropriate.

## A.   Federal, State, and Local Governments Regularly Place Anti-Discrimination Conditions on the Receipt of Government Subsidies and Contracts.

Were the Court to enjoin the enforcement of the Act, the constitutionality of a wide range of federal, state, and municipal laws and policies would be called into question.  Most directly, as outlined in Appendix A of the Attorney General's opposition brief, 18 other states condition government contracts on a contractor's refraining from boycotting Israel.[2]  Each of these states joins Arizona in requiring contractors to certify their compliance with the applicable conditions.[3]

More broadly, the federal government,[4] as well as a large number of state[5] and local governments,[6] condition government contracts on the contractors not discriminating

---

[2]   An additional five states (Colorado, Illinois, Indiana, New York, and New Jersey) require divestment from entities participating in boycotts of Israel.

[3]   Iowa and North Carolina maintain a list of companies that are banned from contracting with those states due to their participation in boycotts of Israel.  *See* Iowa Code Ann. § 12J.3(1)(a) (West 2017); N.C. Gen. Stat. Ann. § 147-86.80(4) (West 2017). In those states, prospective contractors are only required to certify compliance with the law if they wish to remove themselves from the list of banned companies.  *See* Iowa Code Ann. § 12J.3(2)(b) (West 2017); N.C. Gen. Stat. Ann. § 147-86.81(a)(1)(b) (West 2017).

[4]   Exec. Order No. 11246, 30 Fed. Reg. 12319 (Sept. 24, 1965), *amended by* Exec. Order No. 13672, 79 Fed. Reg. 42971 (July 21, 2014) (requiring that all contracts between the federal government and contractors include a clause prohibiting the contractor from "discriminat[ing] against any employee or applicant for employment because of race, creed, color, sex, sexual orientation, gender identity, or national origin").

[5]   *See, e.g.*, Alaska Stat. Ann. § 36.30.040 (West 2017); Ariz. Exec. Order No. 99-4/999 (1999), *amending* Ariz. Exec. Order. No. 75-5 (1975); Cal. Pub. Con. Code

4

on the basis of national origin, race, sexual orientation, and other classifications.  The

federal government places similar anti-discrimination conditions on its funding for public

and private universities.[7]  The government does so both as a carrot and as a stick: to in-

centivize private actors to distance themselves from discrimination, and to disincentivize

discrimination.  Such conditions also appropriately ensure that government funds—that

is, public funds—are not used to subsidize or support discriminatory conduct.  It is diffi-

cult to imagine what our schools, labor force, and communities would look like if the

---

§ 2010 (West 2018); Conn. Gen. Stat. Ann. § 4a-60 (West 2017);  Del. Code Ann. tit. 29, § 6519A (West 2017); Del. Code Ann. tit. 29, § 6962 (West 2017); Idaho Exec. Order No. 2004-05 Art. II (2004); Idaho Code Ann. § 67-5902(6)(a) (West 2017); 775 Ill. Comp. Stat. Ann. 5/2-105 (West 2018); Ind. Code Ann. § 22-9-1-10 (West 2017); Iowa Code Ann. § 19B.7 (West 2017); Kan. Stat. Ann. § 44-1030 (West 2017); Ky. Rev. Stat. Ann. § 45A.675 (West 2017); Ky. Rev. Stat. Ann. § 45.600 (West 2017); Me. Rev. Stat. Ann. tit. 5, § 784 (2017); Md. Code Ann., State Fin. & Proc. § 13-219 (West 2017); Mass. Exec. Order No. 246 (1984); Mich. Comp. Laws Ann. 37.2209 (West 2018); Minn. Stat. Ann. § 181.59 (West 2017); Mo. Exec. Order No. 87-6 (1987); Mont. Code Ann. § 49-3-207 (West 2017); Nev. Rev. Stat. Ann. § 338.125 (West 2017); N.J. Stat. Ann. § 10:2-1 (West 2017); N.Y. Lab. Law § 220-e (West 2018); Ohio Rev. Code Ann. § 125.111 (West 2017); Okla. Stat. Ann. tit. 25, §§ 1301-1302 (West 2017); 16 Pa. Code § 49.101 (West 2018); Vt. Stat. Ann. tit. 21, § 495a (West 2017); Wash. Exec. Order No. 66-03 (Aug. 2, 1996); Wis. Stat. Ann. § 16.765 (West 2017).

