Kathleen E. Brody, AZ Bar No. 026331
Darrell L. Hill, AZ Bar No. 030424
ACLU Foundation of Arizona
P.O. Box 17148
Phoenix, AZ 85011
Telephone: (602) 650-1854
kbrody@acluaz.org
dhill@acluaz.org

Brian Hauss (*pro hac vice*)
Vera Eidelman (*pro hac vice*)
Ben Wizner (*pro hac vice*)
ACLU Foundation
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org
bwizner@aclu.org

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., | CV17-08263-DJH |
| Plaintiffs, | **PLAINTIFFS' COMBINED RESPONSE TO THE STATE'S MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, WITH ACCOMPANYING DECLARATION** |
| Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Jail District Board of Directors Member; Lena Fowler, Coconino County Jail District Board of Directors Member; Elizabeth Archuleta, Coconino County Jail District Board of Directors Member; Art Babbott, Coconino County Jail District Board of Directors Member; Jim Parks, Coconino County Jail District Board of Directors Member, all in their official capacities, | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ............................................................................................ 1

ARGUMENT ................................................................................................. 3

    I.     The First Amendment Protects Participation in Political Boycotts. ......... 3

         A.    *Claiborne Hardware* Protects Political Boycotts
              Like the One at Issue Here. ............................................... 3

         B.    The State's Other Cases Are Inapposite. ...................................... 6

    II.    The Certification Requirement Penalizes Expression
         Based on Content and Viewpoint. .............................................. 8

    III.   The Certification Requirement Compels Speech. .................................. 11

         A.    The Certification Requirement Imposes an Ideological
              Litmus Test. ....................................................................... 11

         B.    The Certification Requirement Applies to
              Mr. Jordahl's Boycott. ...................................................... 13

         C.    The Certification Requirement Forces Mr. Jordahl to
              Disown His Boycott. ........................................................ 16

    IV.   The Certification Requirement Restricts Contractor Expression. ........... 17

    V.    The State Fails to Justify the Certification Requirement. ...................... 20

    VI.   The Certification Requirement Is an Unconstitutional Condition. ......... 23

    VII.  Plaintiffs Are Suffering Irreparable Harm. ............................................. 26

    VIII. A Broad Preliminary Injunction Is Necessary to Prevent Further
         Harm to Contractors' First Amendment Rights. .................................... 27

    IX.   The Attorney General Is a Proper Defendant. ........................................ 28

CONCLUSION ............................................................................................. 28

i

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .............17, 20, 24, 25

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) .......................................4

*Baggett v. Bullitt*, 377 U.S. 360 (1964)...............................................................................19, 21

*Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) ...........................................................12, 13, 20

*Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668 (1996)..................................................................11, 24

*Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984)..............................................6

*Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010) ...........................................................26

*Citizens United v. FEC*, 558 U.S. 310 (2010)...........................................................................4, 18

*Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011)..............................................24

*Cole v. Richardson*, 405 U.S. 676 (1972) ...............................................................................11, 13

*Courthouse News Serv. v. Planet*, 750 F.3d 776 (9th Cir. 2014)..................................................15

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ...........................................................................27

*Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59 (1978) .................................28

*Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cty. Sch. Dist. No. 9*, --- F.3d ----,

     No. 15-35705, 2018 WL 560527 (9th Cir. Jan. 26, 2018)...........................................................9

*Eastern R.R. Presidents Conference v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961)................5

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...............................................................................21, 26

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................................26, 27

*FCC v. League of Women Voters*, 468 U.S. 364 (1984)..............................................................25, 26

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990).................................................3

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995)..............16, 23

*International Longshoremen's Association, AFL-CIO v. Allied International, Inc.*,

456 U.S. 212 (1982)......................................................................................................6

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*,

    968 F.2d 286 (2d Cir. 1992)....................................................................................23

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) ...............................................................27

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) .....................................28

*Koontz v. Watson*, --- F. Supp. 3d ----, Case No. 17-4099-DDC-KGS, 2018 WL 617894

    (D. Kan. Jan. 30, 2018) ...................................................................................passim

*Lane v. Franks*, 134 S. Ct. 2369 (2014)........................................................................18

*Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*,

    485 U.S. 360 (1988)............................................................................................25, 26

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)............................................................5

*NAACP v. Button*, 371 U.S. 415 (1963)....................................................................19, 20

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)......................................passim

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) .....................................25

*O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712 (1996) ......................11, 24

*Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374 (9th Cir. 1985) ..................27

*Pickering v. Board of Education*, 391 U.S. 563 (1968)................................................17

*Planned Parenthood of Ariz., Inc. v. Brnovich*, 172 F. Supp. 3d 1075 (D. Ariz. 2016)................28

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004) ............28

*Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92 (1972)....................................9

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...........................................................22

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).....................................................9, 20

*Regan v. Taxation with Representation of Wash.*, 461 U.S. 540 (1983) ..................24, 25

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................................22

iii

*Rumsfeld v. Forum for Academic & Institutional Rights*, 547 U.S. 47 (2006) ............................7, 24

*Rust v. Sullivan*, 500 U.S. 173 (1991) ...........................................................................................25

*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) ..........................................................................20, 21

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ...............................................26

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) ............9

*Speiser v. Randall*, 357 U.S. 513 (1958) ................................................................................12, 13

*Stenberg v. Carhart*, 530 U.S. 914 (2000) .....................................................................................19

*Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441 (2d Cir. 1968) ...............................................10

*Texas v. Johnson*, 491 U.S. 397 (1989) .............................................................................9, 10, 18

*United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003) .....................................................25

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) ...............................................17

*United States v. O'Brien*, 391 U.S. 367 (1968) ..............................................................................10

*United States v. Swisher*, 811 F.3d 299 (9th Cir. 2016) .................................................................10

*Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376 (2d Cir. 2000) ...........................................19

**Statutes**

19 U.S.C. § 4452 ..............................................................................................................................7

50 U.S.C. § 4607 ..............................................................................................................................6

A.R.S. § 35-301 ..............................................................................................................................28

A.R.S. § 35-393 ................................................................................................................ 1, 13, 21, 25

A.R.S. § 38-341 ..............................................................................................................................28

A.R.S. § 38-345 ..............................................................................................................................28

A.R.S. § 39-393 ..............................................................................................................................21

A.R.S. § 41-194 ..............................................................................................................................28

iv

**Other Authorities**

S. 720, 115th Cong. § 4 (2017) ..............................................................................7

2016 Ariz. Sess. Laws ch. 46, § 2 .........................................................................8

*Hearing on HB 2617 Before the S. Fin. Comm.*,

    52nd Leg. 2nd Regular Sess. (Ariz. 2016)................................................ 8, 21

# INTRODUCTION

Plaintiffs Mikkel Jordahl and Mikkel (Mik) Jordahl, P.C. challenge the Certification Requirement implemented by A.R.S. § 35-393 *et seq.* ("the Act"), which requires all state and local contractors in Arizona to certify that they are not participating in boycotts of Israel. A federal district court in Kansas recently entered a preliminary injunction against a similar certification requirement, holding that the law imposed a "plainly unconstitutional choice" on that state's contractors. *Koontz v. Watson*, --- F. Supp. 3d ----, Case No. 17-4099-DDC-KGS, 2018 WL 617894, at *13 (D. Kan. Jan. 30, 2018). Arizona's Certification Requirement imposes the same unconstitutional choice on Plaintiffs.

Plaintiffs' argument is straightforward: The First Amendment protects the right to participate in political boycotts, including Plaintiffs' boycott of territories controlled by Israel. The Certification Requirement facially violates the First Amendment in three respects. *First*, the Certification Requirement is both content- and viewpoint-discriminatory because it applies only to boycotts of one country, Israel. Indeed, the State and its *amici* candidly acknowledge that the Certification Requirement is targeted "squarely" at a particular political movement, the Boycott, Divestment, and Sanctions ("BDS") movement. *Second*, by forcing state contractors to certify that they are not participating in these boycotts, the Certification Requirement unconstitutionally requires plaintiffs to disavow participation in protected political activity. *Third*, the Certification Requirement unconstitutionally prohibits every state and local contractor from participating in protected boycotts of Israel, and chills related advocacy. Plaintiffs' success on any one of these theories would require a preliminary injunction.

