# EXHIBIT 1

Carly F. Gammill, *admitted pro hac vice*
**AMERICAN CENTER FOR LAW & JUSTICE**
625 Bakers Bridge Ave, Ste 105-121
Franklin, Tennessee 37067
Telephone: (615) 599-5572
Fax: (615) 309-8832
cgammill@aclj-dc.org

*Counsel for Amicus Curiae American Center for Law & Justice*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., <br><br> *Plaintiffs*, <br><br> vs. <br><br> Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta, Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities, <br><br> *Defendants*. | Case No: 3:17-CV-08263-PCT-DJH <br><br> **AMICUS CURIAE BRIEF OF AMERICAN CENTER FOR LAW AND JUSTICE IN SUPPORT OF DEFENDANTS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

FACTUAL BACKGROUND .................................................................................. 2

SUMMARY OF ARGUMENT ............................................................................... 4

ARGUMENT ........................................................................................................... 4

    The Arizona State Law Does Not Violate the First Amendment Because It Constitutes Permissible Government Speech and Does Not Unconstitutionally Infringe Private Speech ........................... 4

CONCLUSION ........................................................................................................ 8

# TABLE OF AUTHORITIES

**Cases**

*Bd. of County Comm'rs. v. Umbehr*,
　518 U.S. 668 (1996) ............................................................................................. 6

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*,
　359 F. Supp. 2d 749 (E.D. Wis. 2005) ................................................................ 6

*Rust v. Sullivan*, 500 U.S. 173 (1991) ............................................................... 5, 8

*Walker v. Texas Division, Sons of Confederate Veterans, Inc.*,
　135 S.Ct. 2239 (2015) ...................................................................................... 5, 8

*Waters v. Churchill*, 511 U.S. 661 (1994) ......................................................... 6, 8

**Statutes**

50 U.S.C. § 4607 ...................................................................................................... 2

Ariz. Rev. Stat. §35-393 ................................................................................. 1, 3, 8

Ariz. Rev. Stat. §35-393.01 ..................................................................................... 3

**Legislative Materials**

HB 2617, 52nd Ariz. Leg. §2 (2016), "Legislative findings,"
　https://www.azleg.gov/legtext/52leg/2r/bills/hb2617p.pdf. .............................. 3

**Other Authorities**

Int. Trade. Admin., *Arizona Exports, Jobs, & Foreign Investment*, U.S. Dept. of
　Comm. (Feb. 2017),
　https://www.trade.gov/mas/ian/statereports/states/az.pdf. ............................ 2, 7

Jewish Virtual Library, *State-to-State Cooperation: Arizona and Israel*, Jewish
　Virtual Library (Feb. 15, 2018), http://www.jewishvirtuallibrary.org/arizona-
　israel-cooperation ................................................................................................ 7

**INTEREST OF *AMICUS CURIAE***

*Amicus,* the American Center for Law and Justice (ACLJ), is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued numerous cases before the Supreme Court of the United States and have participated as amicus curiae in a number of significant cases involving the Free Speech Clause of the First Amendment.

*Amicus* has dedicated time and effort to defending and protecting Americans' First Amendment freedoms. The ACLJ's commitment to the integrity of the United States Constitution and Bill of Rights compels it to support the State of Arizona in its efforts, including the enactment of Arizona Revised Statutes § 35-393, to avoid becoming complicit in the global Boycott, Divestment and Sanctions (BDS) Movement, a discriminatory form of economic warfare targeting the State of Israel.

**FACTUAL BACKGROUND**

The BDS movement operates as a coordinated, sophisticated effort to disrupt the economy of the State of Israel, with the ultimate goal of destroying the nation altogether. It uses the threat of withdrawing financial support in an effort to coerce companies to cease or refuse to engage in business relations with Israel, its nationals, and its residents. Moreover, it often discriminatorily targets people who are Jewish or who do business with persons who are Jewish.

