**MARK BRNOVICH**
**ATTORNEY GENERAL**
Drew C. Ensign (No. 25463)
Oramel H. (O.H.) Skinner (No. 32891)
Brunn (Beau) W. Roysden III (No. 28698)
Evan G. Daniels (No. 30624)
Keith J. Miller (No. 29885)
Aaron Duell (No. 33450)
 Assistant Attorneys General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for Defendant Mark Brnovich
in his official capacity as Attorney General
and Proposed Intervenor-Defendant
State of Arizona*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., <br><br> Plaintiffs, <br><br> vs. <br><br> Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities, <br><br> Defendants. | Case No: 3:17-cv-08263-PCT-DJH <br><br> **STATE'S REPLY TO RESPONSE IN SUPPORT OF ITS MOTION TO DISMISS** <br><br> **Oral Argument Requested** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 2

    I.    THE ACT DOES NOT APPLY TO PLAINTIFFS' DESIRED BOYCOTT. 2

    II.   PLAINTIFFS' CONDUCT IS NOT "INHERENTLY EXPRESSIVE" ........ 3

    III.  PLAINTIFFS' FIRST AMENDMENT CHALLENGES FAIL ..................... 6

        A. The State's Powerful Interests Overwhelm Any First Amendment Interest Asserted Here .............................................................................................. 6

        B. The Act Is A Valid Viewpoint-Neutral, Anti-Discrimination Statute ........... 8

        C. The Act's Certification Requirement Does Not Mandate Speech .................. 9

        D. The Act Merely Denies A Subsidy To Plaintiffs' Conduct And Is Therefore Not An Unconstitutional Condition ............................................................... 10

    IV.  THE ATTORNEY GENERAL MUST BE DISMISSED ............................ 11

CONCLUSION ................................................................................................. 11

# TABLE OF AUTHORITIES

**CASES**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*
   133 S. Ct. 2321 (2013)................................................................................ 11

*Board of Directors of Rotary Int'l v. Rotary Club of Duarte*
   481 U.S. 537 (1987) ..................................................................................... 8

*Briggs & Stratton Corp. v. Baldrige*
   728 F.2d 915 (7th Cir. 1984)........................................................................ 6

*Crowder v. Kitagawa*
   81 F.3d 1480 (9th Cir. 1996)........................................................................ 7

*EEOC v. Wyoming*
   460 U.S. 226 (1983) ..................................................................................... 9

*FCC v. League of Women Voters*
   468 U.S. 364 (1984) ................................................................................... 11

*FTC v. Superior Court Trial Lawyers Ass'n*
   493 U.S. 411 (1990) ..................................................................................... 6

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*
   515U.S. 557 (1995) ...................................................................................... 7

*Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*,
   456 U.S. 212 (1982) .................................................................................. 1, 5

*Koontz v. Watson*
   No. 17-4099, 2018 WL 617894, at *1 (D. Kan. Jan. 30, 2018)................... 4

*Lehman Bros. v. Schein*
   416 U.S. 386 (1974) ..................................................................................... 3

*NAACP v. Claiborne Hardware Co.*
   458 U.S. 886 (1982) ..................................................................................... 5

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*
   272 F.3d 104 (2d Cir. 2001)........................................................................ 10

*Ohralik v. Ohio State Bar Ass'n*
   436 U.S. 447 (1978) ..................................................................................... 9

*Pennhurst State Sch. & Hosp. v. Halderman*
   465 U.S. 89 (1984) ..................................................................................... 11

*Pickup v. Brown*
   740 F.3d 1208 (9th Cir. 2014)...................................................................... 3

*Regan v. Taxation With Representation of Wash.*
   461 U.S. 540 (1983) ................................................................................... 10

| | |
|---|---|
| *Rumsfeld v. FAIR*<br>547 U.S. 47 (2006) | .............................................................................................*passim* |
| *Tennessee v. Lane*<br>541 U.S. 509 (2004) | ............................................................................................................ 7 |
| *Todd v. United States*<br>849 F.2d 365 (9th Cir. 1988) | ..................................................................................... 10 |
| *Wisconsin v. Mitchell*<br>508 U.S. 476 (1993) | ...................................................................................... 8, 9 |

**STATUTES**

29 U.S.C. § 621 ............................................................................................................... 9

A.R.S. § 35-393 .............................................................................................................. 2

