**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Mikkel Jordahl, et al.,

              Plaintiffs,

v.

Mark Brnovich, et al.,

              Defendants.

No. CV-17-08263-PCT-DJH

**ORDER**

## INTRODUCTION

In 2016, Arizona joined a growing number of states that enacted legislation "aimed at divesting state funding from companies that engage in a boycott of Israel." AZ S.F. Sheet, 2016 Reg. Sess. H.B. 2617. Arizona's House Bill 2617 was codified at Arizona Revised Statute § 35-393.01, and states in subsection (A) that:

> A public entity may not enter into a contract with a company to acquire or dispose of services, supplies, information technology or construction unless the contract includes a written certification that the company is not currently engaged in, and agrees for the duration of the contract to not engage in, a boycott of Israel.

A.R.S. § 35-393.01(A) (hereafter, "Certification Requirement" or "the Act").[1]   The Act

---

[1] Subsection (B) separately prohibits public entities from "adopt[ing] a procurement, investment or other policy that has the effect of inducing or requiring a person or company to boycott Israel." A.R.S. § 35-393.01(B). Although Plaintiffs seek to enjoin A.R.S. § 35-393.01, the facts presented by Plaintiffs, as well as the arguments they have advanced, show that A.R.S. § 35-393.01(B) has no applicability here. (*See also* Doc. 20, First Amended Complaint ("FAC") (omitting any reference to A.R.S. § 35-393.01(B))). Accordingly, this Order will not address the constitutionality or enforceability of that subsection.

defines "boycott" as:

> …engaging in a refusal to deal, terminating business activities or performing other actions that are intended to limit commercial relations with Israel or with persons or entities doing business in Israel or in territories controlled by Israel, if those actions are taken either:
>
> (a) In compliance with or adherence to calls for a boycott of Israel other than those boycotts to which 50 United States Code § 4607(c) applies.[2]
>
> (b) In a matter that discriminates on the basis of nationality, national origin or religion and that is not based on a valid business reason.[3]

A.R.S. § 35-393(1).

Plaintiff Mikkel Jordahl ("Mr. Jordahl") is an attorney and sole owner of Plaintiff Mikkel (Mik) Jordahl, P.C. ("the Firm") (collectively, "Plaintiffs"). Mr. Jordahl personally participates in a boycott of consumer goods and services offered by businesses supporting Israel's occupation of the Palestinian territories. In doing so, Mr. Jordahl claims that he is moved by the Peace Not Walls campaign promoted by the Evangelical Lutheran Church in America ("ELCA"). The ELCA calls on "individuals to invest in Palestinian products to build their economy and to utilize selective purchasing to avoid buying products made in illegal Israeli settlements built on Palestinian land."[4] Mr. Jordahl is also a non-Jewish member of Jewish Voice for Peace ("JVP"), which "endorses the call from Palestinian civil society for Boycott, Divestment, and Sanctions campaigns to protest the Israeli government's occupation of Palestinian territories."

---

[2] 50 U.S.C. §4607(a)(1) is part of the Export Administration Act ("EAA"), which prohibits "any United States person, with respect to his activities in the interstate or foreign commerce of the United States, from taking or knowingly agreeing to take [certain enumerated actions] with intent to comply with, further, or support any boycott fostered or imposed by a foreign country against a country which is friendly to the United States and which is not itself the object of any form of boycott pursuant to United States law or regulation." Subsection 4607(c) states that this prohibition shall preempt any state law that "pertains to participation in, compliance with, implementation of, or the furnishing of information regarding restrictive trade practices or boycotts fostered or imposed by foreign countries against other countries." *Id.*

[3] The parties seem to agree that this subsection does not apply to Plaintiffs' desired boycotting activities. (*See* Doc. 28 at 13 and Doc. 39 at 22).

[4] Evangelical Lutheran Church in America, *Peace Not Walls*, https://www.elca.org/Our-Work/Publicly-Engaged-Church/Peace-Not-Walls (last visited Sept. 27, 2018).

(Doc. 6 at 4).  Mr. Jordahl would like the Firm to participate in his boycott of "all businesses operating in Israeli settlements in the occupied Palestinian territories." (Doc. 57 at 6:6-7).  He would also like his Firm "to be able to associate and provide financial resources and legal resources to Jewish Voice for Peace."  (*Id*. at 6:8-10).

For the past twelve years, Mr. Jordahl's firm has contracted with the Coconino County Jail District ("the County") to provide legal advice to incarcerated individuals.  In 2016, following the passage of A.R.S. § 35-393.01, the County asked Mr. Jordahl to execute a written certification, on the Firm's behalf, that the Firm "is not currently engaged in a boycott of Israel," that "no wholly owned subsidiaries, majority-owned subsidiaries, parent companies, or affiliates" of the Firm are "engaged in a boycott of Israel," and that neither the Firm nor any of the above-mentioned associated entities would "engage in a boycott of Israel" for the duration of the contract agreement.  (Doc. 6-1, Ex. 1).  The requested certification went on to state that "Any violation of this Certification by the Independent Contractor shall constitute an event of material breach of the Agreement." (*Id*.)  Mr. Jordahl signed the 2016 certification under protest ("2016 Certification"), and sought confirmation with the County that the certification would not apply to his personal consumer decisions.  (Doc. 6-1 at Exs. 1 & 2).  The County did not respond to his inquiry but paid the Firm for its services during that year.  During the contract year, Mr. Jordahl claims that he turned down opportunities for his Firm to provide administrative and pro bono services to organizations like JVP and he personally refrained from speaking out vocally about his personal boycott participation for fear that it might cast suspicion that his Firm was engaging in activity prohibited under the 2016 Certification. (Doc. 6-1 at 4-6).

The Firm's contract with the County came up for renewal in 2017, and the County again asked Mr. Jordahl to sign the required certification ("the 2017 Certification"), which by that time had been approved by the County's Jail Board of Directors.  (Doc. 6 at 10; Doc. 6-1 at Ex. 5).  The 2017 Certification was substantially unchanged from the 2016 Certification.  This time, Mr. Jordahl refused to sign.  (Doc. 6-1 at 5-6).

Notwithstanding his refusal to sign, the Firm has continued to provide representative services to the County under the contract; the County, however, has not paid the Firm for those services.  Mr. Jordahl fears that he will lose approximately 10% of his total income if his Firm loses its contract with the County as a result of his refusal to sign the 2017 Certification.

In their Amended Complaint, Plaintiffs allege that section 35-393.01 violates the First and Fourteenth Amendments because it requires the Firm and other government contractors to disavow their participation in political boycotts or risk forfeiting the opportunity to work for the government.  (Doc. 21 ¶ 1).  Plaintiffs brought suit against the Arizona Attorney General ("the Attorney General"), the Coconino County Sheriff ("the Sheriff"), and various members of the Coconino County Jail District Board of Directors ("the Board") in their official capacities (collectively, "the Defendants").  (*Id.*)  Thereafter, the parties consented to, and the Court granted, the State of Arizona's ("the State") request to intervene for the purpose of defending the facial constitutionality of the Act.  (Docs. 24 & 48).

Plaintiffs have moved for a preliminary injunction in which they seek to have the Court enjoin Defendants from enforcing the Certification Requirement in A.R.S. § 35-393.01, or alternatively to enjoin Defendants from enforcing the Certification Requirement against them.  (Doc. 6 at 1).  Defendants oppose Plaintiffs' motion for injunctive relief and contend that Plaintiffs are unlikely to succeed on the merits and that their alleged injuries are insufficient to justify injunctive relief.  (Doc. 28 at 37).  The State, joined by the Attorney General ("Defendants" or "the State"), has also moved to dismiss Plaintiffs' complaint. (Doc. 28).  In doing so, Defendants challenge Plaintiffs' standing and argue that to the extent the Act applies to Plaintiffs' conduct, the Court should abstain or certify the question of the scope of the Act to the Arizona Supreme Court.  (*Id.*) Citing state sovereign immunity, standing, and ripeness issues, Defendants specifically seek to dismiss the Attorney General from the case.  (*Id.* at 32-33).

