**MARK BRNOVICH**
**ATTORNEY GENERAL**
Drew C. Ensign (No. 25463)
Oramel H. (O.H.) Skinner (No. 32891)
Brunn (Beau) W. Roysden III (No. 28698)
  Assistant Attorneys General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5252
Drew.Ensign@azag.gov

*Attorneys for Defendant Mark Brnovich*
*in his official capacity as Attorney General*
*and Intervenor-Defendant State of Arizona*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Mikkel Jordahl; Mikkel (Mik) Jordahl, P.C., | Case No: 3:17-cv-08263-PCT-DJH |
| Plaintiffs, | |
| vs. | **STATE'S EMERGENCY MOTION TO STAY THE COURT'S SEPTEMBER 27, 2018 ORDER PENDING APPEAL** |
| Mark Brnovich, Arizona Attorney General; Jim Driscoll, Coconino County Sheriff; Matt Ryan, Coconino County Board of Supervisors Chair; Lena Fowler, Coconino County Board of Supervisors Vice Chair; Elizabeth Archuleta Coconino County Board of Supervisors Member; Art Babbott, Coconino County Board of Supervisors Member; Jim Parks, Coconino County Board of Supervisors Member; Sarah Benatar, Coconino County Treasurer, all in their official capacities, | |
| Defendants, | |
| and | |
| State of Arizona, | |
| Intervenor-Defendant. | |

**INTRODUCTION**

Mark Brnovich in his official capacity as Arizona Attorney General and the State of Arizona (collectively, the "State") respectfully move for a stay pending appeal of the preliminary injunction entered by this Court on September 27, 2018 ("Preliminary Injunction"), which enjoined enforcement of A.R.S. § 35-393 *et seq.* (the "Act"). Given the circumstances surrounding the Preliminary Injunction, as well as its scope, the State initially sought an emergency telephonic hearing in order to expeditiously make an oral request for a stay (and obtain a ruling on that request). Doc. 64. The State now makes this written motion for a stay in accordance with the Court's instructions in its order denying the State's request. *See* Doc. 65.

This case involves issues of first impression in both this District and Circuit. Additionally, this Court's Preliminary Injunction extends First Amendment protection to commercial boycotts under *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982), for only the second time since that decision was released over 35 years ago. At a bare minimum, the merits of Plaintiffs' First Amendment claim are fairly contestable and a stay is warranted pending resolution of the State's appeal to the Ninth Circuit. Indeed, for all of the reasons set forth in the State's prior briefing and herein, the State believes that this Court's Preliminary Injunction rests on legal error.

The State will also suffer irreparable harm in the absence of a stay. The statute this Court enjoined by the Preliminary Injunction was passed by bipartisan supermajorities of the elected representatives of the people of Arizona. The State by definition suffers irreparable harm when it is precluded from carrying out the laws passed by its democratic processes. *See*, *e.g.*, *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). Moreover, the statewide injunction here imposes a particularized irreparable harm, given that the State will need to provide notice and notation to pending requests for proposals ("RFPs") that contain the pertinent anti-Israel-boycott certification language. Although precise numbers cannot be known at this

time, it is expected that the State Procurement Office itself will likely issue approximately hundreds of new contracts in the next six months to one year.

The balance of equities and public interest also favor a stay. The Arizona Legislature has already defined the public interest, as has Congress by declaring official U.S. policy as "oppos[ing] … boycotts … against Israel." 19 U.S.C. § 4452(b)(4)-(5). Allowing the Act to stay in effect during the short time of an appeal is thus in the public interest. *See*, *e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'").

Nor will Plaintiffs suffer any meaningful harm during the pendency of an appeal. As explained previously, Plaintiffs' harms are minimal: particularly as Plaintiffs continue to perform work under the public contracts allegedly denied, and there is every reason to believe that Plaintiffs will ultimately be paid for that work. *See* Doc. 28 at 31-32. Moreover, Plaintiffs' harms are entirely conjectural.

For all of these reasons, this Court should grant a stay pending appeal.