[6]      *See, e.g.*, Christy Mallory & Brad Sears, *An Evaluation of Local Laws Requiring Government Contractors to Adopt Non-Discrimination and Affirmative Action Policies to Protect LGBT Employees* 2 n.7 (2012) (citing 61 local ordinances that "prohibit discrimination on the basis of sexual orientation in employment by local government contractors"), *available at* http://williamsinstitute.law.ucla.edu/wp-content/uploads/Mallory-Sears-Govt-Contractors-Non-Discrim-Feb-2012.pdf.

[7]      *See, e.g.*, 42 U.S.C. § 2000d *et seq.* ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 20 U.S.C. § 1681 ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."); 34 C.F.R. § 100.3 (Department of Education regulation prohibiting educational institutions that receive federal financial assistance from discriminating on the basis of race, color, or national origin); 34 C.F.R. § 106.21 *et seq.* (Department of Education regulation prohibiting schools that receive federal financial assistance from discriminating on the basis of sex).

First Amendment prevented governments from setting contract conditions that combat

racism, sexism, anti-Semitism, and other discriminatory conduct.

### B. The First Amendment Permits the Government to Require that the Recipient of a Government Subsidy or Contract Not Engage in Discriminatory Conduct.

Anti-discrimination conditions on government subsidies and contracting routinely

withstand First Amendment and other constitutional challenges.[8]  These cases are of a

---

[8]        Cases rejecting First Amendment challenges to conditions on government subsidies include *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984) (rejecting First Amendment challenge by university to requirement that recipient of federal tuition assistance submit a certification that the university does not discriminate on the basis of sex); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that conditioning tax-exempt status on a university's adoption of non-discrimination policies did not infringe the university's First Amendment rights); *see also Cutter v. Wilkinson*, 544 U.S. 709, 732–33 (2005) (noting that "while Congress' condition stands, the States subject themselves to that condition by voluntarily accepting federal funds," and thus upheld against First Amendment challenge condition that states that received federal funds for prison activities or programs had to comply with federal statute aimed at protecting the free exercise of religion); *Charles v. Verhagen*, 348 F.3d 601, 610 (7th Cir. 2003) (same); *Telesat Cablevision, Inc. v. City of Riviera Beach*, 773 F. Supp. 383, 399–401 (S.D. Fla. 1991) (rejecting cable operator's First Amendment challenge to city's imposition of a requirement that cable operators provide universal service throughout the city's boundaries as a condition of being franchised).  Such conditions have also withstood other constitutional challenges.  *See, e.g., Cutter v. Wilkinson*, 423 F.3d 579, 5 89–90 (6th Cir. 2005) (upholding against Tenth Amendment challenge to conditions imposed on states that received federal funds through the Religious Land Use and Institutionalized Persons Act, a statute enacted to guard against religious discrimination in prisons); *Ill. Builders Ass'n v. Ogilvie*, 327 F. Supp. 1154, 1160–62 (S.D. Ill. 1971), *aff'd*, 471 F.2d 680 (7th Cir. 1972) (rejecting Fifth and Fourteenth Amendment challenges to requirement that government contractors take affirmative action in the recruiting, training, and hiring of minority groups, in order "to insure no discrimination exists in contracts involving public funds"); *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 311 F. Supp. 1002, 1011–13 (E.D. Pa. 1970), *aff'd*, 442 F.2d 159 (3d Cir. 1971) (upholding against Fifth and Fourteenth Amendment challenges the "Philadelphia Plan," a state regulation requiring that government contracts include a provision mandating that contractors not discriminate against employees or job applicants due to race, color, religion, sex, or national origin).

6

1    piece with the U.S. Supreme Court's consistent rejection of First Amendment challenges

2    to conditions on the receipt of state subsidies.[9]

3         The Supreme Court has made clear that these conditions do not prohibit any con-

4    stitutionally protected speech or conduct.  *See Am. Library*, 539 U.S. at 212.  The subsidy

5    recipient is "free to [engage in the protected conduct] without [government] assistance."