The State is wrong that the Certification Requirement does not apply to Plaintiffs. Mr. Jordahl is participating in a BDS boycott of companies supporting Israel's occupation of the Palestinian territories, including companies operating in Israeli settlements in the West Bank. The Certification Requirement applies to boycotts of Israel

1

or territories controlled by Israel, which encompasses the West Bank. Mr. Jordahl wants his one-person law firm, Plaintiff Mikkel (Mik) Jordahl, P.C. (the "Firm"), to participate in his boycott. However, because Mr. Jordahl signed the required certification in his Firm's 2016 contract with the Coconino County Jail District ("County"), his Firm is prohibited from boycotting. Even if that certification did not apply, Plaintiffs have standing and their claims are ripe because Mr. Jordahl cannot renew his Firm's contract with the County unless he again signs the facially unconstitutional certification.

The State's merits arguments fare no better. It relies on a trio of cases to argue that the Supreme Court's decision in *NAACP v. Claiborne Hardware Co.* does not, in fact, protect political boycotts. But none of the State's cases concern a political boycott like the one protected in *Claiborne*. The State also argues that its interest in regulating commercial conduct and preventing discrimination justify the Certification Requirement. But the State fails to show that the Certification Requirement is narrowly tailored to these interests: It concedes that the Certification Requirement is targeted at politically motivated BDS boycotts, not purely commercial conduct. And the State cannot invoke its interest in preventing discrimination to justify a law that directly targets political boycotts, particularly when the law applies to boycotts of only one country. Finally, the State argues that the Certification Requirement is a permissible condition on government funding. But the Certification Requirement impermissibly requires contractors to affirmatively disavow all participation in boycotts of Israel, even if those activities occur outside the scope of their government contracts.

Plaintiffs are entitled to a broad preliminary injunction to prevent further irreparable harm to their First Amendment rights and the First Amendment rights of other contractors throughout the state. Further, Defendant Brnovich should not be dismissed, given the pivotal role he plays in enforcing the Certification Requirement.

2

**ARGUMENT**

I.      **The First Amendment Protects Participation in Political Boycotts.**

A.  *Claiborne Hardware* **Protects Political Boycotts Like the One at Issue Here.**

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), firmly established the constitutional right to participate in political boycotts. In that case, the Supreme Court held that the First Amendment protected an NAACP-organized boycott of white-owned businesses in Port Gibson, Mississippi. *Id.* at 915. The Court acknowledged the State's "broad power to regulate economic activity," but did "not find a comparable right to prohibit peaceful political activity such as that found in the [NAACP] boycott." *Id.* at 913. As the Court explained, "[t]he black citizens named as defendants in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect," a practice "deeply embedded in the American political process." *Id.* at 907 (citation and internal quotation marks omitted). The Court identified "peaceful political" boycotts as a form of "expression on public issues," which "has always rested on the highest rung of the hierarchy of First Amendment values." *Id.* at 913 (citation and internal quotation marks omitted).

*Claiborne* also established the principles for distinguishing protected political boycotts from unprotected economic boycotts. Given the state's interest "in certain forms of economic regulation," the Court held that it could curtail "[t]he right of business entities to 'associate' to suppress competition," and that other "[u]nfair trade practices may be restricted," along with "secondary boycotts and picketing by labor unions." *Id.* at 912 (citations omitted); *see also id.* at 915 n.49 (noting that the Court "need not decide in this case the extent to which a narrowly tailored statute designed to prohibit" these types of proscribable boycotts, or other boycotts "designed to secure aims that are themselves prohibited by a valid state law," may incidentally restrict associated First Amendment activity); *accord FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 427 (1990);

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988). On the other hand, *Claiborne* established that a "nonviolent, politically motivated boycott" is "constitutionally protected." 458 U.S. at 915.

"The conduct prohibited by the [Arizona] law is protected for the same reason as the boycotters' conduct in *Claiborne* was protected." *Koontz*, 2018 WL 617894, at *9. Plaintiffs and other BDS participants "have banded together to express, collectively, their dissatisfaction with Israel and to influence governmental action. Namely, [the boycott] organizers have banded together to express collectively their dissatisfaction with the injustice and violence they perceive, as experienced by both Palestinian and Israeli citizens." *Id.* Thus, "[Plaintiffs] and others participating in this boycott of Israel seek to amplify their voices to influence change, as did the boycotters in *Claiborne*." *Id.* Like the *Claiborne* boycott, BDS campaigns apply economic pressure to make "government and business leaders comply with a list of demands for equality and racial justice." *Allied Tube*, 486 U.S. at 508. Plaintiffs and other BDS participants do not "stand to profit financially from a lessening of competition in the boycotted market," *id.*, nor do they seek to achieve ends prohibited by any valid state or federal law. BDS campaigns are "peaceful acts of protest and based on political beliefs." Dep. 173:22-173:23. Participation in these boycotts is a form of political expression. Dep. 173:24-174:2.

The State's attempts to dispel *Claiborne* are unavailing. *See* State Br. at 28–29. First, the State provides no authority for its argument that *Claiborne* applies only to individual boycotts. The Supreme Court has expressly "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not natural persons." *Citizens United v. FEC*, 558 U.S. 310, 343 (2010) (citation and internal quotation marks omitted). Indeed, the Court supported its First Amendment holding in *Claiborne* by drawing an extended analogy to the right of business organizations to lobby for legislation.

4

1    *Claiborne*, 458 U.S. at 913–14 (discussing *Eastern R.R. Presidents Conference v. Noerr*

2    *Motor Freight Inc.*, 365 U.S. 127 (1961)).

3          Second, the State contends that "*Claiborne*'s central holding invalidated

4    Mississippi's attempt to impose liability on the NAACP purely for *speech*." State Br. at

5    28. But, as discussed above, *Claiborne* also "held explicitly" that "[t]he First Amendment

6    protects the right to participate in a boycott." *Koontz*, 2018 WL 617894, at *8 (citing

7    *Claiborne*, 458 U.S. at 907). The Supreme Court's analysis of the incitement issue, to

8    which the State refers, was expressly founded on the conclusion that the boycott itself

9    was constitutionally protected. *See* 458 U.S. at 915 ("The fact that such [boycott] activity

10   is constitutionally protected, however, imposes a special obligation on this Court to

11   examine critically the basis on which liability was imposed.").

12         Finally, the State asserts that *Claiborne* applies only to boycotts seeking to assert

13   constitutional rights. That has never been the test for determining whether boycotts—or

14   any other forms of political expression—are constitutionally protected. *See Koontz*, 2018

15   WL 617894, at *9. The *Claiborne* boycott was broadly political; it was not simply a

16   demand for the local government to respect constitutional rights. It was directed at "both

17   civic and business leaders," 458 U.S. at 907, and "sought to bring about political, social,

18   and economic change," *id.* at 911. In fact, the trial judge declared the boycott unlawful

19   partly because it targeted business owners in no position to address the boycott

20   participants' legal rights. *Id.* at 891–92. The Supreme Court rejected this framing, instead

21   holding that the boycott was protected as "peaceful political activity" and "expression on

22   public issues." *Id.* at 913. The State's argument—that the First Amendment protects only

23   those boycotts vindicating constitutional rights—ignores our "profound national

24   commitment to the principle that debate on public issues should be uninhibited, robust,

25   and wide-open," as well as the Supreme Court's clear instruction that "constitutional

26   protection does not turn upon 'the truth, popularity, or social utility of the ideas and

27   beliefs which are offered.'" *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 271 (1964).