The State of Arizona has chosen not to participate or become complicit in this boycott. The State does a tremendous amount of business with Israel. From 2006-2016 Israel was Arizona's third fastest growing trade partner. Int. Trade. Admin., *Arizona Exports, Jobs, & Foreign Investment*, U.S. Dept. of Comm. (Feb. 2017), https://www.trade.gov/mas/ian/statereports/states/az.pdf. It would be both illogical and irresponsible to do business with companies engaged in economic warfare against one of the State's leading trade partners. As the State legislature pointed out in its legislative findings here:

> Boycotts and related tactics have become a tool of economic warfare that threaten the sovereignty and security of key allies and trade partners of the United States. The state of Israel is the most prominent target of such boycott activity. . . . Companies that refuse to deal with United States trade partners such as Israel, or entities that do business with or in such countries, make discriminatory decisions on the basis of national origin that impair those companies' commercial soundness. It is the public policy of the United States, as enshrined in several federal acts, including 50 United States Code section 4607, to oppose such boycotts, and Congress has concluded as a matter of national trade policy that cooperation with Israel materially benefits United States companies and improves American competitiveness. Israel in particular is known for its dynamic and innovative approach in many business sectors, and a company's decision to discriminate against Israel, Israeli entities or entities that do business with Israel or in Israel is an unsound business practice making the company an unduly risky contracting partner or vehicle for investment. This state seeks to implement Congress's announced policy of "examining a

company's promotion or compliance with unsanctioned boycotts, divestment from, or sanctions against Israel as part of its consideration in awarding grants and contracts and supports the divestment of State assets from companies that support or promote actions to boycott, divest from, or sanction Israel."

HB 2617, 52nd Ariz. Leg. § 2 (2016), "Legislative findings," https://www.azleg.gov/legtext/52leg/2r/bills/hb2617p.pdf. Accordingly, in March 2016, the Arizona State Legislature enacted Ariz. Rev. Stat. § 35-393 (hereinafter the "Statute"). Section 35-393.01 of the Statute prohibits the State of Arizona, or any of its agencies, from entering into any contract with companies that are complying with or adhering to third-party calls for a boycott of Israel. Ariz. Rev. Stat. § 35-393; § 35-393.01.

Plaintiff Mikkel Jordahl is an Arizona-based attorney who is actively involved in organizations that share a common anti-Israel bias and agenda. Jordahl Compl. ¶¶ 26–28. In the past, Jordahl, through his sole proprietorship, has contracted with the State of Arizona to provide legal advice and training to inmates at the Coconino County Jail District. *Id.*, ¶¶ 29–30. In the fall of 2016, Jordahl applied to renew his contract and, in compliance with the statute, was required to certify that his business was not acting in compliance with or adherence to calls for a boycott against Israel. *Id.*, ¶¶ 31–33. Despite objecting, citing First Amendment concerns, he signed the agreement and certified that his company would be complying with the Statute but that he, in his personal capacity, would not necessarily refrain from the types of boycotts addressed in the Statute. *Id.*, ¶¶ 33-35. The County accepted his certification, and Jordahl abided by the terms of the certification, including separating his personal boycott participation from the workings of his firm. *Id.*, ¶¶ 36-37.

In November 2017, Jordahl chose not to renew his contract with the State of Arizona, citing his objection to the Statute. *Id.*, ¶¶ 38–41. On December 7, 2017, Jordahl, represented by the American Civil Liberties Union (ACLU), filed

3

this lawsuit against the State of Arizona claiming that the Statute simultaneously chills and compels private speech in violation of the First Amendment.

## SUMMARY OF ARGUMENT

The Statute is a quintessential example of constitutional government speech whereby the State of Arizona has determined which agendas and policies it will and will not support when contracting with commercial partners. The government is not required to remain viewpoint-neutral in such circumstances but is instead permitted to take or not take a position of its own. In this case, the State of Arizona has merely chosen not to enter into business relations with companies that participate in activity that directly undermines the State's own commercial policies and interests.

To the extent that private speech may be implicated here, the Statute has no unconstitutional chilling effect, nor does it unconstitutionally compel private speech. Because the State is acting here not as sovereign but instead in its capacity as a contractor, its substantial interests in ensuring the efficient and effective operation of government services greatly outweighs any private speech rights that may be implicated by the terms of the Statute. Furthermore, the Statute does not prohibit any private individual, acting in a personal capacity and according to a personal choice, from boycotting the State of Israel or engaging in related speech of his or her choosing, as Mr. Jordahl's Complaint makes absolutely clear.