**OTHER AUTHORITIES**

Brian Hauss, *Kansas Doesn't Even Try to Defend Its Israel Anti-Boycott Law*, (last visited March 15, 2018), https://www.aclu.org/blog/kansas-doesnt-even-try-defend-its-israel-anti-boycott-law ............................................................................................. 4

Exec. Order No. 11,246 § 203 (1965) ......................................................................... 10

*Webster's Third New International Dictionary* (3d ed. 1993) ....................................... 11

**INTRODUCTION**

Plaintiffs' Complaint raises constitutional issues that this Court need not—and should not—reach. Plaintiffs' desired boycott falls outside the scope of the Act, and Plaintiffs thus lack standing to challenge it. *See* Doc. 28 ("MTD") at 8-14. Plaintiffs' contrary arguments should be rejected as violating the Act's text. And if the applicability of the Act is at all uncertain, this Court should certify that question or abstain, thereby permitting state courts to resolve those important, threshold issues of state law.

As to the merits, a long line of Supreme Court precedents, including in particular *FAIR* and *Longshoreman*, controls here. As in *FAIR*, the Act merely "affects what [Plaintiffs] must *do* … not what they may or may not *say*." *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006). And as in *Longshoremen*, this case is about a "political boycott" resulting from a political dispute with a foreign government's policy. *Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212, 214, 223-26 (1982). In response to these seminal decisions, Plaintiffs offer little more than facile distinctions, arguing that there was no "political boycott" in *FAIR* and that this case is unlike *Longshoremen* because here these is no boycott *by a union* here. But *FAIR* involved a boycott challenging the military's exclusion of openly gay service-members—plainly a "political boycott"—and Plaintiffs offer no rationale for why union boycotts should enjoy less protection than a boycott by Plaintiffs' company with nearly the same core international relations contours as in *Longshoremen*. Indeed, if anything the picketing in *Longshoreman* is far *more expressive* than the commercial purchasing decisions here.

And even if the State could not prohibit boycotts against Israel directly, the First Amendment does not compel the State to *subsidize* such boycotts with public funds. Plaintiffs concede (at 24-25) that the State can deny subsidies to lobbying and striking/picketing—both highly expressive activities—but deny the same authority for commercial boycotts. There is no principled basis for such a distinction. And because the Act does not compel Plaintiffs' to say anything or adopt any governmental position as its own, the Act does not impose any unconstitutional condition.

1

Ultimately, this case boils down to a simple choice: this Court (1) can either follow the clear holdings of *FAIR*, *Longshoreman*, *Briggs*, *FTC* and *Regan*, or (2) embrace a maximalist reading of *Claiborne* that only one court has adopted in the 35 years since that case was decided—and even then only as what amounts to a default judgment, *see infra* at 4 n.2. Because the State's argument is supported by the overwhelming weight of authority, Plaintiffs' Complaint should be dismissed.

## ARGUMENT

### I. THE ACT DOES NOT APPLY TO PLAINTIFFS' DESIRED BOYCOTT

Plaintiffs' Opposition seeks to have this Court improperly—and gratuitously—resolve constitutional issues that may easily be avoided by resolving threshold issues of state law. As explained previously, Plaintiffs' desired boycotting conduct does not fall within the scope of the statute. *See* MTD at 8-14.

Plaintiffs seek to gloss over the mismatch between their confirmed conduct and the statutory language. But while Plaintiffs argue that their boycott is "[i]n compliance with or adherence to calls for a boycott of Israel," A.R.S. § 35-393(1)(a), it is undisputed that (1) Jordahl *exclusively* creates his own list of companies to boycott by himself, rather than relying on any other organization's list, and that (2) Plaintiffs' boycott differs substantially in its scope from those of organizations he claims to be inspired by. MTD at 12-13.[1] Similarly, Plaintiffs attempt to gloss over the statutory requirement of a "boycott of Israel" by debating whether or not the territories are included in the definition of "Israel." Opp. at 14. But that is not the point—Plaintiffs' boycott targets companies they disagree with. MTD at 8-10. That boycott is neither exclusive to, nor comprehensive of, Israeli companies—and is thus not a boycott "*of Israel*." *See id.* And Plaintiffs have no response to the State's example of a sweatshop boycott merely

---

[1] Plaintiffs' argument (at 13, 15) effectively rewrites the statutory language "in compliance with or adherence to" to say simply "in response to." But that is not what the statute says and the difference is not "immaterial": Plaintiffs' boycott *violates* core elements of the referenced organizations' boycotts. Indeed, while JVP call for boycotts of 100% of Israelis, Jordahl *defies more than 90%* of that call by exempting all Israelis outside the settlements. *See* goo.gl/HFC6iS.