The Court held oral argument on these issues on May 23, 2018. (Doc. 50).  The

parties continued to file documents with the Court after this hearing, including Plaintiffs' Notice that the State had misstated Arizona law during oral argument regarding the Attorney General's authority to offer opinions on the meaning of Arizona law (Doc. 58); Plaintiffs' Notice that Plaintiffs' counsel had misattributed a fact to the wrong authority during their oral argument (Doc. 59); and the State's Notice of Supplemental Authority regarding updates (1) to an Arizona Agency Handbook providing interpretative guidance on A.R.S. § 35-393 and (2) on *Koontz v. Watson*, 2018WL 617894 (D. Kan. Jan. 30, 2018), a case relied upon by Plaintiffs, which since oral argument has been voluntary dismissed as a result of a settlement (Doc. 61).   Defendants responded to Plaintiff's notice of misstatement (Doc. 60) and Plaintiffs have responded to the State's supplemental authority (Doc. 62).  The Court has considered these filings in its decision, and where necessary, has addressed them below.

## DISCUSSION

The Court will first resolve the issues and concerns related to Plaintiffs' standing and the Court's retention of this case.  The Court will then turn to the merits of Plaintiffs' Motion for Preliminary Injunction and ascertain whether Plaintiffs have met their burden of showing that the Certification Requirement runs afoul of First Amendment protections afforded to Arizona companies wishing to engage in "boycott[s] of Israel", as that term is defined in the Act.

**I.      Standing**

In moving to dismiss the Plaintiffs' First Amended Complaint, the State argues that Plaintiffs do not have standing to challenge the constitutionality of the Act because their desired conduct is not covered by its terms.  Defendants also contend that Plaintiffs do not have standing to sue the Attorney General because he has not enforced the Act, and does not have the authority to do so.  Because a party that lacks standing divests the court of jurisdiction to hear the case, the Court will address the standing inquiries at the threshold. *See e.g., Fleck v. Assocs., Inc. v. City of Phoenix,* 471 F.3d 1100, 1107 n. 4 (9th Cir. 2006) (noting that "no matter how important the issue, a court lacking

jurisdiction is powerless to reach the merits under Article III of the Constitution"); *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992) ("If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case").

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction.  A Rule 12(b)(1) challenge may be either facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Article III of the Constitution limits federal court jurisdiction to "cases" and "controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992).  To establish Article III standing, Plaintiffs must demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  *Accord Lujan*, 504 U.S. at 560-61.  Because the court's role is "neither to issue advisory opinions nor to declare rights in hypothetical cases," the case or controversy standard also requires that a claim be ripe for review.  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) ("The constitutional component of the ripeness inquiry is often treated under the rubric of standing…").

A plaintiff must prove standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Ordinarily, "'[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). Here, however, Plaintiffs are also moving for a preliminary injunction, and as such, they must make "a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013).  *See also Lopez,* 630 F.3d at 785 ("[A]t the preliminary

injunction stage, a plaintiff must make a 'clear showing' of his injury in fact") (internal citation omitted).

### A. Plaintiffs Have Standing to Challenge the Constitutionality of the Act

The State first argues that Plaintiffs have no standing to challenge the constitutionality of the Certification Requirement because the conduct that Plaintiffs say they desire to engage in "does not fall within the narrow scope of the Act" and as a result, they "will suffer no irreparable injury absent an injunction." (Doc. 28 at 8). As far as the Court can tell, the State seems to think Plaintiffs are only harmed if they actually breach the contract by engaging in the prohibited activity. Thus, because Plaintiffs have not engaged in activity that falls within the statutory definition, Defendants say Plaintiffs cannot establish they have been injured by the Certification Requirement.

The Court first notes that "[s]tanding, or the lack of it, may be intertwined with whether the complaint states a claim upon which relief can be granted, but it is not the same thing. Standing is not about who wins the lawsuit; it is about who is allowed to have their case heard in court." *Catholic League for Religious and Civil Rights v. City and Cnty. of San. Fran.*, 624 F.3d 1043, 1048 (9th Cir. 2010). "'At bottom, the gist of the question of standing is whether petitioners have such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Id.* (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 517 (2007)) (internal citation omitted).

Because sweeping restrictions on speech can have chilling effects on lawfully protected speech, "the Supreme Court has dispensed with rigid standing requirements" in First Amendment cases. *Cal. Pro–Life Council Inc. v. Getman,* 328 F.3d 1088, 1094 (9th Cir. 2003) ("*CPLC-I*"). *See also Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (First Amendment cases "present unique standing considerations"). For standing purposes, "[o]ne does not have to await the consummation of threatened injury to obtain preventative relief." *Bayless*, 320 F.3d at 1006. Plaintiffs alleging a violation of a First Amendment right must only show "a realistic danger of

sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* (internal quotation marks omitted) (noting that the "Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences") (citing *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965). *See also LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000) ("[w]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing").

The State's characterization of Plaintiffs' injury-in-fact presumes that Plaintiffs are only harmed if the Firm breaches its contract with the County by engaging in the conduct proscribed by the Act. The Court finds that the focus of the State's argument is misplaced, at least for purposes of standing. The Firm has been injured in at least two ways that suffice for standing to sue: one, when it was required to promise from refrain to engaging in arguably constitutionally protected activity; and two, when the County stopped paying it for services rendered.

First, the Firm was injured when it was asked to promise to refrain from engaging in a broad swath of boycotting activities, at least some of which is protected under the First Amendment, in exchange for receiving a government contract. The Supreme Court has made clear that corporations and other associations do not lose their First Amendment protections simply because they are not natural persons. *Citizens United v. FEC*, 558 U.S. 310, 342 (2010). Defendants cannot dispute that as a "company" under A.R.S. § 35-393(2), the Certification Requirement applies to the Firm; after all, the County has twice asked Mr. Jordahl, on behalf of the Firm, to sign the Certification Requirement in order to receive the benefits of the County contracts. The substance of the Certifications required the Firm to promise to refrain from a "course of conduct arguably affected with a constitutional interest," or risk forfeiting a profitable government contract. *LSO, Ltd.*, 205 F.3d at 1154-55 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). *See also Alliance for Open Soc. Intern., Inc. v. U.S. Agency for Intern. Dev.*, 570 F. Supp. 2d 533 (S.D.N.Y. 2008) (finding the "fact that []

members are required to speak the Government's message in exchange for [the Government's] subsidy is a sufficient injury-in-fact for their compelled speech claim"). Mr. Jordahl has established that were it not for the Certification Requirement, he would extend his boycott participation to his Firm's consumer choices.  (Doc. 6-1 ¶ 24).  For example, he would "refuse to purchase Hewlett Packard equipment for [the Firm] because of Hewlett Packard's provision of information technology services used by Israeli checkpoints throughout the West Bank." (*Id.*)  He would further like his Firm to provide administrative, financial, and pro bono legal services to organizations like JVP that "employ[] boycott, divestment, and sanctions tactics to put political pressure on Israel" but has not done so because he believes these actions will run afoul of the Certification.  (*Id.* ¶ 25-6).  The Firm thus sustained injuries-in-fact when the County conditioned the Firm's contracts on a promise to refrain from engaging in this protected course of conduct and the Firm refrained from engaging in such actions for fear of breaching the contract.

Moreover, when Mr. Jordahl refused to sign the 2017 Certification on behalf of the Firm, the County stopped paying the Firm for its services.  In this regard, the Firm has not only experienced "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," it has actually sustained injury: it is not getting paid for services rendered due to its refusal to sign the certification.  *Bayless*, 320 F.2d at 1006.  The Firm has clearly shown it has standing to challenge the constitutionality of the Act.