**LEGAL STANDARD**

In evaluating a request for a stay pending appeal, this Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

**ARGUMENT**

**I.    THE STATE IS LIKELY TO PREVAIL IN ITS APPEAL**

As this Court has recognized, "[c]ourts have interpreted th[e] first [stay-pending-appeal] criterion as requiring that the movant show that 'the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear.'" *Overstreet v. Thomas Davis Medical Centers, P.C.*, 978 F. Supp. 1313, 1314 (D. Ariz. 1997) (quoting

1  *Mamula v. Satralloy, Inc.*, 578 F. Supp. 563, 580 (S.D. Ohio 1983)).  That standard is
2  easily satisfied here.
3        Plaintiffs' First Amendment claim raises issues of first impression both in this
4  Court and in the Ninth Circuit, and the law in this area is at least "somewhat unclear."
5  Plaintiffs have not cited a single case anywhere in this Circuit where a court has
6  recognized that a boycott enjoys First Amendment protection under *Claiborne*.  And
7  aside from the District of Kansas's decision in *Koontz v. Watson*, No. 17-4099, 2018 WL
8  617894 (D. Kan. Jan. 30, 2018)—which was akin to a default judgment and was later
9  vacated in any event, *see* Doc. 46 at 4 n.2, Doc. 61-2—no court anywhere has seemingly
10 extended *Claiborne* to protect a boycott.  And the Supreme Court expressly refused to
11 extend *Claiborne* in *FTC v. Superior Court Trial Lawyers Ass'n* to commercial (rather
12 than consumer) boycotts and indicated that *Claiborne* was limited to boycotts that (unlike
13 here) "sought only the equal respect and equal treatment to which [the boycott
14 participants] were constitutionally entitled."  493 U.S. 411, 426 (1990).
15       This Court decided to extend *Claiborne* to Plaintiffs' boycott.  The State obviously
16 disagrees with that decision.  But, more relevant here, the complete dearth of controlling
17 authority means that this case raises "serious and difficult questions of law in an area
18 where the law is somewhat unclear.'"  *Overstreet*, 978 F. Supp. at 1314.
19       More generally, this Court's decision errs for all of the reasons explained in the
20 State's prior briefing.  *See* Docs. 28, 46.  The State will not belabor those arguments here.
21 But four aspects of this Court's Preliminary Injunction Order bear emphasis on the
22 question of whether the State is likely to prevail on its appeal.
23       *First*, this Court's distinction of *International Longshoremen's Ass'n, AFL-CIO v.*
24 *Allied Int'l, Inc.*, 456 U.S. 212 (1982), is untenable.  This Court reasoned that
25 *Longshoremen* "does not purport to state that there is no constitutional right to engage in
26 boycotting activities" but instead relied upon "the [labor-law] context in which this type
27 of governmental infringement on the First Amendment rights of labor unions and their
28 members is justified."  Doc. 63 at 21.  But that is not a fair reading of *Longshoremen*.

1    That case did not recognize a First Amendment interest and then conclude that
2 "governmental infringement" of that right was justified by the government's purportedly
3 unique interest in regulating labor law.  Instead, *Longshoremen*'s terse analysis is outright
4 dismissive of the idea that any First Amendment interest existed at all, announcing
5 succinctly what all nine Justices considered obvious:  there was no "protected activity
6 under the First Amendment."  456 U.S. at 226-27.  And that conclusion is underscored by
7 the absence of any discussion of compelling state interests or narrow tailoring.
8    Nor did this Court ever meaningfully address the State's contention that "picketing
9 is *far* more expressive than Plaintiffs' selection of computers and printers."  Doc. 28 at
10 16.  Thus, to the extent that *Longshoremen* is distinguishable, it is to Plaintiffs' detriment.
11    *Second*, this Court's distinction of *Rumsfeld v. Forum for Academic &*
12 *Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47 (2006), is similarly unlikely to withstand
13 appellate scrutiny.  Notably, this Court recognized that under *FAIR* "the commercial
14 actions (or non-actions) of one person, e.g., the decision not to buy a particular brand of
15 printer … may not be deserving of First Amendment protections…"  Doc. 63 at 23.  But
16 this Court nonetheless distinguished *FAIR* because Plaintiffs' boycott was purportedly in
17 "response to larger calls to action that the state opposes" thereby "infringing on the very
18 kind of expressive conduct at issue in *Claiborne*."  *Id.* at 23-24.
19    But the boycotts in *FAIR* were also undeniably in "response to larger calls to
20 action"—indeed, virtually every law school in the nation opposed the military's then
21 "Don't Ask, Don't Tell" policy, and each boycotted the military based on that "larger
22 call."  *See FAIR v. Rumsfeld*, 291 F. Supp. 2d 269, 280-81 (D.N.J. 2003).  And there was
23 never any doubt that the law schools' actual *speech* opposing that policy—*i.e.*, a very
24 "large[] call to action"—was protected under the First Amendment.  *FAIR*, 547 U.S. at
25 60.  But it was equally clear that the law schools' boycotting conduct in "response to
26 [those] larger calls to action" enjoyed no such protection—indeed not a *single Justice*
27 thought otherwise.  *Id.* at 61-70.
28    Just so here.  Although Plaintiffs' boycott may be in response to *pure speech* that

1  is protected under the First Amendment, the *conduct* at issue must be inherently
2  expressive itself, or it enjoys no protection under *FAIR*.  And *FAIR* specifically evaluated
3  whether *each* relevant act was inherently expressive by itself, rather than allowing the
4  law schools to bootstrap their arguments by pointing to either explanatory speech or
5  being part of a broader message.  *Id.* at 64-66.  This Court erred by allowing Plaintiffs to
6  rely on that exact sort of bootstrapping here, in contravention of *FAIR*.