6    *Id.*  Thus, "[a] refusal to fund protected activity, without more, cannot be equated with

7    the imposition of a penalty on that activity.  A legislature's decision not to subsidize the

8    exercise of a fundamental right does not infringe the right."  *Id.* (citations, brackets, and

9    internal quotation marks omitted).  In fact, "the Government may allocate competitive

10   funding according to criteria that would be impermissible were direct regulation of

11   speech or a criminal penalty at stake."  *Finley*, 524 U.S. at 587–88.

12        The Court elaborated on the distinction between prohibitions of conduct and con-

13   ditions on subsidies in *Lyng*.  In that case, Congress had amended the Food Stamp Act so

14   that "no household [could] become eligible to participate in the food stamp program dur-

15   ing the time that any member of the household [wa]s on strike or [could] increase the al-

16   lotment of food stamps that it was receiving already because the income of the striking

17   member ha[d] decreased."  485 U.S. at 362.  The plaintiffs (unions and their members)

18   claimed that the amended Act violated their First Amendment rights of association and

19   expression.  *Id.* at 363–64.

20        The Court rejected both arguments.  *Id.* at 364.  As to the right of free association,

21   "the statute at issue . . . . d[id] not order [the plaintiffs] not to associate together for the

22   purpose of conducting a strike, or for any other purpose, and it d[id] not prevent them

23   from associating together."  *Id.* at 366 (internal quotation marks omitted).  The decision

24   in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), was distinguishable because

25

---

26         [9]     *See, e.g., United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003);

27   *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *Rust v. Sullivan*, 500 U.S.
     173 (1991); *Lyng v. UAW*, 485 U.S. 360 (1988); *Grove City Coll.*, 465 U.S. at 575; *Regan*

28   *v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983).

"[e]xposing the members of an association to physical and economic reprisals or to civil liability merely because of their membership in that group poses a much greater danger to the exercise of associational freedoms than does the withdrawal of a government benefit based not on membership in an organization but merely for the duration of one activity that may be undertaken by that organization." *Lyng*, 485 U.S. at 367 n.5. As to the right of free expression, "the statute . . . require[d] no exaction from any individual; it d[id] not coerce belief; and it d[id] not require [plaintiffs] to participate in political activities or support political views with which they disagree. It merely decline[d] to extend additional food stamp assistance to striking individuals." *Id.* at 369 (internal quotation marks omitted).

The Act is constitutionally appropriate for the same reasons. The law does not forbid any citizen of Arizona from boycotting Israel. Nor does the law coerce state contractors into believing or supporting a particular view about such boycotts.[10] Instead, the Act "merely declines to extend" the subsidy of a government contract to state contractors "for the duration of" their participation in any boycott of Israel. *See id.* at 367 n.5, 369. Contractors are free to forego contracting with Arizona in order to boycott Israel, and they are free to accept a contract with Arizona while speaking, writing, and advocating in support of boycotts of Israel, so long as they don't themselves actively and actually participate in the boycott itself for the duration of the contract.

---

[10] For this reason, Plaintiffs' citation to *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013), is off the mark. The relevant subsidy in that case conditioned a grant on an organization's adopting a "policy explicitly opposing prostitution and sex trafficking." 22 U.S.C. § 7631(f). Such a requirement "compel[led] a grant recipient to adopt a particular belief." *Open Soc'y*, 570 U.S. at 218. The Act does not compel, or mention *at all*, particular policies or beliefs that a government contractor must adopt. And the Supreme Court reaffirmed in *Open Society* that, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Id.* at 214.

II.     **In Conditioning the Receipt of a Government Contract on a Commitment Not to Engage in a Boycott of Israel, the Act Appropriately Regulates Discriminatory Conduct—Not Speech.**

The Act prohibits the State of Arizona and its agencies and subdivisions from entering into a contract with any "company" that does not agree to refrain from "engag[ing] in" a "boycott of Israel" or people who do business with Israel for the duration of the contract.  Ariz. Rev. Stat. §§ 35-393.01(A) & 35-393(1).  In doing so, the law disincentivizes discriminatory boycotts and ensures that public funds will not subsidize discriminatory conduct.  It does not regulate in any way any individual citizen, any company that does not seek voluntarily to enter into a commercial contract with the state, or any speech of any kind.