28

**B.  The State's Other Cases Are Inapposite**.

The State invokes a grab bag of other precedents, none of which apply. It argues that the Supreme Court "rejected a First Amendment claim strikingly similar to this case" in *International Longshoremen's Association, AFL-CIO v. Allied International, Inc.*, 456 U.S. 212 (1982). State Br. at 15. But *Longshoremen* reflects an exception, not the rule. The case concerned a labor union's refusal to serve ships carrying Russian cargo. 456 U.S. at 214–15. The Supreme Court held that this constituted an illegal secondary boycott under the National Labor Relations Act, *id.* at 218–226, and that the First Amendment does not protect such boycotts, *id.* at 226–27. A few months later, in *Claiborne*, the Court held that although the government cannot prohibit political boycotts, "[s]econdary boycotts and picketing *by labor unions* may be prohibited, as part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.'" 458 U.S. at 912 (emphasis added) (citing, inter alia, *Longshoremen*). *Id.* Plaintiffs are not engaged in a secondary labor boycott.

The State's reliance on *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984), as the "authoritative and final word on the constitutionality of anti-Israel boycott prohibitions," State Br. at 17, is equally misplaced. In *Briggs*, two companies doing business in the Arab League challenged Export Administration Act ("EAA") provisions prohibiting U.S. companies from participating in government-led boycotts of countries friendly to the United States. The plaintiffs "concede[d] that their desire to answer the questionnaires [verifying their boycott participation] is motivated by economics: . . . [they] hope[d] to avoid the disruption of trade relationships that depend on access to the Arab states." *Briggs*, 728 F.2d at 917. The Seventh Circuit analyzed the companies' claims under the commercial speech doctrine, declining to extend them the constitutional protections for political expression. *Id.* 917–18. *Claiborne* did not apply, because the companies did not seek to participate in the boycott for political reasons.

Here, there is no dispute that Plaintiffs' boycott is politically motivated, and therefore constitutionally protected. *See Koontz*, 2018 WL 617894, at *8–*9.[1]

The State also leans heavily on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), incorrectly arguing that "virtually every sentence of the Supreme Court's First Amendment reasoning cuts against Plaintiffs here." State Br. at 19. *Rumsfeld* rejected a First Amendment challenge to the Solomon Amendment—which allows the Department of Defense to deny federal funds to law schools that prohibit or impede military representatives from participating in on-campus recruiting—on the ground that providing equal access to military recruiters "is not inherently expressive." 547 U.S. at 66. The Court further concluded that the government could compel law schools that "send[] scheduling e-mails for other recruiters to send one for a military recruiter," because this form of compelled speech "is plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 62. As *Koontz* recognized, *Rumsfeld* is inapplicable here because political boycotts, including BDS boycotts, are inherently expressive. *See Koontz*, 2018 WL 617894, at *11 ("It is easy enough to associate plaintiff's conduct with the message that the boycotters believe Israel should improve its treatment of Palestinians." (citing *Claiborne*, 458 U.S. at 907–08)).

---

[1] The State is also flatly wrong in asserting that the absence of First Amendment challenges to the EAA demonstrates the constitutionality of anti-BDS laws like the one at issue here. State Br. at 17. The relevant provisions in the EAA prohibit U.S. companies from complying with a *foreign government's* request for boycott. *See* 50 U.S.C. § 4607. The Israel Anti-Boycott Act bill in Congress would extend those provisions to requests for boycott by international governmental organizations. *See* S. 720, 115th Cong. § 4(b) (2017). Neither the EAA nor the Israel Anti-Boycott Act applies to boycotts called for by non-governmental entities, such as Jewish Voice for Peace ("JVP"), the Evangelical Lutheran Church in America ("ELCA"), or the BDS National Committee.

## II.   The Certification Requirement Penalizes Expression Based on Content and Viewpoint.

The Certification Requirement's constitutionality, and the harms it inflicts on Plaintiffs, must be evaluated in light of the law's fundamental purpose. *See* Pls.' Opening Br. at 12–13. The Certification Requirement applies to boycotts involving precisely one country: Israel. As the State acknowledges, and as its *amici* agree, the Act and the Certification Requirement are "squarely addressed" at the "Boycott, Divest [sic] and Sanctions ('BDS') movement." State Br. at 1; *see also id.* at 5, 9, 10, 30, 32. The State identifies BDS boycotts as "politically motivated actions that penalize or otherwise limit commercial relations specifically with Israel." *Id.* at 4 (quoting 19 U.S.C. § 4452). The Act's legislative findings "expressly reference federal policy of 'examining a company's promotion or compliance' with BDS campaigns in 'awarding grants and contracts.'" State Br. at 5 (quoting 2016 Ariz. Sess. Laws ch. 46, § 2(F)). The Act's primary sponsor, former Arizona House Speaker David Gowan, "said he wanted to use the economic strength of the state to undermine the BDS movement and its goal of getting people to boycott companies that do business with Israel to pressure that country to change its policies." Hauss Decl., Exh. A. Defendant Attorney General Brnovich said, "I think the message the Legislature wanted to send was we're going to stand with Israel." *Id.* And he "made it quite clear that, as far as he sees it, there's no need for the Arizona law to treat all sides equally." *Id.*[2]

---

[2] The legislative record is rife with similar statements. For instance, at the Senate Finance Committee hearing, Senator Farley asked if a future legislature could impose a similar requirement on businesses that boycott Planned Parenthood. Speaker Gowan responded, "We're talking about anti-BDS right now." Senator Farley then asked whether the "government should as a matter of political policy say we're only doing business with people who do business with people we like." Speaker Gowan replied, "[T]his is a strong ally . . .  As I assume you that would stand with your friends, period, that's the suggestion here that I'm asking you to do, is stand with our friend, Israel." *Hearing on HB 2617 Before the S. Fin. Comm.*, 52nd Leg. 2nd Regular Sess. (Ariz. 2016) at 7:23, *available at* goo.gl/htaWAK.

"This is either viewpoint discrimination against the opinion that Israel mistreats Palestinians or subject matter discrimination on the topic of Israel. Both are impermissible goals under the First Amendment." *Koontz*, 2018 WL 617894, at *10; *cf. Claiborne*, 458 U.S. at 913 (holding that the government does not have a legitimate interest in suppressing politically motivated boycotts). The Certification Requirement "describes impermissible [boycotting] not in terms of time, place, and manner, but in terms of subject matter." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 99 (1972). "[T]he government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). The State's brief and the statements made by Attorney General Brnovich and Speaker Gowan establish that the law's core purpose is to suppress criticism of Israel by removing one of the most effective tools for expressing this criticism. *See Claiborne*, 458 U.S. at 907–08 (describing the effectiveness of boycotts). This is patent viewpoint discrimination. *See Eagle Point Educ. Ass'n/SOBC/OEA v. Jackson Cty. Sch. Dist. No. 9*, --- F.3d ----, No. 15-35705, 2018 WL 560527, at *7 (9th Cir. Jan. 26, 2018) ("Viewpoint discrimination . . . occurs when the specific motivating ideology or the opinion or perspective of the speaker is the *rationale* for the restriction . . . ." (omissions and emphasis in original) (citation and internal quotation marks omitted)). Viewed as content or viewpoint discrimination, the Certification Requirement must satisfy strict scrutiny. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).