## ARGUMENT

**The Arizona Statute Does Not Violate the First Amendment Because It Constitutes Permissible Government Speech and Does Not Unconstitutionally Infringe Private Speech.**

The Complaint alleges that the Statute's certification requirement unconstitutionally compels speech and engages in viewpoint discrimination. In

4

1 fact, however, it does neither. The Statute only regulates government speech
2 (*i.e.*, in the context of contractual spending) and relays the government's
3 decision concerning those companies with which it wishes to conduct business.
4 The Supreme Court in *Walker v. Texas Division, Sons of Confederate Veterans,*
5 *Inc.*, held that "[w]hen government speaks, it is not barred by the Free Speech
6 Clause from determining the content of what it says." 135 S.Ct. 2239, 2246
7 (2015). Without this ability, the government "would [simply] not work." *Id.* In
8 fact, the Supreme Court has continually refused "[t]o hold that the Government
9 unconstitutionally discriminates on the basis of viewpoint when it chooses to
10 fund a program dedicated to advance certain permissible goals, because the
11 program in advancing those goals necessarily discourages alternative goals." *Id.*
12 (citing *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)).

13 In *Rust*, the Supreme Court found that regulations prohibiting the use of
14 Title X funds for abortion, and even the pure speech of abortion-related
15 counseling, did not violate any free speech rights held by program recipients.
16 *Rust*, 500 U.S. at 173. As the Court noted, holding a program unconstitutional
17 because the Government advocates for one viewpoint – but not a countervailing
18 one – would mean that government funding of efforts to establish democracy
19 abroad would require equal funding for efforts advocating for communism and
20 fascism. *Id*. at 194. As in *Rust*, the State here is "simply insisting that the public
21 funds be spent for the purposes for which they were authorized." *Id*. at 196. The
22 terms of the Statute merely confirm that the State's commercial contracting
23 funds are authorized to be spent only in furtherance of the commercial policies
24 and interests of the State. Contracting with companies that wish to undermine
25 those interests, unremarkably, is therefore not authorized.

26 In its capacity as contractor, the State is required to ensure that it does not
27 contract with companies engaging in activity contrary to the economic best

interests of the state. What the Supreme Court explained about the government as employer in *Waters v. Churchill* likewise applies to the government as contractor:

> [C]onstitutional review of government [contracting] decisions must rest on different principles than review of speech restraints imposed by the government as sovereign. . . . [T]he extra power the government has in this area comes from the nature of the government's mission as [contractor]. Government agencies are charged by law with doing particular tasks. Agencies hire employees [and contract with other persons] to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary [or offered funds through a government commercial contract] so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government [as contractor] must have some power to restrain her. . . . The key to First Amendment analysis of government [contracting] decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as [contractor].

511 U.S. 661, 674-675 (1994) (bracketed language inserted to reflect contracting rather than strictly employment context).

This is not a controversial idea, as courts have clearly recognized both the similarity of these two governmental roles and the heightened authority to restrict speech in pursuing these roles:

> When a governmental entity acts as a contractor or employer, it has broader authority to restrict the speech of the party with whom it contracts or whom it employs than it does when it acts as a sovereign and restricts the speech of members of the public.

*Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 359 F. Supp. 2d 749, 765 (E.D. Wis. 2005) (citing *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 673-81 (1996) and *Waters*, 511 U.S. at 671).