2

implicating Israel, which illustrates how Plaintiffs' boycott falls outside the Act. *Id.* at 9.

The statutory language is clear that Plaintiffs' boycott does not fall within the Act's scope. But if there is any doubt, this Court should either certify that question or abstain under *Pullman*—particularly given the importance of the issues and the lack of any state court decision addressing the Act. *See, e.g.*, *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (certification is "particularly appropriate in view of the novelty of the question and the great unsettlement of [state] law.").

## II. PLAINTIFFS' CONDUCT IS NOT "INHERENTLY EXPRESSIVE"

Both Supreme Court and Ninth Circuit precedent make plain that "First Amendment protection does not apply to conduct that is not 'inherently expressive.'" MTD at 19 (quoting *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014)). Plaintiffs never dispute this. Thus, if Plaintiffs' conduct is not "inherently expressive," virtually all of Plaintiffs' arguments fail on this threshold ground. And that is just the case.

*Rumsfeld v. FAIR* is perfectly clear that if (as here) someone has to explain with speech the expressive message of the conduct at issue, that conduct is *not* inherently expressive. In *FAIR*, the plaintiffs' First Amendment expressive conduct claim failed because the "actions [at issue] were expressive only because [plaintiffs] accompanied their conduct with speech explaining it." 547 U.S. at 66. That is even more true here than in *FAIR*. Plaintiffs offer no explanation for how anyone would be likely to perceive the expressive message of Plaintiffs' purchase of an HP printer versus one from Canon or Lexmark as relating to Israeli governmental policies. Indeed, ***Plaintiffs effectively admit as much***, explaining that: "***These decisions are expressive because Mr. Jordahl explicitly characterizes them*** as part of his participation in a BDS boycott." Opp. at 16 (emphasis added). Plaintiffs' admission is fatal under *FAIR*—because Plaintiffs' conduct is purportedly expressive only because of Plaintiffs' own characterization and explanatory speech, *FAIR* mandates dismissal. 547 U.S. at 66; MTD at 20-21.

Plaintiffs attempt to distinguish *FAIR* by contending that Plaintiffs' boycott is a "political boycott," while FAIR's was not. Opp. at 7 ("*Rumsfeld* is inapplicable here

3

because political boycotts, including BDS boycotts, are inherently expressive."). That is specious. The boycott in *FAIR* was patently political: the law schools disagreed politically with the military's "Don't Ask, Don't Tell" policy. That disagreement *about governmental policy*—which led to boycotting all military on-campus recruiting—was a "political boycott" under *any* reasonable understanding of that term. Nor does the decision in *Koontz* provide any basis for disguising *FAIR*.[2] And aside from contending that *FAIR* did not involve a "political boycott," Plaintiffs do not offer *any* other argument why *FAIR* does not apply here. It does, and is dispositive of Plaintiffs' claims.

It is equally clear that *Longshoremen* involved a "political boycott"—and, as here, a secondary boycott. There the boycott's sole basis was the union's political dispute with

---

[2] Plaintiffs rely on *Koontz v. Watson*, No. 17-4099-DDC-KGS, 2018 WL 617894 (D. Kan. Jan. 30, 2018), in support of this distinction. But *Koontz* cannot save Plaintiffs' claim. As an initial matter, Kansas's brief in that case did not address the merits of the First Amendment claim there, or indeed ever use the words "First Amendment"—as Plaintiffs' counsel gleefully has noted. *See* Brian Hauss, *Kansas Doesn't Even Try to Defend Its Israel Anti-Boycott Law available at* https://www.aclu.org/blog/kansas-doesnt-even-try-defend-its-israel-anti-boycott-law (last visited March 15, 2018). As Plaintiffs' counsel aptly observed, "The state quite literally has no defense for the law's First Amendment [alleged] violations." *Id.* Because the merits of the First Amendment claim were not briefed, *Koontz* is thus best understood as being akin to a default judgment, rather than any meaningful adjudication of the First Amendment merits.