Defendants also assert that Mr. Jordahl cannot establish injury for standing purposes because the Certification Requirement does not apply to Mr. Jordahl personally, and even if it did, the activities he wishes to engage in do not constitute a "boycott of Israel" as that term is defined in the Act.  The Court finds, however, that Mr. Jordahl has sufficiently established his personal stake in the outcome of this controversy to challenge the constitutionality of the Certification Requirement.  Although Mr. Jordahl is not a "company" under the Act, as the sole lawyer in a Firm that *is* required to sign the

Certification to obtain the County contract, he has sufficiently established that his personal conduct, at least some of which would be prohibited by the Act, has been impermissibly chilled for fear that it may be confused with the Firm's conduct.  For example, Mr. Jordahl has averred that in response to calls from JVP, the ELCA, and other "Boycott Divestment and Sanction" organizations, he has ceased purchasing products from Hewlett-Packard, Airbnb, and SodaStream, all which are companies that are "doing business…in territories controlled by Israel." § 35-393.01(A).  He says he has ceased some of these political activities for fear that they may be confused with those of his Firm's.  Where a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a "constitutionally sufficient injury" as long as it is based on "an actual and well-founded fear" that the challenged statute will be enforced.  *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010); *CPLC–I*, 328 F.3d at 1093, 1095.  *See also Bayless*, 320 F.3d at 1006 (finding that an entity that was "forced to modify its speech and behavior to comply with the statute" had suffered injury even though it had "neither violated the statute nor been subject to penalties for doing so").  Relatedly, the fact that Mr. Jordahl has to affirmatively certify that his Firm is not participating in such activities is also sufficient injury for standing purposes.   Requiring such an avowal undermines the expressive nature of collective political boycotts by chilling Plaintiffs' ability to join in larger calls for political change. The harm stemming from these chilling effects is sufficient injury for standing purposes.

Plaintiffs' injuries are plainly traceable to the Certification Requirement and would be alieved if the Act was found constitutionally unenforceable.  *Spokeo*, 136 S. Ct. at 1547.  Plaintiffs thus have standing to challenge the constitutionality of the Act.

### B.  Plaintiffs' Standing to Sue the Attorney General

The State and the Attorney General have also moved to dismiss Plaintiffs' claim against the Attorney General on the grounds that he has not acted to enforce the Act and thus that no alleged injury can be attributed to him.  They contend that the lack of

sufficient connection between Plaintiffs' injuries and the Attorney General's conduct render him an improper party under principles of standing and sovereign immunity.

The Ninth Circuit has noted how issues related to a plaintiff's standing overlap with issues related to a state official's immunity from suit. Whether a state official, acting in his official capacity, is a proper defendant to an action is

> really the common denominator of two separate inquiries: first, there is the requisite causal connection between their responsibilities and any injury that the plaintiffs *might* suffer, such that relief against the defendants would provide redress [i.e., Article III standing], and second, whether [ ] jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*, 209 U.S. 123 [] (1908), which requires "some connection" between a named state officer and enforcement of a challenged state law.

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004) (citations omitted) (emphasis added). *See also Okpalobi v. Foster*, 190 F.3d 337, 347 (5th Cir. 1999) (observing that Article III standing and Eleventh Amendment immunity present "a closely related – indeed, overlapping – inquiry").

Causation for Article III standing requires that "the injury [] be fairly…traceable to the challenged action of the defendant, and not…the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. The "line of causation" between a defendant's actions and a plaintiff's alleged harm must be more than "attenuated." *Allen v. Wright*, 468 U.S. 737, 757 (1984).

As stated in *Wasden*, courts determining whether an exception to the Eleventh Amendment applies in a given case assess causality – "the common denominator" – in a very similar manner. Typically, the Eleventh Amendment bars federal court lawsuits against a state "by Citizens of another State, or by Citizens or Subjects of any Foreign State," without the state's consent. U.S. Const. amend. XI. State agencies such as the Attorney General's Office fall within the protection of the Eleventh Amendment because a suit against that office is considered a suit against the State itself. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). There are, however, several exceptions to the protection of sovereign immunity. Sovereign immunity does not apply, for one, when

lawsuits are brought against state officers in their official capacities for an injunction prohibiting future violations of federal law.  *Ex parte Young*, 209 U.S. 123 (1908). "Official-capacity actions for prospective relief are not treated as actions against the State" for purposes of the Eleventh Amendment because state officers do not have the authority to violate the Constitution of the United States.  *Will*, 491 U.S. at 71 n.10 (internal quotations omitted); Erwin Chemerinsky, *Federal Jurisdiction*, § 7.5 (6th ed. 2012).

But the *Ex parte Young* exception does not apply to all state officers. To enjoin the enforcement of an allegedly unconstitutional statute, the officer named in the suit "must have some connection with the enforcement of the act."  209 U.S. at 157.  Moreover, the connection between the officer and the act "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)); *Sweat v. Hull*, 200 F. Supp. 2d 1162, 1167 (D. Ariz. 2001).

Plaintiffs have sued Mark Brnovich in his official capacity as the Arizona Attorney General.  They allege that Mr. Brnovich is the chief law enforcement officer of Arizona under A.R.S. § 41-192(A).  They further allege that under A.R.S. § 41-194.01, he has the authority to investigate, at the request of a state legislator, whether county actions violate state law; to initiate legal proceedings if he concludes that a county's actions do or may violate state law; and to notify the Arizona State Treasurer of his conclusions so that the Treasurer will withhold and redistribute state shared monies. They also allege that under A.R.S. § 41-193(A)(2), Mr. Brnovich has the authority to prosecute public officials and others for misappropriation of public monies.

The Arizona Attorney General is not directly responsible for enforcement of the Act, a fact that Plaintiffs acknowledge.  But the lack of direct enforcement authority does not necessarily mean that the Attorney General's authority is unconnected to Plaintiffs'

failure to be paid for their services, or the self-censorship Plaintiffs impose on their conduct.  Courts have found a requisite connection for purposes of both standing and application of *Ex parte Young* not only where the law has specifically granted the defendant enforcement authority*, see, e.g., Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013), but also when there is a sufficient connection between the official's responsibilities and the injury that Plaintiffs might suffer, *see e.g., Wasden*, 376 F.3d at 919-20.  Indeed, the Attorney General's conduct need not be the first or final step "in the chain of causation" in order to be fairly traceable to the enforcement of the Act from which Plaintiffs' injuries arise.  *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997).  *See also Maya*, 658 F.3d at 1070 ("A causal chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le].'") (*quoting Nat'l Audubon Soc*., 307 F.3d at 849). Notably, the Supreme Court has found sufficient connection where an "injury [is] produced by [the official's] determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169 (holding that although Fish and Wildlife Service's opinion statement to action agency was theoretically advisory, "in reality," it held "a powerful coercive effect" on agency's decision because disregarding it could expose the agency to civil and criminal penalties).

Sufficient causality exists here for both Article III standing purposes and *Ex Parte Young*. Specifically, a sufficient connection exists between the Attorney General's authority to prosecute persons illegally paying public contractors and Plaintiffs' injuries. *See* A.R.S. § 41-193(A)(2). Pursuant to A.R.S. § 35-301(1), the Attorney General is authorized to prosecute custodians of public funds who pay public funds to another person "[w]ithout authority of law."  At the same time, the Act makes it unlawful for any public entity to enter into a contract for services unless the contracting company certifies that it is not and will not engage in a boycott of Israel.  A.R.S. § 35-393.01.  The County's decision to pay or not pay its government contractors is necessarily guided and determined in large part on whether that payment is authorized; if the payment is not

1    authorized, but is nonetheless made, the Attorney General can prosecute the custodian of

2    those funds.  This authority to prosecute custodians of public funds for payment made in

3    violation of the law imposes "a powerful coercive effect" on the County and entities

4    charged with directly enforcing the Certification Requirement.  *Bennett*, 520 U.S. at 169.

5    Indeed, the County has ceased paying the Firm out of public funds presumably because to

6    do so would expose it to prosecution under § 35-301(1).

7         The Attorney General's authority, together with the actions of the County, form a

8    clear and plausible causal chain resulting in Plaintiffs' alleged constitutional injuries.

9    The Attorney General is therefore a proper party to this suit and will not be dismissed for

10   want of standing.  Likewise, principles of sovereign immunity do not bar Plaintiffs' claim

11   for injunctive relief against the Attorney General.  The State's Motion to Dismiss the

12   Attorney General from this action is therefore denied.

13   **II.    Abstention and Certification**

14        Defendants next argue that given the lack of interpretative law on this recent state

15   legislation, the Court should abstain from hearing this case or alternatively, "certify the

16   legal question of the scope of the Act to the Arizona Supreme Court." (Doc. 28 at 14).