7  *Third*, this Court erred in concluding that the State's "fears of subsidizing boycotts
8  of Israel" were "speculative."  Doc. 63 at 34.  Money is fungible, and the provision of
9  public funds inevitably results in a subsidization of the activities of the fund recipient.
10 The Supreme Court in *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540,
11 549 (1983), for example, did not examine specifically whether the marginal funds that
12 would otherwise accrue to an organization by more favorable 501(c)(3) tax treatment
13 would actually be spent directly on lobbying.  Instead, it was sufficient for purposes of
14 the unconstitutional-conditions doctrine that *any* funds of the organizations would be
15 spent on lobbying.

16 So too here.  The provision of *any* public funds to an entity engaged in
17 discriminatory conduct in violation of Arizona public policy is necessarily a subsidy of
18 that activity.  Given the fungibility of money, governments are not held to the burden of
19 proving specific public dollars go to a specific purpose.  This Court squarely violated
20 *Regan* and other Supreme Court precedents by concluding otherwise.

21 The error is particularly apparent in light of the Court's failure to account for the
22 fact that federal law has banned employment discrimination on the basis of national
23 origin for all federal contractors for more than 50 years.  *See* Exec. Order No. 11,246
24 §203 (1965).  No court has ever required that the federal government prove that the funds
25 from the contract at issue were directly subsidizing such discrimination.  There is no
26 doubt, for example, that even if the federal government only contracts with one division
27 of a company, it may nonetheless demand the entire company not engage in
28 discrimination based on national origin (as well as race, religion and sex, etc.).  Indeed, it

1  has been the virtually unquestioned law for a half century that the government can decide
2  that even a single federal dollar spent on a contractor engaged in national-origin
3  discrimination is too much.  This Court's rupture from that settled legal consensus is
4  unlikely to survive appellate review.
5       *Fourth*, this Court wrongly discounted the State's compelling anti-discrimination
6  interests here.  Although this Court reasoned that the "State has similarly produced
7  no evidence that Arizona businesses have or are engaged in discriminatory practices
8  against Israel, Israeli entities, or entities that do business with Israel," Doc. 63 at 34, that
9  is plainly wrong.  To refuse to do business with entities based on their nationality is to
10 discriminate on the basis of national origin—*by definition*.  Congress, for example, has
11 banned discrimination against the old, but not the young—thereby defining what
12 discrimination is invidious and illegal—and that is plainly constitutional.  *See*, *e.g.*,
13 *EEOC v. Wyoming*, 460 U.S. 226 (1983).  Moreover, the Court's order later
14 acknowledges that the Act is an anti-discrimination statute when it stated that "the State
15 clearly has less intrusive and more viewpoint-neutral means to combat *such*
16 *discrimination* [targeted by the Act]."  Doc. 63 at 35 (emphasis added).
17      Here, the Arizona Legislature has specifically concluded that boycotts on the basis
18 of Israeli nationality or doing business with Israelis were discriminatory:  "Companies
19 that refuse to deal with United States trade partners such as Israel, or entities that do
20 business with or in such countries, make discriminatory decisions on the basis of national
21 origin."  See 2016 Ariz. Legis. Serv. Ch. 46.  Arizona is hardly alone is this conclusion.
22 Congress has expressly made an equivalent finding:  "boycotts … against Israel … are
23 contrary to the principle of nondiscrimination[.]"  19 U.S.C. § 4452(b)(4)-(5).  Moreover,
24 at least 23 other states have reached the same conclusion.  *See* Doc. 28 App'x A.
25      This Court also failed to consider meaningfully how truly radical the act of
26 invalidating an anti-discrimination law on First Amendment grounds is.  In fact, the
27 Supreme Court has done so only twice, in *Boy Scouts of America v. Dale,* 530 U.S. 640
28 (2000), and *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 568

(1995). Both of those cases involved forced inclusion into groups—something not even conceivably at issue here. Nor did *Claiborne* invalidate an anti-discrimination statute. This Court's invalidation of an anti-discrimination statute under the First Amendment on the basis of conduct that even the Court acknowledges is not inherently expressive by itself is unlikely to survive appellate review.