The law is on par with the commonplace anti-discrimination conditions on contracting discussed above; it does not lose any validity simply on the ground that the discrimination it targets is discrimination against Israel and people who do business with Israel, or that the conduct it targets is a discriminatory boycott.

To begin with, discrimination is not protected speech.  The states possess "historic police powers to prohibit discrimination on specified grounds."  *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 981 (9th Cir. 2005), *as amended* (Feb. 13, 2006); State's Combined Response to Plaintiffs' Motion for a Preliminary Injunction & Motion to Dismiss at 23–25, *Jordahl v. Brnovich*, No. 17-cv-08263 (D. Ariz. Jan. 18, 2018), ECF No. 28.  The federal government and many states have exercised these powers by directly prohibiting

9

private discrimination on the basis of national origin, religion, and other classifications, including in the context of employment[11] and public accommodations.[12]

Here, the Act targets discriminatory conduct. To "discriminate[] means to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." *CSX Transp., Inc. v. Alabama Dep't of Rev.*, 562 U.S. 277, 286-87 (2011) (quoting Webster's Third New Int'l Dictionary 648 (1976)). A boycott focusing on a single country discriminates on the basis of national origin by categorically treating that country's affiliated persons and products as different than all other persons or products no matter their relative merit. Indeed, the Arizona Legislature expressly found, when passing the Act, that "Companies that refuse to deal with . . . Israel, or entities that do business with or in [Israel], make discriminatory decisions on the basis of national origin." 2016 Ariz. Sess. Laws ch. 46, § 2(C). This finding is entitled to great deference. National origin discrimination is one of the foundational categories of impermissible discrimination that our Nation's laws have long sought to root out.

---

[11]    *See, e.g.*, Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000e *et seq.*); Barry A. Hartstein, *50 Ways from Sunday – Can a Corporation Have a Successful Nationwide Policy that Is Consistent with State and Local Laws: Survey of State EEO and Related Laws, Including Significant Recent Developments and Jury Verdicts* iii (2009), *available at* http://apps.americanbar.org/labor/eeocomm/mw/Papers/2009/data/papers/19.pdf ("[M]ost states have state [fair employment practices] laws similar to Title VII that prohibit discrimination on the basis of . . . religion and national origin.").

[12]    *See, e.g.*, Title II of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000a *et seq.*); National Conference of State Legislatures, *State Public Accommodation Laws* (July 13, 2016), http://www.ncsl.org/research/civil-and-criminal-justice/state-public-accommodation-laws.aspx ("All states with a public accommodation law prohibit discrimination on the grounds of . . . ancestry [*i.e.*, national origin] and religion.").

The discriminatory nature of a boycott against Israel and people who do business with Israel is even more invidious, given the fact that such boycotts have historically been motivated by animus towards Jews on the basis of their religion and race; indeed, anti-Semitism has been manifested through boycott campaigns since at least as early as the 1700s.[13]   As Brandeis Center President and General Counsel Kenneth Marcus has explained, "[t]he pre-Nazi, Nazi, Arab League and BDS [*i.e.*, modern Boycott, Divestment, and Sanctions campaign] boycotts all share common elements: they seek to deny Jewish legitimacy or normalcy as punishment for supposed Jewish transgressions."[14]   The Act thus combats odious discrimination on the basis of religion and race.