The State argues that the Certification Requirement regulates conduct, not speech, and that it therefore cannot be considered viewpoint discriminatory. State Br. at 23–24 & n.13. But political boycotts are a form of inherently expressive conduct closely akin to pure speech. *Claiborne*, 458 U.S. at 913; *Koontz*, 2018 WL 617894, at *11 ("[B]oycotts—like parades—have an expressive quality."); *cf. Texas v. Johnson*, 491 U.S. 397, 404 (1989) (recognizing "the expressive nature of [a] . . . sit-in by blacks in a 'whites only'

area to protest segregation"). Because political boycotts are constitutionally protected, *United States v. O'Brien*, 391 U.S. 367 (1968), does not apply. The *O'Brien* test governing regulations of expressive conduct may not be applied "unless 'the conduct itself may constitutionally be regulated.'" *United States v. Swisher*, 811 F.3d 299, 312 (9th Cir. 2016) (en banc) (citation omitted). Political boycotts cannot be regulated. *Claiborne*, 458 U.S. at 894, 918 (holding that the facially neutral tort of business interference could not be applied to political boycotts).[3]

Even if political boycotts could be regulated, *O'Brien* still would not apply. "[I]f a government enactment is 'directed at the communicative nature of conduct' then it is content-based, and 'must, like a law directed at speech itself, be justified by the substantial showing of need that the First Amendment requires.'" *Swisher*, 811 F.3d at 312–13 (quoting *Johnson*, 491 U.S. at 406). Laws that "cannot be justified without reference to the content" of the regulated expressive conduct, or that were adopted "because of disagreement with the message" conveyed, are content-based. *Id.* at 313 (citation and internal quotation marks omitted). "For instance, where a state prohibited burning the American flag because it might lead people to believe that the flag does not stand for the positive concepts of 'nationhood and national unity,' the Court was quick to conclude that such 'concerns blossom only when a person's treatment of the flag communicates some message, and thus are related to the suppression of free expression.'" *Id.* (citing *Johnson*, 491 U.S. at 410). Just as the law in *Johnson* was motivated by the

---

[3] The State argues that affording First Amendment protection to political boycotts would mean that the government could not impose embargoes on foreign countries. State Br. at 28–29 n.19. But embargoes prohibit everyone from doing business with the targeted country, which is necessary to "restrict[] the dollar flow to hostile nations." *Teague v. Reg'l Comm'r of Customs*, 404 F.2d 441, 445 (2d Cir. 1968). Because embargoes primarily target non-expressive commercial transactions, "the infringement of first amendment freedoms is permissible as incidental to the proper, important, and substantial general purpose of the regulations." *Id.* at 446. By contrast, the Certification Requirement is "squarely addressed" to political boycotts, which are inherently expressive.

desire to suppress messages associated with flag burning, the Certification Requirement is motivated by the State's conclusion that the message expressed by BDS boycotts is inconsistent with the State's "values," particularly its support for Israel. State Br. at 23.[4]

## III.     The Certification Requirement Compels Speech.

### A.  The Certification Requirement Imposes an Ideological Litmus Test.

The Constitution prohibits the State from imposing political and ideological litmus tests on government benefits. Public "[e]mployment may not be conditioned on an oath denying past, or abjuring future, associational activities within constitutional protection." *Cole v. Richardson*, 405 U.S. 676, 680 (1972). "Nor may employment be conditioned on an oath that one has not engaged, or will not engage, in protected speech activities." *Id.* The same rules apply to government contractors. *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674–75 (1996) (extending public employee free speech protections to government contractors) ("We have held that government workers are constitutionally protected from dismissal for refusing to take an oath regarding their political affiliation."); *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 725–26 (1996) ("Government officials may indeed terminate at-will relationships . . .  but it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views.").

The State maintains that the Certification Requirement does not compel any speech. State Br. at 17. But this is plainly false. It requires all state contractors, including the Firm, to certify that they are not participating in boycotts of Israel, and will not for the

---

[4] The State also argues that the Certification Requirement is not viewpoint discriminatory because it prohibits everyone from participating in group boycotts of Israel regardless of their reasons. State Br. at 24 n.13. The State's argument, reminiscent of the old adage that the law prohibits the rich and poor alike from sleeping underneath the bridges of Paris, does not address the fact that the Certification Requirement is facially content discriminatory and expressly justified on grounds of viewpoint discrimination.

1  duration of their contracts. *See* Jordahl Decl., Exh. 5. Mr. Jordahl objects to the

2  certification and refuses to sign it. Jordahl Decl. ¶¶ 4, 31; Ensign Decl. Exh. A, Jan. 8,

3  2018, 30(b)(6) Deposition of Mikkel (Mik) Jordahl, P.C. ("Dep.") 106:22-107:7; 112:17-

4  113:21; 119:6-120:19; 170:6-171:14. The County cannot renew the Firm's contract

5  unless Mr. Jordahl signs the certification. Hauss Decl., Exh. B; Dep. 93:24-94:23;

6  163:13-169:6; 171:8-171:14. In short, the Firm is being denied a government benefit

7  because Mr. Jordahl refuses to sign a certification forswearing the Firm's participation in

8  protected political expression and association. This is a well-recognized Article III injury.

9  *See, e.g.*, *Speiser v. Randall*, 357 U.S. 513, 518–19 (1958) (striking down a California

10  law that required veterans to declare that they were not engaged in subversive advocacy

11  in order to obtain tax benefits).

12        The State argues at length that the Certification Requirement does not apply to

13  Plaintiffs' boycott participation. State Br. at 8–10. As set forth in Section III.B, these

14  arguments are unavailing, but the question is beside the point. Even if Plaintiffs were not

15  engaged in any boycott activity at all, the State's attempt to make Mr. Jordahl sign a

16  certification about his Firm's protected political activities and associations infringes

17  Plaintiffs' First Amendment rights. *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971), is

18  directly on point. There, the plaintiff objected to a question on her bar application

19  requiring her to disclose "whether she had ever been a member of the Communist Party

20  or any organization 'that advocates overthrow of the United States Government by force

21  or violence.'" *Id.* at 4–5. There was nothing in the record to suggest that she belonged to

22  a Communist organization—in fact, none of the organizations to which she belonged

23  were identified as potential Communist fronts. *See id.* at 4, 7 n.7. Nonetheless, the

24  Supreme Court upheld her First Amendment claim, declaring: "When a State seeks to

25  inquire about an individual's beliefs and associations a heavy burden lies upon it to show

26  that the inquiry is necessary to protect a legitimate state interest. And whatever

27  justification may be offered, a State may not inquire about a man's views or associations

28

12

solely for the purpose of withholding a right or benefit because of what he believes." *Id.* at 6–7. The Certification Requirement directly violates this principle.[5]

### B.  The Certification Requirement Applies to Mr. Jordahl's Boycott.

The State argues that the Certification Requirement does not apply to Mr. Jordahl's boycott, which it mischaracterizes as a boycott of "companies whose policies he disagrees with." State Br. at 6, 8–10. Not so. Mr. Jordahl boycotts "consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories." Jordahl Decl. ¶ 3, 11. This boycott includes all companies operating in Israeli settlements in the West Bank. Dep. 58:9-58:13; 58:23-59:5. Mr. Jordahl considers his boycott to be a BDS boycott. Dep. 37:3-38:23. He initiated this boycott in response to calls made by JVP, of which he is a member, the ELCA, and a number of BDS groups. *Id.* ¶¶ 9–11; Dep. 34:20-36:5; 123:13-123:16; 159:21-160:12. 176:3-176:13. He reviews information provided by these groups in determining which companies to boycott. Dep. 27:17-29:24. Based on the information he has reviewed, Mr. Jordahl has taken boycott actions against a number of companies, including Hewlett-Packard, Airbnb, SodaStream, and all products originating in the West Bank settlements. Dep. 13:14-13:21; 15:23-16:7; 43:6-43:17; 173:4-173:17. Mr. Jordahl has signed JVP petitions asking Hewlett-Packard and Airbnb to stop operating in the West Bank. Dep. 20:12-20:20. He has also "asked

---

[5] Attempting to distinguish *Baird*, the State contends that the Certification Requirement does not compel speech about political beliefs or association. State Br. at 29. As discussed in Section I, political boycotts are a protected form of expression and association based on shared political belief. *See Claiborne*, 458 U.S. at 907; Dep. 173:18-173:23. Moreover, compelling state contractors to disown participation in protected political expression, particularly a form of group protest, is just as obnoxious to the First Amendment as requiring them to disavow particular political beliefs. *See Cole*, 405 U.S. at 680; *Speiser*, 357 U.S. at 518–19. The State can no more require contractors to certify their abstention from BDS campaigns than it can require them to certify that they are not members of the Communist party or engaged in Communist advocacy.