It is thus especially true – and even obvious – that the government is not required to contract or do business with an entity that is boycotting an ally and a

6

legitimate business partner of the state in a manner that could cause significant harm to the state's economy. There are almost a hundred different Arizona companies that do business with the State of Israel. Int. Trade. Admin., *Arizona Exports, Jobs, & Foreign Investment*, U.S. Dept. of Comm. (Feb. 2017), https://www.trade.gov/mas/ian/statereports/states/az.pdf. From 1996 to the present day, Arizona has exported more than $2.7 billion USD to Israel. Jewish Virtual Library, *State-to-State Cooperation: Arizona and Israel*, Jewish Virtual Library (Feb. 15, 2018), http://www.jewishvirtuallibrary.org/arizona-israel-cooperation. Grants shared between Israel and Arizona have been used for agricultural, industrial, and scientific development, totaling nearly $7 million USD over time. *Id*. Researchers at Ben-Gurion University and Arizona State University have signed collaborative research agreements for work in areas like cybersecurity, nanotechnology, robotics, and advances in medical equipment. *Id*. The University of Arizona's Water Resources Research Center and the Udall Center for Studies in Public Policy were responsible for holding an "Arizona-Israel-Palestinian Water Management & Policy Workshop" as all the parties have the common goal of increasing access to water in the desert environments in which they all live. *Id*. The relationship between Israel and Arizona has led to quantifiable financial gains, advances in technology, environmental developments, and any of a number of successes that make it essential for them to maintain a healthy relationship. It would be absurd to think that the State of Arizona cannot refrain from doing official commercial business with companies that boycott one of the State's key trade partners. Indeed, doing such business could cost the State significantly.

In light of the foregoing, there is no issue of compelled speech here. To make sure that the commercial interests of the State are *not* infringed, Arizona simply asks that its contractors confirm their commitment to *not* engage in any

1  discriminatory conduct against a key Arizona trade partner, and only for the
2  duration of the contract with the State. The government is not requiring
3  individual companies or institutions that engage in BDS activities targeting
4  Israel to alter their beliefs, stop their support for BDS, or change their messages
5  in any way. The statute merely expresses the *government's* position on the issue,
6  explains how and where it will spend public contracting funds within its
7  jurisdiction, and notifies the public as to its decision. This is consistent with the
8  Supreme Court's prior rulings in *Rust*, *Walker*, and *Waters*.
9     Notably, nothing in the Statute affects in any way the boycott activities of
10 any individual, who, in operating a company, may simultaneously comply with
11 the Statute's terms commercially while engaging in anti-Israel boycott activities
12 personally. Indeed, this is the exact approach Plaintiff utilized for an entire year
13 before deciding he would no longer keep his personal feelings separate from
14 those of his firm. Jordahl Compl. ¶¶ 36-37. However, while Mr. Jordahl, and
15 other individuals of like mind, are in no way required by the Statute to change
16 their personal thoughts or feelings on this issue, the State is likewise not
17 required to contract with any company engaged in these activities, since to do so
18 would directly and substantially interfere with Arizona's own commercial
19 positions and interests.

20                         **CONCLUSION**

21     Because the purpose of the law is a legitimate expression of state and
22 national policy in foreign relations and commerce, *i.e.*, government speech, and
23 does not impermissibly infringe private speech, the First Amendment is not
24 violated here. *Amicus* urges this Court to recognize as much and decline
25 Plaintiff's invitation to enjoin A.R.S. §35-393.

26

27 Dated: February 16, 2018         Respectfully submitted,

28

8

Jay Alan Sekulow, *Counsel of Record*
Stuart J. Roth
Jordan Sekulow
Mark Goldfeder
Jeffrey Ballabon
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Avenue, N.E.
Washington, DC 20002
Telephone: (202) 546-8890

*/s/ Carly F. Gammill*
Carly F. Gammill, *admitted pro hac vice*
AMERICAN CENTER FOR LAW & JUSTICE
625 Bakers Bridge Avenue, Ste 105-121
Franklin, TN 37067
Telephone: (615) 599-5572
Fax: (615) 309-8832


*Attorneys for Amicus Curiae American Center for Law & Justice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of February, 2018, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF System.

Dated: February 16, 2018      */s/ Carly F. Gammill*
                             Carly F. Gammill, *admitted pro hac vice*
                             AMERICAN CENTER FOR LAW & JUSTICE
                             625 Bakers Bridge Avenue, Ste 105-121
                             Franklin, TN 37067
                             Telephone: (615) 599-5572
                             Fax: (615) 309-8832
                             cgammill@aclj-dc.org