In any event—and perhaps unsurprisingly given the completely one-sided nature of the briefing—*Koontz* profoundly misapprehended the governing law. *Koontz* simply asserted—without any explanation—that the political boycotts in *FAIR* and *Koontz* were somehow different: "Because the Kansas Law regulates inherently expressive conduct and forces plaintiff to accommodate Kansas's message, it is unlike the law at issue in *Rumsfeld*." 2018 WL 617894, at *11. But the *Koontz* court did not identify any facets of Koontz's boycott that were any different from *FAIR*. Notably, both involved boycotts and both were motivated by disagreements with governmental policy set forth by statute. *Koontz* does not provide a single intelligible or principled basis for distinguishing between the inherent expressiveness of political boycotts in *FAIR* and *Koontz*. Nor could it. Moreover, *Koontz* also does not attempt to address *Longshoremen*, *FTC* or *Briggs* (likely because none of those cases were brought to the court's attention).

In addition, the Kansas statute applied to all state contracts "with an individual or company," Kan. Stat. Ann. § 75–3740f(a), thus reaching *consumer* boycotts like Kootz's. In contrast, Arizona's act only applies to "companies," and thus commercial boycotts.

It is also worth noting that even *Koontz* explained that "Conduct is inherently expressive when someone understands that the conduct is expressing an idea without any spoken or written explanation." *Id.* Given Plaintiffs' admission (at 16) that their boycott is expressive precisely (and only) because of how Jordahl has "characterized" it with speech, Plaintiffs' boycott necessarily enjoys no protection even under *Koontz*.

4

the U.S.S.R.'s policy in Afghanistan. But the *Longshoremen* union's political boycott did not enjoy any First Amendment protection *at all*. 456 U.S. at 226-27. That was the case even though the *Longshoremen*'s boycott involved actual picketing—*i.e.*, conduct that is *far* more expressive than printer purchases and other business supply decisions.

Plaintiffs (at 6) half-heartedly try to distinguish *Longshoremen* on the sole basis that "Plaintiffs are not engaged in a secondary labor boycott." But Plaintiffs do not acknowledge the untethered, unsupported premise underlying that skeletal assertion—that unions somehow enjoy lesser First Amendment rights than Jordahl's business entity.

Faced with the fact that the content of their boycott is not inherently expressive, Plaintiffs retreat to *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). Under *Claiborne*, Plaintiffs argue that *all* conduct that is part of a "political boycott" is *always* inherently expressive as a matter of law, even where it is obvious (as here) that the conduct is not inherently—or even modestly—expressive as a matter of fact. *Claiborne* cannot bear the weight Plaintiffs put upon it for four reasons.

*First*, Plaintiffs' position that any conduct connected to "political boycotts" is inherently expressive is contrary to *FAIR* and would lead to absurd results. For example, Plaintiffs apparently contend that Plaintiffs' purchase of an HP desktop computer that would be exclusively used in Jordahl's personal office is "inherently expressive" even though no client has ever set foot in that office, Dep. 80:12-15, 47:2-48:11—and thus no one could even conceivably perceive whatever message the computer purports to convey. That is specious. Under that view, Plaintiffs' continued use of an HP printer would similarly be "inherently expressive" even if the HP decal had fallen off or become illegible. But such a decal-less printer is not expressive *at all*, let alone *inherently* expressive. Similarly, by contending that all acts constituting a "political boycott" are inherently expressive as a matter of law, Plaintiffs' position would presumably extend constitutional protection to acts like speeding on the way to a boycott meeting. While such an act lacks any expressive value, Plaintiffs' position offers no basis for avoiding this absurd outcome.

5

1 | *FAIR* rejected such bootstrapping and judged whether each relevant act was
2 | inherently expressive. 547 U.S. at 64-66. Plaintiffs cannot simply cry "political boycott"
3 | and thereby hand-wave off any analysis of how expressive the acts in question truly are.

*Second*, *Claiborne* addressed a consumer boycott by individuals, rather than a commercial boycott by businesses. *See* MTD at 28. Plaintiffs contend (at 4) that the commercial nature of the regulated boycotts is irrelevant. But Plaintiffs themselves attempt to distinguish *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984), on the commercial nature of the conduct at issue there. Opp. at 6-7. Moreover, the Supreme Court's decision in *FTC v. Superior Court Trial Lawyers Ass'n* specifically declined to extend protection to a political boycott because of the commercial nature and interest of the boycott and its participants. 493 U.S. 411, 426 (1990).