17        In order to avoid conflict with a state's legislature and the laws it enacts, federal

18   cases raising constitutional issues sometimes warrant federal court abstention under the

19   *Pullman* doctrine.  *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 498 (1941)

20   ("*Pullman*"); *San Remo Hotel v. City & Cty. of San Francisco*, 145 F.3d 1095, 1105 (9th

21   Cir. 1998).  In order for a court to abstain from adjudicating a matter under *Pullman*,

22   three requirements need to be met.  Specifically, a court must find that:

> (1) the case touches on a sensitive area of social policy upon which the
> federal courts ought not enter unless no alternative to its adjudication is
> open, (2) constitutional adjudication plainly can be avoided if a definite
> ruling on the state issue would terminate the controversy, and (3) the proper
> resolution of the possible determinative issue of state law is uncertain.

27   *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003) (internal alteration and quotation

28   marks omitted) (referencing *Pullman*, 312 U.S at 498).  A district court only has

discretion to abstain under *Pullman* if all three of these requirements are met.   Indeed, so as to "give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims," courts have held that the doctrine should rarely apply. *Porter*, 319 F.3d at 492 (quoting *Zwickler v. Koota*, 389 U.S. 241, 248 (1967)). Notably, the Ninth Circuit has stated that *Pullman* abstention is almost never appropriate in First Amendment cases "because the guarantee of free expression is always an area of particular federal concern." *Ripplinger v. Collins*, 868 F.2d 1043, 1048 (9th Cir. 1989).[5]

Unlike abstention, which entails a full round of litigation in the state court system before a plaintiff can resume proceedings in federal court, the certification process authorized by Arizona's statute enables a federal court to pose a question directly to the state's highest court. *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1973) (certification of novel or unsettled questions of state law may help save a federal court "time, energy, and resources and hel[p] build a cooperative judicial federalism").   To warrant certification, "[i]t is sufficient that the statute is susceptible of…an interpretation [that] would avoid or substantially modify the federal constitutional challenge to the statute." *Belloti v. Baird*, 428 U.S. 132, 148 (1976).

With regard to abstention, the Court finds that at least two of the requisite *Pullman* factors are not present, making abstention under that doctrine improper.   This case squarely raises important questions surrounding First Amendment guarantees – "an area of particular federal concern" – that are not overridden by any sensitive area of social policy inappropriate for this Court.   *Id.*   The first requirement is therefore not met.   The second requirement is also not met because Defendants have failed to show how a dispositive ruling on a "state issue" would avoid the need for constitutional adjudication. Defendants suggest that a state court ruling on the scope of what constitutes a "boycott of Israel" would resolve the need to reach the constitutional question.   Defendants interpret "the Act's requirement not to engage in a 'boycott of Israel' to mean that the boycott is

---

[5] The only First Amendment case in which the Ninth Circuit has ever held that a district court properly invoked *Pullman* abstention "was procedurally aberrational." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 784 (9th Cir. 2014) (referencing *Almodovar v. Reiner*, 832 F.2d 1138 (9th Cir. 1987)).

1   actually a general boycott of Israel—i.e., a broad or total boycott of Israel such as those

2   called for by the Boycott, Divest and Sanctions ('BDS') movement, to which the Act is

3   squarely addressed."  (Doc. 28 at 7).  They similarly contend that certification of this

4   proposed scope of the phrase "boycott of Israel" to the Arizona Supreme Court would

5   avoid or substantially modify the First Amendment concerns raised by Plaintiffs.

6       Defendants' proposed limiting construction of "boycott of Israel" does not,

7   however, resolve the constitutionality of the Certification Requirement.  As an initial

8   matter, the proposed construction is contrary to the plain language of the Act.  Courts

9   should not apply limiting constructions when the proposed construction is "contrary to

10  the plain language of the statute."  *Valle Del Sol v. Whiting*, 709 F.3d 808, n.3 (9th Cir.

11  2013) (citing *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 575

12  (1987) (refusing to adopt a limiting construction because "the words of the resolution

13  simply leave no room for a narrowing construction")).  Under Defendants' interpretation,

14  while adhering to a call to boycott Israel, a contracting company that refused to deal with

15  another company that does business in Israel would *not* be in violation of 35-393.01

16  because such conduct would not be a "general boycott of Israel."  This construction is

17  belied by the plain language in § 35-393(1), which defines "boycott" to include actions

18  against not only the country of Israel, but also of "persons or entities doing business in

19  Israel or in territories controlled by Israel."  A.R.S. § 35-393(1). [6]

---

[6] Even under the Defendants' proposed meaning of "boycott of Israel", it remains unclear what a "broad or total boycott of Israel such as those called for the Boycott, Divest and Sanctions ("BDS") movement" constitutes.  Although the Court does not find that the Act is unconstitutionally vague – the Act, after all, unambiguously defines "boycott" to include conduct other than just a "total boycott of Israel" – the Court notes that the vagueness inherent in the Defendants' proposed interpretation of "boycott of Israel" heightens, not lessens, the risk that protected conduct will be chilled, a factor that weighs against abstention. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) ("Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms") (internal quotations and alterations omitted) (citations omitted).  Even assuming that the recently amended Arizona Agency Handbook ("Handbook") that was submitted with the State's Notice of Supplemental Authority  (Doc. 61-1) has any binding or authoritative value, the same is true with regard to the purportedly clarifying interpretations of "boycott of Israel" therein. (*See* Doc. 61-1 at 5.4.18 (stating, in part, that "A boycott is not a "boycott of Israel" if it targets multiple countries and does not principally target Israel or those doing business with them [sic].")).

1       Moreover, while interpretive guidance on the scope of "boycott of Israel" may
2   help courts (and companies wishing to contract with a public entity in Arizona) determine
3   whether certain activities constitute a breach of an avowal to refrain from the conduct
4   prohibited by the Act, such an interpretation would not resolve the question of whether
5   the Act's Certification Requirement unconstitutionally imposes a condition on receipt of
6   a government contract.    Indeed, this position presupposes that Arizona can
7   constitutionally condition a company's right to engage in "a general boycott of Israel"
8   that is taken in response to a larger call for such action on receipt of any public contract.
9   But as the Court discusses *infra*, to justify such a broad restriction, regulation of activity
10  that infringes on expressive boycotting activities must be "necessary" to the "actual
11  operation of the government."   *U.S. v. Nat'l Treasury Employees Union*, 513 U.S. 454,
12  469 (1995) (hereafter, "*Nat'l Treasury*").   Defendants have failed to show that the
13  government has such an interest here.   Thus, the constitutional question would not be
14  obviated even under Defendants' proposed interpretation of "boycott of Israel."

15      In sum, this case fails at least two of *Pullman's* requirements. This Court therefore
16  lacks the discretion to abstain and the State's request for the same is denied.  For similar
17  reasons, Defendants' request to certify a question to the Arizona Supreme Court pursuant
18  to A.R.S. § 12-8161 regarding the scope of "boycott of Israel" is also denied.

19      Having satisfied itself that this case is justiciable and abstention or certification to
20  the Arizona Supreme Court would be improper, the Court will now turn to the merits of
21  Plaintiffs' motion for injunctive relief.

## III.    Plaintiffs' Motion for Preliminary Injunction

23      A preliminary injunction "is an extraordinary and drastic remedy, one that should
24  not be granted unless the movant, by a clear showing, carries the burden of persuasion."
25  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright,
26  A. Miller, & M. Kane, Federal Practice and Procedure § 2948, 129–130 (2d ed. 1995)).
27  An injunction may be granted when the movant shows that "'he is likely to succeed on
28  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  In this circuit, a preliminary injunction may also be issued when a plaintiff shows that "'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)). The movant has the burden of proof on each element of the test. *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

### A. Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed in showing that the Certification Requirement unconstitutionally infringes on their First Amendment rights.  In doing so, Plaintiffs contend that the Certification Requirement is an unconstitutional condition, is viewpoint and content discriminatory, and impermissibly compels protected speech. They further contend that the Certification Requirement is not justified by sufficiently legitimate government interests.  Defendants argue that the activity that Plaintiffs wish to engage in is unexpressive commercial conduct that is not protected by the First Amendment, and that to the extent such conduct is protected, it is more than justified by the State's interest in regulating its "commercial activity to align commerce in the State with the State's policy objectives and values" as well as its interest in preventing discrimination on the basis of national origin.  (Doc. 28 at 22-24).  Accordingly, Defendants contend that "Plaintiffs are not likely to prevail on the merits and their Complaint should be dismissed." (Doc. 28 at 15).