* * * * *

For all of these reasons, the State has at least proved the existence of "serious and difficult questions of law in an area where the law is somewhat unclear.'" *Overstreet*, 978 F. Supp. at 1314. The State has thus amply satisfied the first factor for obtaining a stay pending appeal.

**II.    THE STATE WILL SUFFER IRREPARABLE HARM ABSENT A STAY**

The State is certain to suffer irreparable harm absent a stay. The statute enjoined by this Court was passed by bipartisan supermajorities. And the State by definition suffers irreparable harm when it is precluded from carrying out the laws passed by its democratic processes. *See*, *e.g.*, *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."); *accord Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating [its] statutes … it suffers a form of irreparable injury.").

In addition to the frustration of its democratic processes as prescribed by its constitution, the State will also suffer additional irreparable harm from the disruptive consequences of this Court's preliminary injunction. The certification at issue is required in contracts entered into by a "public entity," *see* A.R.S. § 35-393.01(A), which is defined as "this state, a political subdivision of this state or an agency, board, commission or department of this state or a political subdivision of this state." A.R.S. § 35-393(5). This Court's injunction thus appears to affect most pending requests for proposals (RFPs) by the State or any of its subdivisions that contain an anti-Israel-boycott provision. The State anticipates that it may need to also inform potential bidders of the changes to the

1  pending RFPs.[1]  Although precise numbers cannot be known at this time, the State
2  Procurement Office estimates that it will issue hundreds of new contracts in the next six
3  months to one year.  The preliminary injunction's effect is therefore to cause a massive
4  upheaval in the State's procurement systems, which is not remotely justified—
5  particularly given the extremely low number of apparent objectors to the Anti-Israel
6  Boycott contractual clauses under the Act.

**III.   THE REMAINING FACTORS FAVOR A STAY PENDING APPEAL**

While, "[t]he first two factors of the traditional standard are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), the balance of the remaining factors also favors granting a stay pending appeal.  The public interest clearly favors a stay.  Here, the Arizona Legislature has already defined the public interest.  So has Congress, declaring that U.S. policy is to "oppose[] … boycotts … against Israel."  19 U.S.C. § 4452(b)(4)-(5).  Those legislative enactments should be given effect.  *See Cannabis Buyers*, 532 U.S. at 497 ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'"); *see also Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive.").

The balance of harms also tips sharply in favor of a stay.  As explained previously, Plaintiffs' harms are not substantial, and indeed are overwhelmingly theoretical.  *See* Doc. 28 at 31-32.  Plaintiffs notably continue to perform under the contract they are allegedly being denied, and have every expectation of ultimately being paid.  And any loss of time value of money based on late payment is the quintessential sort of injury that is reparable by monetary damages.

---

[1] At present, the State is making good faith efforts to provide notice to as many affected state agencies as is possible, and to add language to pending RFPs indicating that unless and until this Court's injunction is lifted, the State will take no action to enforce the anti-Israel-Boycott certification.  However, this is likely to cause substantial uncertainty—both now and if the Court's injunction is later lifted.  The State is also evaluating whether and how to provide notice to political subdivisions of the State.

Moreover, Plaintiffs failed to identify any actual purchase they would like to make but cannot due to the Act. "Jordahl's company only identified a *single* potential purchase of HP products on the horizon, a computer," and had not even "performed the basic research to determine if an HP [desktop] would be the best computer provider for his business." Doc. 28 at 31-32. Without performing that research, Plaintiffs' harm is entirely conjectural and Plaintiffs have necessarily failed to satisfy his burden of proving that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

In addition, that hypothetical computer purchase is not remotely expressive: it is undisputed that such a desktop computer would be placed in Jordahl's home office that no client has ever set foot in. Doc. 28 at 21. There is thus no one to perceive whatever message Plaintiffs' speculative purchase of a HP desktop purportedly conveys.

## CONCLUSION

For all of the foregoing reasons, the State's motion for a stay pending appeal should be granted.

Respectfully submitted this 2nd day of October, 2018.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ Drew C. Ensign
Drew C. Ensign (No. 25463)
Oramel H. (O.H.) Skinner (No. 32891)
Brunn (Beau) W. Roysden III (No. 28698)

*Attorneys for Defendant Mark Brnovich in his official capacity as Attorney General and Intervenor-Defendant State of Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of October, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for all parties are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

 s/ Drew C. Ensign
*Attorneys for Defendant Mark Brnovich in his official capacity as Attorney General and Intervenor-Defendant State of Arizona*