And states are of course not limited to targeting discrimination that falls into pre-existing legal classifications.  Federal, state, and local governments have regularly extended the protections of anti-discrimination laws to new categories of individuals—with individual states and municipalities often leading the way—as our nation's sensitivity to

---

[13]     *See* Fighting Anti-Semitism:  Hearing on H.B. 476 Before the Ohio H. Comm. on Gov't Accountability & Oversight (2016), at 4–6 (statement of Kenneth L. Marcus, President and General Counsel, Brandeis Center), *available at* http://brandeiscenter.com/wp-content/uploads/2017/10/16-06-09_Ohio_House_of_Representatives_Testimony.pdf.  In the twentieth century, Nazi encouragement led to a resurgence of anti-Jewish boycotts; in Germany, the Nazi regime's first nationwide action against the Jews was a boycott.  *Id.*  The post-World War II boycotts have formally targeted the State of Israel, but have been closely associated with this history of general boycotts against Jews.  *Id.*

[14]     *Id.* at 13; *see also* Kenneth L. Marcus, *The Definition of Anti-Semitism* 213 (Oxford Univ. Press 2015) (although every BDS supporter is not necessarily motivated by personal prejudice, "[t]he modern BDS campaign is anti-Semitic, as its predecessors were, because some of its proponents act out of conscious hostility to the Jewish people; others act from unconscious or tacit disdain for Jews; and still others operate out of a climate of opinion that contains elements that are hostile to Jews and serve as the conduits through whom anti-Jewish tropes and memes are communicated; while all of them work to sustain a movement that attacks the commitment to Israel that is central to the identity of the Jewish people as a whole").

additional forms of discrimination becomes more acute.  The ability of each state to "serve as a laboratory" of democracy in order to "try novel social and economic experiments without risk to the rest of the country," as so eloquently explained by the Brandeis Center's namesake, must be safeguarded.  *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

Nor is the discriminatory conduct at issue immunized from regulation merely because it might be related to a boycotter's political opinions about Israel.  In *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47 (2006), for example, the Supreme Court held that there was nothing "inherently expressive" about law schools' policies banning military recruiters from campus, because "[a]n observer who sees military recruiters interviewing away from the law school has no way of knowing" that the law school's political views had prompted the off-campus recruiting.  *Id.* at 66.  Just the same, an observer who sees an Arizonan engaged in a boycott of Israel would have no way of inferring anything other than a set of consumer preferences.  To be sure, any accompanying speech might alter this conclusion, but the Act is sensitive to this distinction (as it should be) in requiring only that state contractors refrain from "engag[ing] in" a "boycott of Israel," Ariz. Rev. Stat. § 35-393.01(A)—naked discriminatory conduct—and in omitting any regulation of accompanying advocacy, criticism, or speech of any kind.[15]

---

[15]     Linguistic usage confirms that a boycott is conduct.  The phrase most routinely used to describe what one does to effect a boycott is to "conduct" a boycott.  *See, e.g.*, *Claiborne*, 458 U.S. at 930 n.77 ("the manner in which the boycott was conducted"); *see also FTC v. Sup. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 427 (1990) ("a boycott conducted by business competitors").  Indeed, when not analyzing the speech-conduct distinction, courts reflexively describe boycotts as "conduct."  *See, e.g.*, *Truax v. Corrigan*, 257 U.S. 312, 347 (1921) (describing question of whether "boycotting, or the conduct of

1    Plaintiffs nevertheless contend that under *Claiborne*, 458 U.S. 886, the First

2  Amendment shields their boycott from anti-discrimination laws.  But this dangerous in-

3  terpretation of *Claiborne* has been debunked.  In *Jews for Jesus, Inc. v. Jewish Cmty. Re-*

4

5  *lations Council of N.Y., Inc.*, 968 F.2d 286 (2d Cir. 1992), for example, the court rejected

6  the defendant-boycotters' efforts to use *Claiborne* and the First Amendment to inoculate

7  their discriminatory boycott.  The court began with the proposition that "[s]tates can con-

8  stitutionally regulate conduct even if such regulation entails an incidental limitation on

9

10  speech," so long as the regulation furthers an important state interest and is narrowly tai-

11  lored.  *Id.* at 295 (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968)).  The

12  court held that the state anti-discrimination law at issue "easily satisf[ied] these criteria,"

13  because it was aimed at "discrimination, not speech," which states have "the constitution-

14  al authority . . . and a substantial, indeed compelling, interest in prohibiting."  *Id.*[16]  The

15

16  court also had no trouble distinguishing *Claiborne*, because the Supreme Court in

17  *Claiborne* had "noted that it was not 'presented with a boycott designed to secure aims

18  that are themselves prohibited by a valid state law,'" such as discrimination.  *Id.* at 297

19

20  (quoting *Claiborne*, 458 U.S. at 915 n.49).  The boycott in *Jews for Jesus*, like the boy-

21

22

23

24

_____

25  defendants however described, is unlawful"); *LaSalvia v. United Dairymen of Ariz.*, 804
F.2d 1113, 1118 (9th Cir. 1986) ("The plaintiff . . . alleged a group boycott.  Such con-
26  duct is analytically indistinguishable . . . .").