1   [his elected] representatives to reduce funding to Israel in an amount proportional to

2   Israeli spending on settlements in the occupied Palestinian territories." Jordahl Decl. ¶ 8;

3   *see also* Dep. 20:25-21:10. Mr. Jordahl would like to extend his personal boycott

4   activities to his Firm, but has not done so because of the Certification Requirement.

5   Jordahl Decl.. ¶ 24; Dep. 46:21-49:23.

6           The State's interpretation of the Act is equally misleading. First, the State argues

7   that the Certification Requirement applies only to boycotts of Israel proper, and so has no

8   bearing on Mr. Jordahl's boycott of businesses supporting Israel's occupation of the

9   Palestinian territories. State Br. at 8–10. The State conveniently omits the Act's definition

10  of "boycott," A.R.S. § 35-393(1):

11          "Boycott" means engaging in a refusal to deal, terminating business activities or
            performing other actions that are intended to limit commercial relations with Israel
12          or with persons or entities doing business in Israel **or in territories controlled by
            Israel**, if those actions are taken either: (a) in compliance with or adherence to
13          calls for a boycott of Israel other than those boycotts to which 50 [U.S.C.] §
            4607(c) applies. (b) in a manner that discriminates on the basis of nationality,
14          national origin or religion and that is not based on a valid business reason.

15

16  (Emphasis added.) This language is also included in the certification that Mr. Jordahl

17  must sign to renew his Firm's contract. *See* Jordahl Decl., Exh. 5 at 3. Mr. Jordahl has

18  expressly agreed that he is "refusing to deal and taking other actions intended to limit

19  commercial relations with companies doing business in territories controlled by Israel."

20  Dep. 160:7-160:12.[6]

21          The State also contends that Mr. Jordahl's boycott is not "in compliance with or

22  adherence to calls for a boycott of Israel," A.R.S. § 35-393(1)(a), because his boycott

23  activities are narrower than JVP's broad boycott of Israeli companies. State Br. at 12–13.

24  In fact, the scope of Mr. Jordahl's boycott lines up closely with the ELCA's call for a

25  _____

26  [6] The plain meaning of "territories controlled by Israel" includes Palestinian territories
    under Israeli occupation. Hauss Decl., Exhs. C, D.

27

28

                                            14

boycott of products made in Israeli settlements in the occupied Palestinian territories. Jordahl Decl. ¶ 9. In any event, the difference in scope between Mr. Jordahl's boycott activity and any particular call for boycott is immaterial. The certification states that the signatory will not engage in a refusal to deal, terminate business activities, or perform "other actions that are intended to limit commercial relations . . . if those actions are taken . . . in compliance with or adherence to calls for a boycott of Israel." Jordahl Decl., Exh. 5; *accord* A.R.S. § 35-393(1). In other words, the Certification Requirement compels contractors to disavow *any* intentional participation in a group boycott of Israel or its territories. *See also id.* § 35-393.02(B)(3) (stating that the Board of Investment may consider "a statement by a company that it is participating in a boycott of Israel *or that it has taken a boycott action* at the request of, in compliance with or in furtherance of calls for a boycott of Israel," in determining whether a company is engaged in a proscribed boycott of Israel (emphasis added)). Mr. Jordahl unequivocally participates in a group boycott of Israel, even though his personal boycott actions are focused on companies directly supporting Israel's occupation. Dep. 34:20-36:2.

Finally, the State's request for *Pullman* abstention, State Br. at 14, should be denied. "*Pullman* abstention 'is generally inappropriate when First Amendment rights are at stake. . . . 'because the guarantee of free expression is always an area of particular federal concern.'" *Courthouse News Serv. v. Planet*, 750 F.3d 776, 784 (9th Cir. 2014) (citations omitted) (collecting cases). "The only First Amendment case in which [the Ninth Circuit has] ever found the first requirement for *Pullman* abstention to be satisfied was procedurally aberrational. There, the plaintiffs had already reached the California Supreme Court in a pending case that presented the same issues as their federal suit, so they would not need to 'undergo the expense or delay of a full state court litigation' while their federal case was stayed. These exceptional factors are not present here." *Id.* (citation omitted). Certification to the Arizona Supreme Court is also unnecessary. Even under the State's implausible interpretation of the Act, Plaintiffs have standing and their claims are

ripe because the Firm's contracts are conditioned on a compelled statement to which Plaintiffs object. Moreover, even under the State's interpretation of the Act, the Certification Requirement facially violates the First Amendment because it is content and viewpoint discriminatory, compels speech, and unconstitutionally restricts participation in BDS boycotts.

### C. The Certification Requirement Forces Mr. Jordahl to Disown His Boycott.

The Certification Requirement particularly harms Plaintiffs because it requires Mr. Jordahl to certify that his Firm is not participating in his BDS boycott of companies supporting Israel's occupation. A political boycott's expressive value depends on the collective recognition that the participants are engaged in a boycott, not merely making similar consumer choices—much as a parade's expressive value depends on the collective recognition that marchers are participating in a parade, not merely walking in the same direction. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 568 (1995) ("[W]e use the word 'parade' to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way."). As the State itself argues, nobody is likely to draw any inferences about Mr. Jordahl's political beliefs based solely on the products he does or does not purchase. State Br. at 21. These decisions are expressive because Mr. Jordahl explicitly characterizes them as part of his participation in a BDS boycott.

The Certification Requirement compels Mr. Jordahl to contradict the very message he wishes to communicate—namely, that he and his Firm are boycotting. Effectively, signing the certification would require Mr. Jordahl to endorse the State's message of opposition to BDS and support for Israel. *See Koontz*, 2018 WL 617894, at *11 ("Forcing plaintiff to disown her boycott is akin to forcing plaintiff to accommodate Kansas's message of support for Israel."); *cf. Hurley*, 515 U.S. at 573–74 (holding that antidiscrimination law could not be enforced to require parade organizers to accommodate a message they did not wish to express). Signing the certification would

also affect Mr. Jordahl's personal boycott by exposing him to charges of hypocrisy, given that he and his Firm are closely identified. *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013); Dep. 50:5-50:7. The Certification Requirement thus forces Mr. Jordahl to express a message that violates his beliefs and undermines his protected expression. Dep. 113:12-113:21; 119:20-120:1; 159:9-159:14.

## IV.    The Certification Requirement Restricts Contractor Expression.

As *Koontz* recognized, boycott certification laws like the one at issue here are facially invalid because they unconstitutionally restrict government contractors' protected expression. *Koontz*, 2018 WL 617894, at *8, *14 (enjoining defendant from enforcing the certification requirement against any state contractors). "To determine whether a state is infringing on an independent contractor's rights under the First Amendment, courts use the same guidelines developed in [*Pickering v. Board of Education*, 391 U.S. 563 (1968)] and its progeny." *Id.* at *8; If Plaintiffs demonstrate that the Certification Requirement suppresses protected expression and association, the government must justify its infringement on First Amendment rights. *Id.* (citing *Pickering*, 391 U.S. at 675). Where, as here, the government imposes a statutory restriction on protected expression and association, it "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995). "To make this showing, the government must establish a real harm that the law will alleviate directly." *Koontz*, 2018 WL 617894, at *8 (citing *NTEU*, 513 U.S. at 475).