*Third*, the *Claiborne* boycott "sought only the equal respect and equal treatment to which [the African-American boycotters] were constitutionally entitled." *FTC*, 493 U.S. at 426. Contrary to Plaintiffs' suggestion (at 5), this distinction was not invented by the State but is rather a direct quotation from the Court's decision in *FTC*—which substantially relied on the fact that the *Claiborne* boycott sought *only* to vindicate constitutional rights in holding that the *political boycott* in *FTC* was not protected under the First Amendment. 493 U.S. at 426-27.

*Fourth*, *Longshoremen* is *far* closer to the present circumstances than *Claiborne*: involving a commercial boycott aimed against a foreign nation due to disagreements with its policies, rather than a domestic consumer boycott aimed at securing constitutional rights to which the boycotters were already entitled.

### III. PLAINTIFFS' FIRST AMENDMENT CHALLENGES FAIL

Even if Plaintiffs' conduct were inherently expressive, Plaintiffs' First Amendment claim would still fail.

#### A. The State's Powerful Interests Overwhelm Any First Amendment Interest Asserted Here

Plaintiffs make the categorical and absolutist claim (at 10) that "Political boycotts

6

1 cannot be regulated." That is demonstrably false. The outcomes of *FAIR*, *FTC*, and
2 *Longshoremen*—all of which involved political boycotts—alone demonstrate that there is
3 nothing talismanic about the characterization "political boycott." Political boycotts have
4 actually fared poorly in federal courts. Indeed, aside from *Koontz*—effectively a default
5 judgment on the First Amendment issues, *supra* at 4 n.2—Plaintiffs have cited no case
6 that has *ever* applied *Claiborne* to strike state regulation of a political boycott.

Even if Plaintiffs' boycotting conduct were inherently expressive, the State has explained how its powerful interests in regulating commerce and eliminating invidious, status-based discrimination in the buying and selling of goods are more than sufficient to justify any burden on Plaintiffs' First Amendment rights. MTD at 22-25.

Plaintiffs offer a smattering of skeletal reasons why the State's interests are insufficient here, but none of them withstands scrutiny. *First*, Plaintiffs argue (at 22) that subsection (A) of the statute shows that the statute is not a valid anti-discrimination statute because subsection (B) already addresses discrimination. But subsection (B) only addresses specific discriminatory intent, while subsection (A) address conduct that is likely to be discriminatory in effect. Statutes banning discriminatory effect have been widely upheld against constitutional challenge.[3] *Second*, Plaintiffs argue anti-discrimination statutes must yield to the First Amendment, citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,* 515 U.S. 557, 568 (1995).[4] But *Hurley* involved forced inclusion into an inherently expressive gathering (a parade), and did not involve regulation of commercial conduct *at all*.[5]

Plaintiffs conclude (at 23) with a parade of horribles under which the State

---

[3] For example, the Americans with Disabilities Act ("ADA") prohibits both intentional discrimination *and* discriminatory effect. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1483-84 (9th Cir. 1996). But that hardly renders the ADA an unconstitutional anti-discrimination statute. *See*, *e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004).
[4] Plaintiffs also argue the Act's anti-discrimination provisions are impermissibly content- or viewpoint-based, which fails for the reasons discussed next. *See infra* at 8-9.
[5] Plaintiffs contend (at 20-21) that the Act is not narrowly tailored. That argument appeared in neither their initial motion nor their Complaint, and is thus waived. It further fails because strict scrutiny does not apply. To the extent that strict scrutiny or *O'Brien* would apply, the applicable requirements are satisfied. *See* MTD at 25.

7

supposedly "could have invoked its antidiscrimination interests to suppress the campaign to boycott apartheid South Africa." But Plaintiffs ignore that their arguments would necessarily mean the State would have been powerless to *require* that government contractors boycott apartheid South Africa (as numerous states did).[6] Nor do Plaintiffs answer the State's argument that Plaintiffs' position could effectively unravel all sanctions laws on First Amendment grounds. *See* MTD at 28-29 n.19. Plaintiffs thus never genuinely grapple with the obvious consequences of accepting their arguments.