The First Amendment, made applicable to the States by the Fourteenth Amendment, provides that "Congress shall make no law…abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. "The First Amendment protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976); *Roberts v. U.S. Jaycees*, 468 U.S.

609, 622 (1984) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed.").  "The right to eschew association for expressive purposes is likewise protected." *Janus v. Am. Fed'n. of State, Cnty., and Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) (citing *Roberts*, 468 U.S. at 623); *see also Pacific Gas & Elec. Co. v Public Utilities Com'n of California*, 475 U.S. 1, 12 (1986) ("[F]orced associations that burden protected speech are impermissible").  Broad prohibitions of expressive activity on government employees that are not necessary to the operation of their service are also impermissible under the First Amendment.  *Nat'l Treasury*, 513 U.S. at 469.

As the Supreme Court has observed, "[i]t is fundamental that the First Amendment was fashioned to assure an unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (internal quotations omitted); *c.f. United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943) (noting that the interest protected by the First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection").  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994).  *See also Knox v. Service Employees*, 132 S.Ct. 2277, 2288 (2012) ("The government may not…compel the endorsement of ideas that it approves.").  Indeed, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein." *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

Plaintiffs advance various theories as to why the Certification Requirement is

unconstitutional under the First Amendment.[7]   The Court finds, however, that Plaintiffs would at least be able to meet their burden of showing that the Certification Requirement is an unconstitutional condition on government contractors.   In reaching this conclusion, the Court will first discuss why the conduct implicated by the terms of the Act encompasses expressive activity that is protected under the First Amendment. The Court will then provide some background on the unconditional conditions doctrine in the context of government employment.   Finally, the Court will explain why the State's proffered interests do not justify the infringement the Certification Requirement imposes on such expressive conduct.

### 1.      The Act Burdens Expressive Conduct Protected by the First Amendment

Defendants argue that the Supreme Court's decision in *Int'l Longshoremen's Association, AFL-CIO v. Allied International, Inc.*, and the Seventh Circuit's decision in *Briggs & Stratton Corp. v. Baldrige* foreclose Plaintiffs' claims because they establish that economic boycotts are not protected under the First Amendment.   456 U.S. 212 (1982); 728 F.2d 915 (7th Cir. 1984).   Alternatively, Defendants argue that a "boycott of Israel" should not be protected because banning such activity only prohibits non-expressive commercial conduct.

#### a.      *Int'l   Longshoremen's   Association,   AFL-CIO   v.   Allied International, Inc.*, 456 U.S. 212 (1982)

Defendants first contend that Plaintiffs cannot prevail on the merits of their claim because any alleged First Amendment right to engage in an economic boycott is foreclosed by the Supreme Court's decision in *Int'l Longshoremen*.   In *Int'l Longshoremen*, the Supreme Court found that a labor organization's politically-motivated boycott of goods from the Soviet Union was an illegal secondary boycott under section 8(b)(4)(B) of the National Labor Relations Act ("NLRA").   *Id.*   In so finding, the Court

---

[7] "First Amendment doctrines are manifold, and their diverse facts and analyses may reveal but one consistent truth with respect to the amendment—each case is decided on its own merits." *Bishop v. Aronov*, 926 F.2d 1066, 1070 (11th Cir. 1991), cert. denied, 505 U.S. 1218 (1992).

rejected the union's argument that section 8(b)(4)(B) unlawfully infringed on its First Amendment right to engage in a politically-motivated, secondary boycott of Russian goods.  *Id.* at 226 (noting also that the Court has "consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment").  Finding that "labor laws reflect a careful balancing of interests," the Court reasoned that the NLRA's prohibition against secondary boycotts was intended both to prevent imposing heavy financial burdens on neutral employers and the "widening of industrial strife."  *Id.* at 223, 227.

Defendants overstate the meaning of *Int'l Longshoreman*, which was decided in the context of federal labor laws.  *Int'l Longshoreman* does not purport to state that there is no constitutional right to engage in boycotting activities.  It does, however, highlight the context in which this type of governmental infringement on the First Amendment rights of labor unions and their members is justified. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982) ("Secondary boycotts and picketing by labor union may be prohibited, as part of Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.") (internal quote omitted). Outside of the labor union context, however, the government has a much higher burden when it infringes on such activity.  Indeed, only a few months after *Longshoreman* was decided, the Supreme Court in *Claiborne* expressly found that non-union boycotting activities aimed "to bring about political, social and economic change" were protected activities under the First Amendment.  *Claiborne*, 458 U.S. at 907.

In *Claiborne*, civil rights activists called for a boycott of all white merchants in Claiborne County, Mississippi.  *Id.* at 900.  Several years later, those merchants filed suit in state court seeking to enjoin future boycott activities and to recover for the losses they had previously sustained.  *Id.* at 889.  In assessing whether the petitioners' boycotting activities were protected speech under the First Amendment, the Court looked at how and why the boycott originated, and the means by which it was supported.  The Court noted

that:

> The boycott was launched at a meeting of a local branch of the NAACP attended by several hundred persons.  Its acknowledged purpose was to secure compliance by both civil and business leaders with a lengthy list of demands for equality and racial justice.  The boycott was supported by speeches and nonviolent picketing.  Participants repeatedly encouraged others to join its cause.

*Id*. at 906.  The Court found that each "element[] of the boycott [was] a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendment."  *Id*.  In so finding, the Court reasoned that "'the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process.'" *Id.* at 907 (citing *Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981) (recognizing that "by collective effort individuals can make their views known, when individually, their voices would be faint or lost")).

*Claiborne* stands for the proposition that collective boycotting activities undertaken to achieve social, political or economic ends is conduct that is protected by the First Amendment.  *See also NAACP v. Alabama*, 357 U.S. 449 (1959) (recognizing that the freedom of speech embraces the "freedom to engage in association for the advancement of beliefs and ideas").  Thus, the question for this Court is whether the Arizona legislature has infringed upon or restricted these types of boycotting activities.

The Arizona legislature has defined "boycott" to mean "engaging in a refusal to deal, terminating business activities or performing *other actions* that are intended to limited commercial relations with Israel or with persons or entities doing business in Israel or in territories controlled by Israel, *if those actions are taken...in compliance with or adherence to calls for a boycott of Israel*…"  A.R.S. § 35-393(1)(a) (emphasis added).  In accordance with *Claiborne*, these types of boycotting activities, which clearly include "the practice of persons sharing common views banding together to achieve a common end," are entitled constitutional protections.  458 U.S. at 907.  The Act here specifically and generally enumerates certain activity companies cannot engage in if they wish to

contract with a public entity.  Specifically, the Act prohibits companies from "engaging in a refusal to deal," "terminating business activities" or "performing *other actions* that are intended to limit commercial relations." A.R.S. § 35-393(1) (emphasis added).  These actions, however, are only prohibited when taken "in compliance with or adherence to calls for a boycott of Israel." *Id.*   The language of the Act thus necessarily contemplates prohibiting collective conduct aimed "to achieve a common end"; here, a "boycott of Israel."  458 U.S. at 907-08.