27    [16]    Moreover, the court explained, the "governmental interest in prohibiting
such discrimination in these situations is not directed at or related to suppressing expres-
28  sion."  *Jews for Jesus*, 968 F.2d at 295–96.

13

cott Plaintiffs wish to engage in here, was conduct properly regulated by anti-discrimination laws, not speech protected by the First Amendment.[17]

Moreover, the "unique historical, constitutional, and institutional concerns" sur-rounding racial bias in the United States required the Supreme Court to evaluate critically state efforts to undermine the civil right movement. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017). Thus, when evaluating First Amendment challenges in the context of racial bias, the Court expressly modifies its freedom-of-speech analysis to ac-commodate the fact that racial discrimination "violates deeply and widely accepted views of elementary justice," such that rooting it out can justify state regulation that might oth-erwise encroach on the First Amendment. *Bob Jones Univ.*, 461 U.S. at 592. It would turn *Claiborne* on its head to allow the Court's piercing scrutiny of state tort laws that were used to *facilitate* discrimination to shield state contractors from the requirement that they refrain from engaging in discrimination against Israel, effectuated through a refusal to engage in certain commercial transactions. Our entire structure of federal, state, and local laws forbidding discrimination on the basis of national origin, religion, and other classifications—and conditioning the receipt of government funding and contracts on commitments not to discriminate—makes clear that *Claiborne* should not, and cannot, be read to immunize discriminatory conduct from applicable state laws.

---

[17] *Claiborne* confirms that its result was based on the boycott participants' accompanying expressive activities. The *Claiborne* Court listed categories of conduct that, under the First Amendment, are "insufficient predicate[s] on which to impose liabil-ity," including: "[r]egular attendance and participation" in meetings, membership in an association, and communicating the names of individuals who patronized certain busi-nesses. *Id.* at 924–25. Notably, the act of boycotting itself is not listed.

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated above, the Center urges this Court to deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 9th day of February, 2018.

*/s/ Akiva Shapiro*
Lawrence J. Zweifach
Akiva Shapiro
Matthew Greenfield
Vince Eisinger
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-3830

*Attorneys for* Amicus Curiae *The Louis D. Brandeis Center, Inc.*

15

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on this 9th day of February, 2018, I caused the foregoing doc-

3  ument to be electronically transmitted to the Clerk's Office using the CM/ECF System

4  for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF regis-

5  trants:

6  Kathleen E. Brody
   Darrell L. Hill
7  ACLU Foundation of Arizona
8  3707 North 7th Street, Suite 235
   Phoenix, AZ 85014
9  Telephone: (602) 650-1854
   kbrody@acluaz.org
10 dhill@acluaz.org

11
   Brian Hauss
12 Vera Eidelman
13 Ben Wizner
   ACLU Foundation
14 Speech, Privacy & Technology Project
15 125 Broad Street, 18th Floor
   New York, NY 10004
16 Telephone: (212) 549-2500
   bhauss@aclu.org
17 veidelman@aclu.org
18 bwizner@aclu.org

19
20 Drew C. Ensign
   Oramel H. (O.H.) Skinner
21 Brunn (Beau) W. Roysden III
   Evan G. Daniels
22 Keith J. Miller
23 Aaron M. Duell
   2005 N. Central Avenue
24 Phoenix, Arizona 85004
25 Telephone: (602) 542-5200
   Drew.Ensign@azag.gov

26

27    _/s/ Akiva Shapiro_
   *Attorney for* Amicus Curiae *The Louis D. Brandeis Center, Inc.*
28

16