In this case, the Certification Requirement prohibits state and local government contractors throughout Arizona from participating in boycotts of Israel, and directly targets politically motivated BDS boycotts. The State argues that these boycotts do not amount to speech on matters of public concern, and therefore do not deserve protection under *Pickering* and its progeny. State Br. at 29. To the contrary, as discussed in Section

I, boycotts like those at issue here are political expression and association lying at the heart of the First Amendment. *See Claiborne*, 458 U.S. at 915; *see also, e.g.*, *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) (discussing the public concern test). The State also argues that the Certification Requirement does not limit any expression because contractors remain free to voice their criticism of Israel in other ways. On that theory, Texas could have justified its flag burning law by arguing that people could criticize the United States, or even the flag itself, without resorting to flag desecration. The Court considered, and rejected, these arguments in *Johnson*. *See* 491 U.S. at 437–38 (Stevens, J., dissenting). Moreover, political boycotts carry special force that often cannot be replicated through other means. *Claiborne*, 458 U.S. at 907–08.[7]

Since Mr. Jordahl signed the certification in 2016, his Firm has been directly affected by this prohibition. He recently needed to purchase a mobile printer for his Firm. Dep. 46:25-47:3. He went to his local Staples, which had a Hewlett-Packard mobile printer on sale. Dep. 47:5-47:7. Mr. Jordahl boycotts Hewlett-Packard because it is supporting Israel's occupation and profiting from operations in Israeli settlements. Dep. 13:14-13:21; 58:23-59:2; 153:7-153:9. The store did not carry any other printers, and Mr. Jordahl could not find any comparable deals online. Dep. 47:7-47:11. He decided that he had to buy the printer to comply with the certification. Dep. 47:12-47:14. Mr. Jordahl also needs a new desktop for his firm. Dep. 47:24-48:3. He has decided to forgo that purchase while this case is pending, because he doesn't "want to get into the same situation where the State of Arizona is telling [him] which – which computer [he has] to buy if [he] want[s] to work." Dep. 48:9-48:11.

---

[7] The State's defense to overbreadth fails for the same reasons. *See* State Br. at 30–31. Because "[t]he core of the Act" is directed at political boycotts, it has no "plainly legitimate sweep." State Br. at 30. Further, the State offers no evidence to suggest that the law applies primarily to "large corporations and companies." *Id.* at 31. Even if it did, those companies also have free speech rights. *Citizens United*, 558 U.S. at 343.

18

In addition to directly prohibiting boycott activity, the Certification Requirement chills a wide range of boycott-related expression and association. *See Baggett v. Bullitt*, 377 U.S. 360, 367–68 (1964) (invalidating a statute requiring teachers to swear that they were not engaged in acts intended to overthrow the government by revolution, force, or violence, because of "the susceptibility of the statutory language to require forswearing of an undefined variety of 'guiltless knowing behavior'"); *see also NAACP v. Button*, 371 U.S. 415, 434 (1963). Here, Mr. Jordahl's Firm turned down opportunities to support and associate with JVP because of the organization's central commitment to BDS. Jordahl Decl. ¶¶ 25, 26; Dep. 122:12-123:6; 174:8-174:19. The State argues that the Certification Requirement applies only to termination of business activities. State Br. at 11–12. But boycotts take "many forms." *Claiborne*, 458 U.S. at 907. The *Claiborne* boycott involved "elements of speech, assembly, association, and petition," *id.* at 911, and the Mississippi courts imposed liability on the basis of actions that went far beyond the refusal to make purchases—such as "management of the boycott," speech made in support of the boycott, and association with boycott organizers, *id.* at 897–98—because they viewed these actions as aspects of the boycott, *id.* at 921.

Although the State maintains in its brief that the Certification Requirement's use of the term "boycott" does not encompass similar association and advocacy, this litigating position is not binding on state or local agencies, nor is it spelled out in the certification itself. *See Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) ("[O]ur precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities.'"). The State's assurances are thus cold comfort to contractors forced to sign a government form promising that they are not currently engaged in a boycott of Israel. *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383–84 (2d Cir. 2000) (holding that State's representation that it had no intention of suing Vermont Right to Life

19

1  Committee could not "remove VRLC's reasonable fear that it will be subjected to

2  penalties for its planned expressive activities").

3      The Certification Requirement also chills Mr. Jordahl's personal expression.

4  Although Mr. Jordahl agrees that the Certification Requirement should not apply to his

5  personal boycott, the line between his personal activity and his Firm's activities is not

6  always clear. Dep. 162:12-163:7. For instance, Mr. Jordahl boycotts Airbnb in his

7  personal capacity because it operates in the West Bank. Dep. 13:19-13:21. He instead

8  uses VRBO, an alternate vacation rental service. Dep. 48:13-48:23. Mr. Jordahl was

9  planning travel to Phoenix to meet with his attorneys on January 5 and stay through the

10  weekend to appear for his deposition on January 8. Dep. 48:24-49:3. He found a good

11  deal on Airbnb and could not find an equivalent deal on VRBO. Dep. 49:3-49:13. He

12  could not determine whether his travel in this case was personal travel, meaning he could

13  boycott Airbnb, or work travel, meaning he could not. Dep. 49:14-49:23. To resolve the

14  dilemma, Mr. Jordahl decided to forgo meeting with his attorneys in person and booked a

15  hotel for the night before the deposition. Dep. 49:18-49:19. Mr. Jordahl has also refrained

16  from discussing his personal boycott participation out of concern that would it cast

17  suspicion on his Firm's compliance with the certification. Jordahl Decl. ¶ 27; Dep. 74:25-

18  75:9 161:2-161:22. The Certification Requirement forces this calculus on contractors

19  who choose to boycott Israel in their personal capacities. *See Button*, 371 U.S. at 434

20  (stating that laws targeting political speech "understandably" chill people from doing

21  even "what [a] decree purports to allow").

22      **V.      The State Fails to Justify the Certification Requirement.**

23      Whether analyzed as content/viewpoint discrimination, compelled speech, or a

24  statutory restriction on contractor speech, the Certification Requirement must at least be

25  narrowly tailored to advance a legitimate government interest. *See Koontz*, 2018 WL

26  617894, at *10; *see also, e.g.*, *Reed*, 135 S. Ct. at 2231–32; *Open Soc'y*, 570 U.S. at 220–

27  21; *Baird*, 401 U.S. at 706; *Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995) (en banc).

28

1   The Court's inquiry must be limited to the "interests the State itself asserts." *Id.* at 96

2   (internal quotation marks omitted) (quoting *Edenfield v. Fane*, 507 U.S. 761, 768 (1993)).

3   Here, the State asserts two interests to justify the Certification Requirement: (1) its police

4   power interest in regulating commercial activity; and (2) its interest in prohibiting

5   discrimination. The Certification Requirement is not narrowly tailored to either interest.

6          On the one hand, the State argues that even inherently expressive activities may be

7   subject to economic regulations that incidentally burden expression. State Br. at 22. In

8   this case, the State asserts that it "has properly acted to regulate commercial activity to

9   align commerce in the State with the State's policy objectives and values," particularly its

10  interest in supporting Israel and opposing BDS. *Id.* at 23. But, as *Claiborne* established,

11  the government's power to regulate economic activity does not authorize it to suppress

12  inherently expressive political boycotts like BDS. *Claiborne*, 458 U.S. at 913. Further, if

13  the law's purpose were purely economic, it would be both overinclusive and

14  underinclusive. If the law were aimed at preventing anticompetitive boycotts, it would be

15  overinclusive because it applies to protected political boycotts. *Koontz*, 2018 WL 617894,

16  at *10. If the law were intended to protect Arizona's trade relationships, it would be

17  fatally underinclusive because it fails to regulate a whole range of economic activity

18  affecting those relationships. *Id.* The law's acknowledged purpose is not mere regulation

19  of economic activity, but to undermine BDS boycotts of Israel because they do not align

20  with the State's "values." That goal is flatly prohibited by the First Amendment. *Id.*[8]

21  _____

22  [8] The State also speculates that BDS supports terrorist activities by strengthening the
    political position of the Palestinian Authority relative to Israel. State Br. at 23. Similarly,

23  one of the law's proponents testified, "I ask you to strongly and emphatically stand with
    not only the Jewish community, but really the full American community, when we say no