### B. The Act Is A Valid Viewpoint-Neutral, Anti-Discrimination Statute

Plaintiffs also contend the Act is impermissible content-based or viewpoint-based regulation of speech. That argument fails as an initial matter because Plaintiffs' conduct is not inherently expressive. But even if that were otherwise, it is well-established that anti-discrimination laws "make[] no distinctions on the basis of the organization's viewpoint.'" *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987). Indeed, "[F]ederal and state antidiscrimination laws … [are] *permissible content-neutral regulation[s] of conduct*." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (emphasis added). That result follows inexorably from the fact that discrimination is banned regardless of the underlying viewpoint (*e.g.*, actual discriminatory motive or trying to curry favor with bigoted customers). *See* MTD at 24 & n.13. The Act here, for example, would apply equally to a Jewish individual originally from Israel who is boycotting Israel because he believes the Israeli governmental policy has been too soft and that Israel should never have withdrawn its occupation of Gaza.

Plaintiffs do not appear to challenge this general and deep-rooted principle of the constitutionality and viewpoint-neutrality of anti-discrimination laws. But they argue the Act should be the first anti-discrimination statute *ever* struck down as impermissibly content- or viewpoint-based because the Act "applies to boycotts of only one country." Opp. at 2. Anti-discrimination laws, however, have *never* been constitutionally suspect

---

[6] Moreover, because any such law would obviously target just one country, Plaintiffs would apparently condemn it on that basis as well. Opp. at 2.

8

for banning only certain types of discrimination. The federal government may, for example, permissibly ban discrimination against race but not height. That might conceivably be content-based regulation of discrimination, but that has *never* presented a First Amendment concern. *See*, *e.g.*, *Mitchell*, 508 U.S. at 487.

Indeed, Congress has only prohibited some *types* of age discrimination: *i.e.*, discrimination against the old but not the young. *See* 29 U.S.C. § 621. In doing so, the Act might be considered viewpoint-based: endorsing the "viewpoint" that discrimination against the old is bad but discrimination against the young is fine. But the ADEA has repeatedly survived constitutional challenge. *See*, *e.g.*, *EEOC v. Wyoming*, 460 U.S. 226 (1983). The same result should obtain here: the Act's focus on prohibiting discrimination against Israelis and not other nationalities raises no First Amendment concerns.

Even more closely on point, the statute in *FAIR* could easily be characterized as content- or viewpoint-based. It was quite obviously targeted at a single viewpoint: those opposing the military's policy of excluding gay service-members. 547 U.S. at 51. But that argument—which Plaintiffs' counsel specifically made in *FAIR*[7]—obviously did not carry the day, or even secure the vote of a *single* Justice.

**C.     The Act's Certification Requirement Does Not Mandate Speech**

Plaintiffs also now assert that the mere act of signing a certification under the Act constitutes compelled speech. Opp. at 11-17. Not so.

The act of signing a certification is merely incidental to the regulation of conduct by the Act. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity … whenever speech is a component of that activity."). *FAIR* makes that much clear: "Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly" presents a constitutional issue. 547 U.S. at 62. Plaintiffs' signature on the certification is

---

[7] *See* Brief of ACLU et. al, *FAIR*, 2005 WL 2376813, at *15 (Sept. 21, 2005) ("[T]he Solomon Amendment … regulates speech … in a viewpoint discriminatory manner.").

9

1 even more attenuated from actual speech than the "White Applicants Only" sign.

2 More generally, the government constantly and permissibly requires similar certifications. Indeed, "Innumerable federal and state regulatory programs require the disclosure of ... commercial information." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 116 (2d Cir. 2001). Individuals, for example, must file tax return that "compel" them to state their income, but that hardly makes a compelled speech claim. *Cf. Todd v. United States*, 849 F.2d 365, 370 (9th Cir. 1988). Nor do tax returns compel taxpayers to endorse the underlying tax policy, rates and equities; only to certify the statements in the tax return are truthful. So too with Plaintiffs' concern (at 16) that signing the certification "require[s] Mr. Jordahl to endorse the State's message of opposition to BDS."

Similarly, the federal and state governments regularly require recipients of public funds to certify that they do not discriminate on the basis of race, gender, etc. *See*, *e.g.*, Exec. Order No. 11,246 § 203 (1965). Such certifications neither compel any speech nor impermissibly require government contractors to endorse the government's position that discrimination should be prohibited. They merely (as here) require a certification of what conduct contractors are engaged in. Accepting Plaintiffs' arguments here could thus severely hamper governments' ability to enforce their anti-discrimination laws and to prevent public funds from being spent on companies engaged in invidious discrimination.