Indeed, the collective element of the actions that are prohibited, together with the potential reach of what activities constitute "other actions," is what distinguishes this Act from those statutes that lawfully prohibit conduct that is not inherently expressive.  *See e.g.*, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*").  In *FAIR*, the Court rejected the argument that the law schools' decisions to exclude military recruiters from their campuses for purposes of expressing the schools' disagreement with the military's stance on homosexuals in the military was expressive conduct deserving protection under *United States v. O'Brien*, 391 U.S. 367 (1968).  The Court held that the expressive component of the action was "not created by the conduct itself but by the speech that accompanie[d] it." *FAIR*, 547 U.S. at 66 ("The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under *O'Brien*").  Invoking this reasoning, Defendants argue that "[o]nly by talking about why Plaintiffs purchased an iPad or an HP printer would any observer discern any connection between that purchasing decision and Israeli government policies."  (Doc. 28 at 21)  The Court agrees that the commercial actions (or non-actions) of one person, e.g., the decision not to buy a particular brand of printer to show support for a political position, may not be deserving of First Amendment protections on the grounds that such action is typically only expressive when explanatory speech accompanies it.  However, when a statute requires a company, in exchange for a government contract, to promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes,

the state is infringing on the very kind of expressive conduct at issue in *Claiborne*.  Such a regulation squarely raises First Amendment concerns.  Indeed, reasoning otherwise would completely undermine the First Amendment's long-held precedents protecting First Amendment rights to assemble so that citizens of this Country can collectively "secure compliance" with their political demands.  *Claiborne*, 458 U.S. at 906.

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP*, 357 U.S. at 460.  Mr. Jordahl was moved by calls by ELCA and JVP for individuals to collectively boycott products from companies doing business in Israeli-occupied settlements.  Through this collective action, Mr. Jordahl and these organizations seek to promote the "equal human dignity and rights for all people in the Holy Land" and "an end to Israeli settlement building and the occupation of Palestinian land." (Doc. 6-1 at 3).  A restriction of one's ability to participate in collective calls to oppose Israel unquestionably burdens the protected expression of companies wishing to engage in such a boycott.  The type of collective action targeted by the Act specifically implicates the rights of assembly and association that Americans and Arizonans use "to bring about political, social, and economic change." *Claiborne*, 458 U.S. at 911 (stating "[t]he established elements of speech, assembly, association, and petition, though not identical, are inseparable") (internal quotation omitted).  *See also Lyng v. Int'l Union, UAW*, 485 U.S. 360, 367 n.5 (1988) ("[A]ssociational rights…can be abridged even by government actions that do not directly restrict individuals' ability to associate freely").  Under *Claiborne*, this conduct is deserving of First Amendment protection.  Plaintiffs claim is therefore not foreclosed by *Int'l Longshoremen*.

### b.    *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915 (7th Cir. 1984)

Defendants also argue that Plaintiffs' First Amendment claim is precluded by the Seventh Circuit Court of Appeals' decision in *Briggs & Stratton Corp. v. Baldrige*.  In *Briggs*, United States companies doing business with Arab League nations challenged the

constitutionality of a section in the Federal Export Administration Act ("EAA") that prohibits United States companies from participating in a foreign government's request for a boycott against countries friendly to the United States. *See* 50 U.S.C. § 4607. The companies specifically argued that their inability to answer questionnaires propounded by the Arab countries for the purpose of ensuring compliance with those Arab countries' boycott of Israel unduly infringed on their First Amendment rights. *Briggs*, 728 F.2d at 917. The court rejected plaintiffs' claim, finding that their desired speech was commercial in nature and adequately justified by government interests in regulating international trade. *Id.* at 918. In characterizing the desired speech as commercial, and thus deserving of less protection under the First Amendment, the court noted that the companies' desire to answer the questionnaires was solely motivated by economics – not by their desire "to influence the Arabs' decision to conduct or enforce a trade boycott with Israel"; and the "proposed answers to boycott questionnaires would serve only to allow appellants to continue to maintain commercial dealings with the Arab world." *Id.*; *Briggs & Stratton Corp. v. Baldrige*, 539 F. Supp. 1307, 1319 (E. D. Wis. 1982) (finding that "[t]he state interest here is substantial, involving delicate foreign policy questions and the interest of the government in forestalling attempts by foreign governments to embroil American citizens in their battles against others by forcing them to participate in actions which are repugnant to American values and traditions"); *id.* at 1319 ("in passing this section of the EAA, "Congress concluded that supplying information to [foreign] boycott authorities has no legitimate business purpose and should be prohibited") (internal citations and quotations omitted)).

> *Briggs*, as a result, is wholly distinguishable. First, unlike the activities Plaintiffs wish to engage in, and the politically-motivated actions that are contemplated by the plain language of the Act, the Court in *Briggs* found that the plaintiffs' desires to answer questions from their trade partners were not politically-motivated and thus not deserving of First Amendment protection. Second, the substantial state interests advanced by the government in *Briggs* – foreign policy and international trade relations – are simply not

present here.   Thus, even if *Briggs* were binding precedent on this Court, which it is not, the case does not stand for the proposition that the conduct prohibited under the Act falls outside the protections of the First Amendment.

### c.        Restriction of Purely Commercial Conduct

Finally, Defendants argue that the Certification Requirement does not implicate the First Amendment because it "only regulates commercial conduct."  (Doc. 28 at 18). Defendants first maintain that "Plaintiffs may *say absolutely anything* they desire about Israel.  Or they may maintain *complete and absolute silence* regarding their beliefs about the policies of Israel."   (*Id.* (emphasis in original)).   The Court again finds that Defendants interpret the protections of the First Amendment too narrowly.  The fact that the Act does not expressly limit or restrain what Plaintiffs can *say* does not mean that protected conduct is not affected by its terms.  The Supreme Court has held that even a facially speech-neutral statute or regulation may implicate expressive activity protected under the First Amendment. *See Nat'l Treasury*, 513 U.S. at 468-69 (noting that the honoraria ban in question, while "neither prohibit[ing] any speech nor discriminat[ing] among speakers based on the content or viewpoint of their message" nonetheless "unquestionably impose[d] a significant burden on expressive activity").  Even though the Act does not expressly limit speech, its terms limit collective engagement in types of political expression that the Supreme Court has found to fall within First Amendment protections.  *See Claiborne*, 458 U.S. at 907.

The Act thus encompasses and contemplates elements of expressive political conduct protected under the Constitution.  As such, the Court finds it highly likely that Plaintiffs will be able to establish that "boycott," as defined in the Arizona legislature, burdens expressive political activity protected under the First Amendment.  The question then becomes whether the State has an adequate interest in restricting companies' rights to engage in boycotts of Israel by conditioning their government contracts on a promise to refrain from such activity.

…

### 2.      Unconstitutional Conditions on Government Employment

"[C]itizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014).   Thus, the premise that government employment contracts may be subjected to any condition "has been unequivocally rejected."   *Pickering v. Bd of Edu. of Township High Sch. Dist. 205, Will Cty, Ill.*, 391 U.S. 563, 568 (1968). This premise has been extended to independent government contractors.   *Bd. of Cnty. Comm'rs. Wabausee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674-5 (1996).

> Recognizing that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights," […] our modern "unconstitutional conditions" doctrine holds that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected…freedom of speech" even if he has no entitlement to that benefit […]

*Umbehr*, 518 U.S. at 674-5 (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).   On the other hand, the rights guaranteed under the First Amendment, particularly in the context of government employment, are far from absolute.   *Pickering*, 391 U.S. at 568.   "The problem in any case is to arrive at a balance between the interests of the [government employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*.   *Umbehr*, 518 U.S. at 677 (extending *Pickering*'s analytical framework to independent government contractors); *accord Alpha Energy Savers, Inc. Hansen*, 381 F.3d 917, 923 (9th Cir. 2004).   In assessing the constitutionality of First Amendment restrictions imposed retroactively on individual government employees, courts engage in what has been referred to as the *Pickering* balancing test.   In those scenarios, if the challenged restriction at issue reaches expression communicated in a government employee's capacity "as a citizen" and includes discussion of "matter[s] of public concern," "[t]he question becomes whether the relevant government entity had an adequate justification

1     for treating the employee differently from any other member of the general public."

2     *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). *See e.g.*, *Connick v. Myers*, 461 U.S. 138,

3     146 (1983) (dismissal of district attorney for circulating a questionnaire concerning

4     internal office affairs did not violate her First Amendment rights because complaints

5     about supervisors were matters of only private concern).