24  to terrorism, and that this state will not do business with those that oppose the State of
    Israel and, frankly, support terrorist states." Statement of Adam Kwasman, *Hearing on*

25  *HB 2617 Before the S. Fin. Comm.*, 52nd Leg. 2nd Regular Sess. (Az. 2016) at 14:40,
    *available at* goo.gl/htaWAK. "It would be blinking reality not to acknowledge that there

26  are some among us always ready to affix a [terrorist] label upon those whose ideas they
    violently oppose." *Baggett*, 377 U.S. at 373. Contrary to the State's unsupported

27  (continued…)

28

                                        21

On the other hand, the State argues that its interest in preventing discrimination justifies the Certification Requirement. State Br. at 23–24. The Certification Requirement cannot be made to fit this asserted interest. First, only one of the Certification Requirement's two provisions prohibits Israel boycott actions taken "in a manner that discriminates on the basis of nationality, national origin or religion." A.R.S. § 35-393(1)(b). The State concedes that this provision does not apply to Plaintiffs' boycott. State Br. at 13. The other provision—the one that applies to Plaintiffs—prohibits Israel boycott actions taken "in compliance with or adherence to calls for a boycott of Israel." *Id.* § 39-393(1)(a). The State does not explain why this additional provision is necessary.

Second, A.R.S. § 35-393(1)(b) does not generally prohibit contractors from discriminating on the basis of nationality, national origin, or religion. *Compare Roberts v. U.S. Jaycees*, 468 U.S. 609, 615, 623 (1984) (statute prohibiting public accommodations from discriminating based on "race, color, creed, religion, disability, national origin or sex" did "not distinguish between prohibited and permitted activity on the basis of viewpoint"). Instead, it prohibits contractors from discriminating on those grounds when participating in a boycott of Israel. The State cannot enact antidiscrimination laws that target expression or expressive conduct based on its content or viewpoint. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 396 (1992) ("[T]he only interest distinctively served by the content limitation is that of displaying the city council's special hostility towards the particular biases thus singled out. That is precisely what the First Amendment forbids.").

---

insinuations, the Palestinian civil society call for BDS is unequivocally nonviolent. *See* Hauss Decl., Exh. E; *see also Koontz*, 2018 WL 617894, at *9 n.8; Dep. 37:8-37:15. But even if the State could identify individual instances of violence associated with the BDS campaigns in which Mr. Jordahl participates, which it has manifestly failed to do, that would not strip Plaintiffs' boycott of its constitutional protection. *Koontz*, 2018 WL 617894, at *9 (citing *Claiborne*, 458 U.S. at 908).

Finally, the application of even facially neutral antidiscrimination laws to protected expression or inherently expressive activity, such as a political boycott, protest, or parade, is inconsistent with the First Amendment. *See Hurley*, 515 U.S. at 578. The boycott in *Claiborne* explicitly targeted white-owned businesses. 458 U.S. at 900. It was nevertheless constitutionally protected. Indeed, the State's premise—that the government has an antidiscrimination interest in penalizing an expressly political boycott of consumer goods and services, simply because the legislature has characterized the boycott as discriminatory—proves too much. By the State's logic, the government could have invoked its antidiscrimination interests to suppress the campaign to boycott apartheid South Africa, boycotts targeting France after it opposed the U.S. government's military action in Iraq, Hauss Decl., Exh. F, or the boycott in *Claiborne*.[9]

## VI.     The Certification Requirement Is an Unconstitutional Condition.

The State argues that, even if the government cannot prohibit boycotts of Israel directly, it may nonetheless condition government contracts on a certification that contractors are not participating in such boycotts. Not so. Although the government is not required to "subsidize the exercise of a fundamental right," *Regan v. Taxation with*

---

[9] *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286 (2d Cir. 1992), is inapposite. In that case, the Second Circuit held that the Jewish Community Relations Council of New York violated state and federal antidiscrimination laws by *inter alia* threatening to boycott a resort if it did not cancel its contract with Jews for Jesus. The court held that *Claiborne* did not protect the threatened boycott for two reasons. First, it held that the threatened boycott was not protected because it sought "to achieve an objective prohibited by valid state and federal statutes"—i.e., the denial of access to a public accommodation based on religious belief. *Id.* at 297–98. Second, it held that the threatened boycott "was not political speech," but rather "a series of private communications in the context of a private dispute." *Id.* at 298. Neither principle applies here. Plaintiffs and other BDS participants "have banded together to express collectively their dissatisfaction with the injustice and violence they perceive, as experienced both by Palestinians and Israeli citizens," and "to influence governmental action," *Koontz*, 2018 WL 617894, at *9. This is not a conspiracy to violate civil rights laws, but archetypal political expression entitled to full First Amendment protection.

23

1    *Representation of Wash.*, 461 U.S. 540, 549 (1983), it "may not deny a benefit to a

2    person on a basis that infringes his constitutionally protected . . . freedom of speech even

3    if he has no entitlement to that benefit." *Rumsfeld*, 547 U.S. at 59. "[T]he relevant

4    distinction that has emerged . . . is between conditions that define the limits of the

5    government spending program—those that specify the activities [the government] wants

6    to subsidize—and conditions that seek to leverage funding to regulate speech outside the

7    contours of the program itself." *Open Soc'y*, 570 U.S. at 214–15.

8         Courts do not apply these principles on a blank slate. This case concerns the rights

9    of government contractors. "An independent contractor who provides services to the

10   government is generally treated like a public employee for purposes of determining

11   whether the contractor has alleged a violation of his First Amendment rights." *Clairmont

12   v. Sound Mental Health*, 632 F.3d 1091, 1101 (9th Cir. 2011) (citing *Umbehr*, 518 U.S. at

13   673–74); *cf. O'Hare*, 518 U.S. at 721–22 (holding that the analysis for public employee

14   political affiliation claims also applies to independent contractors). As discussed above,

15   the Certification Requirement violates the First Amendment protections afforded to

16   government contractors.

17        The State's reliance on *Regan* is misplaced. State Br. at 26. That case did not

18   concern a government contract at all, but rather upheld a challenge to § 501(c)(3) of the

19   Internal Revenue Code, which requires that organizations seeking tax-exempt status not

20   attempt to influence legislation. 461 U.S. at 544. Reasoning that "[a] tax exemption has

21   much the same effect as a cash grant to the organization," the Court concluded that by

22   limiting § 501(c)(3) status, Congress had permissibly "chose[n] not to subsidize

23   lobbying." *Id.* The Court held that this restriction did not penalize the plaintiff's exercise

24   of First Amendment rights because the organization could separately incorporate and

25   affiliate with a § 501(c)(4) organization. *Id.* The plaintiff could thus receive tax-exempt

26   status for its nonlobbying activities under the § 501(c)(3), while influencing legislation

27   through the § 501(c)(4). Because this fix was not "unduly burdensome," *id.* at 544 n.6,

28

                                              24

Congress had not denied the plaintiff "any independent benefit on account of its intention to lobby," *id.* at 545. *See also Rust v. Sullivan*, 500 U.S. 173, 194 (1991) ("When the Government appropriates public funds to establish a program it is entitled to define the limits of that program."); *accord United States v. Am. Library Ass'n, Inc.,* 539 U.S. 194, 211 (2003); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587–88 (1998); *cf. Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW*, 485 U.S. 360, 369 (1988) (upholding statute that "decline[d] to extend *additional* food stamp assistance to striking individuals simply because the decision to strike inevitably leads to a decline in their income" (emphasis added)).