### D. The Act Merely Denies A Subsidy To Plaintiffs' Conduct And Is Therefore Not An Unconstitutional Condition

Even if the State could not directly prohibit boycotts against Israel, the First Amendment does not compel the State to subsidize such boycotts with public funds. Indeed, even if engaging in political boycotts were a fundamental right, "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983).

Notably, Plaintiffs' themselves admit (at 25-26 n.10) that "[f]unding conditions requiring an entity to comply with antidiscrimination laws primarily regulate unprotected conduct," and thus do not violate the First Amendment. Plaintiffs appear to contend that

| | |
|---|---|
| 1 | the Act is somehow not an "antidiscrimination law," but it plainly is.  And just as |
| 2 | requiring government contractors not to discriminate on the basis of race and gender does |
| 3 | not interfere with contractors' ability to express their views about whether such |
| 4 | discrimination is bad or good, the Act similarly does not "requir[e] contractors to |
| 5 | accommodate a government message or disavow protected expression."  Opp. at 26 n.10. |
| 6 | Plaintiffs' reliance on *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 |
| 7 | S. Ct. 2321, 2328 (2013), is misplaced.  As previously explained, the Act (unlike the |
| 8 | *Open Society* statute) does not require anyone to adopt the State's policy position as its |
| 9 | own official position; it merely restricts commercial conduct.  *See* MTD at 30.  Similarly, |
| 10 | Plaintiffs reliance on *FCC v. League of Women Voters*, 468 U.S. 364 (1984), is misplaced |
| 11 | because (1) the Act does not prevent Plaintiffs from actually speaking about *any* topic |
| 12 | (unlike *FCC*, where the government imposed a blanket ban on *all editorializing*) and (2) |
| 13 | because Plaintiffs could simply form another business entity performing Plaintiffs' non- |
| 14 | governmental contracts, which could boycott Israel.[8] |
| 15 | **IV.   THE ATTORNEY GENERAL MUST BE DISMISSED** |
| 16 | Plaintiffs notably do not offer *any* answer to the State's arguments that claims |
| 17 | asserted against Defendant Brnovich are unripe and lack Article III standing; nor that |
| 18 | Plaintiffs have not alleged any basis for liability against him.  *Compare* MTD at 33 *with* |
| 19 | Opp. at 28.  Those concessions alone mandate dismissal against the Attorney General.[9] |
| 20 | **CONCLUSION** |
| 21 | For the foregoing reasons, the State's Motion to Dismiss should be granted. |

---

[8]  Contrary to Plaintiffs' contention (at 26 n.11), "affiliate" can simply mean "subsidiary," *Webster's Third New International Dictionary* (3d ed. 1993), thus permitting Jordahl to establish a new PC for his non-governmental contracts, which would not be an "affiliate"/subsidiary of Mikkel (Mik) Jordahl, P.C.  But even if that were otherwise, this Court could sever that "affiliate" provision—and that provision alone—to the extent that it could somehow create an unconstitutional condition.

[9] The Attorney General is also immune because even the hypothetical actions he could take would not be directed against Plaintiffs.  Complaint ¶ 8.  And because *Ex parte Young* only strips state officials of immunity when the officer "acts unconstitutionally," and the Attorney General has not taken *any* relevant action, the *Ex parte Young* exception does not apply.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984).

11

Respectfully submitted this 15th day of March, 2018.

        MARK BRNOVICH
        ATTORNEY GENERAL

        By: <u>s/ Drew C. Ensign</u>
        Drew C. Ensign (No. 25463)
        Oramel H. (O.H.) Skinner (No. 32891)
        Brunn (Beau) W. Roysden III (No. 28698)
        Evan G. Daniels (No. 030624)
        Keith J. Miller (No. 29885)
        Aaron M. Duell (No. 033450)

*Attorneys for Defendant Mark Brnovich in his official capacity as Attorney General and Proposed Intervenor-Defendant State of Arizona*

# CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of March, 2018, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Kathleen E. Brody
Darrell L. Hill
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
kbrody@acluaz.org
dhill@acluaz.org

Brian Hauss
Vera Eidelman
Ben Wizner
Speech, Privacy & Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org
bwizner@aclu.org
ACLU Foundation

 s/ Drew C. Ensign
*Attorneys for Defendant Mark Brnovich in his official capacity as Attorney General and Proposed Intervenor-Defendant State of Arizona*