6         The State's burden in justifying a restriction of speech or expressive conduct is

7     greater, however, when the restriction is not related to an isolated employee disciplinary

8     action but instead has widespread prophylactic impact. *Moonin v. Tice*, 868 F.3d 853,

9     861 (9th Cir. 2017). *See Janus*, 138 S. Ct. at 2472 (noting that the adjustments made to

10    the level of scrutiny in these contexts amounts to "a test that more closely resembles

11    exacting scrutiny than the traditional *Pickering* analysis"); *Nat'l Treasury*, 513 U.S. at

12    n.11 (explaining that increased scrutiny is justified where the government's "ban deters

13    an enormous quantity of speech before it is uttered, based only on speculation that the

14    speech might threaten the Government's interests"). The burden is greater in this context

15    because "'[u]nlike an adverse action taken in response to actual speech,'" which is the

16    context in which the *Pickering* balancing framework developed, a prospective restriction

17    or condition on government employment "'chills potential speech before it happens.'"

18    *Moonin*, 868 F.3d at 861 (quoting *Nat'l Treasury*, 513 U.S. at 468). *See Nat'l Treasury*,

19    513 U.S. at 469 (finding provisions of the Ethics Reform Act that prohibited government

20    employees from accepting honorarium for making speeches or writing articles unduly

21    burdened public employee speech and the "public's right to read and hear what

22    Government employees would otherwise have written and said" because it "induce[d]

23    [employees] to curtail their expression if they wish to continue working for the

24    Government").[8] Accordingly,

_____

25    [8] In this way, the prospective employment condition is akin to a prior restraint on speech.

26    A prior restraint traditionally comes "bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Neither

27    the Supreme Court nor the Ninth Circuit has analyzed an analogous government employment condition under the framework of a prior restraint, however. In *Moonin*, the

28    Ninth Circuit distinguished an employer's policy that prospectively chilled employee speech from traditional prior restraints, noting, without expansion, that the former are "analytically distinct from claims involving archetypical prior restraints, like government

Where a 'wholesale deterrent to a broad category of expression' rather than 'a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities' is at issue…the court weighs the impact of the ban as a whole—both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's 'necessary impact on the actual operation' of the Government.

*Moonin*, 868 F.3d at 861 (quoting *Nat'l Treasury*, 513 U.S. at 468) (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731)).[9]

licensing requirements affecting only citizen speech or judicial orders forbidding certain speech by private parties."  *Moonin*, 868 F.3d at 858, n. 1 (citing *Alexander v. United States*, 509 U.S. 544, 550, (1993), *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992), and *Near v. Minnesota*, 283 U.S. 697, 713 (1931)).  Here, the Certification Requirement is a condition imposed on all companies wishing to do business with a public entity in Arizona.  A.R.S. § 35-393.01(A).  As such, it is a restriction imposed only on independent government contractors, not the public at large.  The Court will accordingly follow the guidance of the *Moonin* court and analyze the constitutionality of the Certification Requirement under the employee speech framework in *Pickering* and *Nat'l Treasury*.  But see *Janus*, 138 S. Ct. at 2473 (noting the "poor fit" of *Pickering* to the constitutionality of the labor union's agency-fee scheme in part because a hypothetical employee complaint regarding a raise would be a matter of "private concern" and unprotected under *Pickering*, whereas the same complaint raised by many employees speaking through their union would be of "public concern" and thus protected, despite the fact that the speech may have "a significant effect on the performance of government services").

[9] The context of this case, which challenges the constitutionality of a condition imposed on companies wishing to contract with public entities in Arizona, falls somewhere between the unconstitutional condition employment cases and those cases that assess the constitutionality of conditions imposed on recipients of government funding. *See e.g.*, *Agency for Intern. Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013) (finding government condition that international organization adopt its "view on an issue of public concern" in order to receive funding was an unconstitutional infringement on organization's First Amendment right because requirement went "beyond defining the limits of the federally funded program to defining the recipient"); *Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (noting that cases in which a condition to federal funding has been found unconstitutional "involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program") (emphasis in original); *FCC v. League of Women Voters of California*, 468 U.S. 364, 399-401 (1984) (prohibiting media stations from engaging in all editorializing, even with private funds, in order to receive federal assistance improperly leveraged federal funding to regulate the stations' speech outside the scope of the program); *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546 (1983) (requirement that non-profit organizations seeking tax-exempt status not engage in substantial efforts to influence legislation was not "unduly burdensome" because condition did not prohibit organization from lobbying altogether). Although the Court analyzes the constitutionality of the Certification Requirement under *Nat'l Treasury* and other cases that condition government employment on broad speech bans, the Court also notes that in these government funding cases, the courts apply a

### 3.     The Act Broadly Restricts Government Contractor's Expressive Conduct As Citizens Speaking on Matters of Public Concern

"The first prong of the employee speech analysis involves two inquiries: whether the restriction reaches only speech within the scope of a public employee's official duties, and whether it impacts speech on matters of public concern." *Pickering*, 391 U.S. at 571. In the context of a condition broadly banning certain expressive conduct, a court is to "focus on the text of the [statute] to determine the extent to which it implicates public employees' speech as citizens speaking on matters of public concern." *Id.  See also Moonin*, 868 F.3d at 861.

The Court has little difficulty in finding that actions prohibited by the Act have no relation to Plaintiffs' official duties.  The Ninth Circuit has found that communication "with individuals or entities outside of [an employee's] chain of command…[is] unlikely" to be pursuant to the employee's official duties."  *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1074 (9th Cir. 2013) (en banc).  For the past twelve years, Mr. Jordahl, through his Firm, has represented criminal defendants through a contract with the County.  The State has not and cannot explain how preventing Plaintiffs' from engaging in a boycott of Israel as defined by the Act furthers or affects Plaintiffs' duty in representing his clients in relation to that contract.  The Act requires contracting companies to promise to refrain from engaging in certain conduct if done at the behest of outside "calls" to boycott Israel.  The Act thus clearly aims to suppress expressive conduct that may be "directed to community groups, to city and state legislators, to state and federal officials, and even to family members and friends," and is not limited – or even directed – to the Firm's legal representation of criminal defendants.  *Moonin*, 868 F.3d at 863 (policy prohibiting "direct contact" between employee and "ANY non-departmental and non-law enforcement entity or persons for the purpose of discussing [program]" covered speech outside the employees' official duties).  There is no plausible relationship between the execution of the Firm's representation of their clients under the

similar level of scrutiny.

County contract and the Firm's avowal to refrain from engaging in a boycott of Israel.

The prohibited acts also have no relation to official contractors' duties in general. The Certification Requirement applies to any company that provides "services, supplies, information technology or construction" to a public entity in Arizona.  A.R.S. § 35-393.01(A).  The scope of "official duties" that are encompassed by the number and diversity of companies contracting with the State vary dramatically and the plain language of the Certification Requirement does not limit its scope to prohibit actions taken in furtherance of those duties.  *See Moonin*, 868 F.3d at n.5 (noting that the "focus in the prospective restraint context is on the chilling effect of the employer's policy on employee speech" which is "determined by the language of the policy – what an employee reading the policy would think the policy requires – not what [the employer] subjectively intended the [policy] to say").  The Court thus finds that the Act reaches beyond the scope of contractors' official duties.

The Act also unquestionably touches on matters of public concern.  "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S.Ct. at 2380 (internal quotation marks and citation omitted).  "This circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace." *Tucker v. State of Cal. Dept. of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (emphasis in original). *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) ("Speech that can fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected."); *see also McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) ("Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech deals with individual personnel disputes and grievances.") (citations omitted). "The Supreme Court has also made it clear that an employee need not address the public at large for his speech to be deemed to be

on a matter of public concern." *Tucker*, 97 F.3d at 1210 (citing *Rankin v. McPherson*, 483 U.S. 378, 384–87 (1987) (finding that an employee's statement regarding President Reagan, although only made to co-worker, was on a matter of public concern).