By contrast, in *FCC v. League of Women Voters*, the Court invalidated a funding condition that prohibited editorializing by recipients of federal broadcast grants. 468 U.S. 364, 399–401 (1984). The Court struck the condition down because it prevented recipients from engaging in editorializing activity even with private funds, and thus regulated expression outside the scope of the government program. *Id.* at 400. Later, in *Open Society*, the Court held that the First Amendment prohibited a funding condition requiring nongovernmental organizations receiving certain congressional funds to adopt a policy explicitly opposing sex trafficking. 570 U.S. at 221. The Court held that "the condition by its very nature affect[ed] 'protected conduct outside the scope of the federally funded program,'" because it compelled recipients to express a particular belief. *Id.* at 218 (quoting *Rust*, 500 U.S. at 197). Observing that "[a] recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime," the Court held that the condition went "beyond defining the limits of the federally funded program to defining the recipient." *Id.*[10]

---

[10] Funding conditions requiring an entity to comply with antidiscrimination laws primarily regulate unprotected conduct. *See Christian Legal Soc'y v. Martinez*, 561 U.S. (continued…)

This case is much closer to *Open Society* and *League of Women Voters* than to *Regan* and its progeny. Like the pledge in *Open Society*, the Certification Requirement compels contractors to express a particular message categorically disavowing participation in a boycott of Israel for the duration of their contracts. *See* 570 U.S. at 218 (noting that the Policy Requirement "is an ongoing condition on recipients' speech and activities"). And, like the funding condition in *League of Women Voters*, the Certification Requirement is not restricted to the use of government funding, but applies to a contractor's boycott activity outside the government program. *See* 468 U.S. at 400; *cf. Lyng*, 485 U.S. at 363 n.2 (statute provided that "a household shall not lose its eligibility to participate in the food stamp program as a result of one of its members going on strike if the household was eligible for food stamps immediately prior to such strike"). Finally, unlike *Regan*, the law prohibits contractors from affiliating with entities that participate in a proscribed boycott of Israel. A.R.S. § 35-393(2).[11]

## VII.   Plaintiffs Are Suffering Irreparable Harm.

As set forth in Plaintiffs' opening brief, the violation of First Amendment rights amounts to irreparable harm for purposes of the preliminary injunction analysis. *See, e.g., Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir.

---

661, 696 (2010). Such conditions therefore do not pose the same First Amendment problems as laws requiring contractors to accommodate a government message or disavow protected expression. As discussed in Sections II and V, the Certification Requirement primarily regulates expression and cannot be characterized as an antidiscrimination measure.

[11] The State argues that, "like Plaintiffs," it does not read the Certification Requirement's prohibition on affiliates to include "other companies also owned by the same individual" as the contracting entity. State Br. at 12. In fact, Mr. Jordahl said the opposite. *See* Dep. 105:12-105:13 ("[I]f I set up a separate nonprofit, you know, that would clearly be an affiliate of the other one."). The State's interpretation also contradicts "[t]he plain and ordinary meaning of 'affiliate'" as "'a company effectively controlled by another or associated with others under common ownership or control.'" *Satterfield v. Simon & Schuster, Inc.*, 569 U.S. 946, 955 (9th Cir. 2009) (quoting Webster's Third New International Dictionary 35 (2002)).

26

2014) ("A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief." (citation and internal quotation marks omitted)). The State does not address these arguments, but instead asserts that Plaintiffs' harms are "merely trifling" because the Firm expects to be compensated if Plaintiffs win their lawsuit. It is hardly trifling for Mr. Jordahl's Firm to forgo ten percent of its gross income while performing uncompensated labor for the County. Dep. 93:25-95:9. Moreover, in *Elrod*, the Supreme Court held that a preliminary injunction was warranted to remedy a First Amendment violation—even though back pay would later be available if the plaintiffs were successful—because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373. Here, the "harm is ongoing because the [Arizona] Law is currently chilling [Plaintiffs'] and other putative state contractors' speech rights." *Koontz*, 2018 WL 617894, at *13.[12]

**VIII.   A Broad Preliminary Injunction Is Necessary to Prevent Further Harm to Contractors' First Amendment Rights.**

Given that the Certification Requirement facially violates the First Amendment, the appropriate remedy is an injunction preventing Defendants from enforcing the requirement against all government contractors, not just Plaintiffs. The State argues that, "in the absence of class certification, a preliminary injunction may only properly address the harm to the named plaintiff." State Br. at 32. To the contrary, a court may "reach beyond the particular circumstances of [the] plaintiffs" if they satisfy the standard for a facial challenge. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). In the First

---

[12] The State also asserts that preliminary relief is not merited because Plaintiffs delayed filing suit after they were first aware of their claims. State Br. at 32. But the claims at issue here derive principally from the certification Mr. Jordahl was asked to sign on November 14, 2017, as part of his Firm's contract renewal. Plaintiffs filed this lawsuit less than a month later. Even the case relied on by the State recognizes that preliminary injunctive relief is appropriate where "new harm is imminent." *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

1   Amendment context, in particular, the Ninth Circuit has "consistently recognized the

2   'significant public interest' in upholding free speech principles, as the 'ongoing

3   enforcement of the potentially unconstitutional regulations . . . would infringe not only

4   the free expression interests of [plaintiffs], but also the interests of other people'

5   subjected to the same restrictions." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208

6   (9th Cir. 2009) at 1208 (alterations and omission in original).

7   **IX.    The Attorney General Is a Proper Defendant.**

8          Finally, the Attorney General is a proper defendant. The test for whether the Court

9   can exercise jurisdiction over the Attorney General is whether there is a sufficient

10  connection between his responsibilities and any injury that Plaintiffs might suffer.

11  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919–20 (9th Cir. 2004). The

12  requisite connection exists here. Although the Attorney General is not responsible for

13  directly enforcing the law against state contractors, he is authorized to prosecute

14  custodians of public funds for paying those funds to another person "[w]ithout authority

15  of law." A.R.S. § 35-301(1). The Attorney General thus "has 'a powerful coercive effect

16  on the action agency,'" which makes him a proper defendant in this action challenging

17  the Certification Requirement's constitutionality. *Planned Parenthood of Ariz., Inc. v.*

18  *Brnovich*, 172 F. Supp. 3d 1075, 1095–96 (D. Ariz. 2016) (citation omitted); *see also*

19  *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 71–72 & n.16 (1978).

20                                   **CONCLUSION**

21         For the foregoing reasons, the Court should grant Plaintiffs' motion for

22  preliminary injunction and deny the State's motion to dismiss. [13]

23

24  _____

25  [13] Local Civil Rule 7.2(e) allows 17 pages for an opposition to a motion to dismiss and 11

26  pages for a reply supporting a motion for a preliminary injunction. This combined brief is
    28 pages long, in accordance with the combined page limits.

27

28

1    Respectfully submitted this 15th day of February, 2018

2                                    /s/ Brian Hauss
                                     Brian Hauss (*pro hac vice*)
3                                    Vera Eidelman (*pro hac vice*)
                                     Ben Wizner (*pro hac vice*)
4                                    ACLU Foundation
5                                    Speech, Privacy & Technology Project
                                     125 Broad Street, 18th Floor
6                                    New York, NY 10004
7                                    Telephone: (212) 549-2500
                                     bhauss@aclu.org
8                                    veidelman@aclu.org
9                                    bwizner@aclu.org

10                                   Kathleen E. Brody, AZ Bar No. 026331
                                     Darrell L. Hill, AZ Bar No. 030424
11                                   ACLU Foundation of Arizona
12                                   P.O. Box 17148
                                     Phoenix, AZ 85011
13                                   Telephone: (602) 650-1854
14                                   kbrody@acluaz.org
                                     dhill@acluaz.org
15
16                                   *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that on February 15, 2018, the foregoing Plaintiffs' Combined Opposition to the State's Motion to Dismiss and Reply in Support of Preliminary Injunction and attached exhibits were electronically transmitted to the Clerk's Office using the CM/ECF system for filing and distribution to the following CM/ECF registrants.

Drew C. Ensign
Oramel H. (O.H.) Skinner
Brunn (Beau) W. Roysden III
Evan G. Daniels
Keith J. Miller
Aaron Duell
Arizona Attorney General's Office
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

DATED this 15th day of February, 2018

/s/ Brian Hauss
Brian Hauss (*pro hac vice*)

30