As is evidenced by the parties' briefings, actions taken by Israel in relation to Palestine are matters of much political and public debate.  Plaintiffs want to participate in collective economic boycotts of goods and products from companies doing business in Israeli-occupied settlements in order to show their political discontent with Israel's policies toward Palestine.  Through their actions, Plaintiffs seek to promote "equal human dignity and rights for all people in the Holy Land" and "an end to Israeli settlement building and the occupation of Palestinian land." (Doc. 6-1 at 3). *See also Nat'l Treasury*, 513 U.S. at 461-62 (considering employees' past and intended speech in assessing the First Amendment consequences affecting employee speech). The State, however, finds such actions out of line with its values, stating that "the effect – and often goal – of BDS boycotts is to strengthen the hand of the Palestinian Authority ("PA") at the expense of Israel." (Doc. 28 at 23).  Indeed, by prohibiting certain actions taken in compliance with larger calls for boycotts of Israel, the Arizona legislature's plain definition of "boycott" underscores the public nature of the conduct.

Plaintiffs have thus met their burden of showing not only that they and others are engaged in protected activities, but that the terms of the Act encompass such activities.

### 4.    The State Cannot Meet its Burden of Showing that the Certification Requirement Has a Necessary Impact on the Actual Operation of the State

Of course, properly justified, the fact that the Act infringes on protected activity does not render the Act unconstitutional.   Where a restriction prospectively limits government contractors' expressive conduct, the State can justify such interference by showing the restriction has a "necessary impact on the actual operation" of the State. *Nat'l Treasury*, 513 U.S. at 468.   Here, the State has proffered two interests to justify the Certification Requirement: (1) an interest in regulating the State's "commercial activity to align commerce in the State with the State's policy objectives and values" and (2) an

interest in preventing discrimination on the basis of national origin.  (Doc. 28 at 22-24).

The legislative history of the Act calls these stated interests into doubt.  The Act's history instead suggests that the goal of the Act is to penalize the efforts of those engaged in political boycotts of Israel and those doing business in Israeli-occupied territories because such boycotts are not aligned with the State's values.  *See e.g.*, Ariz. House Republican Caucus News Release, Feb. 4, 2016 (representing that the purpose of the Act is to penalize "companies engaging in actions that are politically motivated and intended to penalize, inflict economic harm on, or otherwise limit commercial relations with Israel, its products, or partners").  If so, such an interest is constitutionally impermissible.  *See Koontz v. Watson*, 283 F. Supp. 3d 1007, 1022 (D. Kan. 2018) (finding that goal behind Kansas law requiring that persons contracting with the state certify that they are not engaged in a boycott of Israel was "either viewpoint discrimination against the opinion that Israel mistreats Palestinians or subject matter discrimination on the topic of Israel" and that "[b]oth are impermissible goals under the First Amendment").

Assuming the legitimacy of the interests advanced by the State, the Court still finds that neither of the proffered interests justify the restriction because the Certification Requirement is not necessary to advance either of them.  To meet its burden, the State "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."  *Nat'l Treasury*, 513 U.S. at 475.  The Arizona Fact Sheet to House Bill 2617 plainly states that "[t]here is no anticipated fiscal impact to the state General Fund associated with this legislation."  AZ S. F. Sheet, 2016 Reg. Sess. H.B. 2617.  In line with that factual background, Defendants have failed to produce any evidence of Arizona's business dealings with Israel, Israeli entities, or entities that do business with Israel that would suggest the State was seeking to regulate boycotts of Israel that were intended to suppress economic competition.  *See Claiborne*, 458 U.S. at 912 (noting that "[t]he right of business entities to 'associate' to suppress competition may be curtailed [by states]").  Instead, the State generally contends that "[a]bsent the Act's prohibitions, public monies

will almost certainly be allocated to companies engaged in boycotts of Israel, thereby subsidizing those boycotts." (Doc. 28 at 25). But "'[f]ear of serious injury cannot alone justify suppression of free speech and assembly…To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced.'" *Nat'l Treasury*, 513 U.S. at 471-72 (quoting *Whitney v. California*, 274 U.S. 357, 376 (1927) (concurring opinion)). *Id.* at 471-72 (noting that though the government's interest in preventing misuse of power by accepting compensation was "undeniably powerful," the government failed to show the necessity of a total ban when it could not produce evidence of misconduct related to honoraria "in the vast rank and file of federal employees below grade GS-16"). The State's speculative fears of subsidizing boycotts of Israel, even assuming a legitimate one, does not justify the broad prospective restriction on boycotting activity that the Act prohibits. The State has similarly produced no evidence that Arizona businesses have or are engaged in discriminatory practices against Israel, Israeli entities, or entities that do business with Israel. And even if the State could make such a showing, by including politically-motivated boycotts of Israel within the activity that is prohibited, the Act is unconstitutionally over-inclusive. *Koontz*, 283 F. Supp. 3d at 1023 (finding certification requirement at issue was impermissibly over-inclusive because it banned political boycotts as well as acts arguably intended to suppress economic competition).

Beyond the conjecture noted above, the State has demonstrated no harms to Arizona, or its economic relationship with Israel, that would be alleviated by conditioning all public entity contracts on the contractors' promise to refrain from engaging in actions taken in response to larger calls to boycott of Israel. Defendants have failed to meet their burden of showing that restricting government contractors' right to boycott Israel is "necessary" to the State's operation.

### B. Likelihood of Irreparable Harm

Having established Plaintiffs' likelihood of success on the merits, the next issue is whether Plaintiffs are likely to suffer irreparable harm absent the protection of a

preliminary injunction.  Generally, courts of equity should not act when the moving party "will not suffer irreparable injury if denied equitable relief." *Younger v. Harris*, 401 U.S. 37, 43–44 (1971).  Plaintiffs have the burden of establishing that there is a likelihood, which is more than just a possibility, that they will suffer irreparable harm if a preliminary injunction is not entered. *See Winter*, 555 U.S. at 21–23.

The Court finds that Plaintiffs have met their burden here.  Plaintiffs' objections to the Act implicate core protections of the First Amendment.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Indeed, when the expressive conduct that is so burdened is political in nature, "[t]he harm is particularly irreparable." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  As such, the harms that Plaintiffs and other companies wishing to contract with the state of Arizona are irreparable per se.

### C.  Balance of the Equities and the Public Interest

The Court also finds that the balance of equities tips in favor of Plaintiffs.  Defendants will experience little to no hardship by enjoining the enforcement of a law that does nothing to further any economic state interest and infringes on First Amendment protections.  Although generally barring discrimination on the basis of national origin is a legitimate state interest, the State clearly has less intrusive and more viewpoint-neutral means to combat such discrimination.   Plaintiffs, on the other hand, have shown a likelihood of irreparable harm if the Certification Requirement is not enjoined.   Moreover, public interest favors an injunction as the public has little interest in enforcement of unconstitutional laws.

### D.  Security

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the plain language of the rule suggests that a bond is mandatory, the Ninth

1    Circuit has held that it "invests the district court with discretion as to the amount of

2    security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  A

3    district court need not require a bond "when it concludes there is no realistic likelihood of

4    harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320

5    F.3d 906, 919 (9th Cir. 2003).  There is no realistic likelihood that Defendants will be

6    harmed by being enjoined from enforcing a law that violates the First Amendment on its

7    face.  No bond will be required.

8                                        **CONCLUSION**

9           Defendants' motion to dismiss Plaintiffs' Amended Complaint is denied, including

10   their request to dismiss the Attorney General from this action.  Moreover, Plaintiffs have

11   shown that they are likely to succeed on the merits of their claim, that they are likely to

12   suffer irreparable harm in the absence of a preliminary injunction, and that the balance of

13   equities and public interest favor an injunction. The Court therefore will grant Plaintiffs'

14   request for a preliminary injunction and enjoin Defendants from enforcing the

15   Certification Requirement in A.R.S. § 35-393.01(A).

16          **IT IS ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 6) is

17   **granted**.  Until further order of the Court, Defendants are enjoined from enforcing A.R.S.

18   § 35-393.01(A).

19          **IT IS FURTHER ORDERED** that Defendants' Motion to Dismiss Plaintiffs'

20   Complaint (Doc. 28) is **denied.**

21          Dated this 27th day of September, 2018.

22

23

24                                        _____
                                          Honorable Diane J. Humetewa
25                                          United States District Judge

26

27

28